# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

SEAFREEZE SHORESIDE, INC.,
et al.,
                    *Plaintiffs*,

v.

THE UNITED STATES DEPARTMENT
OF THE INTERIOR, et al.,
                    *Defendants,*

and

VINEYARD WIND 1, LLC,
                    *Intervenor-Defendant.*

Civil Action No. 1:22-cv-11091-IT

Hon. Indira Talwani

# PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INDEX OF AUTHORITIES..................................................................................iii

GLOSSARY ......................................................................................................iv

INTRODUCTORY STATEMENT ..........................................................................1

JURISDICTIONAL STATEMENT .........................................................................1

LEGAL BACKGROUND .....................................................................................2

STATEMENT OF MATERIAL FACTS ...................................................................2

STANDARD OF REVIEW ...................................................................................3

STATEMENT OF THE CASE................................................................................4

ARGUMENT ....................................................................................................6

I.    The Plaintiffs Have Article III And Prudential Standing........................................6

      A.    Plaintiff Old Squaw Fisheries, Inc. Has Article III and Prudential
            Standing ..............................................................................................6

      B.    Plaintiffs Heritage Fisheries, Inc., Nat W., Inc. and XIII Northeast
            Fisheries Sector, Inc. Have Article III and Prudential Standing..........................16

      C.    Plaintiff Long Island Commercial Fishing Association Has Article III
            and Prudential Standing ........................................................................17

      D.    Plaintiff Seafreeze Shoreside, Inc. Has Article III and Prudential
            Standing ..............................................................................................17

II.   The Federal Defendants' Decision To Issue, Publish, And Award The Vineyard
      Wind Lease Under the "Smart From The Start" Policy Violates Multiple
      Provisions of OCSLA, ESA, NEPA, And The APA (First Claim, Second Claim,
      Third Claim, Ninth Claim, Tenth Claim, Twelfth Claim, Twenty-Fourth Claim,
      Twenty-Fifth Claim, Thirty-First Claim)...........................................................19

      A.    BOEM's Issuance of the Vineyard Wind Lease Without First Preparing
            an Environmental Impact Statement Runs Afoul of the Major Questions
            Doctrine..............................................................................................19

      B.    BOEM's Impermissible Decision to Skip the Environmental Impact
            Statement Requirement at the Leasing Stage Caused Illegal Ripple

Effects Throughout the Subsequent Vineyard Wind Project Approval
Process ................................................................................................................23

C.    The Federal Defendants' Issuance of the Vineyard Wind Lease Violated
Multiple Provisions of Section 1337(p)(4) of OCSLA...........................................25

III.    The Federal Defendants' Decision To Approve The Vineyard Wind COP
Violated Multiple Provisions of OCSLA, ESA, and NEPA (Third Claim, Fourth
Claim, Fifth Claim, Twenty-Third Claim, Twenty-Fourth Claim, Twenty-Fifth
Claim, Twenty-Seventh Claim, Thirty-Second Claim) ......................................................27

A.    The Federal Defendants Approved Vineyard Wind's Woefully
Inadequate Site Assessment Plan and then Failed to Include It in the
Administrative Record ............................................................................................27

B.    In the Draft EIS and the Supplemental Draft EIS Process, the Federal
Defendants Failed to Properly Address Multiple OCSLA and Related
NEPA Requirements and Imperissibly Allowed Vineyard Wind to
Make Policy and Legal Decisions That Should Have Been Made by the
Federal Defendants ................................................................................................28

1.    BOEM impermissibly ignored the dangers hurricanes posed to the
project ..........................................................................................................28

2.    From the beginning, Vineyard Wind used its requirement to
comply with contracts to provide wind energy to Massachusetts as
the sole purpose of the project ....................................................................28

3.    Without conducting independent review and analysis, BOEM
impermissibly acquiesced to Vineyard Wind's major policy
decisions, including but not limited to the fulfillment of Vineyard
Wind's contractual obligations, leading directly to BOEM's
failure to consider a reasonable range of alternatives...................................29

C.    BOEM Terminated and Then Impermissibly Revived the EIS Process...............32

D.    BOEM Impermissibly Downplayed the Devastating Effects of the
Vineyard Wind Project on the Environment and the Commercial
Fishing Industry .....................................................................................................34

E.    The Record of Decision Was Impermissibly Compromised by the Smart
From The Start Policy as well as the Pecuniary Interests of the
Developer and the Renewable Energy Goals of the State of
Massachusetts, Leading to Violations of OCSLA, ESA, and NEPA ...................36

1.    The Federal Defendants issued the ROD knowing that the consultation between BOEM and NMFS was inadequate ..........................36

2.    The ROD impermissibly used Vineyard Wind's agreement with Massachusetts as the rationale for approving the project ............................37

3.    The Federal Defendants failed to address the legitimate concerns of the commercial fishing community ........................................38

4.    The Federal Defendants impermissibly downplayed the devastating effects the project will have on the environment, natural resources, and national security ........................................40

5.    The steps leading to the issuance of the ROD show that the Federal Defendants pursued their goal of authorizing the Vineyard Wind project without complying with the mandated requirements of OCSLA, ESA, and NEPA.........................................................41

IV.    The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated The ESA In Other Ways (Ninth Claim, Tenth Claim)........................................42

V.    The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated the CWA (Seventeenth Claim, Eighteenth Claim, Nineteenth Claim, Twentieth Claim) ........................................................44

VI.    The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated The MMPA (Twenty-First Claim, Twenty-Second Claim)................................44

VII.    The Federal Defendants Violated NEPA By Failing To Perform A Host Of Mandatory Procedural Duties (Twenty-Sixth Claim, Twenty-Eighth Claim, Twenty-Ninth Claim, Thirty-Third Claim).........................................44

        A.    The Federal Defendants Violated 40 C.F.R. § 1502.22(a)-(b) .............................45

        B.    The Federal Defendants Violated 40 C.F.R. § 1506.6............................................46

        C.    The Federal Defendants Violated 40 C.F.R. § 1503.4(a)(5)...................................46

        D.    The Federal Defendants Impermissibly Failed to Use NEPA Regulations In Effect During the NEPA Review ...................................46

VIII.    The Federal Defendants Violated NEPA By Impermissibly Failing To Assess A Reasonable Range Of Alternatives And Reasonably Foreseeable Future Actions (Twenty-Third Claim, Twenty-Fourth Claim, Twenty-Fifth Claim, Twenty-Seventh Claim, Thirty-Second Claim) ...............................................47

A.    The Federal Defendants Failed to Assess a Reasonable Range of Alternatives ................................................................................................47

B.    The Federal Defendants Failed to Properly Examine Reasonably Foreseeable Future Actions ......................................................................48

CONCLUSION ................................................................................................................49

CERTIFICATE OF SERVICE ........................................................................................51

# INDEX OF AUTHORITIES

*Cases:*

*Airport Impact Relief, Inc. v. Wykle*,
 192 F.3d 197 (1st Cir. 1999) .........................................................................3, 4

*Ashley Creek Phosphate Co. v. Norton*,
 420 F.3d 934 (9th Cir. 2005) ...................................................................10, 14, 15

*Azar v. Allina Health Servs.*,
 139 S. Ct. 1804 (2019) ................................................................................19

*Balt. Gas & Elec. Co. v. NRDC*,
 462 U.S. 87 (1983) ......................................................................................24

*Bennett v. Spear*,
 520 U.S. 154 (1997) ........................................................... 4, 10, 13, *passim*

*Blue Ocean Institute v. Gutierrez*,
 585 F.Supp.2d 36 (D.D.C. 2008) ..............................................................4

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ...................................................................................4

*Citizens to Preserve Overton Park, Inv. V. Volpe*,
 401 U.S. 402 (1971) ...................................................................................3

*City of Providence v. Barr*,
 954 F.3d 23 (1st Cir. 2020) .................................................. 3, 21, 34, *passim*

*Clarke v. Sec. Indus. Ass'n*,
 479 U.S. 388 (1987) ...................................................................10, 14, 15

*Commonwealth v. United States*,
 708 F.3d 63 (1st Cir. 2013) .......................................................................24

*Conservation Law Found. v. FHA*,
 630 F.Supp.2d 183 (D.N.H. 2007) ...........................................................35

*Conservation Law Found., Inc. v. Jackson*,
 964 F.Supp.2d 152 (D. Mass. 2013) .........................................................11

*Conservation Law Found. v. United States Army Corps of Eng'rs*,
 457 F.Supp.3d 33 (D.N.H. 2019) ..........................................................24, 25

*Conservation Law Found. v. U.S. Dep't of Air Force*,
    1987 U.S. Dist. LEXIS 15149 (D. Mass. Nov. 23, 1987)...................................16

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) ...................................................................49

*Dubois v. U.S. Dept. of Agric.*,
    102 F.3d 1273 (1st Cir. 1996)...............................................................29, 30

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)...............................................................................22

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986).......................................................................3, 19, 20

*Lobsters, Inc. v. Evans*,
    346 F.Supp.2d 340 (D. Mass. 2004) ..............................................................3

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)............................................................ 9, 10, 13, *passim*

*Mineral Policy Ctr. v. Norton*,
    292 F.Supp.2d 30 (D.D.C. 2003) .................................................................3

*Monsanto Co. v. Geerston Seed Farms*,
    561 U.S. 139 (2010)..............................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................. 3, 23, 27, *passim*

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)...........................................................................38, 48

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ..................................................................25

*New York v. NRC*,
    681 F.3d 471 (D.C. Cir. 2012)..................................................................22

*Northeast Utils. Serv. Co. v. FERC*,
    993 F.2d 937 (1st Cir. 1993)......................................................................3

*NRDC v. U.S. Forest Service*,
    421 F.3d 797 (9th Cir. 2005) ...................................................................35

*Or. Nat. Res. Council Fund v. Goodman,*
    505 F.3d 884 (9th Cir. 2007) ................................................................24

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA,*
    415 F.3d 1078 (9th Cir. 2005) ........................................................15, 16

*Tenakee Springs v. Clough,*
    915 F.2d 1308 (9th Cir. 1990) ............................................................24

*Tenn. Valley Authority v. Hill,*
    437 U.S. 153 (1978)............................................................................43

*Util. Air Regul. Grp. v. EPA,*
    573 U.S. 302 (2014)............................................................................22

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022)................................................ 4, 20, 22, *passim*

**Rules:**

Fed. R. Civ. P. 56(c) ...........................................................................4

**Statutes:**

5 U.S.C. §§ 701-706 ...........................................................................1
5 U.S.C. § 706(2)(A).......................................................................3, 27
5 U.S.C. § 706(2)(C).......................................................................3, 27
16 U.S.C. § 1371.................................................................................6
16 U.S.C. § 1536(a)(2).......................................................................37
16 U.S.C. § 1540(g)(1)(A)...............................................................1, 6
16 U.S.C. § 1540(g)(1)(B)..................................................................1
16 U.S.C. § 1540(g)(1)(C)..................................................................1
16 U.S.C. § 1540(g)(2)(A)..................................................................1
16 U.S.C. § 1540(g)(2)(B)..................................................................1
16 U.S.C. § 1801...............................................................................41
28 U.S.C. § 2201.................................................................................1
33 U.S.C. § 1365(b).........................................................................1, 6
42 U.S.C. §§ 4321-4370h..................................................................1, 6
43 U.S.C. § 1332...............................................................................20
43 U.S.C. § 1332(2)...............................................................10, 26, 27
43 U.S.C. § 1337(p)(1)(C)...............................................................20
43 U.S.C. § 1337(p)(4) ................................................ 9, 20, 26, *passim*
43 U.S.C. § 1337(p)(4)(A)...............................................................10
43 U.S.C. § 1337(p)(4)(B)................................................................10

43 U.S.C. § 1337(p)(4)(D) .................................................................................. 10

43 U.S.C. § 1337(p)(4)(G) .................................................................................. 10

43 U.S.C. § 1337(p)(4)(I) ........................................................................ 10, 27, 39

43 U.S.C. § 1337(p)(4)(K) .................................................................................. 34

43 U.S.C. § 1349(a)(2)(A) .................................................................................. 1, 6


30 C.F.R. § 585.621(b) ........................................................................................ 40

30 C.F.R. § 585.621(c) ........................................................................................ 39

30 C.F.R. § 585.626 ............................................................................................ 34

40 C.F.R. § 1500.2(d) .......................................................................................... 34

40 C.F.R. § 1500.2(e) .............................................................................. 35, 39, 47

40 C.F.R. § 1500.2(f) ........................................................................................... 35

40 C.F.R. § 1502.14 ................................................................................ 35, 39, 47

40 C.F.R. § 1501.3(a) .......................................................................................... 21

40 C.F.R. § 1501.3(b) .......................................................................................... 37

40 C.F.R. § 1502.5(a)-(b) .................................................................................... 20

40 C.F.R. § 1502.14 ............................................................................................ 23

40 C.F.R. § 1502.22(a)-(b) .................................................................................. 45

40 C.F.R. § 1508.25(a)(2)-(3) ............................................................................. 35

50 C.F.R. § 402.14(g)(4) ..................................................................................... 43

50 C.F.R. § 402.14(g)(5) ..................................................................................... 43


77 Fed. Reg. 5830 (Feb. 6, 2012) ............................................................... 19, 21

83 Fed. Reg. 63184 (Dec. 7, 2018) ..................................................................... 28

85 Fed. Reg. 43304 (July 16, 2020) .................................................................... 47

86 Fed. Reg. 12495 (Mar. 2, 2021) ..................................................................... 33

# GLOSSARY

APA.........................................................................................Administrative Procedure Act

OCSLA.................................................................Outer Continental Shelf Lands Act

ESA..........................................................................................Endangered Species Act

CWA..................................................................................................Clean Water Act

MMPA............................................................................Marine Mammal Protection Act

NEPA..........................................................................National Environmental Policy Act

ROD..................................................................................................Record of Decision

COP.............................................................................Construction and Operations Plan

EA...........................................................................................Environmental Assessment

EIS.....................................................................................Environmental Impact Statement

BiOp.......................................................................................................Biological Opinion

BOEM...........................................................................Bureau of Ocean Energy Management

NMFS..........................................................................National Marine Fisheries Service

Corps................................................................................U.S. Army Corps of Engineers

## INTRODUCTORY STATEMENT

The Federal Defendants are single-mindedly pursuing their policy of industrializing vast areas of America's pristine Outer Continental Shelf at the expense of the oceans they must protect and the endangered species they must safeguard.  In their rush to approve as many offshore wind projects as possible, the Federal Defendants failed to comply with their legal duties when they issued the Vineyard Wind lease (the "lease") and approved the Vineyard Wind Construction and Operations Plan (the "COP").  In doing so, they impermissibly disregarded the instructions of Congress and marginalized the injuries they inflicted on the Plaintiffs—American fishermen—who wish to continue their work of feeding America.  Accordingly, the lease and the COP should be set aside.

## JURISDICTIONAL STATEMENT

Plaintiffs bring this action under the relevant provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(a)(2)(A); the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1540(g)(1)(A), (B); the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b); the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h.

This court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA); 28 U.S.C. § 2201 (Declaratory Judgment Act); 43 U.S.C. § 1349(a)(2)(A) (OCSLA citizen suit provision); 16 U.S.C. §§ 1540(g)(1)(A) and (C) and (g)(2)(A) and (B) (ESA citizen suit provisions); and 33 U.S.C. § 1365(b) (CWA citizen suit provision).  Pursuant to the citizen suit provisions of OCSLA, ESA and CWA, Plaintiffs sent a 60-day notice of intent ("NOI") to sue the Federal Defendants over their respective failures to comply with OCSLA, ESA and CWA in issuing the Vineyard wind lease and approving the COP.  The NOI was sent to all Federal

Defendants and certain other addressees required by statute on September 17, 2021. *See* Plaintiffs' Statement of Material Facts ("SOMFs") ¶ 135. Accordingly, Plaintiffs have complied with the 60-day notice requirements of OCSLA, ESA, and CWA.

The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); 5 U.S.C. §§ 701-706 (APA); 43 U.S.C. § 1349 (OCSLA citizen suit provision); 16 U.S.C. § 1540(g) (ESA citizen suit provision); and 33 U.S.C. § 1365(b) (CWA citizen suit provision).

This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States." Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2), 16 U.S.C. § 1540(g)(3)(A), and 5 U.S.C. § 703.

An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201. The Federal Government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702, 43 U.S.C. § 1349, 16 U.S.C. § 1540, and 33 U.S.C. § 1365. Plaintiffs have exhausted all administrative remedies, the agency action is final and ripe for review, and all Plaintiffs have Article III and prudential standing.

## LEGAL BACKGROUND

The Plaintiffs' Statement of Legal Background is set forth in the Complaint, Doc. No. 1 ¶¶ 35-52, which are hereby incorporated by reference herein.

## STATEMENT OF MATERIAL FACTS

The Plaintiffs' Statement of Material Facts, which is filed concurrently herewith, is hereby incorporated by reference herein.

## STANDARD OF REVIEW

In cases challenging federal administrative agency actions, courts set aside actions that exceed "statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), known as *ultra vires* actions. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "Any action that an agency takes outside the bounds of its statutory authority is *ultra vires.*" *City of Providence v. Barr,* 954 F.3d 23, 31 (1st Cir. 2020) (emphasis added); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (holding that "an agency literally has no power to act . . . unless and until Congress confers power upon it"). Courts also set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–414 (1971); *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340 (D. Mass. 2004).

Agency action is arbitrary and capricious when the agency (1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be as ascribed to a difference in view or the product of agency expertise. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. With respect to questions of law, courts owe no deference to federal agencies and undertake *de novo* review. *See Northeast Utils. Serv. Co. v. FERC*, 993 F.2d 937, 944 (1st Cir. 1993); *Lobsters*, 346 F. Supp. 2d at 343; *see also Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 54–55 (D.D.C. 2003).

Courts also set aside federal actions where there is (1) no "rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n* 463 U.S. at 43, (2) the agency has not considered the relevant factors, *id.* at 42, or (3) the agency made a clear error of judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 402, 416 (1971); *see also Airport*

*Impact Relief, Inc. v. Wykle,* 192 F.3d 197, 202 (1st Cir. 1999). Furthermore, courts set aside agency action or inaction when the agency fails to comply with nondiscretionary statutory duties. *Bennett v. Spear*, 520 U.S. 154, 172 (1997). In addition, courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (cleaned up). With regard to "major policy decisions," agencies must point to "clear congressional authorization" for the powers they seek to exercise and the way in which they seek to exercise them. *Id*.

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Institute v. Gutierrez*, 585 F.Supp.2d 36, 41 (D.D.C. 2008). *See* FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Wykle*, 192 F.3d at 202–03.

## STATEMENT OF THE CASE

This is an action for declaratory and injunctive relief against the United States Departments of the Interior, Commerce, and Defense, their subagencies, and their officers acting in their official capacities (collectively, the "Federal Defendants") for violations of the Outer Continental Shelf Lands Act ("OCSLA"), the Endangered Species Act ("ESA"), the Clean Water Act ("CWA"), the Marine Mammal Protection Act ("MMPA"), and the National Environmental Policy Act ("NEPA") and their respective rules and regulations (collectively, the "Federal Laws").

The Federal Defendants violated one or more of the Federal Laws in connection with the issuance of Lease OCS-A-0501 (the "Vineyard Wind lease" or the "lease") and the approval of the Construction and Operations Plan (the "COP") for a massive offshore wind energy generating facility located in an expansive area of the Outer Continental Shelf off the southern coast of Nantucket, Massachusetts, known as the Vineyard Wind 1 offshore wind energy project (the

"Vineyard Wind project").  The Plaintiffs ask this Court to set aside the illegally issued Vineyard Wind lease and the impermissibly approved COP.

Plaintiffs are comprised of commercial fishermen and their trade associations as well as a shoreside business.  Their livelihoods and economic futures depend on fishing in the Vineyard Wind project area.  The final Record of Decision ("ROD") for the Vineyard Wind project confirms that approval of the project will likely result in the permanent abandonment of commercial fishing in the entire project area.  *See* **AR BOEM_0076837** ("While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the *entire* 75,614 acre area will be *abandoned* by commercial fisheries due to difficulties with navigation.") (Emphasis added).  Because the ability to fish in the Vineyard Wind lease area is key to the survival of the Plaintiffs as ongoing businesses, they will be economically ruined by the Federal Defendants' collective actions in issuing the lease and approving the project.  In addition, the pollution of the Vineyard Wind lease area and harm to diverse aquatic life (including endangered species) resulting from the Vineyard Wind project will destroy the many ecological benefits and satisfactions the area provides to the Plaintiffs.

In the process of greenlighting the Vineyard Wind project, the Federal Defendants (1) failed to adhere to their substantive statutory and regulatory responsibilities, (2) acted in ways that are *ultra vires,* arbitrary, capricious, and otherwise not in accordance with law, and (3) fell far short of complying with legally mandated procedures, all to the injury of the Plaintiffs.

The violations of the Federal Laws resulted from the Federal Defendants' maladroit pursuit of their overarching policy goal of increasing the capacity of renewable energy generation on the Outer Continental Shelf as quickly as possible no matter the cost to livelihoods or the environment. By single-mindedly pursuing that goal, the Federal Defendants disregarded their legal

responsibilities. Accordingly, the Court should declare the issuance of the Vineyard Wind lease and the approval of the Vineyard Wind COP unlawful and enjoin further construction of the Vineyard Wind project.

## ARGUMENT

### I.    The Plaintiffs Have Article III And Prudential Standing

The Plaintiffs have standing under Article III of the United States Constitution and prudential standing under the Outer Continental Shelf Lands Act, ("OCSLA"), 43 U.S.C. § 1349(a)(2)(A); the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1540(g)(1)(A), (B); the Clean Water Act ("CWA"), 33 U.S.C. § 1365(b); the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371; and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h. Declarations supporting the Plaintiffs' standing are attached to the Plaintiffs' Motion for Summary Judgment.

### A.    Plaintiff Old Squaw Fisheries, Inc. Has Article III and Prudential Standing

Plaintiff Old Squaw Fisheries, Inc. ("Old Squaw") is a commercial fishing company based in Montauk, New York, whose President is David Aripotch. Old Squaw owns a fishing boat called F/V Caitlin & Mairead, which is captained by David Aripotch. It is a twin-ramp steel stern trawler, that fishes in the federal waters of the Atlantic Ocean, including the Vineyard Wind lease area and other areas of the Outer Continental Shelf ("OCS"). In a typical year, F/V Caitlin & Mairead fishes the waters of the Vineyard Wind lease area approximately 25-40 times, with each trip lasting approximately three days. Annual revenues generated from trip fishing for squid by F/V Caitlin & Mairead in the Vineyard Wind lease area typically amounts to approximately $175,000-$350,000, which constitutes approximately 30% of the total annual revenues of Old Squaw in any

given year.  The continuing economic viability of Old Squaw depends on its ability to continue to fish in the Vineyard Wind lease area.  Aripotch Decl. ¶¶ 2-3, 5-12.

Each of the anticipated 60-80 turbines to be built in the Vineyard Wind lease area will reach approximately the height of Rockefeller Center in New York City, contain large quantities of oils and other chemicals, and include blades approximately as long as a football field.  *See* **AR BOEM_0193460–0193461**.  The turbines will be pile-driven into the ocean bottom of the Vineyard Wind lease area, producing high levels of low-frequency noise capable of injuring fish and marine mammals, and once in place, the turbines will generate continuous operational noise, while the electromagnetic energy emanating from the cables will also disturb existing marine life. *See id*. at **0068617, 0068617, 0110390**.  Additionally, the wind turbines will interfere with marine radar, which will make navigation in the Vineyard Wind lease area extremely dangerous.  *See id.* at **0068749**.  Impacts to high frequency radar used for search and rescue and the height of the turbines themselves will make helicopter rescue efforts in case of damage to the boat and or injury to the crew highly problematic.  *See id*.; *see also* **0110382**; **0111440–0111441**; **0111450**. Furthermore, trawl fishing gear will become entangled in protections placed over cables or around foundations of turbines and related infrastructure, making commercial fishing by the F/V Caitlin & Mairead in the Vineyard Wind lease area untenable.  Aripotch Decl. ¶¶ 13-15; *see also* **AR BOEM_0068617, 0068618, 0068622, 0068624, 0068625**.  If in-water construction of the Vineyard Wind project commences, the F/V Caitlin & Mairead will not be able to fish within the wind energy area because of the safety risks posed by the construction activities.  *See id*. at **0068710**; **0130447–0130449**; Aripotch Decl. ¶ 16.

When the turbines begin to operate, the risks to the F/V Caitlin & Mairead will continue and even increase.  There is a serious risk that the boat will slam into a turbine in the open ocean.

*See* **AR BOEM_068710**.  In addition, the boat could become tangled on another boat's gear because the turbines will lessen the space in the Vineyard Wind area available for fishing, thereby limiting the trawl bottom to the space between the turbines.  *See id.*  With two or more boats tangled, the risk to life and property posed by slamming into one of numerous turbines is greatly increased.  Furthermore, inter-array electric cables leading from turbine to turbine, and electric cables that travel to onshore facilities from the wind turbines in the lease area will became exposed, as has happened frequently in Europe in wind energy facilities in the ocean, *see* **AR BOEM_0110423**, making it likely that the F/V Caitlin & Mairead's gear would be hung up on a cable, and resulting in the loss of steering control of the boat, its capsize, and the consequent loss of life on the open ocean.  Mr. Aripotch has a crew to protect and he will not risk the loss of life that would be greatly increased by the presence of the turbines.  Accordingly, if the Vineyard Wind project is built, he will no longer fish in the Vineyard Wind lease area.   Aripotch Decl. ¶ 17; *see also* **AR BOEM_0068710, 0076837**.

But for the lease issuance and COP approval, F/V Caitlin & Mairead would continue to regularly fish for squid in the Vineyard Wind area.  Aripotch Decl. ¶ 18.  As a result of the lease issuance and COP approval, Old Squaw will lose approximately 30% of its annual revenues, but if the lease issuance or COP approval is set aside by the court, Old Squaw will not suffer such economic injury because it will be able to continue to fish in that area.  Aripotch Decl. ¶ 19.

Thus, the Vineyard Wind project will make fishing in the wind energy area by the F/V Caitlin & Mairead impossible due to: (1) entanglement of trawl fishing gear, (2) lack of adequately wide transit lanes, (3) interference with marine radar, (4) increased dangers in connection with Search and Rescue operations ("SAROPS"), (5) the presence of the wind turbines and associated cables, and (6) the pile driving and associated dredging or jet plowing or jet trenching and filling

operations during construction.  These dangers to fishing safety will also disrupt and displace not only squid but also other marine life in the area, throwing the local marine ecosystem out of balance and further impacting Old Squaw's ability to fish in the waters of the OCS in and around the Vineyard Wind lease area.  These adverse ecological impacts attributable to the Vineyard Wind project constitute the pollution of those waters and the degradation of all living things within them. Aripotch Decl. ¶ 20.

The Federal Defendants have admitted that "[w]hile Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines *it is likely that the entire 75,614-acre area will be abandoned by commercial fisheries due to difficulties with navigation*."  **USACE_AR_011479** (emphasis added).  But even without this admission, Old Squaw has shown by sworn declaration that it is injured in fact by the Federal Defendants' issuance of the lease and approval of the COP because the increased risks to the safety of the F/V Caitlin & Mairead resulting therefrom will require Plaintiff Old Squaw to terminate its commercial fishing operations in the Vineyard Wind area, resulting in substantial economic losses attributable to those actions of the Federal Defendants.  Aripotch Decl. ¶¶ 2-20.  Furthermore, Old Squaw is injured by the impermissible failures of the Federal Defendants to protect the environment, conserve natural resources, prevent interference with reasonable uses of the area, and to properly consider the location of the Vineyard Wind lease, as well as the use of the area as a fishery and sealanes.  *See* 43 U.S.C. § 1337(p)(4).  This Court has the power to redress those injuries attributable to the Federal Defendants' actions by setting aside the lease issuance and COP approval.  *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-561 (1992) (opining that Article III standing is met when plaintiff demonstrates that he has suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision);

9

*Bennett*, 520 U.S. at 162 (same).  Accordingly, Old Squaw has Article III standing to bring this lawsuit.

In addition, Old Squaw has prudential standing under OCSLA which requires Federal Defendants to "ensure that [leasing and approval of construction and operation plans] is carried out in a manner that provides for . . . safety,"  43 U.S.C. § 1337(p)(4)(A), "protection of the environment," 43 U.S.C. § 1337(p)(4)(B), "conservation of the natural resources of the Outer Continental Shelf," 43 U.S.C. § 1337(p)(4)(D), "protection of correlative rights in the Outer Continental Shelf," 43 U.S.C. §1337(p)(4)(G), and "prevention of interference with reasonable uses," 43 U.S.C . §1337(p)(4)(I).  In addition, by issuing the Vineyard Wind lease and approving the COP, the Federal Defendants violated OCSLA's requirement that "the character of the waters above the outer continental shelf as high seas and the right to navigation *and fishing* therein shall not be affected."  43 U.S.C. § 1332(2) (emphasis added).  BOEM failed to abide by these legal requirements in connection with the lease issuance and COP approval for the Vineyard Wind project, to the detriment and injury of Old Squaw.  Aripotch Decl. ¶¶ 2-20.  Accordingly, Old Squaw has prudential standing to bring this lawsuit under OCSLA.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990) ("[T]he plaintiff must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.").  "Whether a plaintiff's interest is arguably protected by the statute within the meaning of the zone-of-interests test is to be determined by reference to the particular provision of law upon which the plaintiff relies."  *Bennett*, 520 U.S. at 175-76 (cleaned up).  The zone of interests test is not meant to be especially demanding, *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987), and is not intended to impose an onerous burden on the plaintiff, *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).  The zone

of interests test "is "particularly generous with respect to claims brought under the APA."
*Conservation Law Found., Inc. v. Jackson*, 964 F.Supp.2d 152, 164 (D. Mass. 2013).

Furthermore, as the Owner and President of Old Squaw, David Aripotch has a keen interest in protecting the purity and cleanliness of these traditional fishing waters, not only because of the adverse economic impacts of the Vineyard Wind project to Old Squaw, but also because he has devoted his entire adult life to fishing in the Atlantic Ocean, including in the Vineyard Wind lease area. The environmental degradation of those waters by the Vineyard Wind project takes away not only from his business activity and profits, but also from the environmental and aesthetic pleasures of fishing in those magnificent waters that he derives as the Owner and President of Old Squaw and as the Captain of F/V Caitlin & Mairead. These adverse environmental and ecosystem impacts are directly attributable to the lease issuance and COP approval, and the court has the power to vacate both, thereby erasing any such environmental, ecological, and aesthetic harms attributable to the Vineyard Wind project. Aripotch Decl. ¶¶ 21-24.

When Mr. Aripotch goes into the Vineyard Wind lease area, he frequently brings his camera with him because he knows the area is full of wildlife. He first went there in 1976 as a deckhand of the F/V Sea Mist, a 55-foot steel trawler. Then and now, the Vineyard Wind lease area is one of the most life-filled places he has ever fished. He loves seeing the North Atlantic Right Whales, ("NARWs"), the fin whales, and the pilot whales that inhabit the lease area. In addition, it is a delight for him to see the tunas, swordfish, skipjack tunas, all jumping, and the sea birds working the bait fish. At night, when he takes his boat further into the lease area to go whiting fishing (whiting are caught at night, squid during the day), before he sets the net and stops the boat, the bait fish magnificently erupt for acres in the water in all directions. The sand bottom

of the Vineyard Wind lease area draws the wildlife there because that is the perfect habitat for these fish and marine mammals.  Aripotch Decl. ¶¶ 25-26.

Mr. Aripotch explains that it is a joy for him to be able to work where he can see and experience the beauty of nature on a daily basis, harvest its bounty, and provide food for people. The work is rewarding to him on many levels.  Watching NARWs with their young skim-feeding is an amazing experience for him, providing an incomparable association with nature and the sea. He understands that the construction and operation of the Vineyard Wind lease area will send the endangered NARWs away from the area and that frightens him.  For thousands of years the NARWs have migrated to breed and thrive in the Vineyard Wind lease area, and now they will be put in harm's way because the Vineyard Wind project will make them change the habits they have had for millennia.  The issuance of the lease and approval of the COP will harm the NARW through devastation of its critical habitat, as the sand shoal bottom laden with copepods, its main feeding source, will be destroyed via pile driving and jet plowing creating a hard bottom strewn with cables spewing electromagnetic frequency and constant low-frequency noise from the operation of the wind farm.  *See* **AR BOEM_0068617**, **0068510**, **0110388–0110390**.  Mr. Aripotch plans to continue to fish in the Vineyard Wind lease area and observe the NARW and all the other whales and marine animals that congregate in that area through the foreseeable future if the Vineyard Wind project does not move forward.  Indeed, the Federal Defendants' actions in approving the project will result in harm, injury, and death to a diverse range of marine species, including whiting, squid, the endangered NARW, and horseshoe crabs, plus destruction of their habitats, and the destabilization of the delicate marine ecosystem that Mr. Aripotch enjoys as the Owner and President of Old Squaw and the Captain of the F/V Caitlin & Mairead.  Aripotch Decl. ¶¶ 27-29,

*see also, e.g.* **AR BOEM_0068531, 0068546, 0068549, 0068578–0068579, 0068584, 0068592, 0068606, 0068608**.

Because the Federal Defendants directly caused these environmental, ecological, and aesthetic injuries by first issuing the Vineyard Wind lease and then approving the Vineyard Wind COP, Old Squaw and Mr. Aripotch have not only economic but also environmental, ecological, and aesthetic interests in reversing those decisions before the imminent in-water construction activities resulting from the COP approval make them irreversible. Without the Vineyard Wind project approval, Mr. Aripotch would continue fishing in the Vineyard Wind area and enjoying the environmental, ecological, and aesthetic benefits of pursuing his calling as a commercial fisherman in that area, both as Captain of the F/V Caitlin & Mairead and as Owner and President of Old Squaw. Aripotch Decl. ¶¶ 30-34.

These environmental and ecological injuries caused by Federal Defendants to Old Squaw would be fully redressed by the relief requested in Old Squaw's complaint, because such relief would prevent imminent in-water offshore wind development in the Vineyard Wind lease area, allowing for continued trawl fishing and continued profitability for Old Squaw, and would protect endangered species and other marine mammals in the area from habitat destruction and harm, preserving the beneficial biodiversity of the ocean and providing Mr. Aripotch with the environmental, ecological, and aesthetic benefits of fishing in the Vineyard Wind area. Aripotch Decl. ¶¶ 21-34.

This Court has the power to redress those environmental, ecological, and aesthetic, injuries to Old Squaw and Mr. Aripotch, as owner of Old Squaw and captain of the F/V Mairead, directly attributable to the Federal Defendants' actions by setting aside the lease issuance and COP approval. *See Lujan,* 504 U.S. at 560-61; *Bennett*, 520 U.S. at 162 (same). In addition, as

indicated, Old Squaw also has prudential standing under OCSLA because of the indicated OCSLA violations set forth above.

Furthermore, Old Squaw has prudential standing under the ESA because the Federal Defendants' issuance of the Vineyard Wind lease and approval of the COP violated ten specific legal requirements imposed on the Federal Defendants by the ESA, as set forth in paragraphs 181-240 of the Plaintiffs' complaint, which are hereby incorporated herein by reference in their entirety. Doc. No. 1 at pp. 48-60 (Sixth through Sixteenth Claims). As shown in Mr. Aripotch's declaration and herein, the Federal Defendants committed these violations of the ESA to the detriment and injury of Old Squaw and Mr. Aripotch in his capacity as owner, operator, and captain of Old Squaw. Aripotch Decl. ¶¶ 21-34. Accordingly, Old Squaw has prudential standing to bring this lawsuit under the ESA. *See Lujan*, 497 U.S. at 883; *Bennett*, 520 U.S. at 175. The zone of interests test "is not meant to be especially demanding." *Clarke*, 479 U.S. at 399; *see also Ashley Creek*, 420 F.3d at 940.

Old Squaw also has prudential standing under the CWA because the Federal Defendants' issuance of the Vineyard Wind lease and approval of the COP violated four specific legal requirements imposed on the Federal Defendants by the CWA, as set forth in paragraphs 241-265 of the Plaintiffs' complaint, which are hereby incorporated by reference herein in their entirety. Doc. No. 1 at pp. 60-64 (Seventeenth through Twentieth Claims). As shown in Mr. Aripotch's declaration and herein, the Federal Defendants committed these violations of the CWA to the detriment and injury of Old Squaw and Mr. Aripotch in his capacity as owner, operator, and captain of Old Squaw. Aripotch Decl. ¶¶ 21-34. Accordingly, Old Squaw has prudential standing to bring this lawsuit under the CWA. *See Lujan*, 497 U.S. at 883; *Bennett*, 520 U.S. at 175; *Clarke,* 479 U.S. at 399; *Ashley Creek*, 420 F.3d at 940.

Old Squaw also has prudential standing under the MMPA because the Federal Defendants' issuance of the Vineyard Wind lease and approval of the COP violated two specific legal requirements imposed on the Federal Defendants by the MMPA, as set forth in paragraphs 266-276 of the Plaintiffs' complaint, which are hereby incorporated herein by reference in their entirety. Doc. No. 1 at pp. 65-68 (Twenty-First and Twenty-Second Claims).  As shown in Mr. Aripotch's declaration and herein, the Federal Defendants committed these violations of the MMPA to the detriment and injury of Old Squaw and Mr. Aripotch in his capacity as owner, operator, and captain of Old Squaw.  Aripotch Decl. ¶¶ 21-34.  Accordingly, Old Squaw has prudential standing to bring this lawsuit under the MMPA.  *See Lujan*, 497 U.S. at 883; *Bennett*, 520 U.S. at 175; *Clarke*, 479 U.S. at 399; *Ashley Creek*, 420 F.3d at 940.

Old Squaw also has prudential standing under NEPA because the Federal Defendants' issuance of the Vineyard Wind lease and approval of the COP violated eleven specific legal requirements imposed on the Federal Defendants by NEPA, as set forth in paragraphs 277-347 of the Plaintiffs' complaint, which are hereby incorporated herein by reference in their entirety.  Doc. No. 1 at pp. 68-81 (Twenty-Third through Thirty-Third Claims).  As shown in Mr. Aripotch's declaration and herein, the Federal Defendants committed these violations of NEPA to the detriment and injury of Old Squaw and Mr. Aripotch in his capacity as owner, operator, and captain of Old Squaw.  Aripotch Decl. ¶¶ 2-34.  Accordingly, Old Squaw has prudential standing to bring this lawsuit under NEPA.  *See Lujan*, 497 U.S. at 883; *Bennett*, 520 U.S. at, 175; *Clarke*, 479 U.S. at 399; *Ashley Creek*, 420 F.3d at 940.

Finally, Mr. Aripotch's declaration shows that Old Squaw's injuries are "tethered to the environment," *id.* at 943, and are "causally related to an act within NEPA's embrace," *Ranchers*

*Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1103 (9th Cir. 2005). This court has recognized that

> [i]n an action under NEPA, the procedural injury implicit in an agency's violation of the statute is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project that he may be expected to suffer whatever environmental consequences the project may have.

*Conservation Law Found. v. U.S. Dep't of Air Force*, 1987 U.S. Dist. LEXIS 15149 at *5 (D. Mass. Nov. 23, 1987); *see also* Aripotch Decl. ¶¶ 21-34. Mr. Aripotch has a sufficient geographical nexus to the Vineyard Wind lease area because he fishes there regularly. The fact that, in addition to its environmental injuries, Old Squaw "also seek[s] to avoid certain economic harms . . . does not strip [Old Squaw] of prudential standing." *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 155–156 (2010) (finding that injury with "an environmental as well as an economic component" was sufficient for standing).

### B. Plaintiffs Heritage Fisheries, Inc., Nat W., Inc., and XIII Northeast Fisheries Sector, Inc. Have Article III and Prudential Standing

Plaintiffs Heritage Fisheries, Inc. ("Heritage Fisheries") and Nat. W., Inc. ("NAT") are commercial fishing companies that routinely fish in the Vineyard Wind lease area, and they and their owners and operators reap substantial economic and ecological benefits from fishing in that area and are injured as a result of the Federal Defendants' actions in the same ways as Old Squaw and its owner and operator are injured, and the arguments for their Article III standing set forth in Section I. A., above are hereby incorporated by reference herein. Heritage Fisheries and NAT are members of Plaintiff XIII Northeast Fisheries Sector, Inc. ("Sector XIII"), a private organization of commercial fishermen formed in 2010 with 49 members responsible for monitoring compliance with 60 fishing permits along the Atlantic Coast of the United States and supporting the commercial fishing industry in the area. Heritage Fisheries and NAT have Article III and

16

prudential standing for the same reasons that Old Squaw has such standing.  Accordingly, Sector XIII has Article III and prudential associational standing on behalf of Heritage Fisheries, NAT, and similarly situated members.  Declaration of Thomas E. Williams, Sr. ¶¶ 2-34; Declaration of Thomas H. Williams ¶¶ 2-33; Declaration of John Haran, ¶¶ 2-29.

### C.   Plaintiff Long Island Commercial Fishing Association Has Article III and Prudential Standing

Plaintiff Old Squaw is a member of Plaintiff Long Island Commercial Fishing Association ("LICFA"), a New York fishing industry membership organization that represents owners and operators from over 150 fishing businesses, boats, and fishermen from multiple ports on Long Island, New York, many of whom are similarly situated to Old Squaw and are injured in similar ways.  Because Old Squaw has Article III and prudential standing, LICFA has such associational standing on behalf of Old Squaw and similarly situated members.  Brady Decl. ¶¶ 2-29; Aripotch Decl. ¶ 3.

### D.   Plaintiff Seafreeze Shoreside, Inc. Has Article III and Prudential Standing

Seafreeze is a seafood dealer located in Narragansett, Rhode Island, that purchases, sells, and processes fish product, primarily squid, caught by local fishermen that operate their boats in the Vineyard Wind lease area.  Ventrone Decl. at ¶ 4; Lapp Decl. at ¶ 3.  The presence and good health of squid and other marine life in the Vineyard Wind lease area is vital to Seafreeze's ongoing business because Seafreeze depends on commercial fishing activities in the Vineyard Wind lease area, especially squid fishing, for a substantial portion of its revenue.  Ventrone Decl. ¶ 5. Seafreeze generates revenues from purchasing, processing, and selling squid seafood product from commercial fishermen who bring such product to its dock in Narragansett, Rhode Island, from catches in the Vineyard Wind area.  For example, in 2016 Seafreeze's annual revenue attributable to the Vineyard Wind area was approximately $1.7 million constituting approximately 19% of

17

total revenue for that year.  Seafreeze's yearly revenues attributable to catches in the Vineyard Wind area vary annually but they are a consistently high percentage of total annual revenues year after year.  Ventrone Decl. ¶ 10.

Issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will result in enormous safety, navigational, and ecological risks to commercial fishermen operating in the area.  Lapp Decl. ¶¶ 27-65.  These dangers will severely limit the availability of squid for processing at Seafreeze's facility in Narragansett, Rhode Island, resulting in substantial loss of revenues to Seafreeze.  This will require Seafreeze to reduce or curtail operations in order to cut costs and will likely result in termination of employees.  Ventrone Decl. ¶ 11.

Seafreeze has been and will continue to be injured in a manner fairly traceable to the Federal Defendants' issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP, because the imminent and economically devastating construction and operation of the Vineyard Wind project would not occur without the Federal Defendants' actions.  The Federal Defendants' actions would be fully redressed by the relief requested in Seafreeze's complaint, because such relief would prevent imminent offshore wind development in the Vineyard Wind lease area, allowing trawl fishing for squid to continue unabated, upon which Seafreeze economically depends.  Ventrone Decl. ¶¶ 12-15; Lapp Decl. ¶¶ 24-63.

This Court has the power to redress Seafreeze's injuries directly attributable to the Federal Defendants' actions by vacating the Lease issuance and COP approval.  *See Lujan*, 504 U.S. at 560–561; *Bennett*, 520 U.S. at 162.  Accordingly, Seafreeze has Article III standing to bring this lawsuit.  Seafreeze also has prudential standing under OCSLA, ESA, CWA, MMPA, and NEPA for similar reasons that Old Squaw, Heritage Fisheries, NAT, Sector XIII, and LICFA have prudential standing under those laws.

II.    **The Federal Defendants' Decision To Issue, Publish, And Award The Vineyard Wind Lease Under the "Smart From The Start" Policy Violates Multiple Provisions of OCSLA, ESA, NEPA, And The APA (First Claim, Second Claim, Third Claim, Ninth Claim, Tenth Claim, Twelfth Claim, Twenty-Fourth Claim, Twenty-Fifth Claim, Thirty-First Claim)**

The Plaintiffs hereby incorporate by reference the arguments on this subject found in the Memorandum of Points and Authorities filed by the plaintiffs in *Responsible Offshore Dev. All. v. U.S. Dep't of the Interior* ("RODA"), Case No. 1:22-cv-11172-IT at § 3(A).  In addition, the Plaintiffs' offer the following.

A.    **BOEM's Issuance of the Vineyard Wind Lease Without First Preparing an Environmental Impact Statement Runs Afoul of the Major Questions Doctrine.**

BOEM initiated its so-called "Smart From The Start" policy on November 23, 2010.  *See* SOMF ¶¶ 27, 29.  It also announced the implementation of the policy in the Federal Register.  77 Fed. Reg. 5830 (Feb. 6. 2012).  *See* SOMFs 33.  The Vineyard Wind lease was issued pursuant to the Smart From The Start Policy, which was intended to "accelerate the leasing process" for offshore wind energy development on the Outer Continental Shelf by, among other things, directing BOEM to prepare an environmental assessment ("EA") instead of an environmental impact statement ("EIS") at the leasing stage. *Id*. *See* **AR BOEM_0000001**; *see also generally* **AR BOEM_0000764**.  Strikingly, the Smart From The Start policy was never promulgated through notice and comment rulemaking while purporting to bind agency employees to implement the policy from the date of its adoption and into the future.  As such it is an impermissible, underground legislative rule that is *ultra vires* and void *ab initio*.  *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019).  There is no statute of limitations applicable to such *ultra vires* rules, including the Smart From The Start policy.  *See  La. Pub. Serv. Comm'n*, 476 U.S. at 374.

Although the purpose of the policy was to expedite the process of issuing leases and, ultimately, of approving construction and operations plans, the extent to which the pristine waters of American's vast Outer Continental Shelf are to be industrialized by wind energy projects is a "major question" if there ever was one.  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (discussing major questions).

Congress directly established detailed criteria that the federal government must use in issuing offshore wind energy leases.  *See* 43 U.S.C. § 1332, 1337(p)(4) (mandating that "The Secretary *shall ensure* that *any* activity under this subsection is carried out in a manner that provides for— (A) safety; (B) protection of the environment; . . .  conservation of natural resources," and a host of other requirements) (emphasis added).  BOEM's issuance of leases on the Outer Continental Shelf is one of the "activities" authorized in the subsection.  *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary to "grant a lease" for activities that "produce or support production, transportation, or transmission of energy other than oil or gas").  By bootstraping BOEM to conduct an environmental assessment ("EA") rather than an environmental impact statement ("EIS") at the lease issuance stage, the Smart From The Start program greenlighted BOEM to issue leases on a fast-track basis without verifying that the "activity" for which the lease was being issued, i.e., the construction and operation of an offshore wind energy facility, will meet OCSLA's statutory mandate to "ensure," e.g., "safety" and "protection of the environment."  *See* 43 U.S.C. § 1337(p)(4); *see also La. Pub. Serv. Comm'n*, 476 U.S. at 374 (holding that "an agency literally has no power to act . . . unless and until Congress confers power upon it").

Furthermore, the Smart From The Start policy is inconsistent with the overarching NEPA rules promulgated by the Council on Environmental Quality ) (CEQ").  *See* 40 C.F.R. § 1502.5(a)-(b) (providing that an EIS "shall be prepared at the feasibility analysis (go-no go) stage" and "early

enough so that it can serve practically as an important contribution to the decisionmaking process and will *not* be used to rationalize or justify decisions already made") (emphasis added). The Smart From The Start policy contravenes the CEQ regulations by impermissibly pushing off the preparation of an EIS until well after an offshore wind lease is issued.

By applying the hurry-up Smart From The Start policy to the issuance of the Vineyard Wind lease, the Federal Defendants started a cascade of OCSLA, NEPA, and ESA violations that extend to the EA, the EIS, the Record of Decision, and the approval of Vineyard Wind's Construction and Operations Plan, resulting in a multitude of actions by the Federal Defendants that were *ultra* vires, arbitrary, capricious, and otherwise not in accordance with law. *See City of Providence* 954 F.3d at 31 ("Any action that an agency takes outside the bounds of its statutory authority is *ultra vires*.").

Specifically, less than a year after publishing the Smart From The Start regulations, BOEM published a notice of intent to prepare an EA for an entire Wind Energy Area ("WEA"), comprised of several potential wind energy leases located off the Massachusetts coast, including Lease OCS-A-0501, which would become the Vineyard Wind lease. 77 Fed. Reg. 5830 (Feb. 6, 2012); *see also* **AR BOEM_0000764** (lease). The decision to forego preparing an EIS and instead preparing only an EA for such a large area, which, at most, scratched the surface of applying OCSLA's mandated criteria at the leasing stage, was a fatal flaw in BOEM's Vineyard Wind lease process.

BOEM knew (or at least should have known) that issuing the Vineyard Wind lease would likely result in the construction of an offshore wind energy project within the lease area, and that such construction would likely have significant environmental impacts. *See* 40 C.F.R. § 1501.3(a) (requiring any federal action that "[i]s *likely* to have significant effects on the environment" be prefaced by an EIS) (emphasis added). "NEPA requires that environmental issues be considered

at every important stage in the decision making process." *New York v. NRC,* 681 F.3d 471, 476 (D.C. Cir. 2012).

Leap-frogging NEPA's EIS requirement to speedily industrialize the Outer Continental Shelf ("OCS") was BOEM's singular purpose for promulgating the Smart From The Start regulations. *See* SOMFs ¶ 29. OCSLA contains no "clear congressional authorization" that allows BOEM to shirk its duty to prepare an EIS at the leasing stage. *See West Virginia v. EPA*, 142 S. at 2609. If deciding to industrialize the Outer Continental Shelf with wind turbines despite serious environmental and economic dangers affecting American fishermen, food supply, businesses, defense readiness, and medicine is not a major question, then nothing is. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (finding agency's interpretation of its own authority that would "bring about an enormous and transformative expansion in [an agency's] regulatory authority without clear congressional authorization" to be "patently unreasonable"). Furthermore, given OCSLA's express requirement to "ensure," e.g., "safety [and] protection of the environment," BOEM's decision to prepare an EA rather than an EIS in connection with the lease issuance for this massive federal project raises nondelegation as well as constitutional avoidance issues. *See West Virginia v. EPA*, 142 S. Ct. at 2609; *see also Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (finding agency claim of delegation on issue of "profound debate" to be "suspect").

BOEM's Smart From The Start policy impermissibly lets it evade its NEPA procedural duty to prepare an EIS at the OCSLA leasing stage. *See Bennett v.* Spear, 520 U.S. at 172 ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking."). Incontrovertibly, NEPA's procedural duties and OCSLA's substantive duties are intertwined in the Vineyard Wind project. By failing to offer evidence of any clear authority to decide the major question of the

extent to which the nation's ocean environment should be industrialized, without *first* following the clear substantive mandates of OCSLA and the equally clear procedural mandates of NEPA, BOEM impermissibly neglected to "ensure" at the leasing stage that its action would "provide for— [e.g.,]. . . safety, protection of the environment . . . [and] conservation of natural resources." *See* 43 U.S.C. § 1337(p)(4).  Accordingly, BOEM's action in issuing the Vineyard Wind lease was *ultra vires*, arbitrary, capricious, and otherwise not in accordance with law.  *See Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43; *see also* 43 U.S.C. § 1332(2) (stating that "the character of the waters above the outer continental shelf as high seas and the right to navigation *and fishing* therein *shall not be affected*" by, e.g., lease issuance) (emphasis added).

**B.    BOEM's Impermissible Decision to Skip the Environmental Impact Statement Requirement at the Leasing Stage Caused Illegal Ripple Effects Throughout the Subsequent Vineyard Wind Project Approval Process.**

Because BOEM failed to prepare an EIS at the leasing stage, BOEM issued the Vineyard Wind lease without "rigorously explor[ing] and objectively evaluat[ing] all reasonable alternatives."  40 C.F.R. § 1502.14; *see* **AR BOEM_0000097-0000098**.  At the very least, when BOEM subsequently discovered, after preparing the EIS in connection with its review of the COP, that wind farm construction in the Vineyard Wind lease area would lead to substantial environmental degradation and the consequent abandonment of the area by commercial fishermen, *see* **AR BOEM_0076837**,[1] BOEM should have rescinded the original EA and reconsidered its

---

[1]    The Plaintiffs are aware that the Federal Defendants issued a supplement to the ROD after the Plaintiffs filed their complaint editing this quotation to attribute its conclusion to commenters, rather than the Corps.  As detailed in the Plaintiffs' Motion to Strike and its accompanying memorandum, Doc. Nos. 56–57, hereby incorporated herein in their entirety, that purported supplement should not be considered part of the AR because it was not part of the AR when the Federal Defendants made their final decision approving the Vineyard Wind COP.  Nor can it be justified by an unbacked claim that the Federal Defendants always meant to attribute this analysis to commenters, or that the supplement merely corrects a scrivener's error or is otherwise harmless

decision to issue the Vineyard Wind lease in light of the findings in the EIS.  By failing to take the requisite "hard look" and preparing an EIS before issuing the lease, BOEM violated NEPA.  *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (opining that a cursory look at impacts on the environment is insufficient, rather, agencies must take a "hard look" at such impacts before deciding on a course of action); *Commonwealth v. United States,* 708 F.3d 63, 67 (1st Cir. 2013) (observing that NEPA requires agencies to take a "hard look at the environmental consequences" of their actions) (cleaned up); *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (same).

The EA also failed to consider the cumulative impacts of issuing the Vineyard Wind lease. Although the EA mentions cumulative impacts in passing, its analysis is woefully limited.  For example, the EA only examines cumulative impacts for a five-year period spanning 2014–2019. *See* **AR BOEM_0000360**.  "NEPA requires that where several actions have a cumulative [impact] or synergistic effect, this consequence must be considered *in an EIS*." *Tenakee Springs v. Clough,* 915 F.2d 1308, 1312 (9th Cir. 1990); *see also Conservation Law Found. v. United States Army Corps of Eng'rs,* 457 F.Supp.3d 33, 59–60 (D.N.H. 2019) (emphasis added).  Not only has the five-year period expired, it is nonsensical to artificially cabin the "incremental effects of the proposed action on the environment when added to other . . . reasonably foreseeable future actions" within the lease area's region to a five-year period when any offshore wind farm meant to be constructed there is intended to be in place for well over five years.  *See* SOMFs ¶ 145; **AR BOEM_0077286, 0077293, 0077295** (Vineyard Wind project has an operational life of 33 years).

---

error.  This change was made after the Plaintiffs filed their complaint, which noted the admission by the Federal Defendants.

Moreover, as documents posted on BOEM's website (but conveniently left out of the AR) detail, many more offshore wind energy projects that were anticipated have now been sited since the EA was issued.  *See* Doc. No. 19 Exhibit 5 (map detailing all foreseeable Atlantic offshore wind leasing as of August 13, 2021).  The EA's estimates of reasonably foreseeable future actions are not accurate, and the leases issued under its purview, including the Vineyard Wind lease, must be set aside until the EA is replaced by a full EIS prepared *at the leasing stage*, thereby satisfying BOEM's substantive duty under OCSLA to "ensure," e.g., safety and protection of the environment at the leasing stage and to comply with BOEM's procedural duties under NEPA at that stage.  A cumulative impacts analysis "must be more than perfunctory, it must provide a useful analysis of the cumulative impacts of past, present, and future projects."  *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011); *see also Conservation Law Found.*, 457 F. Supp. 3d at 59-60.  The EA's cumulative impacts analysis fails even this low bar.

The underlying problem with issuing the lease without a full EIS is that the EIS was prepared much later by the Federal Defendants and does not consider *any* alternatives outside of the lease area, because the project was defined earlier as a wind energy project located solely *within* the lease area.  As set forth in more detail *infra* in Sections III and VIII, this impermissibly cabined the scope of the Federal Defendants' review of the COP during the EIS stage.

## C.    The Federal Defendants' Issuance of the Vineyard Wind Lease Violated Multiple Provisions of Section 1337(p)(4) of OCSLA.

BOEM issued the Vineyard Wind lease without ensuring that it was "carried out in a manner that provides for" safety, environmental protection, conservation of the outer continental shelf's natural resources, protection of national security, "prevention of interference with reasonable uses . . . of the exclusive economic zone, the high seas, and the territorial seas[, or] consideration of any other use of the sea or seabed, including use for a fishery, a sealane, a potential

site of a deep water port, or navigation." 43 U.S.C. § 1337(p)(4). Nowhere in the EA does BOEM directly analyze these mandatory OCSLA decisionmaking criteria, as it must when "grant[ing] a lease . . . on the outer Continental Shelf" to "produce or support production . . . of energy from sources other than oil and gas . . . ." *Id*. at (p)(1)(C). This omission, especially given the EA's acknowledgement (but not application) of factors that would play into a proper § 1337(p)(4) analysis within the WEA, is enough to render the issuance of the Vineyard Wind lease invalid. *See, e.g.* **AR BOEM_0000156–0000157** (noting a requirement of "[a] description of the safety, prevention, and environmental protection features or measures" that a lessee would use *only after* the lease and EA were issued); **AR BOEM_0000229–0000231** (recognizing that essential fish habitat exists within the WEA); **AR BOEM_0000385** (requesting NMFS assistance in analyzing fishery impact, which was denied); **AR BOEM_0000387** (finding "that the proposed action will not significantly affect" essential fish habitat "in the action area" despite not knowing where various "meteorological towers and buoys" will be placed). Additionally, as previously addressed, BOEM did not sufficiently consider the cumulative impact of its decision to issue the Vineyard Wind lease in the Environmental Assessment, tainting its assessment of the 43 U.S.C. § 1337(p)(4) factors by limiting the scope of impacts considered.

So, BOEM's Smart From The Start policy, as applied to the Vineyard Wind lease issuance and all subsequent regulatory actions of the Federal Defendants in connection with the Vineyard Wind project, caused BOEM to evade its OCSLA statutory responsibilities at the leasing stage, especially those detailed in 43 U.S.C. § 1332(2) and 1337(p)(4), as well as their associated NEPA responsibilities. Accordingly, the Vineyard Wind lease should be set aside as *ultra vires*, arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of

procedure required by law, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D); *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Lobsters*, 346 F.Supp.2d at 343.

Having addressed in this Section II the Federal Defendants' statutory and regulatory violations associated with the lease issuance, the following Sections III-VIII address the Federal Defendants' violations associated with their subsequent actions leading to and including the approval of the COP.

### III.    The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated Multiple Provisions Of OCSLA, ESA, and NEPA (Third Claim, Fourth Claim, Fifth Claim, Twenty-Third Claim, Twenty-Fourth Claim, Twenty-Fifth Claim, Twenty-Seventh Claim, Thirty-Second Claim)

The Plaintiffs hereby incorporate by reference the arguments regarding the OCSLA, ESA, and NEPA violations found in the Memorandum of Points and Authorities filed by the Responsible Offshore Development Alliance ("RODA") in Case No. 1:22-cv-11172-IT, at §§ 3, 4.  In addition, the Plaintiffs offer the following.

### A.    The Federal Defendants Approved Vineyard Wind's Woefully Inadequate Site Assessment Plan and then Failed to Include It in the Administrative Record.

After receiving its lease and in advance of providing its COP to the Federal Defendants, Vineyard Wind produced a site assessment plan ("SAP") for the Vineyard Wind lease that the Federal Defendants failed to include in the AR.  *See* SOMFs ¶¶35–39, 54.  The SAP failed to properly assess the commercial fishing effort within the Vineyard Wind lease area.  *See id*. at 56, 58–59; *see also* Doc. No. 1 at 19 (reviewing SAP deficiencies).  The Federal Defendants approved the SAP despite these deficiencies, *see* **AR BOEM_0013366**, thereby violating OCSLA by failing to "ensure" that any activity within the Vineyard Wind lease would be "carried out in a manner that provides for . . . prevention of interference with reasonable uses" of the sea, including commercial fishing.  43 U.S.C. § 1337(p)(4)(I); *see also* § 1337(p)(4)(J)(ii); 43 U.S.C. § 1332(2)

(stating that "the character of the waters above the outer continental shelf as high seas and the right

to navigation *and fishing* therein *shall not be affected*."  (Emphasis added).

**B.**   **In the Draft EIS and the Supplemental Draft EIS Process, the Federal Defendants Failed to Properly Address Multiple OCSLA and Related NEPA Requirements and Impermissibly Allowed Vineyard Wind to Make Policy and Legal Decisions That Should Have Been Made by the Federal Defendants.**

**1.**   **BOEM impermissibly ignored the dangers hurricanes posed to the project.**

Years after obtaining the lease, Vineyard Wind provided its COP to the Federal

Defendants, who only then began to draft an EIS.  *See* 83 Fed. Reg. 63184 (Dec. 7, 2018).  Among

other things, the Draft EIS states that the Vineyard Wind COP's turbines would only be able to

withstand "sustained wind speeds of up to 112 mph[,]" which is the intensity of a Category 3

hurricane.  **AR BOEM_0034754**.  As much more severe hurricanes strike the area of the Outer

Continental Shelf where the Vineyard Wind project was slated to be built, this alone should have

counseled the Federal Defendants to reject the proffered Vineyard Wind COP at the Draft EIS

stage and require Vineyard Wind to conduct further review of the ability of the turbines to

withstand more severe hurricane winds.  *See* SOMFs ¶¶ 53–54, 94–95.

**2.**   **From the beginning, Vineyard Wind used its requirement to comply with contracts to provide wind energy to Massachusetts as the sole purpose of the project.**

Before the Draft EIS was published for public comment, in a decision that would have

ripple effects throughout the Federal Defendants' consideration of the Vineyard Wind project,

Vineyard Wind obtained power purchase agreements ("PPAs") from Massachusetts electric

companies to expeditiously "deliver 800 MW of power."  *See* **AR BOEM_0038223** (describing

agreements); SOMFs ¶ 57, 59.  To fulfill those contractual obligations, Vineyard Wind informed

commercial fishing groups and BOEM that the power must be delivered under the contracts "in

less than 38 months" and that "any delay in BOEM's approval process [beyond Q4 2019] will have a domino effect and will most likely be fatal to the project." **AR BOEM_0038225**; *see also* **0038223** (stating that "Vineyard Wind's *sole project purpose* is to fulfill its obligations under the contracts to deliver 800 MW of power at the prices and within the time period specified in those contracts with the electric distribution companies") (emphasis added). Thus, early in the NEPA process, Vineyard Wind set the stage to ensure that the "purpose" of its project would focus not on any federal purpose or need but rather "solely" on its own pecuniary ends in fulfilling the PPAs. **AR BOEM_0038224**; *see also* SOMFs ¶¶ 57, 59.

> **3.    Without conducting independent review and analysis, BOEM impermissibly acquiesced to Vineyard Wind's major policy decisions, including but not limited to the fulfillment of Vineyard Wind's contractual obligations, leading directly to BOEM's failure to consider a reasonable range of alternatives.**

After considering transit lane options in the project area proposed by commercial fishermen, Vineyard Wind decided unilaterally that reorienting and respacing its wind turbine array would require it to expend additional resources to resurvey the lease area, would lead to delays in BOEM's approval of the project, and, consequently, would result in problems in fulfilling Vineyard Wind's power purchase agreements. **AR BOEM_0038225**. Without exercising independent review of the issue as required by 43 U.S.C. § 1337(p)(4), BOEM acquiesced to Vineyard Wind's refusal to budge on transit lanes. Specifically, the ROD rejected Alternative F's safe transit lane configuration proffered by commercial fishermen on the explicit grounds that "Vineyard Wind *stated* that the combination of the technical complexities and project delay would preclude its ability to meet the current contractual obligations with Massachusetts distribution companies and, *therefore*, Alternative F would not meet the project purpose and need." **AR BOEM_0076823** (emphasis added). *See Dubois v. U.S. Dept. of Agric.*, 102 F.3d 1273, 1286,

1288 (1st Cir. 1996) (opining that a full consideration of reasonable alternatives is "the heart of the EIS" and agency's failure to "rigorously explore" a "reasonably thoughtful" alternative proposed by the public "violated [agency's] EIS obligation under NEPA").

In fact, the foundation for impermissibly deferring to Vineyard Wind on this issue was set in concrete during the Draft EIS stage, when BOEM had rejected the wind turbine alignments proposed by fishermen because they would "create permitting delays and Project risk due to the need for additional surveys for some or all of the Project area, which . . . could impact the proposed Project's ability to meet the requirements of its power purchase agreements." **AR BOEM_0034752**. Thus, even at that early stage of the EIS process, BOEM unlawfully allowed Vineyard Wind's pecuniary goals to determine which alternatives BOEM classified as "reasonable." *See Dubois*, 102 F.2d 1286, 1288; *see also* **AR BOEM_0110439–0110440**.

On March 15, 2019, the National Marine Fisheries Service ("NMFS") refused to concur with the Draft EIS and highlighted several concerns with BOEM's analysis in a letter to BOEM. *See* **AR BOEM_0037615**. Notably, NMFS found it "concerning" that BOEM decided to classify certain alternative wind turbine alignments "infeasible" because they would lead to project delays. **AR BOEM_0037623**. However, NMFS's objections went far beyond that, finding a "lack of adequate analysis" at many crucial points of the Draft EIS. **AR BOEM_0037620**. Shortly thereafter, Vineyard Wind staff members emailed BOEM staffers to stress their permits were urgently needed due to the PPAs. **AR BOEM_0038212**.

Although BOEM did delay approval based on NMFS's concerns, SOMFs ¶ 68, when BOEM emerged with a Supplemental Draft EIS in June 2020, it only confirmed that the Vineyard Wind COP would have devastating effects on the ecosystem, benthic species, and commercial fishing. Specifically, the new document confirmed that special aquatic sites for coral, eelgrass,

and wetlands that exist in and near the Vineyard Wind lease may be permanently damaged by anchoring and other activities during project construction.  *See* **AR BOEM_0057214, 0057220, 0057226**.  BOEM also found that "the overall cumulative impacts on navigation and vessel traffic would be major, due primarily to the increased loss of life due to maritime incidents, which would produce significant local and possibly regional disruptions for ocean users" in the Vineyard Wind lease.  **AR BOEM_0057090**.  In addition, BOEM found that the Vineyard Wind project would have major cumulative impacts on scientific research, surveys, monitoring of endangered species, fishery stock assessment, and "fishery participants and communities."  **AR BOEM_0057104**.  Thus, the Supplemental Draft EIS confirmed NMFS's worst ecological fears.  Yet NMFS incongruously issued a Biological Opinion on September 11, 2020, that gave thumbs up to the Vineyard Wind COP.  *See* **AR NMFS_5**; *see also Motor Vehicle Mfrs. Ass'n* 463 U.S. at 43 (instructing courts to set aside agency action where there is no "rational connection between the facts found and the choice made").

Potential alternatives that would locate the Vineyard Wind project outside of endangered species' habitat, increase the spacing between turbines, reorient the turbines, or limit the project's size (among other things), were not analyzed because they would not meet "the purpose and need of the proposed [p]roject" set by Vineyard Wind's prematurely signed PPAs with distributors supplying electricity to Massachusetts.  *See* **AR BOEM_0057320–0057322**.  In effect, based on Vineyard Wind's pecuniary interests, BOEM impermissibly allowed Massachusetts' electricity distributors and Vineyard Wind to dictate what the federal government would consider as reasonable alternatives, thereby tainting the entire evaluative process in violation of both OCSLA and NEPA.

After completing the Supplemental Draft EIS, BOEM next moved to produce the Final EIS.

### C.    BOEM Terminated and Then Impermissibly Revived the EIS Process

While BOEM was generating the Final EIS, Vineyard Wind withdrew its COP from review to conduct research on new prototype 13 MW turbines it was considering for the project.  **AR BOEM_0067649**.  Shortly thereafter, BOEM received a letter from RODA correctly stating that "NEPA does not allow for a project proponent to simply withdraw and resubmit its application at will during the time period in which the agency conducts its review . . . ."  **AR BOEM_0067665**.

BOEM's letter in response to Vineyard Wind's withdrawal from the COP process on December 11, 2020, agreed with RODA, stating that "BOEM acknowledges that your previous COP has been withdrawn from further review and decision-making," and that "there is no longer a proposal for a major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM."  **AR BOEM_0067677**.  BOEM stated that it would "transmit to the Federal Register a notice stating that the preparation of an [EIS] . . . for this project is no longer necessary, and the process has been *terminated*."  *Id.* (emphasis added); *see also* **AR BOEM_0067694** (Federal Register notice).  BOEM noted that Vineyard Wind was "welcome to submit a *new* COP at any time."  **AR BOEM_0067677** (emphasis added).  And subsequent BOEM communications with other interested parties confirmed that Vineyard Wind's COP was terminated and no longer under review.  *See* **AR BOEM_0067695**.

Then a new administration entered office, and BOEM's position suddenly changed.  Two days after Inauguration Day, Vineyard Wind sent a letter to BOEM stating that based on its review "no changes to the COP are necessary to accommodate" the prototype 13 MW turbines, and purporting to unilaterally "rescind Vineyard Wind's temporary withdrawal" of the COP.  **AR**

**BOEM_0067698**.  For its part, Vineyard Wind had provided BOEM with a diagram showing the size of its prototype wind turbines, while incorrectly asserting that "there are no legal or regulatory limitations to resuming this review."  A**R BOEM_0067701**.

BOEM responded in a single page concluding, without substantive analysis, that the height of Vineyard Wind's proposed turbine was acceptable to BOEM.  **AR BOEM_0067702**.  Then, BOEM notified relevant federal agencies that Vineyard Wind had "resubmitted its Construction and Operations Plan" when, in fact, Vineyard Wind had not done so.  **AR BOEM_0067709**.  BOEM's letter further stated that it had "independently reviewed" Vineyard Wind's submission and found that, because the prototype turbines were within parameters, no changes to the COP or the EIS were necessary and BOEM could "resume its review" of the terminated COP.  *Id*.  The only justification it offered was a single diagram provided by Vineyard Wind.  **AR BOEM_0067712**.  BOEM published notice of this resumed review in the Federal Register, stating that "[b]ecause Vineyard Wind has indicated that its proposed COP is a 'decision pending before BOEM,' BOEM is resuming its review of the COP under NEPA."  86 Fed. Reg. 12495 (Mar. 3, 2021).

BOEM has no power to unilaterally restart review of a withdrawn COP, a review process that had been, by the plain text of BOEM's own announcement, "terminated."  Moreover, BOEM again impermissibly allowed Vineyard Wind to unilaterally determine the outcome of federal policymaking, in violation of 43 U.S.C.§ 1337(p)(4).  Congress never authorized BOEM to cede to wind energy generators federal policymaking regarding the major question of the future of the pristine waters of the Outer Continental Shelf.  Accordingly, its action was *ultra vires*.  *See West Virginia v. EPA*, 142 S. Ct. at 2609.  Nothing in the record indicates that BOEM undertook substantive, independent review of Vineyard Wind's post-termination study of the enormous

turbines and their impacts.  Furthermore, in making its decision to revive the EIS process under these circumstances, BOEM shirked its duty to provide for notice and opportunity to comment under OCSLA and NEPA, or to otherwise engage with relevant public groups, including (in this case) commercial fishermen and shoreside businesses.  The decision was therefore arbitrary and capricious on its face.  *See* 43 U.S.C. § 1337(p)(4)(K); 40 C.F.R. § 1500.2(d); 30 C.F.R. § 585.626; *see also Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *City of Providence*, 954 F.3d at 31.

### D.    BOEM Impermissibly Downplayed the Devastating Effects of the Vineyard Wind Project on the Environment and the Commercial Fishing Industry.

Nine scant days after publication of BOEM's decision to restart review of Vineyard Wind's terminated COP, BOEM and its related agencies completed the Final EIS, confirming the wide-ranging and significant harms the Vineyard Wind project will wreak.  *See, e.g.* **AR BOEM_0068749** (project will increase the risk of collision between vessels); **0068497, 0068722** (turbines will not endure sustained wind speeds over 112 mph and resulting turbine failure will harm commercial fishermen and the environment); **0068584, 0068592** (pile driving during construction will harm benthic environment); **0068531** (construction will disturb horseshoe crab habitat); **0068546, 0068549, 0068578–0068579, 0068606, 0068608** (project will likely permanently harm and displace existing fish, sea turtle, and marine mammal populations, including endangered species); **0068710, 0068718–0068719, 0068722, 0068725–0068726** (impact on bottom trawl fishermen of project will be "moderate" to "major"); **0068717** (wind turbines will interfere with navigational radar); **0068755–0068756** (wind turbines will interfere with military radar).  Most notably, BOEM's Final EIS confirms that impacts from the Vineyard Wind project to commercial fishing, even under its Preferred Alternative, would be "major."  *See* **AR BOEM_0068452**.  BOEM attempts to hedge this admission by claiming impacts to commercial fishing are reversible by "the decommissioning of the Project" but gives no data as to how, when,

or even if this decommissioning will ever occur.  **AR BOEM_0069185**; *see also* SOMF ¶ 145 (providing figure of 33 years of operational life for Vineyard Wind project).  BOEM also provides no proof in the Final EIS that decommissioning will return the benthic habitat to the state needed to support commercial bottom trawl fishing.

Thanks to BOEM's continued adherence to its Smart From The Start policy, the agency impermissibly limited its consideration of reasonable alternatives only to those within the lease area.  *See* **AR BOEM_0068472–0068474** (detailing alternatives considered); **0069186–0069190** (detailing alternatives "considered but not analyzed in detail").  This violated NEPA's clear requirements that agencies (1) "identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment," 40 C.F.R. § 1500.2(e), (2) "not commit resources prejudicing selection of alternatives before making a final decision," 40 C.F.R. § 1502.2(f), and (3) "rigorously explore and objectively evaluate all reasonable alternatives to proposed actions."  40 C.F.R. § 1502.14. The duty to "[r]igorously explore and objectively evaluate all reasonable alternatives . . . is 'the heart of an EIS.'"  *NRDC v. U.S. Forest Service*, 421 F.3d 797, 813 (9th Cir. 2005); *see also Conservation Law Found. v. FHA*, 630 F.Supp.2d 183, 217 (D.N.H. 2007) (requiring a supplemental EIS that considers alternative not fully and properly reviewed by agency).  Again, Congress did not give BOEM clear authorization to ignore federal laws and regulations on the major question of industrializing the oceans.  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).

Furthermore, the Final EIS removed most cumulative impact analysis that was present in the Draft EIS, contrary to its duty under NEPA.  *See* 40 C.F.R. § 1508.25(a)(2)–(3).  It left out any analysis of the foreseeable cumulative impacts of BOEM's established plans to approve multiple

wind farms near the Vineyard Wind project, as detailed in the Complaint.  *See* Doc. No. 1 at 31.

This failure to assess cumulative impact flies in the face of NEPA and the earlier expressed

concerns of NMFS and several commenters.

Finally, as indicated, BOEM published its Final EIS without any notice and opportunity to

comment after it failed to independently review Vineyard Wind's post-termination study of the

huge, prototype, barely tested turbines.  This was only a single instance of a continued flaw in

BOEM's review process, namely failing to make "diligent efforts to involve the public" when

conducting NEPA review.  40 C.F.R. § 1506.6.  This is just one example of BOEM's dereliction

of duty to engage the public in decisionmaking under OCSLA and NEPA.  *See* Lapp Decl. ¶¶ 15-

23; *see also* **AR BOEM_0079230** (Plaintiff Seafreeze commenting that it was not included in

mitigation negotiations).

> **E.    The Record of Decision Was Impermissibly Compromised by the Smart From The Start Policy as well as the Pecuniary Interests of the Developer and the Renewable Energy Goals of the State of Massachusetts, Leading to Violations of OCSLA, ESA, and NEPA.**

BOEM's malfeasance, fueled by its adherence to the accountability-obliterating Smart

From The Start policy framework, bled into and tainted the Joint Record of Decision ("ROD")

published with contributions from NMFS and the U.S. Army Corps of Engineers ("Corps").

Despite the evidence contained in and deficiencies of the Final EIS, all three agencies issued the

ROD, leading BOEM to approve and the COP.  In the process, the Federal Defendants repeated

and deepened their previous errors.

> **1.    The Federal Defendants issued the ROD knowing that the consultation between BOEM and NMFS was inadequate.**

Just three days before issuing the ROD, BOEM reinitiated consultation with NMFS.  **AR**

**BOEM_0076721**.  BOEM did so because "the potential impacts from monitoring surveys to be

conducted by Vineyard Wind if the [COP] is approved were not fully assessed" in NMFS's prior biological opinion, and because "new information regarding the status of the [endangered] North Atlantic right whale" became available since that opinion was issued.  *Id*.  BOEM and NMFS therefore knew that the Final EIS and other documents that relied on the prior biological opinion were based on incomplete and inadequate data, and yet decided to issue the ROD decision approving the Vineyard Wind COP based on those documents anyway.  This is a plain violation of the ESA's admonition that biological opinions must contain "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), NEPA's requirement that agencies fully consider an affected area's "resources, such as listed species . . . under the Endangered Species Act" when assessing an action.  40 C.F.R. § 1501.3(b), and OCSLA's requirement to ensure protection of the environment under 42 U.S.C. § 1337(p)(4).   No "clear Congressional authorization" allows BOEM to issue a ROD under OCSLA based on an EIS that it knows is incomplete and does not comply with OCSLA, ESA or NEPA.  *West Virginia v. EPA*, 142 S. Ct. at 2609.

### 2.    The ROD impermissibly uses Vineyard Wind's agreement with Massachusetts as the rationale for approving the project.

The ROD states that the purpose of its agency action "is to determine whether to approve, approve with modifications, or disapprove the COP . . . to meet New England's demand for renewable energy[,]" and noted that the Vineyard Wind project would "contribute to Massachusetts's renewable energy requirements" and its "mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation."  **AR BOEM_0076808–0076809**.  In other words, BOEM impermissibly cabined its own OCSLA and NEPA decision-making process to fulfill an individual state's independent requirement for offshore wind energy.  The Corps also listed "Vineyard Wind's contractual obligation with . . . Massachusetts to deliver [wind energy] to the Massachusetts power grid" as a criterion it used to

consider whether proposed alternatives were reasonable or practicable. **AR BOEM_0076830** (also limiting alternative consideration to those involving "renewable energy . . . from the use of wind turbines . . . deliver[ing] a minimum of 800 MW to the Massachusetts power grid"). Therefore, the Federal Defendants predetermined their own decision by ensuring that the only way to fulfill the ROD's purpose would be to approve the Vineyard Wind project. They did so by tying the purpose of the federal government's action to state-determined renewable energy requirements and Vineyard Wind's pecuniary interests, rather than the requirements contained in OCSLA. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (stating that it is arbitrary and capricious for an agency's decision to rely "on factors which Congress had not intended it to consider").

If Massachusetts urgently wishes to invest in renewable energy based on its own policy priorities and regulatory strictures, it should place wind turbines in its own state waters. Federal agencies cannot ignore their legal duties to help launder state policymaking goals through the federal regulatory system.

### 3.    The Federal Defendants failed to address the legitimate concerns of the commercial fishing community

The Federal Defendants contributing to the ROD outright dismissed without responding to comments made by the Plaintiffs and others that pointed out multiple flaws in the analysis of the ROD's underlying documents and made concrete proposals as to how they could be changed. *See, e.g.* **AR BOEM_0078089** (Seafreeze comments on scoping impacts); **AR BOEM_0078764**, **AR BOEM_0079009**, **AR BOEM_0079229** (Seafreeze comments on Draft EIS); **AR BOEM_0110382** (Seafreeze comments on Supplemental Draft EIS supporting Alternative G – No Action); **AR BOEM_0111427** (RODA comments on Supplemental Draft EIS); **AR BOEM_0195688** (RODA comments on Draft EIS); **AR BOEM_0202213** (RODA proposal for

project layout that includes transit lanes); **AR BOEM_0111234** (LICFA comment detailing same). BOEM's lack of consideration for reasonable alternatives outside of the lease area and disregard for public comment renders the ROD unacceptable under NEPA and therefore arbitrary and capricious. *See* 40 C.F.R. §§ 1500.2(e), 1502.14.

And perhaps most egregious of all, as mentioned *supra*, the Federal Defendants approved the COP despite admitting that "due to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation." **AR BOEM_0076837**. This admitted adverse effect should have been enough for the Federal Defendants to deny the COP as constituted, because approval would violate OCSLA's requirement that agencies show their actions will not "unreasonably interfere with other uses of the [outer Continental Shelf]." 30 C.F.R. § 585.621(c); *see also* 43 U.S.C. § 1337(p)(4)(I) (requiring agencies to prevent "interference with reasonable uses . . . of . . . the high seas"); 43 U.S.C. § 1337(p)(4)(J) (stating reasonable uses include "use of the sea or seabed . . . for a fishery . . . sealane . . . or navigation"). OCSLA also provides that "the right to navigation and fishing" within "the waters above the outer continental shelf . . . shall not be affected" by BOEM's leasing activities. 43 U.S.C. § 1332(2). Thus, by the ROD's own admission, the Federal Defendants violated multiple provisions of OCSLA when they approved the Vineyard Wind COP.

The Federal Defendants committed several additional significant violations of 43 U.S.C. § 1337(p)(4), including the requirements that the Federal Defendants "ensure" that the Vineyard Wind COP provides for "safety . . . protection of the environment . . . conservation of the natural resources of the outer Continental Shelf . . . [and] protection of the national security interests of the United States." *Id*. at § 1337(p)(4)(A), (B), (D), (F).

Despite comments alerting the Federal Defendants of the detrimental impact the Vineyard Wind project will have on the ability of commercial fishing boats and emergency operations to navigate using radar, the Federal Defendants approved the COP, disregarding the safety of commercial fishermen.  *See* **AR BOEM_0111225** (comment detailing radar interference caused by offshore wind turbines); **0110382** (noting same).  This interference will become severe with the extraordinarily large prototype wind turbines comprising the project, and as mentioned, the public was given no further chance to comment regarding those turbines.  Because the Federal Defendants failed to properly review and analyze the Vineyard Wind COP in the ROD and Final EIS for safety, they exhibited a willful disregard for the requirements of OCSLA and its attendant regulations. *See, e.g.,* 30 C.F.R. § 585.621(b) (requiring BOEM to ensure proposed activity "is safe").

### 4. The Federal Defendants impermissibly downplayed the devastating effects the project will have on the environment, natural resources, and national security.

BOEM also failed to ensure that the Vineyard Wind project would provide for environmental protection or conservation of the Outer Continental Shelf's resources.  *See* 43 U.S.C. § 1337(p)(4)(B), (D).  The Final EIS made clear that: (1) pile driving and other construction activity will disturb, displace, and kill native benthic species, **AR BOEM_0068617**; (2) the project will likely cause the loss of human life due to collisions and radar interference with marine and aerial navigation, **AR BOEM_0068749**; (3) the project will massively devastate the marine environment, especially if severe weather fells one or more turbines, **AR BOEM_0068584, 0068492, 0068722**; (4) scour protection used for cabling will displace squid, a soft-bottom species, from any location it is placed throughout the project, **AR BOEM_0068722**; and (5) BOEM's onshore construction activities will affect horseshoe crab spawning, **AR BOEM_0068531**.

Construction of the project will also devastate the "natural resources" of the Outer Continental Shelf — fish and marine mammals.  16 U.S.C. § 1801, *see also* **AR BOEM_0068546, 0068549, 0068578–0068579, 0068606, 0068608**.  By approving the COP after seeing this data without further analysis and efforts to protect such natural resources, BOEM violated OCSLA.

BOEM also disregarded evidence presented by commenters that the Vineyard Wind project will interfere with defense radar and therefore detrimentally affect military readiness.  *See* **AR BOEM_0110382; 0111440–0111441; 0111450**.  BOEM never addressed the conclusions of these studies in the ROD or detailed mitigation efforts.  BOEM therefore also violated OCSLA's prohibition against approving actions that failed to protect the "national security interests of the United States."  43 U.S.C. § 1337(p)(4)(F).

> **5.  The steps leading to the issuance of the ROD show that the Federal Defendants pursued their goal of authorizing the Vineyard Wind project without complying with the mandated requirements of OCSLA, ESA, and NEPA**

In the process leading up to the ROD, the Federal Defendants impermissibly downplayed adverse impacts to endangered species and failed to engage in a proper analysis of the cumulative impacts of their plans to fill vast areas of America's pristine Outer Continental Shelf with turbines that will interfere with defense radar, make boat collisions more likely, make rescues more difficult, and destroy commercial bottom trawl fishing in the area and the businesses that depend on it.  They also improperly resurrected the terminated EIS by issuing a single letter announcing that they accepted Vineyard Wind's decision to use prototype, enormous turbines without undertaking their own independent review and without permitting public comment.  These conclusions are based entirely on the data provided *by the Federal Defendants themselves* during the various EIS stages leading up to and including the ROD.

In their quest to industrialize the oceans on a fast track, the Federal Defendants impermissibly approved the COP without complying with the mandatory substantive and procedural requirements of OCSLA and NEPA, respectively, and they mishandled the ESA consultation process.  Congress never authorized BOEM to exercise the expansive authority to industrialize the Outer Continental Shelf with wind turbines—a major question if there ever was one—without first adhering to OCSLA's mandatory substantive requirements, NEPA's mandatory procedural requirements, and ESA's mandatory consultation requirements.  *See West Virginia v. EPA*, 142 S. Ct. at 2609.  Accordingly, this Court should set aside the Federal Defendants' decision to approve the Vineyard Wind COP as *ultra vires,* arbitrary, capricious, and otherwise not in accordance with law.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *City of Providence*, 954 F.3d at 31.

## IV.    The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated The ESA In Other Ways (Ninth Claim, Tenth Claim)

The Plaintiffs hereby incorporate by reference the arguments on this subject found in the Memorandum of Points and Authorities filed by RODA, Case No. 1:22-cv-11172-IT, at §§ 3, 4. The Plaintiffs also incorporate by reference arguments made by the plaintiffs in *ACK Residents Against Turbines, et al. v. U.S. Bureau of Ocean Energy Mgmt., et al.*, Case No. 1:21-cv-11390-IT, Doc. No. 89, at §§ II(A), V(A) (July 25, 2022), as well as the arguments made by the Plaintiffs in  Section III(E), above.

In addition, NMFS violated the ESA's regulations within its BiOp when it failed to "[a]dd the effects of the action and cumulative effects to the environmental baseline" when deciding whether approval of the Vineyard Wind COP would harm endangered species or their critical

habitat. 50 C.F.R. § 402.14(g)(4). In the BiOp[2], NMFS failed to fully account for the cumulative effects on endangered species or their critical habitat. At no point in its analysis of the environmental baseline did NMFS consider the full scope of planned offshore wind leasing activity and its effect on the endangered North Atlantic Right Whale ("NARW"). *See* **AR BOEM_0208166-0208184**. This lack of diligence is especially troubling when NMFS admits in the same BiOp that they "anticipate individual right whales to occur year round in the action area," increasing the likelihood of takings. **AR BOEM_0208170**. In light of this determination, NMFS also should have provided BOEM with sufficient reasonable and prudent alternatives that would enable BOEM to avoid taking NARWs or destroying their critical habitat. *See* 50 C.F.R. § 402.14(g)(5). They did no such thing. NMFS's only vague gesture at compliance was a statement that Vineyard Wind must minimize "[e]ffects to ESA-listed whales . . . during pile driving . . . [and] documented during all phases of the proposed action." **AR BOEM_0208364**. This falls far short of a reasonable alternative proposal because it does not prevent the taking of NARWs or critical habitat destruction. *See Tenn. Valley Authority v. Hill*, 437 U.S. 153, 184–185 (1978) (stating that the ESA directs agencies "to use . . . *all* methods and procedures which are necessary to preserve endangered species") (emphasis in original, cleaned up); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. 29, 43 (1983) (an agency decision is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem").

---

[2] The Plaintiffs are aware that NMFS published a revised BiOp almost five months after a decision on the Vineyard Wind COP was issued. As the Plaintiffs set forth in their pending motion to strike, the entirety of which is hereby incorporated by reference herein, this version of the BiOp does not undergird any of the ROD's underlying documents, and was published far after the final agency action under NEPA in this matter. It should not be considered by the Court, and for the reasons set forth in the motion to strike, should not be included in the administrative record. *See* Doc. No. 57 at 8–11.

**V.      The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated the CWA (Seventeenth Claim, Eighteenth Claim, Nineteenth Claim, Twentieth Claim)**

The Plaintiffs hereby incorporate by reference the arguments regarding the Clean Water Act found in the Memorandum of Points and Authorities filed by RODA,  Case No. 1:22-cv-11172-IT, at § 4.

**VI.     The Federal Defendants' Decision To Approve The Vineyard Wind COP Violated The MMPA (Twenty-First Claim, Twenty-Second Claim)**

The Plaintiffs hereby incorporate by reference the arguments regarding the Marine Mammal Protection Act found in the Memorandum of Points and Authorities filed by the plaintiff in the *ALLCO* case.  *See Melone v. Coit et al.*, Case No. 1:21-cv-11171-IT, Doc. No. 145, at  § II(B),(D) (Sept. 7, 2022).

**VII.    The Federal Defendants Violated NEPA By Failing To Perform A Host Of Mandatory Procedural Duties (Twenty-Sixth Claim, Twenty-Eighth Claim, Twenty-Ninth Claim, Thirty-Third Claim)**

The Plaintiffs incorporate by reference here the NEPA arguments set forth in Section III, above.  The Plaintiffs hereby additionally incorporate by reference the NEPA arguments on found in the Memorandum of Points and Authorities filed by RODA, Case No. 1:22-cv-11172-IT, at § 4.  The Plaintiffs also incorporate by reference arguments made by the plaintiffs in *ACK Residents Against Turbines, et al. v. U.S. Bureau of Ocean Energy Mgmt., et al.*, Case No. 1:21-cv-11390-IT, Doc. No. 89, at §§ II(B), V(B)(3) (July 25, 2022).   In addition, the Plaintiffs provide the following additional arguments.

Throughout the Vineyard Wind leasing and approval process, the Federal Defendants committed additional breaches of their statutory duties under NEPA.   "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking [*sic*]."  *Bennett v. Spear*, 520 U.S.

at 172.  Neither the professed green-energy needs of a state nor the perceived urgency to comply with the federal government's preferred policy outcomes grant the Federal Defendants the freedom to ignore federal procedural laws such as NEPA.

### A.     The Federal Defendants Violated 40 C.F.R. § 1502.22(a)–(b).

The environmental analysis documents associated with the ROD discussed significant adverse environmental impacts of the Vineyard Wind project.  *See, e.g.* **AR BOEM_0056994** ("a notable and measurable adverse impact is anticipated"), **0057029** (same); **0057052** (noting adverse impact of "future offshore wind activities in the geographic analysis area"); **0057078** (noting adverse impact on soft-bottom fisheries); **0068537** (finding "notable and measurable adverse impact" on "benthic resources").  The Final EIS included a chart that chronicled a number of adverse impact that will occur if the Vineyard Wind project goes forward.  *See* **AR BOEM_0068500–0068501**.  NEPA's implementing regulations require agencies to follow a number of steps when there is "incomplete information relevant to reasonably foreseeable significant adverse impacts."  40 C.F.R. § 1502.22(a)–(b).  Although BOEM reinitiated consultation with NMFS just before the ROD was issued because "the potential impacts from monitoring surveys to be conducted by Vineyard Wind if the [COP] is approved were not fully assessed," when the ROD was issued the consultation process had not been completed.  **AR BOEM_0076721**.  Therefore, at the time the Vineyard Wind project was approved, the Federal Defendants lacked the requisite information regarding adverse environmental impacts, thereby failing to follow the procedural steps prescribed by NEPA.  *See* 40 C.F.R. § 1502.22(a)–(b); see also *Bennett v. Spear*, 520 U.S. at 172.

**B.      The Federal Defendants Violated 40 C.F.R. § 1506.6.**

Furthermore, BOEM published its Final EIS without any opportunity for notice and comment after Vineyard Wind decided to use its prototype turbines in its project.  *See* 40 C.F.R. § 1506.6 (agencies must make "diligent efforts to involve the public" when conducting NEPA review).  Moreover, BOEM impermissibly ceded its responsibility to engage with the public to state agencies and their appointed boards, which did not engage with a significant and relevant portion of the public: offshore squid trawl fishermen, the shoreside businesses that depend on them, and New York offshore fishing interests.   Lapp Decl. ¶¶15-23; *see also* **AR BOEM_0079230** (Plaintiff Seafreeze commenting that they were not included in mitigation negotiations).

**C.      The Federal Defendants Violated 40 C.F.R. § 1503.4(a)(5).**

Upon preparing the Final EIS, the Federal Defendants are required to explain why "substantive comments . . . do not warrant further agency response."  40 C.F.R. § 1503.4(a)(5).  The Federal Defendants did not sufficiently explain why certain comments provided do not merit further response, as set forth in the Complaint at ¶¶ 318-322.  Additionally, the Federal Defendants did not respond to a variety of other substantive comments.  *See, e.g.,* **AR BOEM_0110428** (stating that bottom trawl vessels cannot operate safely within the offshore wind farm); **AR BOEM_111443–0111444** (asking for explanation of failure to consider cumulative impact to fisheries or fully gather public input).  The Federal Defendants also failed to attach these and other substantive comments to the Final EIS, again violating NEPA.  *See* 40 C.F.R. § 1503.4(b).

**D.      The Federal Defendants Impermissibly Failed to Use NEPA Regulations In Effect During the NEPA Review.**

The Federal Defendants prepared the Final EIS and ROD under NEPA regulations in effect before September 14, 2020.  *See* **AR BOEM_0076801** ("Since BOEM's NEPA review of the

proposed Project began prior to the September 14, 2020, effective date of the updated regulations, BOEM prepared the FEIS and this ROD under the previous version of the regulations.").  BOEM admits that these regulations were revised on July 16, 2020.  *See* 85 Fed. Reg. 43304 (July 16, 2020).  This revision was a significant and lengthy update to NEPA's regulatory framework.  *See id.* at 43315–43316 (summarizing revisions).  Nothing allows the Federal Defendants to refuse to follow these regulatory alterations during their NEPA review of the Vineyard Wind COP simply because they state their NEPA review began before the regulations were altered.  And at no point do the Federal Defendants demonstrate compliance with NEPA's regulations as they existed at the time the Final EIS and ROD were published.  Agencies cannot "ignore the required procedures of decisionmaking" when performing NEPA analysis.  *Bennett*, 520 U.S. at 172.

## VIII. The Federal Defendants Violated NEPA By Impermissibly Failing To Assess A Reasonable Range Of Alternatives And Reasonably Foreseeable Future Actions (Twenty-Third Claim, Twenty-Fourth Claim, Twenty-Fifth Claim, Twenty-Seventh Claim, Thirty-Second Claim)

The Plaintiffs incorporate by reference here the NEPA arguments set forth in Sections III and VII, above, and add the following.

### A.    The Federal Defendants Failed to Assess a Reasonable Range of Alternatives

The failure of the Federal Defendants to conduct an EIS at the leasing stage and their subsequent impermissibly narrow purpose statement were fatal flaws in the NEPA process leading directly to the Federal Defendants' failure to "identify and assess the reasonable alternatives" in order to "avoid or minimize adverse effects . . . upon the quality of the human environment."  40 C.F.R. § 1500.2(e).  Because the review of a reasonable range of alternatives is "the heart of the environmental impact statement," NEPA regulations required BOEM to "rigorously explore and objectively evaluate *all* reasonable alternatives" to siting the Vineyard Wind project where it did.  40 C.F.R. § 1502.14 (emphasis added).  Instead, BOEM boxed itself in by limiting its range of

47

alternatives only to those within the geographic area of the Vineyard Wind lease. No such limitation was contemplated by NEPA. BOEM refused to undertake an analysis outside of the boundaries of the lease because it had committed to those boundaries when the lease was issued and because it felt compelled to stay within those boundaries in order to meet the timing requirements of Vineyard Wind's contract with Massachusetts. **AR BOEM_0076808-0076809; 0057320-0057322.** These were not permissible factors for the Federal Defendants to consider. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007) (agencies' decisions must not rely "on factors which Congress had not intended [them] to consider"). And as mentioned *supra*, commenters provided BOEM with a host of reasonable alternatives. Determined to accomplish the administration's policy goal of industrializing the Outer Continental Shelf as soon as possible, BOEM did not give full and fair consideration to those comments while at the same time violating the regulatory requirements that are at "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

**B.    The Federal Defendants Failed to Properly Examine Reasonably Foreseeable Future Actions**

NEPA also requires the Federal Defendants to examine "reasonably foreseeable future actions" when assessing the cumulative impact of a proposed agency action. 40 C.F.R. § 1508.7. The Federal Defendants did not at any point in their analysis account for the federal government's stated plans to place 30 GW worth of offshore wind turbines in the ocean by 2030, with much more to come. SOMFs at ¶ 96. Instead, the Federal Defendants understated the amount of offshore wind anticipated by 8 GW. *See id.*; *see also* **AR BOEM_68469.**

Vineyard Wind is just one of several offshore wind projects the Administration is either examining or actively assessing. *See* Doc. No. 19 Exhibit 5. NEPA states that if an agency action is an "interdependent par[t] of a larger action," it "depend[s] on the larger action for [its]

48

justification." 40 C.F.R. § 1508.25(a)(1)(iii).  As Vineyard Wind is only the first of a host of offshore wind projects, those projects must be assessed in a comprehensive, cumulative manner in order to determine whether the Vineyard Wind Final EIS and ROD passes NEPA muster.  BOEM never did this analysis in the Final EIS, and therefore the ROD was issued without the requisite compliance with NEPA.  *See Bennett*, 520 U.S. at 172.

Rather than considering the cumulative impact of industrializing the outer Continental Shelf with wind turbines that will pollute the environment and devastate the commercial fishing industry and its related shoreside businesses in the area, BOEM impermissibly segmented its NEPA analysis of this massive action into bite-sized chunks.  *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (prohibiting "divid[ing] connected, cumulative, or similar federal actions into separate projects").  This is yet another reason why the Federal Defendants actions under NEPA are fatally flawed.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgement should be granted.

DATE: November 7, 2022,           Respectfully submitted,


                                  */s/Theodore Hadzi-Antich*
                                  ROBERT HENNEKE (*pro hac vice*)
                                  TX Bar No. 24046058
                                  rhenneke@texaspolicy.com
                                  THEODORE HADZI-ANTICH (*pro hac vice*)
                                  CA Bar No. 264663
                                  tha@texaspolicy.com
                                  CONNOR MIGHELL (*pro hac vice*)
                                  TX Bar No. 24110107
                                  cmighell@texaspolicy.com
                                  TEXAS PUBLIC POLICY FOUNDATION
                                  901 Congress Avenue
                                  Austin, Texas 78701
                                  Telephone:    (512) 472-2700

Facsimile:    (512) 472-2728


/s/*Ira H. Zaleznik*
IRA H. ZALEZNIK (BBO #538800)
izaleznik@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Ave., Suite 345
Boston, MA 02210-2414
Telephone:    (617) 439-4990
Facsimile:    (617) 439-3987

*Attorneys for Seafreeze Shoreside, Ltd., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically on November 7, 2022, with the Clerk of the Court for the District of Massachusetts by using the CM/ECF system, causing electronic service upon all counsel of record who have registered with the Court's CM/ECF system.

/s/Theodore Hadzi-Antich
THEODORE HADZI-ANTICH