**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SEAFREEZE SHORESIDE, INC., et al., *Plaintiffs*, <br><br> v. <br><br> THE UNITED STATES DEPARTMENT OF THE INTERIOR, et al., *Defendants,* <br><br> and <br><br> VINEYARD WIND 1, LLC, *Intervenor-Defendant.* | Civil Action No. 1:22-cv-11091-IT <br><br> Hon. Indira Talwani |

**LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT**
**OF PLAINTIFFS' SEAFREEZE SHORESIDE, INC.'S, ET AL**
**MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiffs Seafreeze Shoreside, Inc., et al., (the "Plaintiffs") set forth the following statement of material facts in support of their Motion for Summary Judgment against The United States Department of the Interior, et al.

**STATEMENT OF MATERIAL FACTS**

***Nature of this Lawsuit***

1.      This is an action for declaratory and injunctive relief against the United States Departments of the Interior, Commerce, and Defense, their subagencies, and their officers acting in their official capacities (collectively, the "Federal Defendants") for violations of the Outer Continental Shelf Lands Act, the Endangered Species Act, the Clean Water Act, the Marine

Mammal Protection Act, the National Environmental Policy Act, and their respective rules and regulations (collectively, the "Federal Laws").

2.      Each of the Federal Defendants violated one or more of the Federal Laws in connection with the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan for a massive offshore wind energy generating facility located in an expansive area of the Outer Continental Shelf off the southern coast of Nantucket, Massachusetts, known as the Vineyard Wind 1 offshore wind energy project (the "Vineyard Wind project"). The Plaintiffs ask this Court to set aside the illegal lease issuance and the approval of the Construction and Operations Plan.

3.      Plaintiffs are comprised of commercial fishermen and their trade associations as well as a shoreside business. Their livelihoods and economic futures depend on fishing in the Vineyard Wind project area. The final Record of Decision ("ROD") for the Vineyard Wind project states that approval of the project will likely result in the permanent abandonment of commercial fishing in the entire project area. **AR BOEM_0076837** ("While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the *entire* 75,614 acre area will be *abandoned* by commercial fisheries due to difficulties with navigation.") (Emphasis added). Because the ability to fish in the Vineyard Wind lease area is key to the survival of the Plaintiffs as ongoing businesses, they will be economically ruined by the Federal Defendants' collective action in approving the project.

4.      While greenlighting the Vineyard Wind project, the Federal Defendants failed to adhere to their substantive statutory and regulatory responsibilities, acted in ways that are *ultra vires,* and fell short of complying with mandated procedures, all to the injury of the Plaintiffs.

5.     The violations of the Federal Laws resulted from the Federal Defendants' single-minded pursuit of their overarching governmental goal of increasing the capacity of renewable energy generation on the Outer Continental Shelf at any cost.

## *Parties*

### Plaintiffs

6.     Plaintiff Seafreeze Shoreside, Inc. ("Seafreeze") is one of the largest fish dealers in Point Judith, Rhode Island, with product sold in both domestic and international markets. Seafreeze purchases,  and processes product—primarily squid—from its own and independent vessels and sells this product to its sister company, Seafreeze Ltd., and other local wholesalers. Seafreeze is also  a primary ice supplier to squid fishing vessels in Port Judith.  Seafreeze services 3 company-owned, federally-permitted vessels (which supply Seafreeze with squid and other marine species) and additionally services approximately 20 independently-owned vessels, many of which are federally-permitted squid vessels.  Seafreeze employs about 40 people, including temporary workers.  Squid is vital to Seafreeze's business and the vessels it services.  In addition to participating in fishery management processes, Seafreeze has long supported cooperative research and works to enhance scientific understanding of fisheries' resources in the context of the wider marine environment.  Seafreeze's entire business is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Seafreeze depends for a substantial portion of its revenues.

7.     Plaintiff Long Island Commercial Fishing Association, Inc. ("LICFA") is a commercial fishing industry group representing New York's commercial fishermen and fishing industry in 11 gear groups in 14 ports on Long Island.  LICFA represents owners and operators

from over 150 fishing businesses, boats, and fishermen who are home-ported on Long Island, some of which fish in state and federal waters that include the Vineyard Wind Lease area. LICFA and its members support extensive cooperative scientific research aimed at improving understanding of the marine environment, in addition to engaging in fisheries management, public education, and outreach. LICFA members are injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which some LICFA members depend for a substantial portion of their revenues.

8.     Plaintiff XIII Northeast Fisheries Sector, Inc. ("Sector XIII") is a private organization of commercial fishermen formed in 2010 with 49 members responsible for monitoring compliance with 60 fishing permits along the Coast of the Northeast United States and supporting the commercial fishing industry in the area. Members of Sector XIII fish the waters of the Vineyard Wind lease area, and their livelihoods depend upon the availability of that area for fishing. Members of Sector XIII are injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Sector XIII members depend for a substantial portion of their revenues.

9.     Plaintiff Heritage Fisheries, Inc. ("Heritage Fisheries") is a commercial fishing company whose President is Thomas E. Williams, Sr., a commercial fisherman who started fishing commercially in 1967. Heritage Fisheries owns a fishing boat called "FV Heritage" that fishes the waters of the Vineyard Wind lease area, which provides approximately 30% - 40% of the annual revenues of the company. FV Heritage is captained by Thomas E. Williams Sr.'s son, Thomas Williams. The continuing economic viability of Heritage Fisheries depends on its ability to

continue to fish in the Vineyard Wind lease area.  Heritage Fisheries is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Heritage Fisheries depends for a substantial portion of its revenues.

10.    Plaintiff NAT W., Inc. ("NAT") is a commercial fishing company whose President Thomas E. Williams, Sr.  NAT owns a fishing boat called "FV Tradition," which is captained by Thomas E. Williams' son, Aaron Williams.  FV Tradition fishes the waters of the Vineyard Wind lease area, which provides approximately 50-60% of the revenues of NAT.  The continuing economic viability of NAT depends on its ability to continue to fish in the Vineyard Wind lease area.  NAT is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which NAT depends for a substantial portion of its revenues.

11.    Plaintiff Old Squaw Fisheries, Inc. ("Old Squaw") is a commercial fishing company based in Montauk, New York, whose President is David Aripotch.  Old Squaw owns a fishing boat called "FV Caitlin & Mairead," which is captained by David Aripotch.  FV Caitlin & Mairead fishes the waters of the Vineyard Wind lease area, which provides approximately 30% of the revenues of Old Squaw.  The continuing economic viability of Old Squaw depends on its ability to continue to fish in the Vineyard Wind lease area.  Old Squaw is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Old Squaw depends for a substantial portion of its revenues.

**Defendants**

12.     Defendant The United States Department of the Interior ("Interior") is a federal executive department created in 1849 and responsible for managing and conserving federal lands and natural resources.  Interior manages approximately 75% of the United States' federal public land.  Interior also administers federal historic preservation programs and oversees federal engagement with Native Americans, Alaska Natives, Native Hawaiians, insular areas, and other federal territories.  Among other things, Interior is responsible for implementation of the Outer Continental Shelf Lands Act.

13.     Defendant The Hon. Deb Haaland is the current Secretary of the Interior.

14.     Defendant Bureau of Ocean Energy Management ("BOEM") is a federal agency within Interior established in 2010 to oversee development of the Outer Continental Shelf.  BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it.  BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

15.     Defendant Amanda Lefton is the current Director of BOEM.

16.     Defendant Laura Daniel-Davis is the Deputy Assistant Secretary, Land and Minerals Management, Department of the Interior.

17.     Defendant The United States Department of Commerce ("Commerce") is a federal executive department focused on job creation, promoting economic growth, encouraging sustainable development, and blocking harmful international trade practices.  Commerce also gathers a wide array of economic and demographic data to assist in business and government decision-making, and sets industry standards in many major fields.  One of Commerce's sub-agencies is the National Oceanic and Atmospheric Administration ("NOAA").  NOAA forecasts

weather, monitors a variety of oceanic and atmospheric conditions, charts and explores the oceans, and (notably for this case) manages protection of marine mammals, threatened species, and endangered species in United States territory.

18.     Defendant The Hon. Gina M. Raimondo is the current Secretary of Commerce.

19.     Defendant The National Marine Fisheries Service ("NMFS" or "NOAA Fisheries") is a federal agency founded in 1871 and placed within NOAA in 1970.  NMFS oversees national marine resources and conserves fish species and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction.  NMFS implements and enforces the Endangered Species Act with regard to marine organisms.

20.     Defendant Catherine Marzin is the current Deputy Director of NOAA Fisheries.

21.     Defendant The United States Department of Defense ("Defense") is the federal executive department responsible for coordinating and supervising all government functions related to national security and the United States' armed forces.

22.     Defendant The Hon. Lloyd J. Austin is the current Secretary of Defense.

23.     Defendant The United States Army Corps of Engineers ("Corps") is a division of the United States Army, which is a sub-agency of Defense.  The Corps' mission is to serve as combat engineers, oversee military construction, and construct civil works like canals and dams. The Corps is also charged with administering portions of the Clean Water Act.

24.     Defendant Lt. Gen. Scott A. Spellmon is the current Commander and Chief of Engineers of the Corps.

25.     Defendant Col. John A. Atilano II is the current District Engineer of the New England District of the Corps.

### *History and Timeline of The Vineyard Wind Project*

### BOEM Promulgates The "Smart From the Start" Program And Begins Investigating Offshore Wind Development

26.     In 2009, BOEM began evaluating the possibility of developing wind energy in the Outer Continental Shelf (OCS) offshore Massachusetts pursuant to its authority under the Outer Continental Shelf Land Act (OCSLA).  **AR BOEM_0068786, 0069170**.

27.     On November 23, 2010, the Obama Administration announced its "Smart From The Start" program, designed to "speed offshore wind energy development off the Atlantic Coast." *Press Release*, U.S. Dept. Of Interior, https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

28.     The "Smart From The Start" program was based on a regulatory initiative that purports to allow BOEM to issue, publish, and award offshore wind leases without satisfying its statutory duty of pre-leasing review.  *Id.*; *see also* 43 U.S.C. § 1337(p)(4) (outlining required factors for pre-leasing review).

29.     BOEM's director commented the following: "As part of th[e Smart From The Start] initiative, [BOEM] . . . will prepare environmental assessments, instead of initially preparing an environmental impact statement, in order to analyze the potential environmental impacts" of wind energy leasing in a given area to "produce significant time-savings." *BOEMRE Director Discusses Future of Offshore Renewable Energy at Offshore Wind Power Conference*, Bureau of Ocean Energy Management, Regulation, and Enforcement (accessed October 19, 2022), https://web.archive.org/web/20110202045325/http://www.boemre.gov/ooc/press/2011/press0201.htm

30.     The Federal Defendants failed to include any information about the implementation of the "Smart From The Start" regulatory program in the administrative record ("AR").  The Plaintiffs therefore have no choice but to cite to an archival version of BOEM's director's policy announcement posted online.

31.     In December 2010, BOEM published a Request for Interest ("RFI") in the Federal Register to determine if there was commercial interest in wind energy development in an approximately 2,224 square nautical mile area of the OCS offshore Massachusetts.  75 Fed. Reg. 82055.  The RFI also invited the public to provide information on environmental issues and data for BOEM to consider in deciding whether to issue leases for wind energy development in the area. *Id*.

32.     BOEM amended its leasing on regulations on May 16, 2011, which contributed to its plans to implementatthe Smart From The Start Policy.  *See* 76 Fed. Reg. 28178.

## BOEM Implements the "Smart from the Start" Program

33.     On February 6, 2012, BOEM published a notice of intent to prepare an environmental assessment for siting several "Smart From The Start" wind energy leases located off the coast of Massachusetts.  *See* 77 Fed. Reg. 5830 (Feb. 6, 2012)

34.     On the same day, BOEM published a call for information and nominations "for commercial leases" off the Massachusetts coast.  77 Fed. Reg. 5820 (Feb. 6, 2012).

35.     BOEM made limited efforts to review commercial fishing impacts as part of its siting decision for its "Smart From The Start" leases located off the coast of Massachusetts.  *See Site Assessment Plan*, BUREAU OF OCEAN ENERGY MANAGEMENT (Nov. 22, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/VW-Site-Assessment-Plan.pdf.

36.     The Federal Defendants failed to include the Site Assessment Plan for the Vineyard Wind lease in the administrative record ("AR").

37.     The review in the SAP purports to list state-by-state fishery dollar values based on commercial landings by weight and value for species that contribute over $1 million in Massachusetts for a single year—a highly-limited snapshot of fishing activity in the proposed lease area that is the subject of this litigation (the "Vineyard Wind lease area" or "Vineyard Wind site"). *Id*. at 58–59.

38.     BOEM's review lists impacts to the Commonwealth of Massachusetts when discussing sites off of the Massachusetts coast, despite the fact that the proposed sites were in federal waters and impacted fisheries from multiple states—one of several narrow limitations BOEM adopted in its "Smart From The Start" program. *Id*. at 56.

39.     BOEM's review found that "[s]tate commercial fishing effort" was "low to medium in State waters south of Martha's Vineyard, adjacent to the location of the [proposed lease site]." *Id*. (cleaned up).  However, the Vineyard Wind lease area is not in "state" waters but is in federal waters on the Outer Continental Shelf.  Accordingly, this finding by its own terms does not apply to the Vineyard Wind lease area.

40.     The entire review was based on a faulty process which defined the Wind Energy Area (the "WEA") through the BOEM Massachusetts Renewable Energy Task Force, whose primary method of communication with affected stakeholders was through a Massachusetts-based focused group that did not conduct substantial outreach to affected federal fisheries permit holders in states other than Massachusetts, such as Rhode Island and New York, where the bulk of commercial fisheries using the Vineyard Wind lease area are based.  *Id.*  Failure to reach out to

commercial fisheries in Rhode Island and New York during the initial phases of implementing the "Smart From The Start" policy doomed the policy to failure from the start.

### BOEM Awards An Offshore Wind Lease to the Predecessor of Vineyard Wind LLC Based on "Smart From The Start"

41.     BOEM awarded Lease OCS-A-0501 (the "Vineyard Wind lease") to a company called Offshore MW LLC in 2015.   *See* 79 Fed. Reg. 70545 (Nov. 26, 2014) (FSN); https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/Lease-OCS-A-0501.pdf.

42.     The Vineyard Wind lease became effective on April 1, 2015.  *See id.*, *see also* **AR BOEM_0000764** (Vineyard Wind lease).

43.     Offshore MW LLC and Vineyard Power, a Martha's Vineyard energy cooperative, were partners in the bidding and lease award.  *See id.*

44.     Through several corporate transactions, Offshore MW LLC became Vineyard Wind LLC.  *See* **AR BOEM_0000811** (change of name).

45.     BOEM awarded Lease OCS-A-0501 under the "Smart From The Start" policy—in other words, without fully considering the requirements set forth in 43 U.S.C. § 1337(p)(4).

46.     BOEM prepared an environmental assessment ("EA") in connection with the lease award.  **AR BOEM_0000090**.

47.     BOEM awarded the Vineyard Wind lease without issuing an environmental impact statement ("EIS").

48.     BOEM received multiple public comments before awarding this lease, some of which specifically objected to BOEM's issuance of the lease without first complying fully with the requirements of 43 U.S.C. § 1337(p)(4) and NEPA. *See, e.g.* **AR BOEM_0110382, 0069488, BOEM_0111443–0111444**.

**Vineyard Wind LLC Submits Its Construction and Operations Plan (the "COP")**

49.      On December 19, 2017, Vineyard Wind LLC (hereinafter "Vineyard Wind") submitted the COP to BOEM for review.  **AR BOEM_0001360–0006005** (original COP); **0006293–0010959** (revised COP).

50.      The COP did not provide sufficient data to demonstrate that its planned construction or operation would ensure safe passage and navigation for commercial fishing boats, safe operations for bottom trawl vessels, or a safe environment for emergency rescue operations or marine life.

**BOEM Issues Its Draft Environmental Impact Statement (the "Draft EIS") and Initiates Consultation with NMFS under the ESA, While The United States Army Corps of Engineers (the "Corps of Engineers" or the "Corps") Begins Public Review of Vineyard Wind's Permit Application under the Clean Water Act (the "CWA")**

51.      Shortly after receiving the COP, BOEM published a Notice of Intent to prepare a Draft EIS in connection with its review of the COP.  *See* 83 Fed. Reg. 13777 (Mar. 30, 2018); *see also* **AR BOEM_0012028**.

52.      BOEM published the Draft EIS on December 7, 2018 and requested public comment.  *See* 83 Fed. Reg. 63184,  *see also* **AR BOEM_0034695**.

53.      Among other things, the Draft EIS found that the turbines Vineyard Wind originally planned to use would not be able to survive a category 3 hurricane.  **AR BOEM_0034754**; *see also The Worst Massachusetts Hurricanes of the 20th Century*, MASS.GOV (accessed Oct. 6, 2022), https://www.mass.gov/service-details/the-worst-massachusetts-hurricanes-of-the-20th-century.

54.      The Site Assessment Plan that the Federal Defendants did not include in the AR contains relevant scientific information regarding hurricane tracks, wave height, and severe weather frequency that relate to the above fact, but much of it has been redacted.

55.     Shortly after its issuance of the Draft EIS, BOEM initiated ESA consultation with the National Marine Fisheries Service ("NMFS") pursuant to the requirements of the ESA. *See* **AR NMFS_1** (detailing all communications between BOEM and NMFS); *see also* **AR BOEM_0077280–0077281**.

56.     The Corps of Engineers announced its public-interest review of Vineyard Wind's Clean Water Act permit application for the Vineyard Wind site on December 26, 2018, and closed the comment period on January 28, 2019. *See* **USACE_AR_003386**.

**Vineyard Wind Enters into a Private Contract with Electric Companies to Provide Offshore Wind Energy and Obtains Regulatory Approval from Massachusetts**

57.     On July 18, 2018, months before the DEIS was published for public comment and months before consultation with NMFS was commenced, Vineyard Wind filed power purchase agreements with several Massachusetts electric companies for offshore wind energy and renewable energy certificates. **AR BOEM_0038223**.

58.     In February 2019, the comment period closed for the Draft EIS.

59.     Shortly afterward, the Massachusetts Department of Public Utilities approved Vineyard Wind's power purchase agreements and issued the requested renewable energy certificates. *Id.*

**NMFS Calls "Time Out"**

60.     In March 2019, NMFS refused to concur with BOEM's Draft EIS, citing concerns over the impact of the Vineyard Wind project on marine species, marine habitat, and socioeconomic resources. **AR BOEM_0037615**.

61.     Among other concerns, NMFS identified the Vineyard Wind lease area and cable route as "one of the primary documented spawning locations for longfin squid" and pointed out that the draft EIS lacks "adequate study on the effects of electrical and electromagnetic frequency

"EMF" and heat from transmission cables on invertebrates . . . ."  Noah Asimow, *NOAA Raises Concerns About Effects of Wind Farm and Undersea Cables*, Vineyard Gazette (Mar. 26, 2019), https://vineyardgazette.com/news/2019/03/26/noaa-raises-concerns-about-effects-wind-farm-and -undersea-cables.

62.     In April 2019, despite these concerns, Vineyard Wind submitted a request to NMFS for an Incidental Harassment Authorization ("IHA") to allow non-lethal takes of marine mammals, including endangered North Atlantic right whales ("NARWs").  *See* **AR NMFS_3144**.

63.     Potential biological removal ("PBR") refers to "the maximum number of animals . . . that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Strahan v. Secretary*, 458 F.Supp.3d 76, 93 (D. Mass. 2020).

64.     The current PBR for the NARW is 0.8.  **AR NMFS_33684**.

65.     NMFS published a notice in the Federal Register on April 30, 2019, proposing to issue an IHA to Vineyard Wind and inviting public comment. *See* **AR NMFS_3392, 3427**.

66.     On May 30, 2019, the period of public comment on the proposed IHA closed.  *See* **AR NMFS_3392.**

67.     On July 29, 2019, Massachusetts Governor Charlie Baker traveled to Washington, DC to lobby BOEM to approve the Vineyard Wind COP despite NMFS's concerns.  Douglas Hook, *Gov. Charlie Baker is in Washington D.C. to push for the wind farm off the coast of Martha's Vineyard*, MassLive (Jul. 29, 2019), https://www.masslive.com/capecod/2019/07/gov-charlie-baker-is-in-washington-d-c-to-push-for-the-wind-farm-off-the-coast-of-marthas-vineyard.html.

68.     At NMFS's urging, on August 9, 2019, BOEM delayed approval of the Vineyard Wind project to conduct an expanded "cumulative impacts analysis" before issuing its final

environmental impact statement ("Final EIS").  Colin A. Young, *Federal Review Will Further Delay Vineyard Wind*, WBUR (Aug. 9, 2019), https://www.wbur.org/news/2019/08/09/vineyard-wind-project-delayed.

69.     Governor Charlie Baker's office called BOEM's delay "a step in the wrong direction."  *Id*.

### NMFS Bungles Its Consultation Responsibilities

70.     In 2019, NMFS promulgated a set of interagency consultation regulations that:

a.      limit when agency action would be deemed to adversely modify designated critical habitat by requiring the action to affect habitat as a whole;

b.      alter the definitions of "effects of the action" and "environmental baseline" to limit the scope of analysis of effects;

c.      require that the effects be:

   i.  a but-for result of agency action;

   ii.  reasonably certain to occur; and

   iii.  based on clear and substantial information;

d.      limit when changed circumstances would require new consultation;

e.      limit agencies' duties to ensure mitigation of adverse effects;

f.      unlawfully delegate to other agencies the ability to make biological determinations that NMFS is required to make; and

g.      allow for rote, slapdash consultations that replace legally required site-specific, in-depth analysis of proposed agency action.

*See* 84 Fed. Reg. 44976 (Aug. 27, 2019).

71.     NMFS's consultation with BOEM regarding the Vineyard Wind COP resulted in several errors:

a.      NMFS did not provide BOEM with any alternative lease sites in connection with any endangered species, despite the lease area encompassing a large area of habitat for the endangered North Atlantic Right Whale.

b.      NMFS issued a biological opinion that (1) does not properly establish the environmental baseline, (2) excludes a number of effects the Vineyard Wind project will have on the endangered  North Atlantic Right Whale, (3) fails to properly consider the impact of the project on the survival and recovery of endangered species in the area, (4) fails to consider research studies showing the short-term harms to the marine habitat of endangered species caused by the construction and operation of wind farms, and (5) is additionally flawed for the reasons set forth in items 1 through 49 of the 60-Day Notice letter dated May 24, 2021, sent on behalf of the Nantucket Residents Against Turbines.

c.      NMFS issued inadequate incidental take statements that failed to take into account all effects to endangered species, especially to the North Atlantic Right Whale.

d.      BOEM failed to reinitiate consultation after receiving new data that would have affected the biological opinion and incidental take statement, or after Vineyard Wind altered its project to include large new Haliade-X turbines.

**BOEM Issues Its Supplemental Draft EIS and NMFS Issues its Biological Opinion**

72.     On June 12, 2020, BOEM issued a notice of availability of a supplemental draft environmental impact statement ("Supplemental Draft EIS") that analyzed "reasonably

foreseeable effects from an expanded cumulative activities scenario for offshore wind development, previously unavailable fishing data, a new transit lane alternative, and changes to the COP since publication of the Draft [EIS]."  85 Fed. Reg. 35952 (June 12, 2020); *see also* **AR BOEM_0057578.**

73.     BOEM closed comments on the Supplemental Draft EIS on July 27, 2020.  *Id.*

74.     The Supplemental Draft EIS confirmed that the Vineyard Wind project would likely harm the local ecosystem, local marine species, commercial fisheries, scientific research and surveys, and military and national security uses.  Specifically, the Supplemental Draft EIS shows that:

> a.     Special aquatic sites for coral, eel grass, and wetlands are located within the impact zone for the Vineyard Wind project.  *See* **AR_BOEM_0057214, 0057220, 0057226.**

> b.     Construction on the Project would likely kill, displace, or disturb local species, including endangered species.  *See* **AR BOEM_0057071–0057072**.

> c.     There would be "major" adverse cumulative impacts on commercial fisheries, scientific research and surveys, and military and national security uses.  *See* **AR BOEM_0056958**.

75.     Three months after BOEM issued the Supplemental Draft EIS, NMFS issued its Biological Opinion, dated September 11, 2020.  *See* **AR BOEM_0060638**.

76.     BOEM planned to issue a Final EIS on the Vineyard Wind project by December 11, 2020 and a decision on the COP by January 15, 2021.  *See* **AR BOEM_0067694**.

**Vineyard Wind Terminates Federal Review Of The COP**

77.     On December 1, 2020, Vineyard Wind withdrew its COP from federal review. Vineyard Wind characterized this withdrawal as "temporary" and claimed it was necessary "to allow the project team to conduct a final technical review associated with the inclusion of General Electric Company's ("GE's") 13-14 MW Haliade-X into the final project design." *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, VINEYARD WIND (accessed Nov. 17, 2021), https://www.vineyardwind.com/press-releases/2020/12/14/vineyard-wind-statement-on-boems-acknowledgement-of-temporary-cop-withdrawal; *see also* **AR BOEM_0067649**.

78.     GE's 13-14 MW Haliade-X is an enormous prototype wind turbine that BOEM had never before analyzed in any context for use on the Outer Continental Shelf before the Vineyard Wind project review.

79.     GE's website story on the Haliade-X turbine begins with the sentence: "It's hard to conceive of just how large it is." *Meet the Haliade-X – Powering 16,000 Homes*, GE Renewable Energy, last accessed Nov. 17, 2021, https://www.ge.com/renewableenergy/stories/new-wind-turbine-to-increase-efficiency-in-offshore-wind-farms.

80.     The 13-14 MW Haliade-X turbine stretches 260 meters in height (approximately 853 feet), which is the approximate height of San Francisco's Transamerica Pyramid, with blades "as long as a football field." *Id*.  The turbine's blades are 107 meters long and the rotor is 220 meters. *Haliade-X offshore wind turbine*, GE Renewable Energy, last accessed December 6, 2021, https://www.ge.com/renewableenergy/wind-energy/offshore-wind/haliade-x-offshore-turbine; *see also* **AR BOEM_0067871.**

81.     The Vineyard Wind project includes sixty-two 13-14 MW Haliade-X units in its final design.  Michelle Lewis, *It gets real – Vineyard Wind orders its Haliade-X wind turbines*,

Electrek (Oct. 13, 2021), https://electrek.co/2021/10/13/egeb-it-gets-real-vineyard-wind-orders-its-haliade-x-wind-turbines/; *see also* **AR BOEM_0067871**.

82.     When Vineyard Wind began reviewing the Haliade-X turbine, the only operating 13-14 MW Haliade-X turbine in the world was located on land at the Port of Rotterdam, Netherlands. **AR BOEM_0193460**.

83.     The Rotterdam Haliade-X turbine had been in operation for less than a year when Vineyard Wind began reviewing it for inclusion in its project pursuant to the notice dated December 1, 2020. *See id*.

84.     In its statement on withdrawal, Vineyard Wind stated that it "look[s] forward to working together [with BOEM] again after we notify [BOEM] to resume its review." *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, VINEYARD WIND (accessed Nov. 17, 2021), https://www.vineyardwind.com/press-releases/2020/12/14/vineyard-wind-statement-on-boems-acknowledgement-of-temporary-cop-withdrawal  This statement misrepresents what it means to withdraw a COP from review, as opposed to seeking a suspension of review.

85.     BOEM published notice that it had terminated (and not merely suspended) review of the Vineyard Wind COP on December 16, 2020.  85 Fed. Reg. 81486 (Dec. 16, 2020); *see also* **AR BOEM _0067694**.

86.     BOEM's notice of termination stated that "[s]ince the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, *nor is there a decision pending before BOEM*."  *Id*. (emphasis added).

## BOEM Resurrects The Vineyard Wind COP

87.    Shortly after the Biden Administration entered office, Vineyard Wind asked BOEM via letter dated January 22, 2021, to resume review of its terminated COP, indicating that it "had completed its technical and logistical due diligence review and had concluded that inclusion of the Haliade-X turbines did not warrant any modifications to the COP."  86 Fed. Reg. 12495 (Mar. 3, 2021).

88.    Vineyard Wind's letter did not provide detailed documentation of its review of the 13-14 MW Haliade-X turbines.  **AR BOEM_0067698**.

89.    Nothing in Vineyard Wind's letter indicates that Vineyard Wind solicited public input on the safety, efficacy, or environmental impact of using the large 13-14 MW Haliade-X turbines during its review from December 16, 2020, to January 22, 2021.

90.    BOEM published the following notice in the Federal Register: "Vineyard Wind . . . informed BOEM that it was rescinding its temporary withdrawal and asked BOEM to resume its review of the COP.  Because Vineyard Wind has indicated that its proposed COP is a 'decision pending before BOEM', BOEM is resuming its review of the COP under NEPA."  86 Fed. Reg. 12495 (Mar. 3, 2021).

91.    BOEM resumed review of the terminated Vineyard Wind COP because Vineyard Wind falsely claimed that the COP was pending review.  *Id*.

92.    BOEM resumed review of the terminated Vineyard Wind COP without requiring Vineyard Wind to update the agency with details describing studies, surveys, and other project-specific information Vineyard Wind gathered during its 13-14 MW Haliade-X review between December 1, 2020 and January 22, 2021.

**BOEM, NMFS, and the Corps Jointly Issue the Final EIS Under NEPA**

93.     Nine days after officially resuming review of the COP, BOEM published the Vineyard Wind site Final EIS.  86 Fed. Reg. 14153 (Mar. 12, 2021).

94.     The Final EIS confirmed that the Vineyard Wind project would significantly harm the ecosystem, marine life, the fishing industry, shoreside businesses, and other statutorily-protected interests such as scientific research and navigational radar.  Specifically, the Final EIS found that:

> a.      The Vineyard Wind project will increase the risk of collision between marine vessels.  *See* **AR-BOEM_0068749.**

> b.      The project will result in massive devastation of the marine environment if severe weather or a hurricane fells Vineyard Wind's large Haliade-X turbines, which have never before been tried or tested anywhere other than at the Port of Rotterdam.  *See id.* at **0068497, 0068722**.

> c.      The project will disturb the coastal breeding grounds of the horseshoe crab, a species whose blood is an essential ingredient for life-saving medical tests and treatments.  *See id*. at **0068531**.

> d.      The project will likely permanently harm, displace, and disturb existing fish, sea turtle, and mammal populations.  *See id.* at **0068546, 0068549, 0068578–0068579, 0068606, 0068608**.

> e.      The proposed spacing between wind turbines will make it nearly impossible for commercial fishing trawl and dredge vessels to operate in the lease area, especially at night and in severe weather.  *See id.* at **0068710**.

f.      The wind turbines will interfere with navigational radar. *See id*. at **0068717**; *see also, e.g.,* Report to the Congressional Defense Committees, "The Effect of Windmill Farms on Military Readiness," Department of Defense Office of the Director of Defense and Research Engineering (2006) at 4.

95.      The Final EIS lacked any findings on whether Vineyard Wind's new prototype Haliade-X turbines could survive an adverse weather event with high winds and surf, such as a major hurricane.

96.      The Final EIS concluded that "approximately 22 GW of Atlantic offshore wind development is reasonably foreseeable." **AR BOEM_0068469**. This figure is inconsistent with the Administration's stated goal of "deploy[ing] 30 gigawatts (GW) of offshore wind in the United States by 2030 . . . Achieving this target also will unlock a pathway to 110 GW by 2050 . . . ." *FACT SHEET: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs*, The White House (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

97.      The Final EIS did not disclose that NARW hotspots overlap and surround the Vineyard Wind lease area. **AR BOEM_0068571–0068603; AR NMFS_53326**.

98.      The Final EIS incorrectly found that NARWs will not be exposed to pile driving noise that will lead to serious harassment. **AR BOEM_0008593–0008594**.

99.      The Final EIS failed to consider a reasonable range of alternatives to the COP that were located outside of the lease area covered by Lease OCS-A-0501 because BOEM's application of the "Smart From The Start" program impermissibly and effectively limited all alternatives to

only those that were within the lease area. **AR BOEM_0068472–0068474** (detailing alternatives considered); **0069186–0069190** (detailing alternatives "considered but not analyzed in detail").

100. Although the Draft Supplemental EIS considered some cumulative impacts, the Final EIS curiously removed most of the cumulative impacts analysis and failed to properly analyze the foreseeable, cumulative ecological impacts that implementation of BOEM's pledged plans to approve multiple wind farms near the Vineyard Wind project would have, including:

     a.     the oil spill risks associated with wind turbines;

     b.     the cumulative environmental risks associated with pile-driving installation of the turbines;

     c.     the cumulative impact that operational underwater sound associated with the installation and operation the turbines will have on marine life and resources;

     d.     the cumulative impact of electrical and electromagnetic frequency ("EMF") discharge from generators and cabling will have on the marine environment; and

     e.     the cumulative impact on commercial fishermen, small harvester fishing businesses, onshore seafood processors, and other point of service seafood sales and businesses.

101. After resuming review of the COP, BOEM did not engage with commercial fishermen, shoreside businesses, or the general public when preparing the Final EIS, including on such crucial issues as environmental and economic impacts.

102. After BOEM resumed its review, affected states gathered no substantial input from the plaintiff commercial fishermen or other similarly situated businesses that use the Vineyard Wind lease area with regard to the environmental and economic impacts of the Vineyard Wind project.

103.     Throughout the process, BOEM, affected states, and Vineyard Wind provided a meager opportunity for financial mitigation to certain limited fishing interests and shoreside businesses without consulting with or mitigating the impact of the COP on other fishing interests, thereby favoring some commercial fishing businesses over others, without adequate explanation.

### BOEM Reinitiates the ESA Consultation Process with NMFS While Simultaneously Issuing its Joint Record of Decision (the "ROD") Under NEPA With NMFS and the Corps of Engineers

104.     On May 7, 2021, two months after issuing the final EIS, BOEM submitted a request to NMFS to reinitiate consultation to consider new information regarding the impacts of the Vineyard Wind Project on endangered species.  **AR_BOEM_0076721**.

105.     Three days later, and before NMFS had the opportunity to analyze the new information submitted by BOEM, on May 10, 2021, BOEM issued its Joint Record of Decision under NEPA with NMFS and the Corps of Engineers approving the Vineyard Wind COP and clearing the way for construction to begin.  *See* 86 Fed. Reg. 26541 (May 14, 2021); *see also* **AR BOEM_0076799**.

106.     Among other things, the ROD states the following:

a.     "The purpose of the [agency action on the Vineyard Wind COP] is to determine whether to approve, approve with modifications, or disapprove the COP . . . to meet New England's demand for renewable energy.  More specifically, the proposed Project would deliver power to the New England Energy grid to contribute to Massachusetts' renewable energy requirements—particularly, the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation . . . ."  **AR BOEM_0076808– 0076809.**

b.      "BOEM's decision on Vineyard Wind's COP is needed to carry out its duty to approve, approve with modifications, or disapprove the proposed Project in furtherance of the United States policy to make OCS energy resources available for expeditious and orderly development . . . ." **AR BOEM_0076809**.

107.   The ROD shows that BOEM dismissed several alternatives to locating the Vineyard Wind project in the lease area in the ROD.  Such alternatives included:

a.      proposals made by Seafreeze that the COP should not be approved until the agencies could fully analyze radar interference caused by Vineyard Wind with search-and-rescue operations;

b.      comments showing that the COP's structural analysis was flawed and should be changed;

c.      concrete proposals to eliminate certain important fisheries areas of the lease from the COP;

d.      concrete proposals showing that Vineyard Wind's decision to use larger turbines would have cumulative impacts necessitating further analysis;

e.      comments urging consideration of the devastating impact the Vineyard Wind project would have on fisheries, specifically the longfin squid fishery;

f.      concrete proposals regarding compensation for commercial fishermen and shoreside industries negatively impacted by the Vineyard Wind Project;

g.      the proposal of the High Frequency Radar Wind Turbine Interference Community Working Group dated June 2019; and

h.      the proposal of a reasonable alternative that set forth proposed transit lanes in the lease area to ensure safety and viability of commercial fishing operations put forward by the Responsible Offshore Development Alliance ("RODA").

*See* **AR BOEM_0078764, 0078089, 0079009, 0079229, 0111234, 0111427, 0110382, 0195688, 0202213**.

108.    BOEM and the other agencies involved in compiling the ROD did not adequately cite sources or sufficiently explain why the following comments do not warrant further response:

a.      Comment 1063-002, which concerned fisheries mitigation and compensation, *see* **AR BOEM_0034437**;

b.      Comment 0076-004, which questions the sufficiency of the purpose and need statement for the purposes of NEPA, *see* **AR BOEM_0034404**;

c.      Comment 13185-017, which pointed out BOEM's failure to consider the cumulative impact of fisheries mitigation plans and associate compensation, *see* **AR BOEM_0034452, 0034453**;

d.      Comment 13185-018, which addressed BOEM's failure to fully analyze impacts to shoreside businesses or gather enough peer review or public input, *see* AR **BOEM_0034453, 0034456**;

e.      All comments made by Seafreeze regarding the last-minute increase in megawatt capacity for each wind turbine generator without adequate analysis; *see, e.g.* **AR BOEM_0110436**; and

f.      Comments 0116-001 through 05, which concerns the fact that New York was not given factual consistency review, was not included in the task force, and

accordingly had no way to negotiate compensation to New York squid fishermen, **AR BOEM_0111225**.

109.    BOEM approved Vineyard Wind's terminated, insufficient, and out-of-date COP without any further environmental impact assessment, despite material and significant discrepancies involving the Vineyard Wind project envelope and project material parameters from the Draft EIS, to the Supplemental Draft EIS, and through the Final EIS.

110.    BOEM approved this terminated and out-of-date COP without public notice or opportunity for comment on the choice of a large prototype wind turbine for the Vineyard Wind project made during the period December 1, 2020, to January 22, 2021.

111.    BOEM approved this terminated and out-of-date COP in disregard of adverse impacts to endangered species, or approved it despite knowing it would harm endangered species.

112.    BOEM approved this terminated and out-of-date COP without accounting for its own plans for widespread development of wind farms on the outer Continental Shelf, or any foreseeable cumulative impacts.

113.    The Corps of Engineers' final decision regarding Vineyard Wind's Clean Water Act permit application was included in the ROD.  *See* **AR BOEM_0076828**.

114.    Among other things, the ROD states the following regarding the Corps' permit grant:

> a.    "Vineyard Wind's contractual obligation with the Commonwealth of Massachusetts to deliver the generated energy to the Massachusetts power grid was used as criteria for the evaluation of alternatives as the ability to deliver to the power grid limits where the project can be located geographically."  *See id*. at **0076830**.

b. "[D]ue to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation. The extent of impact to commercial fisheries and loss of economic income is estimated to total $14 million over the expected 30-year lifetime of the project. . . . When considering these factors, the project as proposed is anticipated to have a negligible beneficial effect to local economics." *Id.* at **0076837**.

115.    As part of its review, the Corps found no jeopardy to endangered species and recommended no adverse modification to the NMFS. *Id*. at **0076846**.

116.    The Corps did not sufficiently consider practicable alternative locations for the Vineyard Wind project outside the lease area in the public-interest review portion of the Record of Decision.

117.    The Corps admitted that "[Vineyard Wind] does not require access or proximity to or siting within a special aquatic site to fulfill its basic project purpose . . . [and] is not water dependent." *Id*. at **0076829**. Yet the Corps also restricted analysis of practicable alternatives to areas in the water because the existing Vineyard Wind lease was in the ocean.

118.    The Corps also erroneously concluded in its public-interest review that the Vineyard Wind project would not discharge into a special aquatic site, even though environmental impact analysis showed it would. *See id.*, *see also* **AR BOEM_0057214, 0057220, 0057226**. Specifically, the public-interest review found that "[t]he project does not propose impacts to wetlands and therefore, the project will have no effect on wetlands." **AR BOEM_0076838**.

119.    The Corps did not take other planned outer Continental Shelf wind energy projects into account when considering the possible cumulative impact of Vineyard Wind.

120.    The Corps' review documentation does not address:

a.      the rise in temperatures at and near the project area due to the project's turbines;

b.      the potential vulnerabilities to the electrical grid caused by relying on so much energy from one source (namely offshore wind power);

c.      the impact on the commercial fishing industry;

d.      harm to endangered species and their critical habitat; or

e.      adverse impacts on food supply.

121.    The Corps never appropriately analyzed the impact that the Vineyard Wind project would likely have on horseshoe crabs—a marine species whose blood contains compounds used for gold-standard endotoxin testing, which is required for all drugs and vaccines, and many implantable medical devices.  **AR BOEM_0067602–0067609**.

122.    Shortly after the ROD's publication, on May 21, 2021, NMFS issued an IHA for marine mammals to Vineyard Wind.  **AR NMFS_3489–3509, 3514**.

123.    The notice of IHA was published in the Federal Register on June 25, 2021.  **AR NMFS_3515**.  The IHA states that it is valid from May 1, 2023 through April 30, 2024.  *Id*.

124.    When issuing the IHA, NMFS only examined harm to marine mammals caused by noise from pile-driving.  **AR NMFS_3489**.  It did not examine the risk of vessel strikes caused by Vineyard Wind's boats, or vessel strikes caused by Vineyard Wind's pile driving chasing NARWs into areas with higher vessel traffic, even though the scientific data it examined stated that oceanographic changes could cause whales to "move into areas with little or no protective measures," leading to "increased exposure to anthropogenic impacts."  **AR NMFS_53319**. Additionally, NMFS did not account for scientific data showing that Vineyard Wind's crew

transfer vessels, which travel in excess of 15 knots, would kill NARWs if they struck them. **AR BOEM_0034861, 0129897, 0129902**.

125.    When examining the impact of noise from pile-driving, NMFS did not account for:

a.    Protected Species Observers ("PSOs") failing to accurately detect and identify NARWs when scanning the ocean from ship decks, **AR BOEM_0077457– 0077458**;

b.    PSOs only being able to detect NARWs at the water's surface and in ideal conditions, and even then unreliably because NARWs have no dorsal fin, **AR BOEM_0077330**;

c.    The BiOp's decision to allow pile driving to continue despite the presence of NARWs if Vineyard Wind's lead engineer believes halting pile driving will adversely affect the pile driving effort, **AR BOEM_0077454**;

d.    The BiOp's decision to allow pile driving after sunset, when PSOs cannot see, **AR BOEM_0077307, 0077454**; or

e.    Scientific evidence demonstrating that sound impacts to benthic species caused by pile driving and wind turbine operation will have an "unknown" impact to benthic species, necessitating further study, **AR NMFS_57132**; or

f.    Scientific evidence demonstrating that elevated levels of low-frequency noise like that created by offshore wind turbines reduces NARW communication space by over 65 percent, affecting their ability to navigate, detect prey, and interact, **AR NMFS_8751–8760, 57132**.

126.    By failing to examine the risk of vessel strikes in their issuance of the IHA, NMFS ignored its own conclusions that "[r]educing vessel speed is one of the most effective, feasible

options available to reduce the likelihood of lethal outcomes from vessel collisions with right whales." **AR NMFS_46923**.

127.    NMFS also ignored its statement that current speed limits and "other vessel strike mitigation efforts are insufficient to reduce the level of lethal right whale vessel strikes to sustainable levels in U.S. waters." **AR NMFS_46926.**

128.    When issuing the IHA, NMFS did not consider the best scientific data available, because it ignored the fact that NARWs return year-round to their feeding and mating grounds, which include the Vineyard Wind lease.  *See* **AR NMFS_6117–6118, 53318–53335**; *see also* O. O'Brien, D. E. Pendleton, L. C. Ganley, K. R. McKenna, R. D. Kenney, E. Quintana-Rizzo, C. A. Mayo, S. D. Kraus & J. V. Redfern, *Repatriation of a historical North Atlantic right whale habitat during an era of rapid climate change* (July 20, 2022), https://www.nature.com/articles/s41598-022-16200-8 (map showing location of NARW feeding and mating grounds).

129.    When issuing the IHA, NMFS did not account for multiple other IHAs it had issued authorizing NARW takes.  *See* Case No. 1:21-cv-11171-IT, Doc. No. 145 Exhibit 1, at 16–17 (chart detailing all NARW takes).

130.    When issuing the IHA, NMFS did not account for scientific data showing that the construction and maintenance of multiple wind turbines could change NARW habitat by influencing oceanographic conditions.  **AR NMFS_53319–53320**.

131.    When issuing the IHA, NMFS did not consider that little scientific data exists as to how construction and operation of projects like the Vineyard Wind project will affect large marine mammals like NARWs.  **AR NMFS_53319.**

132.    BOEM's official letter informing Vineyard Wind that the COP was approved was dated July 15, 2021, and was the result of a cascade of events stemming from the illegitimate

"Smart From The Start" program in connection with the Vineyard Wind project. **AR BOEM_0077150**.

133.    On August 4, 2021, the Federal Defendants issued a purported "supplement" to the ROD.  The ROD was based in part on the Biological Opinion dated September 11, 2020 ("Original BiOp") of the National Marine Fisheries Service ("NMFS"), which was current and in effect as of the time the ROD was issued on May 10, 2021.  The ROD stated that the Vineyard Wind Project included:

- a 23.3 mile-long export cable corridor; and

- 15 total acres of cable scour protection with 2 acres within three nautical miles.

*See* ROD at **USACE_AR_011470, 011474, 011475, 011477**, and **011486**.

134.    But in June 2021, a month after the ROD was issued, Vineyard Wind LLC ("Vineyard Wind") informed the United States Army Corps of Engineers (the "Corps"), a signatory of the ROD, that those two measurements of environmental impacts set forth in the ROD were significantly understated and therefore incorrect.  *See* **USACE_AR_011772** (phone log of conversation between Vineyard Wind and the Corps).  Rather than rescinding the ROD and reopening inter-agency consultation with NMFS due to the increased environmental impacts projected by Vineyard Wind, the Corps published the August 2021 Supplement, which indicates that the project will actually require:

- An export cable corridor up to 49 miles long; and

- 35 total acres of cable scour protection, with 17 acres within three nautical miles.

**USACE_AR_011891-92**.

135.    On September 17, 2021, counsel for the Plaintiffs sent the Federal Defendants (among others) a 60-day notice letter informing the Defendants of their intent to sue.

136.    On October 18, 2021, months after BOEM approved the Vineyard Wind COP, NMFS completed the reinstituted ESA consultation process and published major revisions to the Biological Opinion, which addressed serious risks to endangered species from noise, vessel traffic, and critical habitat and environmental conditions during construction, operation, and decommissioning activities in connection with the Vineyard Wind project.  The revisions to the Biological Opinion were issued in two different versions, the "Revised BiOp," **USACE_AR_013363–013862**, and the "Corrected Revised BiOp," **USACE_AR_ 013869–014372.**  To date, BOEM has not reopened the Final EIS or ROD to address the two versions of the revised Biological Opinion, has not rescinded its approval of the COP, and has not required Vineyard Wind to halt construction of the project pending BOEM's review of the either version of the revised Biological Opinion.

137.    On January 14, 2022, the Federal Defendants issued a "Correction of Clerical Error and Clarification" to the ROD.  **USACE_AR_014373–014374**.

138.    Rather than correcting a clerical error, this document changed the substantive meaning of a sentence in the ROD stating that the entire Vineyard Wind lease would likely be abandoned by commercial fishermen "due to difficulties with navigation" if the COP was approved.  *Id*.

139.    The "Correction of Clerical Error and Clarification" was published less than a month after the Plaintiffs filed their Complaint, which referred to the sentence mentioned *supra* at ¶ 130.

140.     On January 20, 2022, BOEM clarified that the ROD constituted final agency action regarding the Vineyard Wind COP.  *See* **AR BOEM_0077788**.

### *Physical Description of the Vineyard Wind Project*

141.     The Vineyard Wind offshore wind energy project (the "Vineyard Wind project"), along with six other offshore wind farms, will be constructed and operated in an area of the Outer Continental Shelf ("OCS") that is roughly 15 miles south of Martha's Vineyard and Nantucket Island.  **AR BOEM_0077321, 0077285, 0068465**.

142.     The Vineyard Wind project is located in BOEM Lease Area OCS-A-0501.  **AR BOEM_0077285**.

143.     The Vineyard Wind project would include up to 84 wind turbines, known as wind turbine generators ("WTGs"), each designed to generate 14 MW of electricity.  **AR BOEM_0076799, 0077285–0077286**.

144.     Most of the WTGs will be monopiles, but up to 12 may be jacket foundations, which require more pile driving and thus produce more underwater noise and a larger noise footprint.  **AR BOEM_0077286, 00773000, 0068443**.

145.     Construction of the Project will take approximately two years to complete, and the Project will have an approved operational life of 33 years, after which it must be "decommissioned" (i.e., dismantled). **AR BOEM_0077286, 0077293, 0077295**.

### *The Procedural History of this Lawsuit*

146.     Pursuant to the citizen suit provisions of OCSLA, ESA and CWA, Plaintiffs sent a 60-day notice of intent ("NOI") to sue the Federal Defendants over their respective failures to comply with OCSLA, ESA and CWA in reviewing and approving the Vineyard Wind Construction and Operations Plan.  The NOI was sent to all Federal Defendants and certain other

addressees required by statute on September 17, 2021, and was received by the last of them on September 20, 2021.

147.    On December 15, 2021, the Plaintiffs filed their complaint against the Federal Defendants in the United States District Court for the District of Columbia.

148.    On January 14, 2022, the Federal Defendants issued a "Correction of Clerical Error and Clarification" to the ROD dated January 14, 2022.  **USACE_AR_014373–014374**.

149.    On January 18, 2022, the Federal Defendants moved to transfer the case to this court.

150.    On January 19, 2022, the district court in the District of Columbia granted the motion of Vineyard Wind, LLC, to intervene as a defendant in this case.  On the same date, Vineyard Wind filed its answer to the complaint.

151.    On March 3, 2022, the Federal Defendants filed their answer to the complaint.

152.    On April 11, 2022, the Federal Defendants filed the certified index to Administrative Record ("AR"), on May 19, 2022, they filed an addendum to the AR, on June 13, 2022, they filed a second addendum to the AR, and on July 1, 2022, they filed a third addendum to the AR.  The two revised biological opinions, the August Supplement 4, 2021, Supplement and the January 14, 2022, Supplement were included in the AR without any effort to reopen the ROD or the EIS.

153.    On June 27, 2022, the district court in the District of Columbia transferred this case to this court.

154.    On August 30, 2022, this court issued the Scheduling Order, Doc. No. 55, and by order dated October 25, 2022, the Court issued an order extending the page limits for the parties' memoranda of points and authorities, Doc. No. 65.

155.    On September 2, 2022, the Plaintiffs filed a motion to strike the two revised biological opinions, the August 4, 2021 Supplement to the ROD, and the January 14, 2022, Supplement from the AR.  In that motion, the Plaintiffs also sought to add certain documents to the AR.  That motion is pending before the court.   Doc. No. 56.

156.    On September 16, 2022, the Federal Defendants and the Defendant-Intervenor Vineyard Wind filed oppositions to Plaintiffs motion to strike/add documents from and to the AR. Doc. Nos. 58, 59.

157.    On September 27, 2022, the Plaintiffs filed a motion for leave to file a reply to the oppositions of the Federal Defendants and the Defendant-Intervenor to Plaintiffs motion to strike/add documents from and to the AR, Doc. No. 60, which was opposed by the Federal Defendants and the Defendant-Intervenor Vineyard Wind, Doc Nos. 61, 62.  That motion was denied by the court.  Doc. No. 64.

### *The Commercial Fishing Industry In The Vineyard Wind Area and the Effects of the Vineyard Wind Project on That Industry*

158.    All commercial longfin squid fishing in federal waters on the East Coast of the United States is harvested using small mesh bottom trawls. *See* NOAA Fisheries: "The majority of longfin squid is harvested year-round using small-mesh bottom trawls. There are now only a few fishermen that use pound nets and fish traps during the spring and early summer when squid migrate inshore." *Longfin squid*, NOAA FISHERIES, https://www.fisheries.noaa.gov/species/longfin-squid.  Pound nets and fish traps are all in state waters.  Lapp Decl. ¶ 31.  Trawl fisheries are the only practical and commercially viable way to harvest longfin squid in the Greater Atlantic Region and have existed for decades in the Vineyard Wind lease area. The squid fishery uses custom made and manufactured trawl nets that are designed to capture squid and are fitted to a vessel's specific size and horsepower.  Trawl nets are made from fine mesh that can easily tear on

underwater obstructions, making any such obstructions, commonly referred to as "hangs," destructive to the harvesting of fish and vessel operation.  *See* **AR_BOEM_0068722**.  The mouth of the trawl net is held open by two steel otter boards known as "doors" which are attached to the sides, known as the "wings" of the net, by steel cables.  These doors function to spread the mouth of the net wider and "door spread" significantly affects how well the net functions to catch target species.  The doors are connected to winches on the vessel by steel wire.  The boat slowly tows the net behind the vessel through ocean bottom depth contours following the target species using electronic bottom sounders, all while avoiding existing hangs, such as rocks and shipwrecks, plus other vessels nearby.  A net may be towed up to ¼ to ½ mile behind the vessel itself depending on location and individual vessel operations, while vessel position is affected by tides, currents, wind etc.  Therefore, the position of the vessel above the water line may often not indicate the position of the net below the water line.  Rather, the vessel maneuvers as necessary to maintain its course along the duration of a "tow" to position its net so as to harvest fish efficiently and safely.  Brady Decl. ¶ 12; Aripotch Decl. ¶ 10; Thomas H. Williams Decl. ¶¶ 10, Lapp Decl. ¶ 32; *see also* **AR BOEM_0130447–0130449**.

159.    A fishing vessel's restriction in ability to maneuver while fishing has long been a recognized aspect and standard of maritime protocol. The International Maritime Organization's Convention on the International Regulations for Preventing Collisions at Sea 1972, commonly referred to as COLREGS, sets forth the rules of the road for professional mariners and is promulgated in the United States by the US Coast Guard. See https://www.imo.org/en/About/Conventions/Pages/COLREG.aspx and https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi8_PHrhNj2AhUdknIEHWYhAEoQFnoECA8QAQ&url=https%3A%2F%2Fwww.navcen.uscg.gov%2Fpdf%2Fnavrules%2Fna

vrules.pdf&usg=AOvVaw0GM6Ptxf6cF44wPNxwomXK.    For example, Rule 18 of the COLREGS states that power driven vessels and sailing vessels underway "shall keep out of the way of….a vessel engaged in fishing." This is due to the fishing vessel's lack of maneuverability when gear is deployed. When a trawl fishing vessel is towing, its speed is generally limited to a maximum of 2-4 kts due to the drag of the net, and hauling back the net is not an instant process but typically takes about a half hour. Therefore fishing vessel response to a navigational emergency is delayed by de facto speed restrictions and the time it takes to get the gear back onboard the vessel. Lapp Decl. ¶ 33; Brady Decl. ¶ 13; Aaron Williams Decl. ¶ 10; *see also* **AR BOEM_0110424**.

160.    A trawl vessel will make several tows a day, and many over the course of a multi-day trip, with each tow typically requiring one to three hours of tow time to be effective at herding the squid into the net. At the completion of a tow, the vessel will haul back the wires onto its winches and bring the doors and net to the vessel to unload the harvest and ice or chill in the vessel hold(s) as appropriate. Some vessels use ice to chill product, some use a refrigerated seawater system.  Lapp Decl. ¶ 34; Brady Decl. ¶ 14, *see also* **AR BOEM_0141385**.

161.    While the vessel gear is deployed and fishing, the vessel experiences restricted maneuverability, and underwater obstructions from cable armoring and turbine foundations combined with fixed structure of the wind turbines present significant safety and navigational hazards while trawl fishing.  When a vessel's net/doors/gear become entangled on an underwater cable or cable armoring, or turbine foundation, or boulder relocated by the developer, the vessel is placed in a hazardous situation.  *See* **AR BOEM_0034945–0034946; 0034955**.  This will be compounded by the further restricted maneuverability due to the wind turbines themselves and could result in vessel capsize and/or collision with a wind turbine.  For example, at present, without

38

offshore wind in US federal waters, if a vessel's gear becomes entangled on a "hang" the vessel must try to maneuver its gear off the hang safely and with minimal damage. This requires space, and particularly space for maneuverability in the right direction taking into account the wind, current, and the tide at the time. The vessel when "hung up" is essentially tethered to the ocean floor by its gear, and wind/tide have the ability to capsize the vessel if strong enough and the vessel loses maneuverability. When fixed structure is added to the equation in the form of turbines, the vessel loses the space for maneuverability and may simply be swung into a turbine by wind/tide/current or failed attempts at breaking free. Offshore wind will introduce both significant new underwater hangs as well as fixed structure in the form of turbines. Lapp Decl. ¶ 35, *see also* **AR BOEM_0057072**. Towing over electrical inter-turbine cables and/or export cables themselves (particularly should cables become exposed due to shifting sands in a dynamic environment such as the ocean) present substantially increased hazards, which has been made clear to United Kingdom fisheries operating in the vicinity of wind farms. Brady Decl. ¶ 15; Aripotch Decl. ¶¶ 16-18; Thomas E. Williams, Sr. Decl. ¶ 15, *see also* **AR BOEM_0057000**.

162.     The Vineyard Wind lease and approval of the Vineyard Wind Construction and Operations Plan ("COP") will result in the construction and operation of a large number of offshore wind turbines — between 60 and 80 in total — with each turbine reaching the height of San Francisco's Transamerica Pyramid, utilizing blades as long as a football field, and containing large quantities of oil and environmentally unsafe chemicals. *See* **AR BOEM_0193461**. The turbines will be pile-driven into the Outer Continental Shelf within the Vineyard Wind lease area, producing low-frequency noise, and the continuous operation of the turbines will produce further noise and electromagnetic energy that will disturb existing marine life, including squid. These construction and operational activities will make it impossible as a practical matter for squid

fishing to continue in the Vineyard Wind lease area.  All whiting and squid caught in the Vineyard Wind lease area come from commercial trawl fishing.  As the Final Environmental Impact Statement issued by the Federal Defendants acknowledges, trawl fishing gear will likely become "entangled in protections placed over cables or around foundations" of turbines and related infrastructure, making commercial fishing in the Vineyard Wind lease area untenable.  *See* **AR BOEM_0068718, 0068722, 0068724, 0068725**.  Additionally, the wind turbines will interfere with vessel and air radar and impact transit corridors, and will therefore make navigation impossible for commercial fishing vessels and will make rescue efforts problematic or untenable in case of wreck.  *See* **AR BOEM_0068717, 0068722**; *see also* **AR NMFS 34415–34416, 34422– 34424, 34425**.  Ventrone Decl. ¶¶ 6-9; Lapp Decl. ¶¶ 27-28; Aaron Williams Decl. ¶¶ 13-15; Haran Decl. ¶¶ 11-12; Thomas E. Williams, Decl. ¶¶ 19-20; Thomas H. Williams Decl. ¶¶ 15-17.

163.    Towing over electrical export cables themselves, particularly should cables become exposed due to oceanic processes, present substantially increased hazards, which has been made clear to UK fisheries operating in the vicinity of wind farms.  For example, in one notice to U.K. fishermen regarding the Westernmost Rough Offshore Wind Farm from offshore wind developer DONG Energy (now Orsted) and the Kingfisher Information Service, a fisheries information service providing fishermen the location of subsurface and subsea hazards around the U.K., reads, "The closer to the surface a subsea cable is lifted when fouled by fishing gear, the more damage there is to the fishing vessel. In the interests of fishing safety and to prevent damage to subsea structures fishermen are advised to exercise caution when fishing in the vicinity of subsea cables and renewable energy structures. Loss of gear, fishing time, and catch can result if a trawler snags a subsea structure and there is serious risk of loss of life." This notice is quoted and pictured in a comment letter submitted by Seafreeze on the Vineyard Wind SEIS.  *See* **AR BOEM_0110419–**

**0110420**.  Other  similar  notices  etc.,  are  found  throughout  that  comment  letter.    AR BOEM_0110419–0110424;  Lapp Decl. ¶ 36.

164.    The spacing of the turbines will not allow for safe transit lanes in the Vineyard Wind area for trawl fishing vessels.  Additionally, the wind turbines will interfere with marine vessel radar, and will therefore make navigation for fishing vessels more dangerous in the Vineyard Wind lease area. This marine radar interference will also affect the capabilities of USCG rescue vessels, and the turbines themselves will affect helicopter rescue capabilities.  Furthermore, trawl fishing gear will become "entangled in protections placed over cables or around foundations" of turbines and related infrastructure, making commercial fishing by trawl fishing untenable in the Vineyard Wind lease area.  *See* Final EIS at 3-214, 215, 219, 221, 222.   Lapp Decl. ¶¶ 37-38; Brady Decl. ¶¶ 18-19; Haran Decl. ¶¶ 11-12; 18-20; Thomas E. Williams, Sr. Decl. ¶¶ 15, 20.  *See* **AR BOEM_0193461, 0068718, 0068722, 0068724, 0068725**.

165.    These impediments to commercial trawl fishing in the Vineyard Wind lease area resulting from the Federal Defendants' issuance of the lease and the approval of the COP will severely impede and make trawl fishing extremely dangerous in the Vineyard Wind lease area, making future squid fishing trips in the area impossible as a practical matter. *See* **AR BOEM_0068710–0068711**;  Lapp Decl. ¶ 40; Brady Decl. ¶¶ 20-21; Aaron Williams Decl. ¶¶ 13-15; Aripotch Decl. ¶¶ 17-20; Haran Decl. ¶¶ 19-20; Thomas H. Williams Decl. ¶ 17.

166.    In addition,  the presence of the wind turbines and associated cables in connection with pile driving and associated dredging and filling operations during construction will adversely impact the marine water quality of the Vineyard Wind lease area, thereby disrupting and displacing not only squid but also other marine life.  This includes permanent destruction and replacement of squid's preferred sandy bottom habitat with the hard structure of turbine bases and scour

protection.  **AR BOEM_0110388–0110389**.  Furthermore, the type of underwater low frequency sound produced by both pile driving and construction of offshore wind turbines in the marine environment has been shown to cause acoustic trauma and even death in squid and related species. **AR BOEM_0110392–0110393** (citing studies).  These adverse ecological impacts attributable to the Vineyard Wind project constitute the pollution of those waters and the degradation of the local ecosystem, to the detriment of the living things in those waters, thereby adversely impacting Seafreeze's ability to purchase, process, and sell squid caught in the area.  These adverse environmental and ecosystem impacts are directly attributable to the Vineyard Wind lease issuance and COP approval.  Lapp Decl. ¶¶ 42-51; Brady Decl. ¶¶ 22-23; Aripotch Decl. ¶ 20; Haran Decl. ¶ 21; Thomas E. Williams, Sr. Decl. ¶ 24; Thomas H. Williams Decl. ¶¶ 19-20.

167.   Specifically with regard to the North American Right Whale, the issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will result in harm to that endangered species and the devastation of its critical habitat through conversion of the Outer Continental Shelf environment into a hard surface pockmarked with pile-driven turbines, cabling spewing electromagnetic energy, and constant low-frequency noise.  The North Atlantic Right Whale will be forced to flee the Vineyard Wind lease area, or will perish due to the destruction of its critical habitat.  *See* **AR BOEM_0110396–0110409**;  Lapp. Decl. ¶ 53; Brady Decl. ¶ 26; Aripotch Decl. ¶¶ 28-29; Haran Decl. ¶ 24; Thomas E. Williams, Sr. Decl. ¶ 28; Thomas H. Williams Decl. ¶¶ 25-27.

168.   The Federal Defendants' issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will decrease the availability of horseshoe crab blood by allowing the Vineyard Wind project to disturb the delicate marine ecosystem, causing the migration or death of many horseshoe crabs, which are the only known source of life-saving fluids necessary for a

variety of important medications and vaccines.   For example, Limulus Amebocyte Lysate ("LAL"), a substance derived from horseshoe crab blood is the only FDA-licensed product to protect the safety of injectable and implantable medical devices in the United States via endotoxin testing. All injectable and implantable medical devices are required by law to be tested for endotoxins with this substance.   *See* **AR BOEM_0067602–0067609**; Lapp. Decl. ¶ 54; Brady Decl. ¶ 25; Haran Decl. ¶ 26; Thomas E. Williams, Sr. Decl. ¶ 29.

DATE: November 7, 2022,                 Respectfully submitted,

*/s/ Theodore Hadzi-Antich*
ROBERT HENNEKE (*pro hac vice*)
TX Bar No. 24046058
rhenneke@texaspolicy.com
THEODORE HADZI-ANTICH (*pro hac vice*)
CA Bar No. 264663
tha@texaspolicy.com
CONNOR W. MIGHELL (*pro hac vice*)
TX Bar No. 24110107
cmighell@texaspolicy.com
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701
Tel: (512) 472-2700 (Office)
Tel: (916-792-8780) (Cell)
Fax: (512-472-2728)
tha@texaspolicy.com


*/s/Ira H. Zaleznik*
IRA H. ZALEZNIK (BBO #538800)
izaleznik@lawson-weitzen.com
LAWSON & WEITZEN, LLP
88 Black Falcon Ave., Suite 345
Boston, MA 02210-2414
Telephone:     (617) 439-4990
Facsimile:     (617) 439-3987

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically on November 7, 2022, with the Clerk of the Court for the District of Massachusetts by using the CM/ECF system, causing electronic service upon all counsel of record who have registered with the Court's CM/ECF system.

*/s/Theodore Hadzi-Antich*
THEODORE HADZI-ANTICH