**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SEAFREEZE SHORESIDE, INC. *et al.,* <br><br>    Plaintiffs*,* <br><br>    v. <br><br> THE UNITED STATES DEPARTMENT OF THE INTERIOR *et al.,* <br><br>    Defendants, <br><br> and <br><br> VINEYARD WIND 1, LLC, <br><br>    Intervenor-Defendant. | Civil Action No. 1:22-cv-11091-IT |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS SEAFREEZE
SHORESIDE, INC. ET AL.'S MOTION FOR SUMMARY JUDGMENT AND IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

LEGAL BACKGROUND ..................................................................................................... 2

    I.       Renewable Energy Leasing Under the Outer Continental Shelf Lands Act ........... 2

    II.      National Environmental Policy Act ........................................................................ 5

    III.    Endangered Species Act .......................................................................................... 6

    IV.    Marine Mammal Protection Act .............................................................................. 6

STATEMENT OF MATERIAL FACTS.............................................................................. 6

STANDARD OF REVIEW .................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

    I.       Plaintiffs' Claims of Injury Fall Outside NEPA's Zones of Interest ..................... 7

    II.      Plaintiffs' Challenges to the Smart from the Start Initiative, Issuance of the
           Lease, and Approval of the Site Assessment Plan Lack Merit .............................. 8

          A.     The Smart from the Start Initiative Is Not a Reviewable Final
                 Agency Action ............................................................................................ 8

          B.     The Smart from the Start Initiative Does Not Implicate the Major
                 Questions Doctrine....................................................................................... 9

          C      .Plaintiffs' NEPA Challenge to the Lease EA Is Time Barred and
                 Lacks Merit ............................................................................................... 12

          D.     Plaintiffs' OCSLA Challenge to the Issuance of the Lease is Time
                 Barred........................................................................................................ 14

          E.     Plaintiffs' OCSLA Challenge to the Approval of the Site
                 Assessment Plan Is Barred for Failure to Comply with the 60-Day
                 Notice Requirement .................................................................................. 14

          F.     BOEM's Issuance of the Lease and Approval of the Site Assessment
                 Plan Complied with OCSLA ................................................................... 15

    III.    The Temporary Withdrawal of the Construction and Operations Plan and
           Subsequent Resumption of the Review Process Did Not Violate NEPA or
           OCSLA ................................................................................................................. 17

IV.  BOEM's Approval of the Construction and Operations Plan Complied With NEPA ................................................................................................ 19

    A.  The FEIS Contains a Valid Purpose and Need Statement and Analyzes a Reasonable Range of Alternatives ......................................... 19

        1.  The FEIS's purpose and need statement properly balanced Congressional policy and the objectives of the project proponent .................................................................................. 19

        2.  BOEM analyzed a reasonable range of alternatives .................... 20

    B.  The EIS Appropriately Analyzes Impacts to Fishing .............................. 22

    C.  The EIS Appropriately Analyzed Potential Impacts on the Environment ............................................................................................... 28

    D.  BOEM Was Not Required to Wait Until NMFS Issued the 2021 BiOp Prior to Making a Decision Regarding the COP ............................. 28

    E.  The EIS Appropriately Analyzes Cumulative Impacts ............................ 31

    F.  The EIS Otherwise Complies With the NEPA Regulations .................... 33

V.  BOEM's Approval of the Construction and Operations Plan Complied With OCSLA ................................................................................................ 35

    A.  Safety ....................................................................................................... 36

    B.  Protection of the Environment and Conservation of Natural Resources ................................................................................................. 37

    C.  Marine Navigation .................................................................................. 39

    D.  Fishing .................................................................................................... 40

    E.  National Security .................................................................................... 44

VI.  Federal Defendants Complied with the Clean Water Act ................................... 45

VII.  BOEM's Decision To Approve The Vineyard Wind COP Complied With the ESA (Ninth Claim, Tenth Claim) and the MMPA (Twenty-First Claim, Twenty-Second Claim) ........................................................................................ 45

VIII.  Summary Judgment Should Be Granted to Federal Defendants On All Remaining Claims ............................................................................................... 50

IX.  If the Court Finds a Legal Error, It Should Remand Without Vacatur ................. 50

CONCLUSION.................................................................................................................. 50

## TABLE OF AUTHORITIES

**Cases**

*Airport Impact Relief, Inc. v. Wykle*,
 192 F.3d 197 (1st Cir. 1999) ............................................................................... 6

*Allco Renewable Energy Ltd. v. Haaland*,
 No. 1:21-cv-11171-IT, 2022 WL 2373914 (D. Mass. June 30, 2022) ..................... 14

*Allen v. Nat'l Insts. of Health*,
 974 F. Supp. 2d 18 (D. Mass. 2013) ................................................................. 5, 6

*Am. Waterways Operators v. U.S. Coast Guard*,
 2020 WL 360493 (D. Mass. Jan. 22, 2020) ........................................................... 7

*Baltimore Gas & Elec. Co. v. NRDC*,
 462 U.S. 87 (1983) .............................................................................................. 7

*Beyond Nuclear v. U.S. NRC*,
 704 F.3d 12 (1st Cir. 2013) ..................................................................... 5, 20, 22

*Cassidy v. Chertoff*,
 471 F.3d 67 (2d Cir. 2006) ........................................................................... 40, 44

*Central Maine Power Co.*,
 252 F.3d 34 (1st Cir. 2001) ................................................................................ 50

*Citizens Against Burlington, Inc. v. Busey*,
 938 F.2d 190 (D.C. Cir. 1991) ..................................................... 19, 20, 21, 22

*Citizens Awareness Network v. U.S. NRC*,
 59 F.3d 284 (1st Cir. 1995) ................................................................................. 7

*Citizens to Pres. Overton Park v. Volpe*,
 401 U.S. 402 (1971) ............................................................................................ 7

*City of Grapevine v. Dep't of Transp.*,
 17 F.3d 1502 (D.C. Cir. 1994) ........................................................................... 21

*Collins v. Nat'l Transp. Safety Bd.*,
 351 F.3d 1246 (D.C. Cir. 2003) .......................................................................... 39

*Conservation Congress v. U.S. Forest Serv.*,
 720 F.3d 1048 (9th Cir. 2013) ........................................................................... 48

*Ctr for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
 452 F.3d 798 (D.C. Cir. 2006) ............................................................................. 9

*Ctr. for Biological Diversity v. Jewell*,
 563 F.3d 466 (D.C. Cir. 2009) ....................................................................... 2, 11

*Ctr. for Biological Diversity v. NMFS*,
   977 F. Supp. 2d 55 (D.P.R. 2013)...........................................................46

*Ctr. for Sustainable Econ. v. Jewell*,
   779 F.3d 588 (D.C. Cir. 2015).............................................................11

*Dubois v. U.S. Dept. of Agric.*,
   102 F.3d 1273 (1st Cir. 1996).............................................................26

*Fisheries Survival Fund v. Haaland*,
   858 F. App'x. 371 (D.C. Cir. 2021)...............................................passim

*Fisheries Survival Fund v. Jewell*,
   No. 16-cv-2409 (TSC), 2018 WL 4705795 (D.D.C. Sept. 30, 2018)....................11

*Flock v. U.S. Dept. of Transp.*,
   840 F.3d 49 (1st Cir. 2016).................................................................41

*FTC v. Standard Oil Co.*,
   449 U.S. 232 (1980)...........................................................................8

*Garcia v. Cecos Int'l.*,
   761 F.2d 76 (1st Cir. 1985)................................................................14

*Gen. Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002)............................................................9

*Grenier v. Cyanamid Plastics, Inc.*,
   70 F.3d 667 (1st Cir. 1995)................................................................50

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
   920 F.2d 960 (D.C.Cir.1990)..............................................................50

*Katz v. Belveron Real Estate Partners, LLC*,
   28 F.4th 300 (1st Cir. 2022)...............................................................14

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)...........................................................................9

*Lexmark Intern. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014)...........................................................................7

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989)...........................................................................7

*Massachusetts ex rel. Div. of Marine Fisheries v. Daley*,
   170 F.3d 23 (1st Cir. 1999)..................................................................6

*Massachusetts v. Andrus*,
   594 F.2d 872 (1st Cir. 1979)..............................................15, 36, 42, 43

*Molycorp, Inc. v. EPA*,
   197 F.3d 543 (D.C. Cir. 1999)............................................................9

*Mountain States Legal Found. v. Glickman,*
    92 F.3d 1228 (D.C. Cir. 1996) ................................................................ 7

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
    551 U.S. 644 (2007) ............................................................................... 22

*Norfolk v. U.S. EPA,*
    761 F. Supp. 867 (D. Mass. 1991) ......................................................... 27

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) ................................................................................. 36

*Pacific Northwest Generating Co-op v. Brown,*
    38 F.3d 1058 (9th Cir. 1994) .................................................................. 8

*PEER v. Beaudreau,*
    25 F. Supp. 3d 67 (D.D.C. 2014) ........................................................... 15

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ............................................................................ 5, 26

*Sec'y of the Interior v. California,*
    464 U.S. 312 (1984) ................................................................................ 3

*Selkirk Conservation All. v. Forsgren,*
    336 F.3d 944 (9th Cir. 2003) ................................................................. 13

*Sierra Club v. Peterson,*
    717 F.2d 1409 (D.C. Cir. 1983) ............................................................. 11

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,*
    143 F.3d 515 (9th Cir. 1998) ................................................................. 46

*Tennessee Valley Authority v. Hill,*
    437 U.S. 153 (1978) ............................................................................... 47

*Theodore Roosevelt Conservation P'ship v. Salazar,*
    661 F.3d 66 (D.C. Cir. 2011) ................................................................. 21

*Town of Winthrop v. FAA,*
    535 F.3d 1 (1st Cir. 2008) ....................................................................... 5

*Trafalgar Capital, Assocs., Inc. v. Cuomo,*
    159 F.3d 21 (1st Cir. 1998) ..................................................................... 8

*United States v. Coal. for Buzzards Bay,*
    644 F.3d 26 (1st Cir. 2011) ................................................................... 22

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................................. 5

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ............................................................................... 47

*West Virginia v. U.S. EPA*,
    142 S. Ct. 2587 (2022) ................................................................................... 9, 10

*Wilmina Shipping AS v. U.S. Dept. of Homeland Security*,
    934 F. Supp. 2d 1 (D.D.C. 2013) ............................................................................. 40

*Wyo. Outdoor Council v. U.S. Forest Serv.*,
    165 F.3d 43 (D.C. Cir. 1999) ................................................................................. 11

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 701-706 .................................................. 6

Coast Guard Act, 14 U.S.C. § 102(1) ....................................................................... 39

Endangered Species Act, 16 U.S.C. §§ 1532, 1536, 1540 .......................... 45, 46, 47, 49

Time for Commencing Actions Against the United States, 28 U.S.C. § 2401(a) ............. 9, 12, 14

National Environmental Policy Act, 42 U.S.C. § 4321 ............................................... 7

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331, 1332, 1337 .................................. *passim*

Ports and Waterways Security Act, 46 U.S.C. § 70001 .............................................. 40

Maritime Transportation Act of 2002, Pub. L. 107-295, 116 Stat. 2064 (2002) ......................... 40

Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 (2005) .......................................... 3, 10

**Regulations**

U.S. Bureau of Ocean Energy Management, Renewable Energy and Alternate Uses of Existing
    Facilities on the Outer Contintal Shelf, 30 C.F.R. pt. 585 ................................................. *passim*

Council on Environmental Quality Regulations Implementing the National Environmental
    Quality Act 40 C.F.R. pt. 1500 (2018) ................................................................ *passim*

50 C.F.R. §§ 402.02, 402.14(g)(7), 402.14(h) ........................................................ 46, 47, 48, 49

**Other Authorities**

43 Fed. Reg. 55978 (Nov. 29, 1978) ....................................................................... 5

51 Fed. Reg. 15618 (Apr. 25, 1986) ....................................................................... 5

74 Fed. Reg. 19,638 (Apr. 29, 2009) ..................................................................... 3, 4

77 Fed. Reg. 5,830 (Feb. 6, 2012) .......................................................................... 13

85 Fed. Reg. 43,304 (July 16, 2020) .................................................................... 5, 35

86 Fed. Reg. 12,494 (Mar. 3, 2021) ....................................................................... 17

87 Fed. Reg. 23453 (Apr. 20, 2022) ....................................................................... 6

## TABLE OF ACRONYMS

| | |
|---|---|
| **BA** | Biological Assessment |
| **BiOp** | Biological Opinion |
| **BOEM** | U.S. Bureau of Ocean Energy Management |
| **COP** | Construction and Operations Plan |
| **Corps** | U.S. Army Corps of Engineers |
| **CEQ** | Council on Environmental Quality |
| **CWA** | Clean Water Act |
| **DEIS** | Draft Environmental Impact Statement |
| **DoD** | U.S. Department of Defense |
| **EA** | Environmental Assessment |
| **ESA** | Endangered Species Act |
| **FEIS** | Final Environmental Impact Statement |
| **FWS** | U.S. Fish & Wildlife Service |
| **IHA** | Incidental Harassment Authorization |
| **JROD** | Joint Record of Decision |
| **MMPA** | Marine Mammal Protection Act |
| **NEPA** | National Environmental Policy Act |
| **NM** | Nautical Mile |
| **NMFS** | National Marine Fisheries Service |
| **NMFS/GAR** | NMFS Greater Atlantic Region Office |
| **NMFS/OPR** | NMFS Office of Protected Resources |
| **NORAD** | North American Aerospace Defense Command |
| **OCS** | Outer Continental Shelf |
| **OCSLA** | Outer Continental Shelf Lands Act |
| **RHA** | Rivers and Harbors Act |
| **RODA** | Responsible Offshore Development Alliance |
| **RPA** | Reasonable and Prudent Alternative |
| **SAP** | Site Assessment Plan |
| **SDEIS** | Supplemental Draft Environmental Impact Statement |

## INTRODUCTION

The Vineyard Wind Project ("the Project") is an offshore wind energy project planned for an area on the Outer Continental Shelf more than 14 miles from the coasts of Martha's Vineyard and Nantucket Island. The Project will have the capacity to generate approximately 800 megawatts of electricity, which would supply renewable energy to about 400,000 homes in Massachusetts. Vineyard Wind obtained an offshore wind lease for the area in early 2015, and, over the next several years, it gathered extensive data regarding the environmental conditions and uses of the area. The data included information regarding the suitability of seafloor to support wind turbines, the wind conditions in the area, marine mammal and fish species, and the use of the area and adjacent areas for fishing. After gathering all of this information and preparing several reports for the Bureau of Ocean Energy Management's ("BOEM") review, Vineyard Wind submitted a Construction and Operations Plan ("COP") for BOEM's approval.

In cooperation with the National Marine Fisheries Service ("NMFS"), the U.S. Army Corps of Engineers ("Corps"), the U.S. Coast Guard, and several other federal and state agencies, BOEM prepared an environmental impact statement ("EIS") to evaluate the impacts of the Project. The EIS evaluated the potential impacts of the Project on a range of resources and uses of the area, including marine mammals, fish species, commercial fishing, and national security issues. BOEM also obtained substantial input from the public, including the fishing industry, regarding the issues evaluated in the EIS. Through this extensive process and the preparation of lengthy EIS, BOEM met its obligations under the National Environmental Policy Act ("NEPA"). Further, by carefully evaluating the impacts of the Project and determining that it could be conducted safely, would contain appropriate mitigation to avoid and minimize environmental impacts, and would not unreasonably interfere with other uses of the area, BOEM complied with the Outer Continental Shelf Land Act ("OCSLA").

1

Environmental reviews also included consultation between BOEM, as well as other Federal action agencies, and the National Marine Fisheries Service's Greater Atlantic Region ("NMFS/GAR") under the Endangered Species Act ("ESA"). NMFS/GAR reasonably concluded in its 2021 biological opinion ("BiOp"), based on the best available scientific information, that BOEM's approval of the construction and operations plan with conditions, as well as the actions by other Federal agencies, are not likely to jeopardize the North Atlantic right whale ("right whale"). Vineyard Wind also applied to the National Marine Fisheries Services' Office of Protected Resources ("NMFS/OPR") for an incidental harassment authorization ("IHA") issued pursuant to the Marine Mammal Protection Act ("MMPA") for pile driving activities during Project construction. NMFS/OPR issued an IHA to Vineyard Wind on May 21, 2021. Based on the COP, Final EIS ("FEIS"), IHA, and BiOp, BOEM mandated numerous measures to avoid, minimize, reduce, or eliminate effects on right whales when it approved Vineyard Wind's COP with conditions in July 2021.

In sum, the record before the Court establishes that Federal Defendants complied with all applicable laws, and the Court should enter summary judgment in favor of Federal Defendants.

## LEGAL BACKGROUND

### I.    Renewable Energy Leasing Under the Outer Continental Shelf Lands Act

The outer continental shelf consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under OCSLA, the United States holds the outer continental shelf as a "vital national resource reserve . . . for the public," which Congress declared "should be made available for expeditious and orderly development, subject to environmental safeguards." 43 U.S.C. § 1332(3). Congress enacted OCSLA in 1953 to authorize

oil and gas leasing. *Sec'y of the Interior v. California*, 464 U.S. 312, 336 (1984). In 2005, Congress amended OCSLA to authorize the Secretary of the Interior to issue leases on the outer continental shelf to "support production, transportation, storage, or transmission of energy from sources other than oil and gas," including wind energy. 43 U.S.C. 1337(p)(1)(C); *see also* Energy Policy Act of 2005 § 388, Pub. L. 109-58, 119 Stat. 594, 744-45 (2005).

Pursuant to subsection 8(p) of OCSLA, the Secretary, in consultation with the U.S. Coast Guard and other relevant federal agencies, may grant a lease, easement, or right-of-way on the Outer Continental Shelf for the purpose of renewable energy production. 43 U.S.C. § 1337(p)(1)(C). OCSLA requires the Secretary to ensure that "any activity" that she authorizes is "carried out in a manner that provides for" 12 specific enumerated goals. *Id.* § 1337(p)(4)(A)-(L). Those include: safety; protection of the environment; conservation of natural resources; "prevention of interference with reasonable uses (as determined by the Secretary)" of the outer continental shelf; and consideration of other uses of the sea and seabed, including the use of the area for fishing and marine navigation. . *Id.*; *see also* 30 C.F.R. § 585.102(a). Interior has interpreted section 8(p) to mean that "OCSLA imposes a general duty on the Secretary to act in a manner providing for the subsection's enumerated goals," but the Secretary "retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." BOEM_0072956 (Solicitor's M-Opinion M-37067).

Pursuant to the authority granted by Congress, *see* 43 U.S.C. § 1337(p)(8), BOEM has issued regulations governing the leasing process and management of offshore renewable energy projects. *See* 74 Fed. Reg. 19,638 (Apr. 29, 2009); 30 C.F.R. Pt. 585. Under the regulations, BOEM may publish a notice to solicit interest in renewable energy leasing on the outer continental shelf, 30 C.F.R. § 585.210, and may publish a call for information and nominations

of potential lease areas, *id.* § 585.211(a) . Based on information and nominations received and

the agency's own consideration of relevant factors, BOEM will then "identify areas for

environmental analysis and consideration for leasing." *Id.* § 585.211(b) . In so doing, BOEM

"will evaluate potential effects of leasing on the human, marine, and coastal environments," *id.* §

585.211(b)(2) , and will consult with "appropriate Federal agencies, States, local governments,

affected Indian Tribes, and other interested parties." *Id.* § 585.211(b)(3); *see also* 74 Fed. Reg.

19,638, 19,659 (Apr. 29, 2009).

After identifying "wind energy areas," BOEM may proceed to offer the identified areas

or portions of those areas for lease sale by auction. 30 C.F.R. §§ 585.215, 585.216. Prior to

issuing any lease, BOEM will coordinate and consult with relevant federal agencies and other

governmental entities, as directed by OCSLA or other relevant Federal laws. *Id.* § 585.203.

"BOEM will determine the size for each lease based on the area required to accommodate the

anticipated activities." *Id.* § 585.206(a) . Under BOEM's renewable energy program, a lease does

not authorize the development of a wind energy facility; instead, a lessee's right to "install and

operate facilities" for the "production of energy from a renewable energy source," is still

"subject to obtaining the necessary approvals" from BOEM. 30 C.F.R. § 585.200(a)(2); *see also*

BOEM_0000765 (Lease § 2(c)). In other words, in order for any development to occur, a lessee

must first gather site characterization at the site and obtain BOEM's approval of a site

assessment plan ("SAP") and later a construction and operations plan ("COP"). *Id*. § 585.600.

Before conducting "any site assessment activities," *i.e.*, deployment of meteorological

buoys or installation of meteorological towers for data collection, on a leasehold, a lessee must

submit and obtain BOEM approval of a SAP in accordance with BOEM's regulations. 30 C.F.R.

§§ 585.600, 585.605–585.613) . If BOEM approves the SAP, then the lessee has a period of five

years to conduct site assessment activities and gather other data. *Id.* § 585.235(a)(2) . After gathering the necessary data, the lessee must then prepare a proposal for the development of a wind energy facility on the outer continental shelf and submit an application for a COP. *Id.* §§ 585.600, 585.620–585.629. At this stage, BOEM must prepare "an appropriate NEPA analysis." *Id.* § 585.628. After reviewing the application to ensure compliance with OCSLA and BOEM's regulations, BOEM may "approve, disapprove, or approve [the plan] with modifications." 30 C.F.R. §§ 585.613(e), 585.628(f) .

## II.    National Environmental Policy Act

Congress enacted NEPA to establish a process for federal agencies to consider the environmental impacts of their actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA is a strictly procedural statute. It does not mandate particular results; rather, "it simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action." *Allen v. Nat'l Insts. of Health*, 974 F. Supp. 2d 18, 36 (D. Mass. 2013) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 333 (1989)). After completing the necessary environmental review, "NEPA does not prevent agencies from then deciding that the benefits of a proposed action outweigh the potential environmental harms: NEPA guarantees process, not specific outcomes." *Town of Winthrop v. FAA*, 535 F.3d 1, 4 (1st Cir. 2008). NEPA's procedural requirements obligate federal agencies to "take a 'hard look' at environmental consequences." *Beyond Nuclear v. U.S. NRC*, 704 F.3d 12, 19 (1st Cir. 2013). Council on Environmental Quality ("CEQ") regulations guide NEPA implementation.[1] *See* 40 C.F.R. §§ 1500-1508.

---

[1] The CEQ promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55978 (Nov. 29, 1978), and made a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15618 (Apr. 25, 1986). The CEQ revised the regulations again in 2020. *See* 85 Fed. Reg. 43304

### III.    Endangered Species Act

Consistent with this Court's instructions that the parties limit duplicative briefing among the various cases challenging the Project, Federal Defendants incorporate by reference the legal background regarding the ESA set forth in their summary judgment brief filed contemporaneously in *Responsible Offshore Development Alliance v. U.S. Department of the Interior ("RODA")*, No. 1:22-cv-11172-IT.

### IV.    Marine Mammal Protection Act

Federal Defendants incorporate by reference the legal background regarding the Marine Mammal Protection Act ("MMPA") set forth in their summary judgment brief filed in *RODA*.

## STATEMENT OF MATERIAL FACTS

Federal Defendants' Statement of Material Facts and Response to Plaintiffs' Statement of Material Facts, which are filed concurrently with this memorandum, are incorporated by reference.

## STANDARD OF REVIEW

Claims challenging federal agency action are reviewed pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. Doc. No. 1 ¶ 26; *Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 28 (1st Cir. 1999); *Allen*, 974 F. Supp. 2d at 36. Under the APA, a court may set aside "agency action, findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202 (1st Cir. 1999). Review under this standard is to be

_____

(July 16, 2020). More recently, the CEQ published a new rule, effective May 20, 2022, further revising the regulations. 87 Fed. Reg. 23453 (Apr. 20, 2022). The claims in this case arise under the 1978 regulations, as amended in 1986. *See* BOEM_0068440. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. §§ 1500-1508 (2018). For the Court's convenience, a copy of the 1978 regulations is attached as Ex. 1.

"searching and careful" but "narrow," and a court is not to substitute its judgment for that of the agency, *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), but should make its determination based solely on the record on which the decision was made. *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 419 (1971). Review under this standard is highly deferential, and "is especially marked in technical or scientific matters within the agency's area of expertise." *Citizens Awareness Network v. U.S. NRC*, 59 F.3d 284, 290 (1st Cir. 1995); *see also Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983).

## ARGUMENT

### I.    Plaintiffs' Claims of Injury Fall Outside NEPA's Zones of Interest

The Court need not reach Plaintiffs' NEPA claims because Plaintiffs lack standing to bring them. In addition to establishing that it has Article III standing, a plaintiff must also satisfy prudential concerns by establishing that its claimed injuries "fall within the zones of interest protected by the law invoked." *Lexmark Intern. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). Plaintiffs claim that, if the Vineyard Wind Project moves forward, it will cause them to suffer economic injury. Those economic injuries fall outside NEPA's zone of interests.

NEPA is an environmental law that Congress enacted to promote environmental interests. 42 U.S.C. § 4321; *see Am. Waterways Operators v. U.S. Coast Guard*, 2020 WL 360493, at *6 (D. Mass. Jan. 22, 2020). As a result, numerous courts have concluded that purely economic interests fall outside NEPA's zone of interest. *Id.* (collecting cases); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235-36 (D.C. Cir. 1996) (NEPA's zone of interests "do not include purely monetary interests").

Here, Plaintiffs are each commercial fisheries or associations of commercial fisheries. Their concerns, and allegations of injury, center on alleged threat to their businesses and

profits—purely economic injuries that fall outside NEPA's zones of interest. Plaintiffs cannot

cure their lack of prudential standing by relying on claims that their non-plaintiff owners have

individual aesthetic or environmental interests. *See* Doc. No. 67 at 13 (describing alleged

aesthetic interests of David Aripotch, a non-plaintiff owner of Plaintiff Old Squaw Fisheries).

Mr. Aripotch's aesthetic interests are not "environmental interest[s] which [plaintiffs] as a

business enjoy." *Pacific Northwest Generating Co-op v. Brown*, 38 F.3d 1058, 1063 (9th Cir.

1994) (corporations could not assert aesthetic or environmental interests of employees or

members because those interests were not germane to corporate purpose). Plaintiffs therefore

lack "prudential standing" to challenge the Project under NEPA.

## II.   Plaintiffs' Challenges to the Smart from the Start Initiative, Issuance of the Lease, and Approval of the Site Assessment Plan Lack Merit

Plaintiffs' NEPA and OCSLA challenges to the Smart from the Start initiative, issuance

of the lease, and approval of the SAP are barred on jurisdictional grounds and lack merit.[2]

### A.   The Smart from the Start Initiative Is Not a Reviewable Final Agency Action

Plaintiffs begin by challenging Interior's Smart from the Start initiative as unlawful and

contrary to the major questions doctrine. Plaintiffs have no legal basis for these arguments. As an

initial matter, it is unclear what federal action Plaintiffs are challenging. The APA permits suits

against final agency actions. *See Trafalgar Capital, Assocs., Inc. v. Cuomo*, 159 F.3d 21, 35 (1st

Cir. 1998). A final agency action is one that completes the agency decisionmaking process and is

a "definitive statement of the agency's position with direct and immediate consequences." *Id.*

(quoting *FTC v. Standard Oil Co.*, 449 U.S. 232, 241 (1980)) (cleaned up). Plaintiffs refer to

press releases issued on November 23, 2010 and February 1, 2011. *See* Doc. No. 68 ¶¶ 27-29. As

---

[2] Heading II in Plaintiffs' brief refers to the ESA, but there are no arguments regarding the ESA in that section of the brief. Plaintiffs' ESA arguments are addressed in section VII, *infra*.

Plaintiffs correctly state, however, Interior never issued a regulation based on those press releases. *See* Doc. No. 67 at 19. In order for an agency policy document to be a reviewable final agency action, it must "purport[] to bind both applicants and the Agency with the force of law." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *see also Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999) (the "ultimate focus of the inquiry is whether … it has the force of law"). Where a policy has no such binding effect and the "agency remains free to exercise discretion," it is not reviewable under the APA. *Ctr for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 809 (D.C. Cir. 2006). The Smart from the Start initiative and Plaintiffs' cited press releases have no such binding effect and therefore are not a reviewable final agency action. Moreover, even if the 2011 press release and initiative they reference could otherwise be challenged, such a challenge would be time barred based on the six-year statute of limitations for civil actions against the United States. *See* 28 U.S.C. § 2401(a).[3]

**B.     The Smart from the Start Initiative Does Not Implicate the Major Questions Doctrine**

In any event, even if the Court were to consider the merits of Plaintiffs' challenge to the Smart from the Start initiative, it would fail as a matter of law. Plaintiffs assert that the Smart from the Start initiative violated the major questions doctrine because it permitted BOEM to prepare an environmental assessment ("EA") rather than an EIS at the leasing stage. Doc. No. 67 at 19-23 (citing *West Virginia v. U.S. EPA*, 142 S. Ct. 2587, 2609 (2022)). Plaintiffs do not seriously dispute that Interior has the legal authority to approve the development of offshore wind projects on the outer continental shelf. Indeed, with the passage of the Energy Policy Act of

---

[3] Plaintiffs assert that the statute of limitations should be disregarded because they have characterized their challenge to the Smart from the Start initiative as an *ultra vires* claim. *See* Doc. No. 67 at 19. However, the case they cite does not stand for that proposition. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).

2005, Congress expressly authorized the Secretary of the Interior to approve renewable energy projects on the outer continental shelf. *See* 43 U.S.C. § 1337(p)(1) ("The Secretary . . . may grant a lease, easement, or right-of-way on the outer Continental Shelf for activities not otherwise authorized in this subchapter . . . ."); *see also* Energy Policy Act of 2005 § 388, Pub. L. No. 109-58, 119 Stat. at 744-45. Further, Congress delegated to Interior the authority to develop regulations governing renewable energy development. 43 U.S.C. § 1337(p)(8).

Instead, Plaintiffs' major questions doctrine argument is based on the premise that BOEM was required to prepare an EIS analyzing the environmental impacts of the development of the Project prior to issuing a lease. Plaintiffs do not explain how the major questions doctrine would apply to this issue. In *West Virginia v. EPA*, the Supreme Court explained that the major questions doctrine may apply in "extraordinary cases in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority" through ambiguous statutory language. 142 S. Ct. at 2608 (cleaned up). As such, the major questions doctrine does not apply where the statutory language clearly delegates authority to the agency to take the challenged action. *See id.* Moreover, because the major questions doctrine focuses on the scope of an agency's authority to affirmatively regulate a given activity, it does not extend to how the agency complies with the procedural requirements of other statutes, such as NEPA, and Plaintiffs offer no authority for such a proposition. Therefore, all of Plaintiffs' arguments based on the major questions doctrine, *see* Doc. No. 67 at 21-22, 33, 35, 42, fail as a matter of law.

Plaintiffs' argument that an EIS was required also is contradicted by the only circuit court decision to squarely address the issue. *See Fisheries Survival Fund v. Haaland*, 858 F. App'x.

371 (D.C. Cir. 2021). In *Fisheries Survival Fund*, a group of plaintiffs representing fishing interests challenged BOEM's decision to issue a lease for the New York Wind Energy Area. *Id.* at 371-72. BOEM prepared an EA prior to its leasing decision, and the plaintiffs argued that the EA was insufficient to comply with NEPA because it did not analyze the impacts of constructing and operating the Project. *Id.*; *see also Fisheries Survival Fund v. Jewell*, No. 16-cv-2409 (TSC), 2018 WL 4705795, at *2-3 (D.D.C. Sept. 30, 2018), *affirmed sub nom. Fisheries Survival Fund v. Haaland*, 858 F. App'x. 371 (D.C. Cir. 2021). The D.C. Circuit held that the agency's obligation to comply with NEPA had not matured because the agency had not made an "irreversible and irretrievable commitment of resources" towards authorizing the development of an offshore wind project. *Fisheries Survival Fund*, 858 F. App'x. at 372 (quoting *Center for Biological Diversity v. Dept. of the Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009)).

The D.C. Circuit's ruling is consistent with a longstanding line of cases holding that NEPA claims are not ripe unless the agency takes an action that will result in an irreversible and irretrievable commitment of resources. *See Ctr. for Biological Diversity*, 563 F.3d at 480 ("[A]n agency's NEPA obligations mature only once it reaches a 'critical stage of a decision which will result in irreversible and irretrievable commitments of resources' to an action that will affect the environment.'") (quoting *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999)); *see also Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 599-600 (D.C. Cir. 2015). An agency makes such a commitment when, for example, "it no longer retains the authority to preclude all surface disturbing activities subsequent to issuing of an oil and gas lease." *Wyo. Outdoor Council*, 165 F.3d at 49 (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983)) (quotations omitted).

Here, the Court should reach the same conclusion regarding Plaintiffs' argument that

NEPA required BOEM to prepare an EIS analyzing the impacts of the Project at the leasing stage. Like the lease at issue in *Fisheries Survival Fund*, the Vineyard Wind Lease grants Vineyard Wind only the "exclusive right and privilege" to submit a SAP and a COP for BOEM's approval and reserves BOEM's "right to disapprove a SAP or a COP based on [BOEM's] determination that the proposed activities would have unacceptable environmental consequences, would conflict with the requirements set forth in subsection 8(p)(4) of [OCSLA], or for other reasons" pursuant to BOEMs' regulations, 30 C.F.R. § 585.613(e)(2), 585.628(f)(2). *Compare* BOEM_0000765 (Vineyard Wind Lease §§ 2(a), 3(b)) *with Fisheries Survival Fund*, 858 F. App'x. at 372 (quoting the New York area lease terms). Thus, just as in *Fisheries Survival Fund*, BOEM did not, at the leasing stage, make an irreversible and irretrievable commitment of resources towards the approval of a wind energy project and therefore was not required to prepare an EIS analyzing the impacts of developing a project at that time.

### C.    Plaintiffs' NEPA Challenge to the Lease EA Is Time Barred and Lacks Merit

To the extent Plaintiffs are raising a separate NEPA challenge to the EA supporting BOEM's leasing decision, such a challenge is time barred and also is without merit. The claim is time barred because the EA was completed in June 2014 and the lease was issued on March 5, 2015. BOEM_0000092 (EA); BOEM_0000770 (lease). Thus, Plaintiff should have challenged the lease no later than March 2021. *See* 28 U.S.C. § 2401(a) (six-year statute of limitations).

If the Court nonetheless addresses the claim, it is without merit. The purpose of the lease EA was not to evaluate the potential impacts of developing a wind energy project, which at that stage had not yet been proposed. Instead, the EA analyzed what it was the lease would authorize: the impacts of "site characterization activities (i.e., surveys of the lease area), and site assessment activities within the [wind energy area] (i.e., construction and operation of meteorological towers

[and] buoys." BOEM_0000114. The lease EA and the COP EIS served two entirely different purposes. The former analyzed the environmental impacts of issuing a lease and site assessment activities, and the latter analyzed the reasonably foreseeable impacts of constructing and operating an offshore wind farm. *See* Legal Background § I, *supra*, *Fisheries Survival Fund*, 858 F. App'x. at 372. Indeed, BOEM made clear when it announced the preparation of the initial EA that it would analyze the impacts "associated with issuing commercial wind leases and approving site assessment activities on those leases." 77 Fed. Reg. 5,830 (Feb. 6, 2012). BOEM also explained, that "[i]f a lessee proposes development activity, the specific proposal will be given full environmental review at that time." *Id.*; *see also id.* at 5,831 (explaining the scope of the proposed action and analysis); BOEM_0000118-19 (lease EA scope of analysis). Given the stepwise nature of BOEM's approval process, Plaintiffs' argument that after preparing the EIS, "BOEM should have rescinded the original EA," Doc. No. 67 at 23, makes no legal sense.

Given the scope of the EA, it contained an appropriate analysis of impacts that were reasonably foreseeable at the time. *See* BOEM_0000172-0000425. Plaintiffs argue that the analysis of cumulative impacts was inadequate because it was limited to a five-year period from 2014 to 2019. *See* Doc. No. 67 at 24. The temporal scope of analysis was limited to five years because, under BOEM's regulations, site evaluation activities must take place within five years. *See* 30 C.F.R. § 585.235(a)(2); BOEM_0000356. In light of the regulatory requirement to submit a COP within those five years, BOEM's selection of a five-year temporal scope was reasonable and is entitled to deference. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 962 (9th Cir. 2003). Moreover, the EA considered in its cumulative impacts analysis the Block Island Wind Farm, site assessment activities on the outer continental shelf offshore of Rhode Island and Massachusetts, and the Cape Wind Project (which was approved, but never developed).

BOEM_0000357-39. Plaintiffs do not identify any other offshore wind projects or related

activities that were reasonably foreseeable at the time of the lease EA. Instead, they return to

their argument that BOEM was required to prepare an EIS analyzing the impacts over the life of

the Project at the time of lease issuance. Doc. No. 67 at 25. This argument was rejected in

*Fisheries Survival Fund*, 858 F. App'x. at 372.

> **D.    Plaintiffs' OCSLA Challenge to the Issuance of the Lease is Time Barred**

Plaintiffs also argue that BOEM violated OCSLA at the leasing stage by not ensuring

compliance with the factors enumerated in section 8(p)(4). *See* Doc. No. 67 at 25-27. This claim

is time barred because BOEM issued the lease over six years before Plaintiffs filed this case. *See*

28 U.S.C. § 2401(a) (six-year statute of limitations).

> **E.    Plaintiffs' OCSLA Challenge to the Approval of the Site Assessment Plan Is Barred for Failure to Comply with the 60-Day Notice Requirement**

The challenge to the SAP also should be rejected because Plaintiffs failed to provide the

congressionally required 60-day notice in advance of any challenge to the SAP. *See* 43 U.S.C. §

1349(a)(2)(A). The submission of a 60-day notice letter prior to suit is mandatory. *Garcia v.

Cecos Int'l.*, 761 F.2d 76, 79 (1st Cir. 1985); *Allco Renewable Energy Ltd. v. Haaland*, No. 1:21-

cv-11171-IT, 2022 WL 2373914, at *1 (D. Mass. June 30, 2022) (Talwani, J.). Plaintiffs

submitted a 60-day notice letter on September 17, 2021, Doc. No. 1-1. The letter asserts claims

under OCLSA, but none against the SAP. *See id.* at 4-23. Because Plaintiffs failed to comply

with the 60-day notice requirement, the challenge to the SAP is barred. *Allco Renewable Energy*,

2022 WL 2373914, at *2; *Fisheries Survival Fund*, 858 F. App'x. at 373-74.[4]

---

[4] The claim also fails because the complaint, Doc No. 1 at 35-78, contains no claim challenging
the SAP. *See Katz v. Belveron Real Estate Partners, LLC*, 28 F.4th 300, 310 (1st Cir. 2022).

**F.      BOEM's Issuance of the Lease and Approval of the Site Assessment Plan Complied with OCSLA**

If the Court, nevertheless, reaches the merits of Plaintiffs' OCSLA claims regarding the

lease and SAP, they are without merit because BOEM complied with OCSLA during all stages

of the approval process. BOEM's OCSLA compliance at a particular stage of a multi-stage

process must be viewed in the context of the entire process. *See PEER v. Beaudreau*, 25 F. Supp.

3d 67, 107 (D.D.C. 2014), *rev'd in part on other grounds*, 827 F.3d 1077 (2016) ("[T]he

Secretary's overall obligation under 43 U.S.C. § 1337(p)(4) to provide for safety is an obligation

that applies not only to approving individual steps of the process, such as the timing of the

collection of survey data, *but rather to the entirety of the leasing process*." (emphasis added)).

Plaintiffs fail to demonstrate the BOEM violated either OCSLA section 8(p), 43 U.S.C. §

1337(p), or section 3, 43 U.S.C. § 1332(2), when it issued the lease or approved the SAP.

Section 8(p) requires the Secretary to ensure that "any activity" that she authorizes is

"carried out in a manner that provides for" twelve enumerated factors, including safety,

protection of the environment, and consideration of other uses of the sea and seabed, including

for use as a fishery. 43 U.S.C. § 1337(p)(4)(A)-(L). Section 3(2) provides that activities on the

outer continental shelf shall be conducted in a manner such that "the right to navigation and

fishing therein shall not be affected." *Id.* § U.S.C. 1332(2); *see also* section V, *infra*. The First

Circuit has interpreted this subsection 3(2) to mean only that, in granting mineral leasing rights,

Interior may not interfere with "the legal right to fish." *Massachusetts v. Andrus*, 594 F.2d 872,

889 (1st Cir. 1979). Plaintiffs fail to demonstrate that the issuance of the lease and approval of

the SAP, which do not authorize the lessee to develop a project, violated the requirements of

OCSLA in any way. Instead, the pages of the EA that Plaintiffs cite show that BOEM was taking

its OCSLA obligation seriously at all steps of the approval process. *See, e.g.*, BOEM_0000156-

57, 229-31, 385-87.

Moreover, BOEM designated the wind energy area offshore of Massachusetts through extensive cooperation with multiple stakeholder groups, including the Fisheries Working Group on Offshore Renewable Energy and the Massachusetts Habitat Working Group on Offshore Renewable Energy. BOEM_0076941; BOEM_0000120-21. BOEM hosted several public meetings between 2009 and 2012 and met with the working groups five times between 2011 and 2012. BOEM_0076941; BOEM0000121-22. As a result of these meetings, the wind energy area was reduced by 50% to avoid areas used for shipping, recreational and commercial fishing, and the Nantucket Lightship Habitat Closure Area. BOEM_0076941; BOEM_0000123; *see also* BOEM_0000001. BOEM analyzed the resulting wind energy area in the EA, assessing the impacts of leasing and site assessment activities. *See* BOEM_0000172-391 (EA). Thus, BOEM appropriately considered OCSLA's requirements at the leasing stage, at which point no development activities were authorized and no actual project had been proposed.

The same is true at the site assessment phase. BOEM approved Vineyard Wind's site assessment plan in May 2018. BOEM_0013366. BOEM's approval of the SAP required Vineyard Wind to abide by several conditions designed to protect the environment, conserve natural resources, and avoid conflicts with other users of the area. BOEM_0013366-75. Further, the SAP itself analyzes potential impacts to the environment and natural resources that would be affected by the planned site assessment activities, and mitigation measures to avoid such impacts. *See* Vineyard Wind SAP at 21-69, attached as Ex. 2.[5] Plaintiffs fail to show that BOEM's issuance of the lease and subsequent approval of the SAP violated OCSLA.

---

[5] Plaintiffs complain that the SAP was not included in the administrative record, but they did not bring a claim challenging the approval of the SAP, and when they filed a motion requesting supplementation of the record, Plaintiffs did not mention the SAP. *See* Doc. No. 57.

**III.    The Temporary Withdrawal of the Construction and Operations Plan and Subsequent Resumption of the Review Process Did Not Violate NEPA or OCSLA**

Plaintiffs also take issue with BOEM's temporary suspension of the review of the COP and subsequent resumption of the review process. But BOEM's process was lawful. Vineyard Wind requested that BOEM suspend its review because the company had selected General Electric ("GE") to provide wind turbines for the Project and wanted to ensure that the technical aspects of GE's turbines did not require further analysis beyond the impacts that had been analyzed in the Supplemental Draft Environmental Impact Statement ("SDEIS"). BOEM_0067649; BOEM_0067677. Vineyard Wind conducted an internal technical review and found that the specifications of the GE turbines fit within the parameters that were analyzed in the SDEIS. BOEM_0067698-701. BOEM also reviewed the technical information regarding the new turbines and determined that they fell within the design envelope analyzed in the SDEIS. BOEM_0067703-04 (explanation and chart comparing the design parameters analyzed previously with those of the GE turbines); *see also* BOEM_0068440 n.3, 68466. Indeed, following the temporary withdrawal of the COP, RODA—the plaintiffs in a companion case— submitted a letter saying that the project design envelope already encompassed the new GE Turbines. BOEM_0067665. BOEM then resumed its review of the COP under NEPA and other statutory requirements. 86 Fed. Reg. 12,494 (Mar. 3, 2021); *see also* BOEM_0067709-10.

Plaintiffs offer no cogent explanation as to why BOEM's temporary pause and subsequent resumption of the review process violated NEPA or OCSLA. Indeed, Plaintiffs do not identify any statutory or regulatory provision that would have limited BOEM's inherent discretion to do so. Nor is there is any basis for the assertion that the inclusion of the GE turbines into the project design required supplemental NEPA analysis. *See* 40 C.F.R. § 1502.9(c)(1) (supplemental NEPA analysis is required if "[t]he agency makes substantial changes in the

proposed action that are relevant to environmental concerns" or [t]here are significant new circumstances or information relevant to environmental concerns"). BOEM reviewed the new technical specifications and determined that they fell within the specifications already analyzed in the SDEIS, *i.e.*, the new turbines would not have a greater generating capacity and would be no taller or wider than the previously analyzed turbines. BOEM_0067703; BOEM_0068466; *see also* BOEM_0068443-44 (setting forth the design envelope parameters). The number of turbines (62) would also be on the lower end of the number previously analyzed (57-100). *Id.* For the same reason, there was no requirement for an additional public process after the review process resumed. There was already a public comment period on the SDEIS regarding the changes in the design envelope. BOEM_0056972; BOEM_69181. NEPA did not require BOEM to engage in an additional public comment process when there was no significant new information bearing on the project design or environmental impacts. 40 C.F.R. § 1502.9(c)(1).

BOEM also did not violate OCSLA by resuming the review process. Plaintiffs argue that BOEM had "no power to unilaterally restart review of a withdrawn COP," but they provide no citation to BOEM's regulations or other legal authority to support that claim. Doc. No. 67 at 33. BOEM independently reviewed the changes in the design specifications and determined that they were within the parameters that BOEM had already analyzed. BOEM_0067703; BOEM_0068466. Therefore, there is no basis for Plaintiffs' assertion that, when it resumed the review process, BOEM did not evaluate those parameters and determine that the Project would be conducted in accordance with the requirements of 43 U.S.C. § 1337(p)(4).

IV.    **BOEM's Approval of the Construction and Operations Plan Complied With NEPA**

    A.    **The FEIS Contains a Valid Purpose and Need Statement and Analyzes a Reasonable Range of Alternatives**

        1.    **The FEIS's purpose and need statement properly balanced Congressional policy and the objectives of the project proponent**

Plaintiffs begin their NEPA challenge to BOEM's COP approval by contending that the FEIS's purpose and need statement was overly narrow in violation of NEPA. See Doc. No. 67 at 29, 37-38. As shown in section III.D. of Federal Defendants summary judgment brief in *RODA*, the FEIS's purpose and need statement fully complies with NEPA and in no way predetermined Federal Defendants' actions. In addition to the arguments advanced by RODA, the Seafreeze Plaintiffs argue that Vineyard Wind somehow "ensure[d] that the 'purpose' of its project would focus not on any federal purpose or need but rather 'solely' on its own pecuniary interests." Doc. No. 67 at 38.

Plaintiffs' argument lacks any basis in the record or in the law. It lacks a basis in the record because the FEIS never adopted Vineyard Wind's economic interests as the purpose of BOEM's action. Instead, the FEIS makes clear that the purpose and need of BOEM's action was "to determine whether to approve, approve with modifications, or disapprove the COP" submitted by Vineyard Wind. BOEM_0068466. That purpose is consistent with BOEM's statutory obligations under 43 U.S.C. §§ 1332(3), 1337(p) .

And as a legal matter, "[w]hen an agency is asked to sanction a specific plan," it "should take into account the needs and goals of the parties involved in the application." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). BOEM did that here by crafting a purpose and need statement that considered whether to approve, modify, or disapprove of the project Vineyard Wind had proposed, consistent with BOEM's duty to make the OCS "available

for expeditious and orderly development, subject to environmental safeguards."
BOEM_0068466.

### 2.     BOEM analyzed a reasonable range of alternatives

Like RODA, the Seafreeze Plaintiffs also challenge the range of alternatives that BOEM

analyzed in the FEIS. Courts "uphold an agency's definition of objectives so long as the

objectives that the agency chooses are reasonable, and [they] uphold its discussion of alternatives

so long as the alternatives are reasonable and the agency discusses them in reasonable detail."

*Busey*, 938 F.2d at 196; *see also* 40 C.F.R. § 1502.14(a) (applicable CEQ regulations); 43 C.F.R.

§ 46.420(a)(2) (BOEM's NEPA regulation regarding alternatives). Because their arguments

largely overlap, Federal Defendants incorporate the arguments made in section V.D.2., and

separately address the arguments made solely by Seafreeze.

The Seafreeze Plaintiffs contend that BOEM improperly excluded several alternatives,

including to "increase the spacing between turbines, reorient the turbines, or limit the project's

size (among other things)." Doc. No. 67 at 31. According to Plaintiffs, that was improper

because BOEM "allowed Massachusetts' electricity distributors and Vineyard Wind to dictate

what the federal government would consider as reasonable alternatives." *Id.* Similarly, Plaintiffs

contend that BOEM erred by "limiting its consideration of reasonable alternatives only to those

within the lease area." *Id.* at 35; 47-48.[6]

Plaintiffs are incorrect. Courts, including the First Circuit, have repeatedly recognized

that where, as here, "the agency is not itself the project's sponsor, 'consideration of alternatives

may accord substantial weight to the preferences of the applicant.'" *Beyond Nuclear*, 704 F.3d at

---

[6] Plaintiffs' arguments with respect to BOEM's selection of alternatives are also found
throughout various sections of their brief. *See* Doc. No. 67 at 31, 35, 47-48. For the Court's
convenience, we treat them together.

19 (citing *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994)). That makes sense because an agency need only consider alternatives that are "technically and economically practical or feasible." *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 69 (D.C. Cir. 2011). A project proponent's goals necessarily are relevant to the question of which alternatives are practical and feasible because an alternative that is contrary to or inconsistent with a project proponent's goals might so defeat the purpose of the Project to be nonviable. As BOEM explained in the SDEIS, selecting such an alternative would "effectively be the same as selecting Alternative G (No Action)." BOEM_0057321.

The same is true of each of the alternatives Plaintiffs identify. For example, BOEM decided not to include for further analysis in the FEIS an alternative that would have required the Project to be constructed outside the Vineyard Wind lease area because doing so would have been nonresponsive to Vineyard Wind's proposal, which was limited to constructing a facility within its lease area. BOEM_0057321. That decision was reasonable: as BOEM explained, it "would consider proposals on other existing leases through a separate regulatory process." *Id.* But doing so as part of the present NEPA process was not necessary because such an alternative would not have been economically or practically feasible for Vineyard Wind, which could not develop a project in areas for which it had not acquired a lease. *See Busey*, 938 F.2d at 195 ("If licensing the Vernon reactor is meant . . . to stimulate the Vernon job market, licensing a reactor in Lake Placid would be far less effective. The goals of an action delimit the universe of the action's reasonable alternatives."). BOEM never committed to ensuring that Vineyard Wind could satisfy Vineyard Wind's own project objectives. Rather, in evaluating the potential effects associated with any approval of Vineyard Wind's COP, BOEM properly analyzed alternatives that were both compatible with the COP that they had been asked to consider, and consistent

21

with BOEM's duty to make the OCS "available for expeditious and orderly development, subject to environmental safeguards." BOEM_0068466. That approach is fully consistent with NEPA. *Beyond Nuclear*, 704 F.3d at 19.

BOEM's selection of alternatives is entitled to substantial deference, *Busey*, 938 F.2d at 196. Plaintiffs have offered no valid basis for invalidating that selection here.[7]

## B.     The EIS Appropriately Analyzes Impacts to Fishing

The FEIS contains a thorough analysis of potential impacts on fishing. Plaintiffs argue that BOEM's analysis shows that the Project will have "devastating" effects on commercial fishing, and argue that BOEM has somehow downplayed those effects. Doc. No. 67 at 30, 34. Neither is true. BOEM analyzed over several years the Project's potential impacts on fishing, conducted substantial public engagement, and gathered a substantial amount of data. BOEM took the required hard look at the potential impacts of the Project, disclosed those potential impacts to the public, and therefore complied with NEPA. *United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011). Plaintiffs' arguments to the contrary are without merit.

To analyze the impacts on fishing, the FEIS evaluates a large area of the ocean extending

---

[7] Plaintiffs' citation to *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007), is inapposite. Doc. No. 67 at 48. The language Plaintiffs cite had nothing to do with an agency's analysis of alternatives under NEPA. *See Nat'l Assoc. of Home Builders*, 551 U.S. at 658 (addressing EPA's interpretation of its ESA consultation obligations "regarding the effect of a permitting transfer on listed species."). Nor have Plaintiffs identified any impermissible factors that BOEM supposedly considered in selecting which alternatives to analyze. While Plaintiffs speculate that BOEM "felt compelled" to analyze only alternatives within the Vineyard Wind lease area "in order to meet the timing requirements of Vineyard Wind's contract with Massachusetts," Doc. No. 67 at 48, the portions of the record that Plaintiffs cite offer no support for that speculation. In the ROD, BOEM explained that alternatives not analyzed were excluded "because they did not meet the purpose and need or did not meet other screening criteria." BOEM_0076809. And the other record cite—0057320-22—is a letter from Vineyard Wind describing elements of its contract with Massachusetts. As explained above, BOEM reasonably selected alternatives that were compatible with Vineyard Wind's objectives and obligations. *Beyond Nuclear*, 704 F.3d at 19.

from Maine to North Carolina and 200 miles offshore. BOEM_0068700; *see also*

BOEM_0068804, 68835. As explained in the FEIS, fishing in federal waters off the New

England coast is a significant source of revenue, generating $1.6 billion on average annually

from 2009 to 2018. BOEM_0068700. The waters of the Northeast are known for producing

scallop, clam, lobster, squid, and other species. *Id.* Fishing is important economically to the

region through direct employment in the fishing industry and in jobs that support fishing.

BOEM_0068701. The FEIS contains a thorough analysis of fishing traffic through the area based

on sets of data collected by the State of Rhode Island and by NMFS. BOEM_0068701-02.

BOEM used these figures to analyze the fishing revenue that may be affected by the Project. *See*

BOEM_0068702-07. The annual overall value of fish landings in the wind development area

from 2008 to 2009 generally ranged from $300,000 to $600,000, but there was a peak of $1.3

million in 2016. BOEM_0068706.

The construction of the Project could affect fishing in a number of ways, as explained in

the FEIS. BOEM_0068714-29. The placement of cable and maintenance activities, for example,

could temporarily prevent fishing activities. BOEM_0068715-16. In addition, the presence of

structures, primarily the wind turbines, creates a risk that fixed or mobile fishing gear may

become entangled and the risk of allisions with project structures. BOEM_0068717-18. To

mitigate the risk of allisions, turbines and the electrical service platforms would be equipped

with navigational aids, including marking, lighting, and automatic identification system ("AIS")

transponders. BOEM_0068718; *see also* BOEM_0069225-27. Although fishing in the project

area will be more difficult than before, it will be possible to fish. BOEM_0068718. The degree to

which fishing is impacted will depend on the type of gear that fishermen are using. *Id.* Fishing

with mobile gear that is pulled across the seafloor presents a greater risk of snagging on

structures and undersea cables than fixed gear fishing. *Id.* Nevertheless, a navigational risk assessment prepared for the Project found that trawling vessels would be able to operate within the turbine array because they are able to do 180-degree turns within 0.16 to 0.86 nautical miles ("nm"). BOEM_0068718, 68743; *see also* BOEM_0063764-65 (navigational risk assessment showing turning radius data for trawling vessels). During the NEPA process, fishing industry groups indicated that the turbines would need to be 1 nm apart in order to operate safely, BOEM_0068718, and BOEM later adopted that separation distance. BOEM_0076822. In addition, the project area is located so as to avoid other more densely fished areas. *See* BOEM_0069134-36 (FEIS maps showing fishing intensity); BOEM_0063762-63, 63768-70 (maps showing trawling vessel data in the vicinity of the project area).

The FEIS also analyzed the potential impacts of the project structures on marine radar. BOEM_0068717. The presence of the structures could make the use of radar more difficult due to the potential for structures to obscure smaller vessels and duplication of radar images in certain weather conditions, such as heavy fog. *Id.* The U.S. Coast Guard evaluated this issue in the Areas Offshore of Massachusetts and Rhode Island Port Access Route Study ("MARIPARS") and concluded that there were no authoritative scientific studies showing that the presence of wind turbines would degrade marine vessel radar. BOEM_0068739, 0068744; BOEM_0054795. Should radar interference occur, such effects can be mitigated through proper training of radar operators, proper placement of radar equipment on vessels, marked turbines, and the use of AIS transponders to aid in locating the turbines. BOEM_0068744; BOEM_0054795. Vineyard Wind has committed to incorporating mitigation into the project design, such as equipping the turbines with marking, lighting, and electronic signaling devices, in order to enable safe navigation within the turbine array. BOEM_0068744; BOEM_69225-27.

Notwithstanding the fact that BOEM's analysis shows that fishermen will be able to operate within the project area, BOEM recognized that some fishermen would be reluctant to do so. BOEM_0068719. In order to address the lost revenue from any interference with fishing in the turbine array and lost gear and other costs arising from fishing within the turbines, Vineyard Wind has committed to establishing compensation funds through agreements with Rhode Island and Massachusetts, which total $25.4 million, and a compensation fund for other states of $3.3 million. BOEM_0068719-21. This funding is more than sufficient to offset the $14.4 million expected revenue loss from commercial fishing within the project area over the next thirty years (the life of the project plus five years of decommissioning). BOEM_0068721. Vineyard Wind has also committed to an additional $12.5 million fund to support the fishing industry by providing funds for updated equipment, new gear, radar equipment, and training in order to enable fishing within the project area. BOEM_0068721; BOEM_0068728. The company would also commit to establishing a similar $1.75 million fund for Massachusetts, bringing the total amount of compensation funding to over $40 million. BOEM_0068728. Thus, in the FEIS, BOEM thoroughly analyzed and disclosed potential impacts to fishing within the project area and mitigation to minimize those impacts.

Plaintiffs raise a number of arguments regarding BOEM's analysis of fishing impacts, but none has any merit. They argue that the FEIS downplayed the impacts to commercial fishing, Doc. No. 67 at 34, but that is simply belied by the record. The FEIS contains a thorough analysis of impacts to fishing, as discussed above. Far from downplaying those impacts, BOEM thoroughly analyzed them, as well as mitigation to minimize those impacts. BOEM_0068700-35. Contrary to Plaintiffs' assertion, Doc. No. 67 at 34, the FEIS characterizes the impacts on commercial fishing from the Vineyard Wind Project to be moderate, but the impacts on fishing

from the Project *and* other planned projects would be major. BOEM_0068452. Plaintiffs also

argue that BOEM relied on the eventual decommissioning of the Project in an attempt to

minimize the impacts of the Project, Doc. No. 67 at 35. But the cited page merely states that

impacts to commercial fishing would not be irreversible because, after the Project is

decommissioned, it would no longer pose any obstacle to fishing. BOEM_0069185. Plaintiffs

have failed to show that the FEIS downplayed any impacts on fishing.

Plaintiffs also argue that BOEM violated NEPA by not giving sufficient consideration to

Alternative F, the transit lane alternative proposed by commercial fishermen. *See* Doc. No. 67 at

29-30. To the contrary, BOEM fully analyzed the transit lane alternative in the FEIS, *see e.g.*,

BOEM_0068491-96, 68732-34, 68749-52; *see also* BOEM_0068496 ("BOEM elected to *fully*

*evaluate* RODA's proposed layout in the [SDEIS] and in the FEIS.") (emphasis added).

Ultimately, BOEM decided not to select this alternative based on comments from the offshore

wind industry, non-governmental organizations, the Commonwealth of Massachusetts, and

individuals. BOEM_0076823. Vineyard Wind also provided information showing that the transit

lanes would increase the cable length, thus leading to a loss in the transmission of electricity, and

other technical complexities. *Id.* Plaintiffs may disagree with BOEM's decision, but NEPA

requires no substantive outcome.[8] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but

simply prescribes the necessary process."). BOEM thoroughly analyzed the transit lane

alternative and that is all that NEPA requires. *See Dubois v. U.S. Dept. of Agric.*, 102 F.3d 1273,

---

[8] The record belies the notion that BOEM simply acquiesced to Vineyard Wind's demands. In the same letter in which Vineyard Wind laid out its objections to the transit lanes, it also objected to an east-west configuration with 1-nm spacing between the turbines. BOEM_0038225-28. BOEM nevertheless adopted that configuration in the ROD. BOEM_0076822.

1286-87 (1st Cir. 1996). To the extent Plaintiffs are claiming that BOEM's rejection of the transit alternative violated OCSLA, such a claim should be rejected. *See* sections V.C.-D., *infra*.

In addition, Plaintiffs point to comments that NMFS raised regarding the DEIS. BOEM_0037615; Doc. No. 67 at 30. NMFS did raise a number of points in that letter, but BOEM addressed them in the SDEIS. Specifically, in the SDEIS, BOEM provided additional analysis of impacts on fishing and cumulative impacts. BOEM_56977-57150. And NMFS concurred in the FEIS. BOEM_0066945. In other words, the NEPA process worked, and that process benefitted from the valuable input that NMFS and others provided. Plaintiffs' suggestion that this demonstrates a violation of NEPA has no legal basis.

Finally, Plaintiffs are wrong that their comments at various stages of the NEPA process have been ignored. In Seafreeze's scoping comments, they asked for a detailed study of the socioeconomic impacts on the fishing industry and that Vineyard Wind set up a compensation fund for lost gear and lost revenue. BOEM_0078090. BOEM has analyzed such impacts and Vineyard Wind has agreed to substantial compensation funds. BOEM_0068719-29. Further, BOEM developed alternatives D1 and D2 based on scoping comments submitted by the fishing industry and ultimately adopted the 1-nm spacing and east-west configuration in alternative D2. BOEM_0070712. In addition, BOEM responded to Seafreeze's and RODA's comments on the DEIS and SDEIS. BOEM_0069601-23 (response to RODA's comments on DEIS); BOEM_0069631-32, 69760-73 (response to Seafreeze's comments on the DEIS); BOEM_0070468-97 (response to Seafreeze's comments on the SDEIS); BOEM_0070704-24 (response to RODA's comments on the SDEIS). BOEM considered and responded to Plaintiffs' comments, as required by NEPA. *See Norfolk v. U.S. EPA*, 761 F. Supp. 867, 878 (D. Mass. 1991) ("the court must determine whether the agency reasonably addressed public comments").

C.    **The EIS Appropriately Analyzed Potential Impacts on the Environment**

Plaintiffs argue that BOEM failed to adequately analyze the potential impacts on the

environment and natural resources within the project area. Doc. No. 67 at 34. Contrary to

Plaintiffs' assertions, BOEM did not downplay these impacts, but thoroughly analyzed them in

the FEIS. BOEM analyzed the potential impacts to the benthic environment, BOEM_0068519-

42, fish species, BOEM_0068542-71, marine mammals, BOEM_0068571-603, and sea turtles,

BOEM_0068603-24. BOEM also analyzed the potential impacts of hurricanes,

BOEM_0068497-98, 69238-39, and impacts on national security. BOEM_0068765-69.

Plaintiffs' vague claims that BOEM did not sufficiently analyze such impacts are without merit.

D.    **BOEM Was Not Required to Wait Until NMFS Issued the 2021 BiOp Prior to Making a Decision Regarding the COP.**

Plaintiffs next argue that BOEM's approval of the COP while reinitiated consultation

with NMFS was ongoing was arbitrary or capricious. This is incorrect. As explained in section

IV.A. of Federal Defendants' brief in *RODA*, NMFS issued a Biological Opinion in September

2020, which concluded that the proposed project "may adversely affect but is not likely to

jeopardize the continued existence of" several marine species, including right whales.

NMFS_00016027. BOEM relied on that conclusion and its underlying analysis when analyzing

the potential effects of the Project in the FEIS, which was released in March 2021. *See, e.g.*,

BOEM_0068590.

On May 7, 2021, BOEM requested reinitiation of consultation with NMFS/GAR under

ESA Section 7. BOEM_0076721-22. Along with its request for reinitiation, BOEM transmitted

to NMFS/GAR a supplement to BOEM's 2019 Biological Assessment ("BA Supplement").

BOEM_0076723-49. BOEM explained that its purpose in seeking reinitiation was to consider

any potential impacts of fisheries monitoring surveys, which BOEM had proposed as conditions

of COP approval. *Id.* BOEM also observed that the BA Supplement contained updated

information about the status of the right whale. *Id.* In particular, the BA Supplement assessed a

January 2021 publication that reduced the estimated right whale population by four animals

between 2020 and 2021.[9] The BA Supplement also included newly available models of right

whale densities in the wind development area. *Id.* The BA Supplement assessed that updated

information and concluded it did not change BOEM's prior conclusions about potential impacts

of the Project on right whales. *Id.*

On the same day that it requested reinitiation, BOEM also documented its "determination

that, while [it] ha[d] reinitiated formal consultation on the fishery monitoring plan," approval of

the remainder of the Project would not "jeopardize the continued existence of ESA listed

species." BOEM_0208700-11. BOEM further concluded that reinitiated consultation would not

"provide any new information" about the impacts of construction, operation, and

decommissioning activities that had already been analyzed in the still-operative 2020 BiOp.

BOEM_0208709. BOEM explained that it would not authorize the monitoring surveys for which

it had reinitiated consultation during the reinitiation period, and that "commencement of any

monitoring activities would be conditioned on the conclusion of this reinitiated consultation." *Id.*

On July 15, 2021, BOEM approved the COP, with the express condition that its approval

would be "subject to any terms and conditions and reasonable and prudent measures resulting

from a BOEM reinitiated consultation for the Project's BiOp." BOEM_0077152. In October

2021, NMFS concluded the reinitiated consultation and issued a new biological opinion ("2021

---

[9] *See* BOEM_0076728 (discussing North Atlantic right whale Report Card (Pettis et al. 2021)).
The population size estimate is provided as a range, and the 2021 report reduced the range by
four animals, from a likely range of 343-727 in 2020, to a likely range of 339-723 in 2021. *Id.*

BiOp"). BOEM_0077276-0077779. The 2021 BiOp also reached a "no jeopardy" conclusion with respect to right whales, as NMFS had reached in the 2020 BiOp. BOEM_0077657.

Plaintiffs claim that BOEM erred in approving the COP while the reinitiated consultation was ongoing, in violation of 40 C.F.R. § 1502.22(a)-(b). Doc. No. 67 at 45.[10] Section 1502.22 applies if, "[w]hen an agency is evaluating reasonably foreseeable significant adverse effects," the agency determines that "there is incomplete or unavailable information." Plaintiffs' argument fails because they have not identified any incomplete or unavailable information with respect to "reasonably foreseeable significant adverse effects" that BOEM failed to disclose. In fact, Plaintiffs never contend that the monitoring surveys were at all likely to result in reasonably foreseeable significant effects. Nor could they: in the BA Supplement, BOEM assessed potential impacts of the monitoring surveys and concluded that they were not likely to adversely affect any ESA-listed species. *See* BOEM_0076743 (Table 3, summarizing findings). BOEM also concluded that the new information about right whales would not alter the impacts analysis in the FEIS. BOEM_0076728 ("Notably, impacts do not increase in numbers or magnitude."). And, in the end, NMFS's estimates of the number of right whales to be incidentally harassed as a result of pile-driving noise during Project construction (up to 20 right whales) remained unchanged between the 2020 BiOp and the 2021 BiOp. *Compare* NMFS 16179 (2020 BiOp) and NMFS 17366 (2021 BiOp).

Although the reinitiated consultation was ongoing when BOEM approved the COP, there was no incomplete or unavailable information about reasonably foreseeable significant adverse

---

[10] Plaintiffs also claim, without any explanation, that BOEM's COP approval violated 40 C.F.R. § 1501.3(b). Doc. No. 67 at 37. But that regulation addresses when an environmental assessment must be prepared, and subsection (b) simply states that an agency may prepare an environmental assessment "on any action at any time." 40 C.F.R. § 1501.3(b). It is not applicable to Plaintiffs' arguments here concerning BOEM's COP approval.

effects as defined by 40 C.F.R. § 1502.22(a)-(b). BOEM reasonably proceeded with approving

the COP, subject to the condition that the applicant comply with all terms and conditions of the

forthcoming 2021 BiOp. BOEM_0077152.

     **E.    The EIS Appropriately Analyzes Cumulative Impacts**

     Plaintiffs are also incorrect that the FEIS's cumulative impacts analysis violated NEPA.

As explained in section III.A. of Federal Defendants' brief in *RODA*, the FEIS analyzed

cumulative impacts of reasonably foreseeable future offshore wind actions. That discussion is

incorporated here, and Plaintiffs' arguments should be rejected for the same reasons as RODA's.

     Plaintiffs here make two additional arguments concerning cumulative impacts that are not

raised by RODA: (i) Plaintiffs claim that the FEIS "removed most cumulative impact analysis

that was present in the Draft EIS," and "left out any analysis of the foreseeable cumulative

impacts of BOEM's established plans to approve multiple wind farms near the Vineyard Wind

project," Doc. No. 67 at 35-36, and (ii) that FEIS's cumulative impact analysis "underestimated

the amount of offshore wind anticipated by 8 [gigawatts]," *id.* at 48-49. These arguments

contradict one another as well as the record, and should be rejected by this Court.

     *First*, BOEM did not remove its cumulative impact analysis in the FEIS. The SDEIS

describes how BOEM developed its cumulative impacts analysis, beginning at BOEM_0056977;

*see also* SDEIS Appendix B, BOEM_0057214-39 (analyzing various impact producing factors

associated with offshore wind facilities). That information was carried over to the FEIS, which

expressly analyzes potential cumulative effects of other reasonably foreseeable future offshore

wind projects. FEIS Appendix A explains BOEM's methodology for analyzing cumulative

impacts. BOEM_0068796-0068975. The main body of the FEIS discusses cumulative impacts

for each resource for which the Project may have greater than minor impacts, including to

commercial and for-hire fisheries. FEIS Section 3.10.1.1, BOEM_0068707-14; *see also* Federal

Defendants' brief in *RODA* section III.A.

     *Second*, Plaintiffs argue that the cumulative impact analysis in the FEIS was inadequate

because it supposedly "understated the amount of offshore wind anticipated by 8 [gigawatts]."

Doc. No.67 at 48. This argument relies on a speech that the President gave in May 2021, in

which he stated that his administration hopes to "deploy 30 gigawatts of offshore wind in the

United States by 2030." Seafreeze SOMF ¶ 96. According to Plaintiffs, BOEM therefore erred

by assuming for purposes of its cumulative impact analysis that only 22 gigawatt's ("GW")

worth of future projects were reasonably foreseeable. Doc. No. 67 at 48. But BOEM explained

why it arrived at the 22 GW assumption in the FEIS. Specifically, BOEM stated that state

pledges for offshore wind capacity totaled "about 29 GW" at the time the FEIS was published—

a figure that included "awarded, scheduled, and planned but unscheduled procurements."

BOEM_0068800-01. BOEM further explained that "[s]tate goals that are planned but do not

have a scheduled award or procurement dates could occur as a series of procurements, or simply

not be met if future cost reductions do not meet the states' award criteria," or if there is a "lack of

available lease area or technical capacity." BOEM_0068801. As a result, BOEM made the

reasoned decision to consider only 22 GW of state capacity commitments to be reasonably

foreseeable for purposes of its cumulative impacts analysis. *Id.* Plaintiffs offer no explanation

why that decision was arbitrary, or even inconsistent with the administration's goal of reaching

even higher capacity. All the more so given that courts have concluded that goals do not qualify

as reasonably foreseeable projects for purposes of cumulative impacts analyses under NEPA. 43

C.F.R. § 46.30 (reasonably foreseeable actions are those "for which there are existing decisions,

funding, or proposals," but that are not "highly speculative or indefinite"). Plaintiffs' cumulative

impacts arguments lack merit and this Court should reject them.

### F.    The EIS Otherwise Complies With the NEPA Regulations

Plaintiffs make three additional NEPA arguments, each of which lacks merit.[11] *First*,

Plaintiffs argue that Federal Defendants violated 40 C.F.R. § 1506.6, which requires an agency

to "make diligent efforts to involve the public in preparing and implementing their NEPA

procedures," by (a) failing to provide a separate notice and comment period after Vineyard Wind

decided to use its "prototype turbines" in the Project, and by (b) supposedly ceding public

engagement to state agencies and other boards, which failed to engage with portions of the

public. Doc. No. 67 at 46. Plaintiffs are wrong on both fronts. The public had ample opportunity

to comment on anticipated turbine size. The SDEIS stated that turbines could be as large as 14

megawatts. BOEM_0056958. Vineyard Wind ultimately selected turbines that were slightly

smaller than that maximum amount. BOEM_0067698; BOEM_0076926. And BOEM received

and responded to several comments regarding the final turbine size in Volume IV of the FEIS,

including from Seafreeze itself. *See, e.g.*, BOEM_0070471-72 (Seafreeze comment regarding

turbine size and BOEM's response); BOEM_0070476 (same); BOEM_0070482 (same).

More generally, there can be no serious question that BOEM fully complied with its

obligation under section 1506.6(a). The FEIS Appendix C details BOEM's extensive efforts to

involve the public in the NEPA process for this project. BOEM_0069178-82. Throughout that

---

[11] Several of the arguments Plaintiffs raise in Sections VII and VIII of their brief also appear in other sections. Section VII.A addresses BOEM's request to reinitiate consultation with NMFS—a topic also addressed in Section III.E.1. Doc. No. 67 at 36-37, 45-46. Section VIII.A challenges BOEM's selection of alternatives, a topic previously discussed at various prior points in Plaintiffs' brief. Doc. No. 67 at 31, 35, 47-48. Finally, Section VIII.B duplicates (and in some respects contradicts) Plaintiffs' prior arguments challenging to BOEM's cumulative impact analysis. *See* Doc. No. 67 at 35-36, 48-49. For brevity, we address each those issues just once, *see* sections IV.A.,D., E., and do not repeat them here.

process, BOEM held fifteen public meetings and received thousands of public comments.[12] Plaintiffs fail to show that BOEM violated section 1506.6 in any respect.[13]

*Second*, Plaintiffs argue that Federal Defendants violated 40 C.F.R. § 1503.4[14] because they supposedly did not sufficiently explain why certain comments they received did not merit further response (beyond the responses BOEM provided), and by supposedly failing to attach substantive comments to the FEIS. But the very comments Plaintiffs claim were omitted are in fact addressed in Volume IV of the FEIS. In particular, Plaintiffs claim that BOEM failed to respond to their comment, made in a July 27, 2020 letter, that Seafreeze vessels operating trawl gear will be unable to operate safely within a wind facility. Doc. No. 67 at 46. But that comment, and BOEM's corresponding response, appears in Index No. 13102-056, BOEM_0070487. Likewise, the FEIS summarized the comments from RODA that Plaintiffs cite, and the FEIS provided BOEM's response. *See* index no. 13185-017-13185-018, BOEM_0070711.

Section 1503.4(b) expressly permits agencies to include summaries of substantive comments rather than the comments in their entirety. In the end, the FEIS Volumes III and IV include more than 1,400 pages of such summaries. BOEM was well within its discretion to

---

[12] *See* BOEM_0076803-04 (BOEM held five public scoping meetings concerning its notice of intent to prepare an environmental impact statement, held five in-person public meetings, received 341 public comments on the draft environmental impact statement, held five virtual meetings, and received approximately 3,500 unique public comments on the supplement to the draft environmental impact statement).

[13] Plaintiffs' vague complaint that they were "not included in mitigation negotiations," Doc. No. 67 at 46 (citing Lapp Decl. ¶¶ 15-23), lacks any legal basis. Plaintiffs do not, and cannot, cite any statute or regulation that entitles them to directly negotiate with the parties identified in the Lapp declaration (Vineyard Wind, the Governor of Rhode Island, the Rhode Island Coastal Resources Management Council, the Fisherman's Advisory Board). Nor can Plaintiffs seriously contend that they were excluded from participation given their extensive comment letters and BOEM's corresponding responses. *See* section IV.B., *supra*.

[14] Section 1503.4 requires agencies to respond to comments in one of several specifically enumerated ways, and to "stat[e] its response in the final [environmental impact] statement."

include summaries rather than each separate comment letter in the FEIS, and the FEIS evidences BOEM's diligent efforts to involve the public in its NEPA process.

*Third*, Plaintiffs contend that Federal Defendants impermissibly failed to use the NEPA regulations as revised by the CEQ in July 2020. Doc. No. 67 at 46-47. According to Plaintiffs, "[n]othing allows the Federal Defendants" to utilize the prior version of the regulations "simply because they state their NEPA review began before the regulations were altered." *Id.* Plaintiffs are mistaken. In the preamble to the July 2020 Final Rule, CEQ stated: "For NEPA reviews in process that agencies began before the final rule's effective date, agencies may choose whether to apply the revised regulations or proceed under the 1978 regulations and their existing agency NEPA procedures." 85 Fed. Reg. 43304, 43340 (July 16, 2020). BOEM, in turn, clearly explained in the introduction to the FEIS that, because its NEPA review began prior to the September 14, 2020 effective date of the revised regulations, "this FEIS was prepared under the previous version of the regulations (1978, as amended in 1986 and 2005)." BOEM_0068440 n.1. That decision was fully consistent with the applicable CEQ regulations and with NEPA.

## V.    BOEM's Approval of the Construction and Operations Plan Complied With OCSLA

Plaintiffs also assert that BOEM's approval of the COP was contrary to section 8(p)(4) of OCSLA, 43 U.S.C. § 1337(p)(4). Here, too, Plaintiffs are wrong. Section 8(p)(4) requires BOEM, when approving a renewable energy project on the outer continental shelf, to ensure that the proposed project is "carried out in a manner that provides for" twelve enumerated factors, including safety, protection of the environment, and other uses of the sea and seabed, including sea lanes and fisheries. *Id.* § 1337(p)(4)(A)-(L) . Given the many factors that must be evaluated, the Secretary of the Interior has substantial discretion to weigh these factors and strike a rational balance among them, considering Congress's direction to authorize renewable energy

development on the outer continental shelf. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004) (explaining that the broad statutory mandate in the Federal Land Policy and Management Act is "mandatory as to the object to be achieved, but . . . it leaves [the agency] with a great deal of discretion in deciding how to achieve it"); *Andrus*, 594 F.2d at 889 ("[W]here . . . sets of interests conflict, . . . the Secretary must determine which interests must give way, and to what degree, in order to achieve a proper balance."); BOEM_0072954-56 (Solicitor's M-Opinion interpreting OCSLA section 8(p)(4)). As discussed below, BOEM struck a reasonable balance among all of the enumerated factors in section 8(p)(4) when approving the COP. BOEM's decision should therefore be upheld.

### A.    Safety

BOEM ensured that the Vineyard Wind Project would be conducted in a manner that provides for safety. *See* 43 U.S.C. § 1337(p)(4)(A). BOEM has required Vineyard Wind to comply with engineering and technical conditions in order to ensure that the Project meets or exceeds industry standards. BOEM_0076931; BOEM_0076827; BOEM_0076901-21. BOEM engineers have reviewed the geophysical and geotechnical information provided by Vineyard Wind and determined that the conditions present in the area allow for the safe construction and operation of the Project. BOEM_0076931. Further, BOEM's continued oversight of the Project and review of the facility design report and fabrication and installation report will ensure that the Project will be carried out safely. *Id.*; BOEM_0076827. BOEM also consulted with the Bureau of Safety and Environmental Enforcement, the Coast Guard, the Federal Aviation Administration, and NOAA regarding safety issues relating to the project. BOEM_0076931-32. Vineyard Wind also will use the best and safest technology available, use best management practices, and employ properly trained personnel. BOEM_0076933; BOEM_76901-21.

Nevertheless, Plaintiffs argue that BOEM has overlooked the potential for a hurricane to hit the project area. Plaintiffs are mistaken; BOEM addressed the issue. The Project will be designed to be able to withstand sustained winds up to 112 miles per hour ("mph") and wind gusts up to 157 mph, and the turbines would shut down if wind speeds exceeded 69 mph. BOEM_0068497. The turbines also will be able to withstand waves over sixty feet high. *Id.* These parameters are in accordance with International Electrotechnical Commission standards, which require that project components be able to withstand an extreme weather event that has a 2% chance of occurring in a year. BOEM_0034067; BOEM_0069549; *see also* BOEM_0023259-60. Given the ability of the turbines to withstand wind and waves of these magnitudes, it is highly unlikely that the turbines would collapse or fall apart during extreme weather. BOEM_0068497-98. Over the past 160 years, there have been several hurricanes that passed through the project area, but none was above a category 3. BOEM_0069238-39. The project would be designed to withstand a category 3 hurricane. BOEM_68497, 69475, 69549-50; BOEM_0023259-60. Therefore, BOEM has reasonably implemented its duty to ensure that the project will be conducted safely and has accounted for the risk of hurricanes in the project area.

## B.   Protection of the Environment and Conservation of Natural Resources

BOEM also acted reasonably in its efforts to ensure that the Project will be carried out in a manner that ensures the protection of the environment and conservation of natural resources. *See* 43 U.S.C. §§ 1337(p)(4)(B), (D). In order to analyze the potential impacts of the project on the environment, BOEM initiated a NEPA process in March 2018. BOEM_0076928. The Corps, NMFS, Interior, BSEE, U.S. Coast Guard, and the U.S. EPA were cooperating agencies. *Id.* The FEIS analyzed the potential impacts of the project on the environment across a number of topics, including potential impacts to benthic species, fish, marine mammals, and marine ecosystems.

37

BOEM_0068519-624. Potential impacts to the marine environment and particular species of fish and marine mammals range from negligible to moderate with some potentially beneficial impacts. BOEM_0076928; BOEM_0068452-53. BOEM also required mitigation measures to avoid and minimize potential impacts on the environment. BOEM_0076934; BOEM_0069166-221 (FEIS App. D); BOEM_0076854-87 (ROD App. A); BOEM_0077177-221 (COP approval letter). BOEM also engaged in consultation with NMFS/GAR regarding threatened and endangered species. BOEM_0076934-35. In September 2020, NMFS issued a Biological Opinion concluding that the Project was not likely to jeopardize the continued existence of listed marine mammal species, including the right whale, or sea turtles. BOEM_0076935.

Plaintiffs argue that BOEM's decision to approve the project in May 2021 violated OCSLA because NMFS subsequently issued a separate BiOp in October 2021. *See* Doc. No. 67 at 36-37. BOEM reviewed the 2020 BiOp before issuing its decision in May 2021. BOEM_0076935. BOEM also prepared a Biological Assessment Supplement in May 2021 and concluded that planned monitoring surveys were not likely to adversely affect right whales. BOEM_0076723-49; *see also* BOEM_0208700-10 (BOEM memorandum documenting its conclusion that project would not jeopardize listed species or destroy or adversely modify their habitat). Following the reinitiated consultation, NMFS still found that the federal actions were not likely to jeopardize the continued existence of listed species. NMFS_0017558 (2021 BiOp); *see also* NMFS_0017686-87 (NMFS Oct. 15, 2021 transmittal letter). Moreover, BOEM accounted for the reinitiation of consultation with NMFS by conditioning its approval of the COP on Vineyard Wind's compliance with "any terms and conditions and reasonable and prudent measures resulting from a BOEM reinitiated consultation for the Project's BiOp." BOEM 0077152; *see also* BOEM_0077789. Accordingly, BOEM reasonably ensured the

protection of the environment and conservation of natural resources in approving the COP.

### C.    Marine Navigation

Nor did BOEM act arbitrarily in its efforts to ensure that the Project would not unreasonably interfere with sea lanes and marine navigation. *See* 43 U.S.C. § 1337(p)(4)(I), (J). Primary vessel traffic and commercial shipping lanes to and from major ports in the geographic region are located outside of the project area. BOEM_0076941. In order to minimize impacts to marine navigation, BOEM selected an alternative that was consistent with the U.S. Coast Guard's recommendations in the Areas Offshore of Massachusetts and Rhode Island Port Access Route Study ("MARIPARS"). BOEM_0076942; BOEM_0054765. In that report, the Coast Guard recommended that: (1) "[l]anes for vessel transit be oriented in a northwest to southeast direction, 0.6 to 0.8 NM wide;" (2) "[l]anes for commercial fishing vessels actively engaged in fishing should be oriented in an east to west direction, 1 NM wide;" and (3) "[l]anes for [search and rescue] operations should be oriented in a north to south and east to west direction, 1 NM wide." BOEM_0054808. BOEM adopted these features in its selected alternative, BOEM_0076942; *see also* BOEM_0076822-24. BOEM also required a suite of mitigation measures, including the appropriate lighting and marking of turbines, equipping the turbines with AIS transponders, and enabling the shutdown of the turbines in the event of an emergency. BOEM_0076890, 76892-95 (ROD App. A); BOEM_0077170-74 (COP Approval Letter).

By adopting the Coast Guard's recommendations, BOEM reasonably ensured that there would not be unreasonable interference with marine navigation. The Coast Guard is the expert agency charged by multiple statutes with promoting navigational safety on the nation's waterways. *See Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003); *see also* Coast Guard Act, 14 U.S.C. § 102(1) ("The Coast Guard shall – . . . enforce or assist in the

39

enforcement of all applicable Federal laws on, under, and over the high seas and waters subject to the jurisdiction of the United States."); Ports and Waterways Security Act, 46 U.S.C. § 70001 *et seq.*; Maritime Transportation Act of 2002, Pub. L. 107-295, 116 Stat. 2064 (2002). The Coast Guard's determinations regarding marine navigational safety are entitled to a high degree of deference. *See Cassidy v. Chertoff*, 471 F.3d 67, 84 (2d Cir. 2006) ("Expert determinations by the Coast Guard . . . , which are based on an explicit Congressional delegation of legislative authority . . . are entitled to significant deference."); *see also Wilmina Shipping AS v. U.S. Dept. of Homeland Security*, 934 F. Supp. 2d 1, 13 (D.D.C. 2013). Further, the transit lane alternative proposed by commercial fishermen, which would have included a 2- or 4-mile transit lane through the project area, *see* BOEM_0068491-96, was not among the Coast Guard's recommendations, *see* BOEM_0054808, and therefore it was reasonable for BOEM not to include it. BOEM_0076823.

### D.    Fishing

BOEM likewise acted reasonably in its efforts to ensure that the Project would not unreasonably interfere with commercial and recreational fishing. *See* 43 U.S.C. 1337(p)(4)(I), (J). Section 8(p)(4)(I) of OCSLA requires the U.S. Department of the Interior to ensure that it prevents "interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas." 43 U.S.C. § 1337(p)(4)(I). Interior has reasonably interpreted this provision to mean that not *all* interference with fishing is precluded. BOEM_0072952 (Solicitor's M-Opinion 37067). Instead, Interior's regulations provide that, when approving a COP, BOEM should ensure that the planned project will "not unreasonably interfere with other uses of the [outer continental shelf]." 30 C.F.R. § 585.621(c). Interior's interpretation of OCSLA—in an area where it was expressly directed by Congress to regulate—

is entitled to deference. *Flock v. U.S. Dept. of Transp.*, 840 F.3d 49, 54-55 (1st Cir. 2016).

Section 8(p)(4)(J) requires Interior to consider "any other use of the sea or seabed, including for

use as a fishery . . . ." BOEM's approval of the COP complied with OCSLA by considering the

use of the area for fishing and by preventing unreasonable interference with fishing.

Fishing will not be precluded in the turbine array. BOEM_0076944. By adopting the

recommendations of the MARIPARS report, including the 1-nm wide, east-west fishing lanes for

commercial fishing vessels, BOEM's decision reduces the potential impacts on fishing. *Id.* And

consistent with the Coast Guard's report, the navigational risk assessment prepared for the

project shows that it is feasible for fishing vessels with mobile gear to navigate through the

turbine array. BOEM_0076942; BOEM_0068718 ("[T]rawling vessels require 180-degree

turning diameters between 0.16 [NM] and 0.86 [NM] in good weather and sea conditions (larger

diameters would be required in poor weather and sea conditions."); *see also* BOEM_0063764-

65). To be sure, BOEM found in the FEIS that there would be impacts to fishing. For example,

fishing gear may become entangled in the protective gear placed over cables or around the

turbines and electrical services platform. BOEM_0068718. Fishing with fixed gear, such as with

hook and line, lobster pots, and gill nets, is not likely to be affected as much as fishing with

mobile gear. BOEM_0076944; BOEM_0068718.

In addition to adopting the Coast Guard's recommendations, BOEM's decision reduces

the level of interference with fishing by removing six turbines in the northernmost portion of the

wind energy area, which is an area used by commercial fishermen for scallop, surf clam, and

ocean quahog fishing. BOEM_0076944. This was in addition to the roughly 50% reduction in

the wind energy area prior to the issuance of the lease. BOEM_0076941. Further, the project

location avoids more densely fished areas. *See* BOEM_0069134-36; BOEM_0063762-63,

63768-70. BOEM has also restricted the time of year in which Vineyard Wind is allowed to conduct construction impacts in order to reduce impacts on fishing. BOEM_0076945. Moreover, BOEM required extensive mitigation to enable fishermen to operate within the project area, including the appropriate marking of turbines, a two-way communication channel between fishermen and Project operators, and sharing of electronic chart information showing the Project structures with the fishing community. BOEM_0076890-95 (ROD App. A); BOEM_0077170-74, 77222-24 (COP Approval Letter).

Notwithstanding the steps that BOEM has taken to reduce impacts to fishing, BOEM anticipates that, due to the potential risks of navigating within the turbine array, some fishing vessels may avoid the project area. BOEM_0076944. In order to compensate fishermen and other business owners who rely on fishing, Vineyard Wind will establish compensation funds totaling $26.7 million. BOEM_0076946. Vineyard Wind has also reached agreements with Massachusetts and Rhode Island for additional funds totaling $14.25 million, bringing the total compensation funding to $40.9 million. *Id.* Thus, BOEM has not only taken measures to reduce impacts to fishing, it has also ensured that fishermen will not suffer economic losses due to the project. This is more than sufficient to comply with section 8(p)(4)(I) and (J) of OCSLA.

Moreover, there is no basis for Plaintiffs' assertion that BOEM violated section 3 of OCSLA. 43 U.S.C. § 1332. Section 3 is a broad declaration of policy regarding the potential development of mineral resources on the outer continental shelf. *Id.* The First Circuit has interpreted subsection 3(2) to mean only that, in granting mineral leasing rights, Interior may not interfere with "the legal right to fish." *Andrus*, 594 F.2d at 889 (citing Convention on the Continental Shelf, Apr. 29, 1958, 15 U.S.T. 471, T.I.A.S. No. 5578). And, more broadly, the Secretary has the discretion "to achieve a proper balance" between fishing interest and mineral

leasing. *Id.* Thus, assuming that section 3 applies in the offshore wind context, BOEM has satisfied its requirements through compliance with section 8(p)(4) of OCSLA.

Plaintiffs' argument that BOEM violated OCSLA in approving the COP relies on a statement in the Corps' ROD that has since been corrected. They argue that the "Federal Defendants" stated in the ROD that the entire project area would be "abandoned" by commercial fishermen. Doc. No. 67 at 39 (quoting BOEM_0076837). BOEM never made that statement; instead, it was made in the Corps' portion of the ROD. BOEM_00768376. In the BOEM portion of the ROD, BOEM explained that it had selected a combination of alternatives C, D2, and E. BOEM_0076821. Alternative D2 contained the east-west fishing lanes and 1-nm spacing between turbines recommended by the Coast Guard, and alternative E reduced the size of the project and consequently reduced impacts to fishing. BOEM_0076822-23. The FEIS explained that alternative D2 would improve the ability of fishing vessels to maneuver within the project area and minimize the conflict between vessels using mobile and fixed gear. BOEM_0068730. The FEIS also found the alternative E would reduce impacts to fishing because there would be 16 fewer turbines. BOEM_0068731. In addition, the FEIS expressly found that fishing vessels would be able to navigate within the turbine array. BOEM_0068718, 68743. Thus, there is no basis for Plaintiffs' assertion that *BOEM* ever concluded that fishermen would abandon the project area.

In any event, as Plaintiffs are well aware, the Corps clarified that its statement in the ROD was "based solely upon comments of interested parties submitted to BOEM during the public comment period for the [DEIS]," not based on an independent analysis conducted by the Corps. USACE_AR_014374; *see also*, *e.g.*, BOEM_0069602 (RODA comments asserting that it would not be possible for commercial fishermen to operate within the turbine array). Plaintiffs'

efforts to strike the clarification should be rejected because the Corps' clarification is consistent

with the record. *See* Doc. No. 58 at 13-16. But even if the Court were to strike it, the one

statement in the ROD does not outweigh the lengthy analysis in the FEIS showing that fishermen

will be able to fish within the project area.

Plaintiffs are also incorrect that BOEM did not consider the potential impacts on marine

radar. The FEIS acknowledges the potential for turbines to affect radar by causing clutter,

particularly in poor weather. BOEM_0068717; BOEM_0068739. The Coast Guard evaluated the

issue in the MARIPARS report and concluded that there were no authoritative scientific studies

showing that the presence of wind turbines would degrade marine vessel radar. BOEM_68739;

BOEM_0054795. In general, there are several types of interference with radar that may occur,

such as false targets, multiple reflections, and blocking of objects in the line of sight of the radar,

but these are not unique to wind farms. BOEM_0054795. Radar operators must be properly

trained to identify these issues, and the location of the radar onboard a vessel may affect the

ability of the radar to detect objects. *Id.* But studies in the United Kingdom have shown that

"mitigation measures, such as properly trained radar operators, properly installed and adjusted

equipment, marked wind turbines and the use of [an onboard transponder], enable safe

navigation with minimal loss or radar detection." *Id.* The Coast Guard's findings within an area

of its technical expertise are entitled to deference. *See Cassidy*, 471 F.3d at 84.

### E.    National Security

BOEM also reasonably ensured that the project would be carried out in a manner that

would protect national security interests. *See* 43 U.S.C. 1337(p)(4)(F). BOEM consulted with the

U.S. Department of Defense ("DoD") at every stage of the process, beginning with the request

for interest in December 2010. BOEM_0076938. A portion of the wind energy area is within the

military's Narragansett Bay Operating Area, and most of the area is within the U.S. Navy's

Aviation Warning Area. BOEM_0076938-39. BOEM consulted with DoD about these issues,

and DoD concluded that any issues could be addressed through mitigation. BOEM_0076939.

BOEM requested review of the COP by multiple DoD agencies, and as a result of this review,

the U.S. Air Force, North American Aerospace Defense Command ("NORAD"), and the U.S.

Navy requested that BOEM require the adoption of certain measures. BOEM did so and

indicated that it would include in the COP approval any additional mitigation requested by DoD.

BOEM_0076939; *see also* BOEM_0068765-69 (FEIS analyzing impacts to military and national

security issues and explaining the coordination with DoD); BOEM_0063225-26 (letter from

DoD regarding potential impacts to the Air Force's 104th fighter wing training and NORAD's

radar systems); BOEM_0077175 (COP approval letter incorporating mitigation from DoD).

## VI.    Federal Defendants Complied with the Clean Water Act

Federal Defendants incorporate by reference the arguments regarding the Clean Water

Act in section V of their summary judgment brief filed in *RODA*.

## VII.   BOEM's Decision To Approve The Vineyard Wind COP Complied With the ESA (Ninth Claim, Tenth Claim) and the MMPA (Twenty-First Claim, Twenty-Second Claim)

As a threshold matter, BOEM was the only Federal agency that approved the Vineyard

Wind COP, so to the extent Plaintiffs suggest that any other Federal agency approved the

Vineyard Wind COP, *see* Doc. No. 67 at 42, the claim must be dismissed. To the extent that

Plaintiffs challenge any of the Federal Defendants' decisions to rely on the 2021 BiOp, Plaintiffs

failed to satisfy the mandatory pre-suit notice requirement as to such claims. 16 U.S.C. §

1540(g)(2)(A)(i).[15]

---

[15] Plaintiffs filed their pre-suit notice on September 17, 2021. Doc. No. 1-1. The operative 2021
BiOp was issued on October 18, 2021, and was subsequently corrected on November 1, 2021.

If the Court reaches the merits of any of Plaintiffs' ESA, the relevant issue is whether BOEM's approval of the Vineyard Wind COP, with conditions based on its chosen NEPA-related mitigation as well as the MMPA take authorization "*reasonably would be expected*, directly or indirectly, to reduce appreciably *the likelihood* of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02[16] (emphasis added) (definition of "jeopardize the continued existence of"), *cited in Ctr. for Biological Diversity v. NMFS,* 977 F. Supp. 2d 55, 72 (D.P.R. 2013). The 2021 BiOp analyzes "effects of the action" including all consequences to listed species or critical habitat that are caused by the proposed action, defined as:

> all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur.

50 C.F.R. § 402.02. Based on the effects analysis considered in the context of the status of the species, environmental baseline, and cumulative effects, the 2021 BiOp reasonably concludes that the Federal actions for the Vineyard Wind Project are not likely to jeopardize the continued existence of the right whale. NMFS 17558.[17]

Plaintiffs conflate "incidental taking"[18] with jeopardy when they suggest that NMFS

---

NMFS 17176. Any ESA claims concerning Federal Defendants' reliance on the 2021 BiOp are subject to dismissal due to Plaintiffs' failure to provide the requisite pre-suit notice. *See, e.g.*, *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520-22 (9th Cir. 1998) (notice letter must alert the recipients to the actual violation alleged in a subsequently filed complaint).

[16] All references to 50 C.F.R. sections are to the 2022 version.

[17] Plaintiffs continue to assert that the 2021 BiOp is not properly part of the administrative record and the Court should strike references to it. Doc. No. 67 at 23-24 n.1. Federal Defendants incorporate their arguments in response to Plaintiffs' Motion to Strike. Doc. No. 58.

[18] "Take" as defined by the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in such conduct." 16 U.S.C. § 1532(19). Take

should have identified reasonable and prudent alternatives ("RPAs") to avoid taking right whales or destroying their critical habitat pursuant to 50 C.F.R. § 402.14(h). *See* Doc. No. 67 at 43. RPAs are developed where necessary to avoid jeopardy to a species or adverse modification of critical habitat, not to avoid incidental take. *See* 16 U.S.C. § 1536(b)(3)(A). Here, the 2021 BiOp anticipated the harassment of some individual right whales, but no deaths or injuries or other types of harm that would reduce the numbers, reproduction, and distribution of right whales are anticipated. NMFS 17530.[19] Based on its determination that the actions were not likely to appreciably reduce the likelihood of the survival and recovery of right whales, *id,* NMFS/GAR reasonably concluded that the Federal actions are not likely to jeopardize the right whale. NMFS 17558. The 2021 BiOp further concluded that the Federal actions will have "no effect" on right whale critical habitat. *Id.* Because in the 2021 BiOp NMFS/GAR reached "no jeopardy" and "no adverse modification conclusions," *see* NMFS 17558, no RPAs were required and Plaintiffs' discussion of them is simply misplaced.

Plaintiffs' citation to *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184-185 (1978) ("*TVA*"), is inapposite because the record in that case established that the challenged agency action would jeopardize the continued existence of the endangered snail darter. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) (noting that the issue of elimination of an endangered species by destruction of its habitat was conceded in *TVA*). Here, by contrast, the 2021 BiOp properly evaluates Federal actions with regard to cumulative effects, *see* NMFS

---

incidental to federal actions that is "reasonably certain to occur" can be exempted from liability as part of the consultation process in an incidental take statement ("ITS") in a biological opinion. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).

[19] Plaintiffs fail to present any evidence to suggest that injury or death of right whales are reasonably certain to occur. Therefore, Plaintiffs cannot show that it was arbitrary and capricious for NMFS/GAR to determine that incidental take by harassment of 20 right whales is reasonably certain to occur. NMFS 17561.

17504-05, 17688-89, which have different meanings under the ESA and NEPA, and the environmental baseline. *Conservation Congress v. U.S. Forest Serv.*, 720 F.3d 1048, 1055 (9th Cir. 2013). As explained in Federal Defendants' *Ack Residents* summary judgment briefs, Doc. Nos. 96 at 19-20 and 114 at 15, the effects of future Federal actions such as other wind energy projects in the MA/RI WEA will undergo ESA Section 7 consultation later, if and when they occur. As a Section 7 consultation is completed on a windfarm, "the effects of the action associated with that project would be considered in the Environmental Baseline for the next one in line for consultation." NMFS 17292. *See also* NMFS 17688-17689. Thus, it was unnecessary to include the effects of future wind energy projects as part of the environmental baseline or cumulative effects sections of the 2021 BiOp.[20]

The 2021 BiOp considered the best available scientific information on the status of the right whale, its population trends, and threats including operational noise. NMFS 17230-42. NMFS/GAR adequately explained why it relied on one study over another, a scientific and technical choice that is entitled to deference. NMFS 17683. Finally, NMFS/GAR integrated the information presented in the BiOp and reasonably concluded that the effects of the action in the context of the right whale's status, the environmental baseline, and cumulative effects, are not reasonably expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or

---

[20] "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* Since future wind projects will be subject to ESA section 7 consultation, they are considered future federal activities, so would not be included in a cumulative effects analysis.

distribution of that species. NMFS 17527-17532. In fact, NMFS/GAR reasonably concluded that the action was not expected to reduce right whale numbers, reproduction, or distribution at all. Under these circumstances, the "no jeopardy" conclusion was scientifically sound, well-supported, and satisfies all legal requirements. *Id.* BOEM and the Corps complied with their respective ESA obligations by reviewing and adopting the new BiOp, and incorporating its reasonable and prudent measures[21] ("RPMs") and their implementing terms and conditions as conditions of Project approval. The JROD notes that "any mitigation measures requiring additional consultation under the ESA will not be authorized to be conducted until said consultation is completed." BOEM_0076852. *See also* BOEM_0077152 ("Activities authorized herein will be subject to any terms and conditions and reasonable and prudent measures resulting from a BOEM-reinitiated consultation for the Project's BiOp."); USACE_AR_012636 ("Your authorization under this Corps permit is conditional upon your compliance with all of the mandatory terms and conditions associated with incidental take of the attached BO, and any future BO that replaces it, which terms and conditions are incorporated by reference in this permit.").[22]

[21] Reasonable and prudent measures refer to those actions "necessary or appropriate to minimize" the amount or extent of incidental take caused by the proposed action. 50 C.F.R. § 402.02; 16 U.S.C. § 1536(b)(4)(B).

[22] In response to Plaintiffs' Ninth and Tenth Claims, Federal Defendants incorporate by reference the ESA-related arguments set forth in Federal Defendants' *Ack Residents* summary judgment briefing. *See ACK Residents Against Turbines, et al. v. U.S. Bureau of Ocean Energy Mgmt., et al.,* Case No. 1:21-cv-11390-IT, Doc. Nos. 96 and 114, as well as the responses to arguments made by the Plaintiffs in Section III.E., *supra.* In response to Plaintiffs' Twenty-First and Twenty-Second Claims, Federal Defendants hereby incorporate by reference the arguments regarding the MMPA as set forth in Federal Defendants' summary judgment briefing in the ALLCO case. *See Melone v. Coit et al.*, Case No. 1:21-cv-11171-IT, Doc. No. 153.

**VIII.   Summary Judgment Should Be Granted to Federal Defendants On All Remaining Claims**

To the extent that Plaintiffs have not briefed claims that were pled in their complaint, summary judgment should be granted to Federal Defendants on all such claims. *See Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995).

**IX.   If the Court Finds a Legal Error, It Should Remand Without Vacatur**

If the Court were to find any legal deficiency, however, it should exercise its discretion to remand the agency decision(s) without vacatur. A court's decision to remand without vacatur "depends inter alia on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Central Maine Power Co.*, 252 F.3d 34, 48 (1st Cir. 2001) (citing *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966-67 (D.C.Cir.1990)). Here, even if Plaintiffs had demonstrated that the agencies committed any legal errors, the errors they allege to have occurred could be corrected without altering the ultimate decision. The equities and public interest also would favor allowing this Project to proceed during the course of any remand. To the extent there is any doubt on this score, Federal Defendants request that the Court provide an opportunity for arguments as to any appropriate remedy.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted to Federal Defendants on all claims.

Respectfully submitted,

DATED: December 20, 2022

*Of Counsel:*

PEDRO MELENDEZ-ARREAGA
Lead Attorney-Advisor

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice

*/s/ Perry M. Rosen*

50

Offshore Renewable Energy Team
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
(202) 513-7759
pedro.melendez-arrea@sol.doi.gov


MATTHEW J. HARRIS
Assistant District Counsel
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742
 (978) 318-8244
matthew.j.harris@usace.army.mil

LEA TYHACH
Attorney - Advisor
National Oceanic and Atmospheric
Administration
Office of General Counsel
Northeast Section
55 Great Republic Drive
Gloucester, MA 01930
(978) 281-9242
lea.tyhach@noaa.gov

PERRY M. ROSEN
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 353-7792
E-mail: perry.rosen@usdoj.gov

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0204
Fax: (202) 305-0275
E-mail: mark.brown@usdoj.gov

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
ANGELA ELLIS
Trial Attorney
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Attorneys for Federal Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filings to the attorneys of record for Plaintiffs and all other parties, who have registered with the Court's CM/ECF system.

So certified this 20th day of December, 2022 by

<u>/s/ *Luther L. Hajek*</u>
Luther L. Hajek
U.S. Department of Justice