## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SEAFREEZE SHORESIDE, INC., *et al.*,<br><br>      Plaintiffs*,*<br><br>   v.<br><br>THE UNITED STATES DEPARTMENT OF<br>THE INTERIOR, *et al.,*<br><br>      Defendants,<br><br> and<br><br>VINEYARD WIND 1, LLC,<br><br>      Intervenor-Defendant. | Civil Action No. 1:22-cv-11091-IT |
| RESPONSIBLE OFFSHORE DEVELOPMENT<br>ALLIANCE*,*<br><br>      Plaintiff*,*<br><br>   v.<br><br>THE UNITED STATES DEPARTMENT OF<br>THE INTERIOR, *et al.,*<br><br>      Defendants,<br><br> and<br><br>VINEYARD WIND 1, LLC,<br><br>      Intervenor-Defendant. | Civil Action No. 1:22-cv-11172-IT |

**FEDERAL DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN
SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Federal Defendants respectfully submit this Rule 56(c)(1) Statement of Undisputed Material Facts ("Fed. Defs. SOF") in support of their own Cross-Motion for Summary Judgment. Federal Defendants note that in a case brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, the district court acts as a reviewing court and does not act as a fact finder. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id.*[1]

**The Parties**

1.      Defendant Janet Coit is the Assistant Administrator for Fisheries, U.S. National Marine Fisheries Service ("NMFS"). Doc. 58, ¶ 29 (first amended complaint); Doc. 82 (Stipulation and Proposed Order to Revise Caption and Substitute Co-Defendant); Doc 84 (Order substituting Janet Coit as Co-Defendant in place of Paul Doremus).

2.      Defendant NMFS is an office of the National Oceanic and Atmospheric Administration ("NOAA") within the Department of Commerce. Doc. 58, ¶ 33 (first amended complaint).

3.      Intervenor-defendant Vineyard Wind 1, LLC (Vineyard Wind) is based in New Bedford, Massachusetts, and is jointly owned by Copenhagen Infrastructure Partners P/S, and Avangrid Renewables, LLC. Doc. 8, ¶ 3 (Pachter Decl.). Prior to October 2016, Vineyard Wind

---

[1] Federal Defendants are submitting the same statement of undisputed material facts in *Seafreeze Shoreside, Inc. v. U.S. Department of the Interior*, No. 1:22-cv-11091-IT, and *Responsible Offshore Development Alliance v. U.S. Department of the Interior*, No. 1:22-cv-11172-IT. "BOEM" refers to the U.S. Bureau of Ocean Energy Management's record; "NMFS" refers to the National Marine Fisheries Service's record, and "USACE_AR" refers to the U.S. Army Corps of Engineers' record.

was called Offshore MW LLC. *Id*. Vineyard Wind has received approval from BOEM to construct and operate an offshore wind energy project (Project) in BOEM Lease Area OCS-A 0501 off the coast of Massachusetts. BOEM_0077150 (July 15, 2021 COP approval letter).

**BOEM's Issuance of an OCSLA Lease to Vineyard Wind**

4.      In 2009, BOEM began evaluating the possibility of developing wind energy in the Outer Continental Shelf (OCS) offshore Massachusetts pursuant to its authority under the Outer Continental Shelf Land Act (OCSLA). BOEM_0068786 (FEIS Vol. II) at BOEM_0069170. BOEM established an intergovernmental renewable energy task force comprised of elected officials from state, local and tribal governments and representatives of affected federal agencies to coordinate with BOEM throughout the leasing process. BOEM_0068786 at BOEM_0069170; 75 Fed. Reg. 82,055, 82,056 (Dec. 29, 2010).

5.      In December 2010, BOEM published a Request for Interest (RFI) in the Federal Register to determine if there was commercial interest in wind energy development in an approximately 2,224 square nautical mile area of the OCS offshore Massachusetts. 75 Fed. Reg. at 82,055. The RFI also invited the public to provide information on environmental issues and data for BOEM to consider in deciding whether to issue leases for wind energy development in the area. BOEM_0068786 (FEIS Vol. II) at BOEM_0069170; 75 Fed. Reg. at 82055. In response to comments, and to address navigation and commercial fisheries concerns, BOEM reduced the planning area by 50 percent. BOEM_0068786 at BOEM_0069170; BOEM_0000090 (2014 Revised Environmental Assessment) at BOEM_0000123.

6.      In February 2012, BOEM published a Call for Information and Nominations (Call) in the Federal Register to solicit industry interest in acquiring commercial leases for developing wind energy projects in the Call area. BOEM_0068786 (FEIS Vol. II) at

BOEM_0069170; 77 Fed. Reg. 5821 (Feb. 6, 2021). BOEM also published a Notice of Intent to prepare an Environmental Assessment for commercial leasing and site assessment activities offshore Massachusetts. BOEM_0068786 at BOEM_0069170; 77 Fed. Reg. 5830 (Feb. 6, 2012).

7.    In response to comments received in response to the Call, BOEM in May 2012 identified a reduced Wind Energy Area (WEA) reduced from that included in the Call area because of high sea duck concentrations and an area of high-value fisheries. BOEM_0068786 (FEIS Vol. II) at BOEM_0069170; BOEM_0000001 (May 30, 2012 Announcement of Area Identification).

8.    BOEM prepared an Environmental Assessment (EA) under the National Environmental Policy Act (NEPA) in May 2012 and a Revised Environmental Assessment in June 2014 to inform its decisions to issue leases in the WEA and to approve site assessment plans for the assessment of the wind resources on those leases. BOEM_0000090 (2014 Revised Environmental Assessment) at BOEM_0000118. BOEM concluded that the reasonably foreseeable consequences associated with its leasing and site assessment actions would not significantly impact the environment. BOEM_0000090 at BOEM_00000100.

9.    In June 2014, BOEM published a proposed sale notice and invited public comment on a proposal to sell commercial wind energy leases in the Wind Energy Area. 79 Fed. Reg. 34,771 (June 18, 2014). After considering the comments it received, BOEM published a final sale notice announcing that it would sell four commercial wind energy leases in the Wind Energy Area in a public auction on January 29, 2015. BOEM_0068786 (FEIS Vol. II) at BOEM_0069171; 79 Fed. Reg. 70,545 (Nov. 26, 2014).

10.     Vineyard Wind (then called Offshore MW LLC) won Lease OCS-A 0501 at the auction. BOEM_0068786 (FEIS Vol. II) at BOEM_0069171. The lease covers 166,886 acres in the OCS. BOEM_0000764 (April 1, 2015 Lease) at BOEM_0000776.

11.     The "lease does not, by itself, authorize any activity within the leased area. BOEM_0000764 (April 1, 2015 Lease) at BOEM_0000765. Instead, it grants Vineyard Wind the right to "(1) submit to [BOEM] for approval a Site Assessment Plan (SAP) and a Construction and Operations Plan (COP)" for a wind energy project within the leased area, and "(2) conduct activities in [the leased area] that are described in a SAP or COP that has been approved by [BOEM]." *Id.*

### BOEM's NEPA Review and Approval of Vineyard Wind's COP for the Project

12.     On December 19, 2017, Vineyard Wind submitted a proposed COP for the Project. BOEM_0006004 (Letter Submitting COP); BOEM_0000866–6003 (COP). The COP proposed the development of a wind energy project with the capacity to generate approximately 800 megawatts (MW) of electricity. BOEM_0006004; BOEM_0076799 (ROD) at BOEM_0076803. The Project will be constructed in what is referred to as the wind development area (WDA)—an area of approximately 65,296 acres of the Vineyard Wind lease area. BOEM_0077150 at BOEM_0077261 (COP Approval Letter). The WDA is approximately 14 miles southeast of Martha's Vineyard. BOEM_0076799 at BOEM_0076808.

13.     The COP described the major elements of the Project—including the wind turbine array, inter-array cabling, offshore electrical service platforms, offshore transmission cables to shore, onshore underground transmission cables, and an onshore substation—with a "project envelope" that defined the parameters of Project elements and gave Vineyard Wind the

flexibility to select and purchase Project components that fit within those defined parameters. BOEM_0006004 (Letter Submitting COP).

14.     BOEM's Office of Renewable Energy Programs then undertook a sufficiency review, a technical review, and an environmental review of the COP to determine whether it complies with OCSLA subsection 8(p) and BOEM's regulations pertaining to COPs, 30 C.F.R. §§ 585.620, 621. BOEM_0076922 (OCSLA Compliance Memo) at BOEM_0076925–30.

15.     During BOEM's review process, Vineyard Wind updated the COP to address comments from BOEM, modifications of the project envelope, and the selection of the location of the onshore substation. BOEM_0076922 (OCSLA Compliance Memo) at BOEM_0076926; BOEM_0068786 (FEIS Vol. II) at BOEM_0069170; BOEM_0067698 (Jan. 22, 2021 Letter).

16.     As part of its review process under NEPA, BOEM decided to prepare an Environmental Impact Statement (EIS) for the Project, BOEM_0000837–38 (EIS). In addition, BOEM consulted with the NMFS under Section 7 of the Endangered Species Act (ESA). BOEM_0077276 (2021 Biological Opinion (BiOp)) at BOEM_0077280–81 (consultation history in Oct. 18, 2021 BiOp, corrected).

17.     On March 30, 2018, BOEM published in the Federal Register a notice of its intent to prepare an EIS. BOEM_0012028 (83 Fed. Reg. 13,777 (Mar. 30, 2018)). The notice described the proposed Project and invited the public to participate in the NEPA public scoping process by submitting written comments and/or attending public scoping meetings. BOEM_0012028–29. The notice explained that "[t]hroughout the scoping process, Federal agencies, state, tribal, and local governments, and the general public have the opportunity to help BOEM determine significant resources and issues, impact-producing factors, reasonable alternatives (*e.g.* size,

geographic, seasonal, or other restrictions on construction and siting of facilities and activities), and potential mitigation measures to be analyzed in the EIS." BOEM_0012028–29.

18.    Notice of the public scoping meetings were published the following newspapers: the Cape Cod Times (BOEM_0012044), MVT (BOEM_0012045, BOEM_0012046), Nantucket Inquirer and Mirror (BOEM_0012047), and the Independent (BOEM_0012048).

19.    In April 2018, BOEM held public scoping meetings in four towns in Massachusetts (New Bedford, Vineyard Haven, Nantucket, and Hyannis) and one town in Rhode Island (Kingston). BOEM_0012406–12537 (New Bedford Tr.); BOEM_0012538–12626 (Vineyard Haven Tr.); BOEM_0012733–12805 (Nantucket Tr.); BOEM_0012806–12944 (Hyannis Tr.); BOEM_0012955–13078 (Kingston Tr.).

20.    BOEM then prepared a draft environmental impact statement (DEIS) that analyzed Vineyard Wind's proposed COP and several alternatives to the proposed Project that included a different cable landfall location, a reduction in project size, several options for modified wind turbine layouts, and a no-action alternative to disapprove the COP. NMFS_0021626, at 21911 (DEIS); BOEM_0034694 (83 Fed. Reg. 63,184 (Dec. 7, 2018)) at BOEM_0034695. The DEIS also considered proposed mitigation measures that BOEM might take if it approved the proposed Project or an alternative. NMFS 0021671; BOEM_0034695.

21.    On December 7, 2018, BOEM published in the Federal Register a notice of the availability of the DEIS for the Vineyard Wind COP, which was posted on BOEM's website. BOEM_0034694–95 (83 Fed. Reg. 63,184). The notice invited the public to comment on the DEIS by submitting written comments and/or attending public hearings. BOEM_0034694–95.

22.    During the comment period (which lasted until February 22, 2019), BOEM received a total of 341 unique submittals from the public, agencies, and other interested groups

and stakeholders. BOEM_0076799 (ROD) at BOEM_0076803; BOEM_0069428 (FEIS Vol. III) at BOEM_0069441–69805 (FEIS Vol. III, listing comments); BOEM_0078447 – 0079591 (Comments on the DEIS).

23.     During the comment period, BOEM also held public hearings to discuss the DEIS in the same four towns in Massachusetts (New Bedford, Hyannis, Nantucket, and Vineyard Haven) and Rhode Island (Narragansett) where it held public scoping meetings. BOEM_0076799 (ROD) at BOEM_0076803; BOEM_0035872–35961 (Nantucket Tr.); BOEM_0035962–36058 (Vineyard Haven Tr.); BOEM_0036081–36165 (Hyannis Tr.); BOEM_0036166–36269 (New Bedford Tr.); BOEM_0036299–36396 (Narragansett Tr.).

24.     After publication of the DEIS, Vineyard Wind submitted an updated COP with changes to the project design envelope to allow for the possibility of using higher-capacity wind turbine generators, which would allow the Project to use fewer wind turbines and have a smaller footprint. BOEM_ 0056950 (Supplement to the DEIS) at BOEM_0056972.

25.     In response to comments from the public and other Federal and State agencies on the DEIS, BOEM prepared a supplement to the DEIS that included, inter alia, an expanded analysis of potential cumulative effects from expanded reasonably foreseeable activities for offshore wind development, previously unavailable fishing data, a new transit lane alternative, and changes to the COP since the publication of the DEIS. BOEM_0076799 (ROD) at BOEM_0076803. On June 12, 2020, BOEM published in the Federal Register a notice of the availability of the supplement to the DEIS, which was posted on BOEM's website. BOEM_0057578 (85 Fed. Reg. 35,952 (June 12, 2020)), and in a newspaper. BOEM_0057577. The notice invited the public to submit written comments on the supplement to the DEIS and/or to participate in virtual public meetings. BOEM_0057578.

26.     The new transit lane alternative was included in response to a proposal from the Responsible Offshore Development Association (RODA) to include a northwest/southeast transit corridor to facilitate vessel transit from southern New England ports to fishing areas on Georges Bank. BOEM_0056958; *see also* BOEM_0068491-96, 68732-34, 68749-52.

27.     During the public comment period on the supplement to the DEIS (which lasted until July 27, 2020), BOEM received 29,987 submissions from the public, agencies, and other interested groups and stakeholders. BOEM_0069428 (FEIS Vol. III) at BOEM_0069806. This includes unique submissions as well as variant and non-variant form letter submissions. BOEM_0069428 at BOEM_0069806; BOEM_0069428 at BOEM_0069807–70058 (listing comments); BOEM_0058001–146 (June 26, 2020 Hearing Tr.); BOEM_0079606 – 0112693 (comments on supplement to DEIS).

28.     During the public comment period, BOEM also held five virtual public meetings to discuss the supplement to the DEIS. BOEM_0076799 (ROD) at BOEM_0076803; BOEM_0058001–146 (June 26, 2020 Hearing Tr.); BOEM_0058202–58328 (June 30, 2020 Hearing Tr.); BOEM_0058365–58501 (July 2, 2020 Hearing Tr.); BOEM_0058589–58800 (July 7, 2020 Hearing Tr.); BOEM_0059154–59241 (July 14, 2020 Hearing Tr.).

29.     On December 1, 2020, Vineyard Wind submitted a letter to BOEM notifying the agency of its intent to withdraw the COP from further review. BOEM_0067649 (Vineyard Wind Letter to withdraw COP 2020); BOEM_0076922 (OCSLA Compliance Memo) at BOEM_0076926. Vineyard Wind indicated in the letter to BOEM that it had decided to use Haliade-X wind turbines manufactured by General Electric, and its project team needed to conduct a technical and logistical review associated with the inclusion of the Haliade-X into the final project design. BOEM_0067649. Vineyard Wind stated that this final due diligence review

8

of the Project would confirm the absence of any elements that could lead to modifications after publication of the Final Environmental Impact Statement (FEIS), and thereby cause further delays and additional supplemental reviews by BOEM. BOEM_0067649. Vineyard Wind said it would keep BOEM informed of the progress of its due diligence review, as well as an expected date for rescinding this temporary withdrawal of the COP. BOEM_0067649.

30.    On December 4, 2020, RODA wrote a letter to the Secretary of the Interior and the Acting Director of BOEM to "express concern" over Vineyard Wind's temporary withdrawal of the COP and to "respectfully request that [they] exercise the utmost transparency and adhere to the National Environmental Policy Act (NEPA) review process." BOEM_0067665 (Dec. 4, 2020 RODA Letter). RODA said that "[i]f changes are proposed to the project design that are beyond the scope of the soon-to-be published FEIS, this would require the re-initiation of environmental review, with additional public comment opportunity." *Id.*

31.    On December 16, 2020, BOEM published a Notice in the Federal Register stating that, because "the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM." BOEM_0067694 (85 Fed. Reg. 81,486 (Dec. 16, 2020)). Thus, the "notice advises the public that the preparation and completion of an EIS is no longer necessary, and the process is hereby terminated." *Id.*

32.    On January 22, 2021, Vineyard Wind notified BOEM that it had completed its due diligence review and confirmed that its selection of the Haliade-X 13 MW Wind Turbine Generator into the final project design would not necessitate any modifications to the COP that might in turn require further analysis under NEPA prior to the finalization of the FEIS. BOEM_0067698 (Jan. 22, 2021 Letter). Vineyard Wind therefore rescinded its temporary

withdrawal of the COP and requested that BOEM "resume its review of the final COP dated

September 20, 2020." *Id*.; BOEM_0076922 (OCSLA Compliance Memo) at BOEM_0076926–

27.

    33.    After reviewing the information Vineyard Wind submitted, BOEM concluded on

February 2, 2021, that no changes to the COP or Supplemental EIS were necessary, and it

resumed its review of the COP under NEPA and OCSLA. BOEM_0076799 (ROD) at

BOEM_0076804; BOEM_0076922 (OCSLA Compliance Memo) at BOEM_0076927-28;

BOEM_0067702 (January 26, 2021 Memo to File).

    34.    On March 3, 2021, BOEM published a notice in the Federal Register stating that

it was resuming the preparation of a final environmental impact statement for the COP. 86 Fed.

Reg. 12,494 (Mar. 3, 2021).

    35.    On March 12, 2021, BOEM published in the Federal Register a notice of the

availability of the FEIS for the Vineyard Wind COP, which was posted on BOEM's website.

BOEM_0071036 (86 Fed. Reg. 14,153 (Mar. 12, 2012)).

    36.    The FEIS includes four volumes. Volume I contains three sections: Introduction,

Alternatives Including the Proposed Action, and Affected Environment and Environmental

Consequences. BOEM_0068456-59. Volume II contains Appendices A-J, including Appendix A

(Planned Action Offshore Wind Scenario and Assessment of Resources With Minor Impacts)

and Appendix D (Mitigation and Monitoring). BOEM_0068459. Volumes III and IV contain

public comments and responses thereto. *Id.*

    37.    Chapter 1 of the FEIS states the purpose and need as follows:

> Through a competitive leasing process pursuant to 30 C.F.R. § 585.211, Vineyard
> Wind was awarded Lease Number OCS-A 0501 (Lease) covered a leased area
> offshore of Massachusetts and the exclusive right to submit a COP for activities
> within the lease arca. Vineyard Wind has submitted a COP proposing the

construction, operation, maintenance, and conceptual decommissioning of a commercial-scale, offshore wind energy facility within the area of the Lease. Vineyard Wind provided the most recent updates to this COP on September 30, 2020 (Epsilon 2018a, 2019c, 2020a, 2020b). Vineyard Wind plans to begin construction in 2021.

The purpose of the federal agency action in response to the Vineyard Wind Project COP (Epsilon 2018a, 2019c, 2020a, 2020b) is to determine whether to approve, approve with modifications, or disapprove the COP to construct, operate, and decommission an approximately 800 MW, commercial-scale wind energy facility within the area of the Lease to meet New England's demand for renewable energy. More specifically, the proposed Project would deliver power to the New England energy grid to contribute to Massachusetts's renewable energy requirements— particularly, the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation (220 Code of Massachusetts Regulations § 23.04(5)). BOEM's decision on Vineyard Wind's COP is needed to execute its duty to approve, approve with modifications, or disapprove the proposed Project in furtherance of the United States' policy to make OCS energy resources available for expeditious and orderly development, subject to environmental safeguards (43 U.S.C. § 1332(3)), including consideration of natural resources and existing ocean uses.

BOEM_0068466,

38.     Chapter 2 of the FEIS sets forth the alternatives to be analyzed, including the proposed action. The FEIS analyzed five action alternatives and the no action alternative in detail. BOEM_0068472-73. The five action alternatives were:

Alternative A – the Proposed Action based the project parameters proposed in Vineyard Wind's COP;[2]

Alternative C – No Surface Occupancy in the Northernmost Portion of the Project Area, resulting in the exclusion of the six northernmost turbines;

Alternative D – Wind Turbine Layout Modification to reduce impacts in existing uses of the ocean, including commercial fishing and marine navigation. The FEIS analyzed two such alternatives: Alternative D1, in which the turbines would be spaced 1 nautical mile ("nm") apart, and Alternative D2, which would include 1-

---

[2] Vineyard Wind initially contemplated two potential cable routes, but ultimately settled on the Covell's Beach landfall location after securing the necessary permits. BOEM_0068742 n.2. Therefore, Alternative B (Covell's Beach Cable Landfall Alternative) was eliminated as a separate alternative and instead adopted into each of the action alternatives. *Id.*

nm spacing between turbines and also an east-west orientation, which is consistent with the fishing practices of mobile and fixed-gear fishing vessels;

Alternative E – Reduced Project Size, in which the project would consist of no more than 84 turbines; and

Alternative F – Vessel Transit Lane alternative, in which a vessel transit lane of 2-nm or 4-nm would be established through the project area.

BOEM_0068472-73; *see also* BOEM_0068474-96.

39.    The FEIS also identified a preferred alternative. BOEM_0068498, 68502. BOEM

described the preferred alternative as follows:

 BOEM has identified the combination of Alternatives C (No Surface Occupancy in the Northernmost Portion of the Project Area Alternative), D2 (East-West and One-Nautical-Mile Turbine Eayout), and E (Reduced Project Size Alternative) as its preferred alternative (Preferred Alternative) (Figure 2.5-1). Alternative E would limit the proposed Project to 57 to 84 WTGs. The Preferred Alternative would entail the construction, operation, maintenance, and eventual decommissioning of an 800 MW large-scale commercial wind energy facility consisting of no more than 84 WTGs on the OCS offshore Massachusetts within the proposed WDA with the export cable making landfall at Covell's Beach. The Preferred Alternative would allow up to 84 turbines to be installed in 100 of the 106 proposed locations and would prohibit the installation of WTGs in 6 locations in the northernmost portion of the WDA. The Preferred Alternative would require the WTGs to be arranged in a north-south and east-west orientation with a minimum spacing of 1 nautical mile between them, and 0.6- to 0.8-nautical-mile-wide lanes when traveling northwest-southeast or northeast-southwest. The Preferred Alternative would conform to the design parameter ranges outlined in the Vineyard Wind COP, which includes measures that Vineyard Wind has voluntarily committed to implement to avoid or reduce impacts, except that cabling is likely to exceed the COP design parameters. Impacts from such additional cabling have been considered within this FEIS.

BOEM_0068502.

40.    Section 3 of the FEIS analyzes the affected environment and the potential impacts

of the proposed action and alternatives. BOEM_0068504-783. Specifically, Section 3.2 analyses

impacts to benthic resources, BOEM_0068519-42; Section 3.3 analyzes impacts to finfish,

invertebrates, and essential fish habitat, BOEM_0068542-71; Section 3.4 analyzes impacts to

marine mammals, BOEM_0068571-603; section 3.5 analyzes impacts to sea turtles, BOEM_0068603-24; Section 3.10 analyzes impacts to commercial fisheries and for-hire recreational fishing, BOEM_0068700-35; Section 3.11 analyzes impacts on marine navigation and vessel traffic. BOEM_0068735-53, and Section 3.12 analyzes impacts on other uses, including military and national security uses. BOEM_0068765-76.

41.    For purposes of analyzing potential impacts to commercial fishing, the FEIS evaluates a large area of the ocean extending from Maine to North Carolina and 200 miles offshore. BOEM_0068700; *see also* BOEM_0068804, 68835. The FEIS analyzed the revenue generated by fishing in federal waters off the New England coast, and found that fishing generated $1.6 billion on average annually from 2009 to 2018. BOEM_0068700. The waters of the Northeast are known for producing scallop, clam, lobster, squid, and other species. *Id.* The FEIS also found that fishing is important economically to the region through direct employment in the fishing industry and in jobs that support fishing. BOEM_0068701. The FEIS analyzed fishing traffic through the area based on sets of data collected by the State of Rhode Island and by NMFS. BOEM_0068701-02. BOEM used that data to analyze the fishing revenue that may be affected by the Project. *See* BOEM_0068702-07. The annual overall value of fish landings in the wind development area from 2008 to 2009 generally ranged from $300,000 to $600,000, but there was a peak of $1.3 million in 2016. BOEM_0068706.

42.    The FEIS found that the construction of the Project could affect fishing in a number of ways, as explained in the FEIS. BOEM_0068714-29. The placement of cable and maintenance activities, for example, could temporarily prevent fishing activities. BOEM_0068715-16. In addition, the presence of structures, primarily the wind turbines, creates a risk that fixed or mobile fishing gear may become entangled in the protection placed over

undersea cables and turbine foundations and also a risk of allisions with project structures. BOEM_0068717-18. To mitigate the risk of allisions, turbines and the electrical service platforms would be equipped with navigational aids, including marking, lighting, and automatic identification system ("AIS") transponders. BOEM_0068718; *see also* BOEM_0069225-27. The FEIS found that, although fishing in the project area will be more difficult than before, it will be possible to fish. BOEM_0068718.

43.    The FEIS found that the degree to which fishing is impacted will depend on the type of gear that fishermen are using. *Id.* Fishing with mobile gear that is pulled across the seafloor presents a greater risk of snagging on structures and undersea cables than fixed gear fishing. *Id.* A navigational risk assessment prepared for the project found that trawling vessels would be able to operate within the turbine array because they are able to do 180-degree turns within 0.16 to 0.86 nm. BOEM_0068718, 68743; *see also* BOEM_0063764-65 (navigational risk assessment showing turning radius data for trawling vessels). During the public comment process, fishing industry groups indicated that the turbines would need to be 1 nm apart in order to operate safely. BOEM_0068718.

44.    Appendix B contains tables and figures referenced in the FEIS. BOEM_0068978-69167. Figure 3.10-1 shows fishing revenue intensity from 2007 to 2017 within and surrounding the project area. BOEM_0068700, 69134. The figure shows moderate revenue intensity within the project area. *Id.* Figure 3.10-2 shows squid vessel fishing density during 2015 to 2016 within and surrounding the project area based on Vessel Monitoring System ("VMS") data collected by the Rhode Island Department of Environmental Management. BOEM_0068702, 69135. The figure shows large densely fished area to the north and northeast of the project area. BOEM_0069135. Figure 3.10-3 shows lobster pot landings from 2001 to 2010 within and

surrounding the project area. BOEM_0068703, 69136. The figure shows low lobster pot landings within the project area. *Id.*

45.    A contractor for Vineyard Wind prepared a Revised Navigational Risk Assessment for the Project ("Risk Assessment"). BOEM_0063362-826. The Risk Assessment analyzed fishing vessel patters in and around the project using AIS data. BOEM_0063752-72. Figure 2.14 depicts the density of trawling activity within and surround the project area. BOEM_0063760, 63762. The figure shows that the density of trawling activity is significantly greater in the areas closer to Martha's Vineyard and Nantucket than it is within the project area. *Id.* Figures 2.17 to 2.20 depict trawling vessel data for vessels operating out of Point Judith, Rhode Island and New Bedford, Massachusetts from 2016 to 2018. BOEM 0063765, 63767-70. The AIS transmission data show that trawling activity for vessels operating out of Point Judith and New Bedford within the project area during that timeframe was limited. BOEM_0063766-70.

46.    The FEIS also analyzed the potential impacts of the project structures on marine radar. BOEM_0068717. The presence of the structures could make the use of radar more difficult due to the potential for structures to obscure smaller vessels and duplication of radar images in certain weather conditions, such as heavy fog. *Id.* The U.S. Coast Guard evaluated this issue in the Areas Offshore of Massachusetts and Rhode Island Port Access Route Study ("MARIPARS") and concluded that there were no authoritative scientific studies showing that the presence of wind turbines would degrade marine vessel radar. BOEM_0068739, 0068744; BOEM_0054795. Should radar interference occur, according to the Coast Guard's findings, such effects can be mitigated through proper training of radar operators, proper placement of radar equipment on vessels, marked turbines, and the use of AIS transponders to aid in locating the

15

turbines. BOEM_0068744; BOEM_0054795. Vineyard Wind has committed to incorporating mitigation into the project design, such as equipping the turbines with marking, lighting, and electronic signaling devices, in order to enable safe navigation within the turbine array. BOEM_0068744; BOEM_69225-27.

47.    The FEIS also analyzed compensation funds that would be established by Vineyard Wind. BOEM_0068719. As set forth in the FEIS, in order to address the lost revenue from any interference with fishing in the turbine array and lost gear and other costs arising from fishing within the turbines, Vineyard Wind committed to establishing compensation funds through agreements with Rhode Island and Massachusetts, which total $25.4 million, and a compensation fund for other states of $3.3 million. BOEM_0068719-21. This funding would offset the approximately $14 million expected revenue loss from commercial fishing within the project area over the next thirty years (the life of the project plus five years of decommissioning). BOEM_0068721. Vineyard Wind also committed to an additional $12.5 million fund to support the fishing industry by providing funds for updated equipment, new gear, radar equipment, and training in order to enable fishing within the project area. BOEM_0068721; BOEM_0068728. Vineyard Wind also committed to establishing a similar $1.75 million fund for Massachusetts. BOEM_0068728.

48.    The FEIS also analyzed the potential impacts of hurricanes. BOEM_0068497-98, 69238-39. The FEIS found that Project will be designed to be able to withstand sustained winds up to 112 miles per hour ("mph") and wind gusts up to 157 mph, and the turbines would shut down if wind speeds exceeded 69 mph. BOEM_0068497. It also found that the turbines also will be able to withstand waves over sixty feet high. *Id.* These parameters are in accordance with International Electrotechnical Commission standards, which require that project components be

able to withstand an extreme weather event that has a 2% chance of occurring in a year. BOEM_0034067; BOEM_0069549; *see also* BOEM_0023259-60. Given the ability of the turbines to withstand wind and waves of these magnitudes, the FEIS found that it is highly unlikely that the turbines would collapse or fall apart during extreme weather. BOEM_0068497-98. Over the past 160 years, there have been several hurricanes that passed through the project area, but none was above a category 3. BOEM_0069238-39.

49.    The FEIS also considered, "[i]n the context of other reasonably foreseeable environmental trends, combined impacts resulting from individual [impact producing factors] from planned actions" and each action alternative. BOEM_0068728. Appendix A in Volume II of the FEIS describes BOEM's methodology for analyzing cumulative impacts, which it sometimes refers to as "planned action impacts." BOEM_0068796.

50.    As described in Appendix A, Chapter 3 in the main body of the FEIS discusses potential impacts for every resource for which BOEM anticipated greater than minor impacts. *Id.* Appendix A then discussed potential impacts for those resources for which BOEM anticipated no greater than minor adverse impacts. *Id.* Section A.4 and Table A-4 describe in depth the offshore wind projects and related assumptions that were utilized in the cumulative impacts/planned action analysis. BOEM_0068808-16.

51.    Section 3.10.1.1 of the FEIS discusses possible impacts to commercial and for-hire recreational fisheries from future offshore wind activities without the Vineyard Wind project. BOEM_0068707-14. That analysis is organized by each impact producing factor (e.g., anchoring, new cable emplacement, etc.). *Id.* The FEIS then goes on to analyze the likely impact of each Vineyard Wind-related alternative, both in isolation and cumulatively—the latter of which was within the broader "context of reasonably foreseeable trends, ongoing and future

17

planned actions" (including other foreseeable offshore wind projects). *See, e.g.*, BOEM_0068728

(discussing cumulative impacts of Alternative A); BOEM_0068729 (same for Alternative C);

BOEM_0068731 (same for Alternative D); BOEM_0068731-32 (same for Alternative E);

BOEM_0068733 (same for Alternative F).

52.     BOEM's responses to public comments on the DEIS and SDEIS are contained in

Appendix K (FEIS Volumes III and IV). BOEM_0069428-70855. BOEM responded to

Seafreeze's and RODA's comments on the DEIS and SDEIS. BOEM_0069601-23 (response to

RODA's comments on DEIS); BOEM_0069631-32, 69760-72 (response to Seafreeze's

comments on the DEIS); BOEM_0070468-96 (response to Seafreeze's comments on the

SDEIS); BOEM_0070704-24 (response to RODA's comments on the SDEIS).

53.     On May 10, 2021, BOEM, the Army Corps, and NMFS Office of Protected

Resources (NMFS/OPR) issued a joint Record of Decision (ROD) for the FEIS.

BOEM_0076799–76898 (ROD or JROD). The ROD addressed BOEM's action to approve the

COP under section 8(p) of OCSLA, the Army Corps' permitting actions under section 404 of the

Clean Water Act (CWA) and section 10 of the Rivers and Harbors Act (RHA), and

NMFS/OPR's action of issuing an Incidental Harassment Authorization (IHA) under the Marine

Mammal Protection Act (MMPA). BOEM_0076799 at BOEM_0076801.

54.     The section of the ROD addressing the approval of the COP was signed by Laura

Daniel-Davis, Principal Deputy Assistant Secretary, Land and Minerals Management, in the

Department of the Interior. BOEM_0076799 (ROD) at BOEM_0076821–76827. It said that the

Department of the Interior has decided to approve the COP for Vineyard Wind using a

combination of alternatives that were considered in the FEIS. BOEM_0076821. In the FEIS,

BOEM identified this combination as its environmentally preferred action alternative ("Preferred Alternative"). BOEM_0076821.

55.     The ROD explained that the Preferred Alternative will allow 84 or fewer wind turbine generators (WTGs) to be installed in 100 of the 106 locations proposed by Vineyard Wind and will prohibit the installation of the WTGs in six locations in the northern-most portion of the project area. BOEM_0076799 (ROD) at BOEM_0076821. The Preferred Alternative also requires that the turbine layout be arranged in an east-west orientation and that all of the WTGs in the north-south and east-west direction will have a minimum spacing of 1 nautical mile between them, consistent with the United States Coast Guard's recommendations in the final MARIPARS Report. BOEM_0076821; BOEM_0054765 (MARIPARS Report).

56.     The ROD also stated that approval of the COP would be subject to mitigation and monitoring measures identified in the FEIS and technical, navigational and safety conditions imposed by BOEM. BOEM_0076799 (ROD) at BOEM_0076820–21 (adopting, inter alia, all practicable measures identified in Appendix D of the FEIS and further modifying some measures to be more protective of the North Atlantic right whale in response to comments regarding the status of the North Atlantic right whale), BOEM_0076827.

57.     BOEM attached to the ROD, a memorandum from James F. Bennett, Program Manager in BOEM's Office of Renewable Energy Programs, to Amanda Lefton, BOEM's Director, describing BOEM's sufficiency, technical and environmental review of the COP and explaining why the Preferred Alternative satisfies the requirements of OCSLA subsection 8(p) and BOEM's regulations. BOEM_0076922–76952 (OCSLA Compliance Memo); BOEM_0076423 (ETRB recommendation memo); BOEM_0076899–76921 (proposed technical, and navigational and aviation safety conditions). On July 15, 2021, BOEM issued its final

approval of the COP for the Project on commercial lease OCS-A-501 offshore Massachusetts,
subject to a 115-page list of terms and conditions. BOEM_0077150–0077265 (July 15, 2021
COP approval letter). In the OCSLA Compliance memo, among other things, BOEM determined
that:

a. "Vineyard Wind proposes to use the best available and safest technology, best
management practices, and properly trained personnel for the construction and
operation of the Proposed Project." BOEM_0076933.

b. "approval of the COP as contemplated under the Preferred Alternative will result in
the protection of the environment and prevention of undue harm or damage to natural
resources; life (including human and wildlife); property; the marine, coastal, or
human environment; or sites, structures, or objects of historical or archeological
significance." BOEM_0076936.

c. Although the "layout does not maximize the potential wind energy produced, the
Preferred Alternative strikes a rational balance between the conservation of natural
resources and the prevention of interference with reasonable uses of the OCS."
BOEM_76937.

d. BOEM had "engaged with relevant Federal agencies to obtain expert advice, comply
with regulatory requirements, and ensure proper coordination." BOEM_0076937.

e. "To protect the security interests of the United States," BOEM would impose
conditions requested by the Department of Defense and other defense agencies.
BOEM_0076939.

f.  Approval of the COP as contemplated under the Preferred Alternative "will result in the protection of the rights of other authorized users of the OCS" and "a fair return to the United States." BOEM_0076940.

g.  BOEM took actions to ensure that the activities approved in the COP would not "unreasonably interfere" with other OCS uses in the lease area, "including sealanes and navigation, aviation, fishing activities, and NOAA scientific research and surveys." BOEM_0076940-41.

58.    BOEM explained that it had selected an alternative that was consistent with the U.S. Coast Guard's recommendations in the MARIPARS report. BOEM_0076942; BOEM_0054765. In that report, the Coast Guard recommended that: (1) "[l]anes for vessel transit be oriented in a northwest to southeast direction, 0.6 to 0.8 NM wide;" (2) "[l]anes for commercial fishing vessels actively engaged in fishing should be oriented in a north to south and east to west direction, 1 NM wide;" and (3) "[l]anes for [search and rescue] operations should be oriented in a north to south and east to west direction, 1 NM wide." BOEM_0054808. BOEM adopted these features in its selected alternative, BOEM_0076942; *see also* BOEM_0076822-24. BOEM also required a suite of mitigation measures, including the appropriate lighting and marking of turbines, equipping the turbines with AIS transponders, and enabling the shutdown of the turbines in the event of an emergency. BOEM_0076890, 76892-95 (ROD App. A); BOEM_0077170-74 (COP Approval Letter).

59.    BOEM also explained that fishing will not be precluded in the turbine array. BOEM_0076944. Further, BOEM stated:

> While BOEM expects that with time, many fishermen will adapt to the spacing and be able to fish successfully in the [project area], BOEM has identified several ways to reduce the level of interference the Project would have with commercial fisheries.  For example, the selection of the Preferred Alternative would remove

> the 6 northernmost [turbines] to provide more unobstructed space in the
> northernmost area, which is commonly used by commercial fisheries, including
> scallop and surf/claim/ocean quahog fishery. The Preferred Alternative would
> also require an east-west/north-south project layout with 1 nmi between
> [turbines]. This project layout reduces interference with commercial fisheries,
> since the layout is representative of the traditional fishing arrangements in the
> area (e.g., mobile gear and fixed gear fishermen would fish in a nearly east-west
> orientation along alternating latitudinal lines).

BOEM_0076944-45.

60.     BOEM also noted that Vineyard Wind will be establishing compensation funds to

in order to compensate fishermen for lost gear and revenue. BOEM_0076945. Vineyard Wind

will establish compensation funds totaling $26.7 million. *Id.* Vineyard Wind has also reached

agreements with Massachusetts and Rhode Island for additional funds to support the fishing

industry totaling $14.25 million, bringing the total compensation and mitigation funding to $40.9

million. BOEM_0076946; *see also* BOEM_0068719-21, 68728.

61.     With respect to national security issues, BOEM explained that it had consulted

with the U.S. Department of Defense ("DoD") at every stage of the process, beginning with the

request for interest in December 2010. BOEM_0076938. A portion of the wind energy area is

within the military's Narragansett Bay Operating Area, and most of the area is within the U.S.

Navy's Aviation Warning Area. BOEM_0076938-39. BOEM consulted with DoD about these

issues, and DoD concluded that any issues could be addressed through mitigation.

BOEM_0076939. BOEM requested review of the COP by multiple DoD agencies, and as a result

of this review, the U.S. Air Force, North American Aerospace Defense Command ("NORAD"),

and the U.S. Navy requested the BOEM require the adoption of certain measures. BOEM did so

and indicated that it would include in the COP approval any additional mitigation requested by

DoD. BOEM_0076939; *see also* BOEM_0068765-69 (FEIS analyzing impacts to military and

national security issues and explaining the coordination with DoD); BOEM_0063225-26 (letter

from DoD regarding potential impacts to the Air Force's 104th fighter wing training and NORAD's radar systems); BOEM_0077175-76 (COP approval letter incorporating mitigation from DoD).

62.     The OCSLA memo concluded as follows:

[BOEM's Office of Renewable Energy Programs] has evaluated all the information that Vineyard Wind provided in its COP and has assessed it in relation to the enumerated goals in OCSLA subsection 8(p)(4) and BOEM's implementing regulations at 30 C.F.R. part 585. In our view, approval of the COP—as modified by the Preferred Alternative and the proposed technical, and navigational and aviation safety terms and conditions attached herein—would be in accordance with the regulations at 30 C.F.R. part 585 and would strike a rational balance among the various goals enumerated in subsection 8(p)(4) of OCSLA.

BOEM_0076952.

### Army Corps Review and Approval of Vineyard Wind's Permit Applications

63.     On November 27, 2018, Vineyard Wind submitted to the Army Corps, New England District, an application for a Department of the Army ("DA") permit, which was ultimately issued pursuant to section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, and section 404 of the Clean Water Act, 33 U.S.C. § 1344. USACE_AR_000025–003382 (USACE Permit Application).

64.     On December 26, 2018, the Army Corps issued a public notice of Vineyard Wind's permit application and solicited comments from the public. USACE_AR_003865–85 (USACE Public Notice of Permit Application). The public notice stated that BOEM was the "lead Federal agency" for the Project and that BOEM had prepared a draft environmental impact statement (DEIS) under NEPA. USACE_AR_003865–3866. The public notice further explained that BOEM would be holding five public comment meetings on the DEIS in January 2019, and it gave the dates and locations of each of those meetings. USACE_AR_003866.

65.    During 30-day public comment period—December 26, 2018, to January 18, 2019—the Army Corps received no comments from the general public and just two comments from state and municipal entities. USACE_AR_012641 (ROD) at USACE_AR_12645; USACE_AR_ 003890-003910. The Army Corps received no requests for an extension of the comment period, and no public comments were submitted after the public comment period closed. USACE_AR_012670. The Army Corps received no requests for public meetings. USACE_AR_012670.

66.    On May 10, 2021, Colonel John A. Atilano II of the Army Corps signed the joint ROD issued by BOEM at the conclusion of the NEPA review. USACE_AR_012641 (ROD) at USACE_AR_012688–89. The Army Corps participated in the NEPA review and the development of the FEIS as a cooperating agency under the Council for Environmental Quality (CEQ) NEPA regulations. USACE_AR_012649. The Army Corps reviewed and evaluated the information in the FEIS and adopted "the FEIS as appropriate for the purposes of NEPA" and other reviews. USACE_AR_012649.

67.    The Army Corps' section of the ROD provides supporting analysis for the Army Corps' decision to issue a DA permit for the Project. USACE_AR_012641 (ROD) at USACE_AR_012670–12689. In deciding to issue the permit, the Army Corps relied on its independent analysis as well as on the FEIS and the record developed in the NEPA process. USACE_AR_012649.

68.    On August 6, 2021, the Army Corps prepared a supplement to the ROD to "correct several clerical errors contained in the USACE section of the JROD." USACE_AR_011889 (2021 ROD Supplement) at USACE_AR_011889-011893.

69.     Also on August 6, 2021, after signing the supplement to the ROD, the Army

Corps sent Vineyard Wind a proffered DA permit with information on required next steps for

finalizing the permit. USACE_AR_011894-012626 (Cover Email and Attachments).

70.     Vineyard Wind signed the proffered DA permit and returned it to the Army Corps

on August 9, 2021. USACE_AR_012627–12632 (Cover Email and Signed Proffered DA

Permit).

71.     On August 10, 2021, the Army Corps provided Vineyard Wind with the final DA

permit (Permit No. NAE-2017-01206) that was signed by the Army Corps as well as by

Vineyard Wind. USACE_AR_012633–12634 (e-mail); USACE_AR_012639–12640 (letter);

USACE_AR_012635–12638 (signed permit dated August 9, 2021). The Clean Water Act

Section 404 Permit authorizes the discharge of dredged or fill material into Waters of the United

States, which extend seaward three nautical miles from the territorial seas baseline.

USACE_AR_000025 (USACE Permit Application) at USACE_AR_000046;

USACE_AR_012635 (permit). The Rivers and Harbors Act Section 10 Permit authorizes

construction activities in waters which extend seaward three nautical miles from the territorial

seas baseline, and certain other construction activities in the OCS beyond the three nautical mile

limit. *Id*. at USACE_AR_000045 (citing 33 C.F.R. § 320.2); USACE_AR_012635 (permit).

72.     On January 14, 2022, the Army Corps supplemented the ROD to "correct a

clerical error in the JROD and clarify a statement contained in the USACE section of the JROD."

USACE_AR_014373 (2022 ROD Supplement) at USACE_AR_014373.

73.     Special Condition 5 of the Corps's permit states that the Corps's approval is

conditioned upon compliance with all conditions set forth in "the attached [September 11, 2020

Biological Opinion] and any future [Biological Opinion] that replaces it, which terms and

25

conditions are incorporated by reference in this permit." USACE AR012636 (Permit); USACE AR014379.

74.    On February 16, 2022, the Army Corps determined, pursuant to 50 C.F.R. § 402.15(a), that it would proceed by accepting NMFS' 2021 Biological Opinion, including its revised Incidental Take Statement (ITS), for compliance with its obligations under the ESA, and that the terms and conditions of the 2021 ITS would automatically be incorporated into the DA Permit by operation of an existing permit condition. USACE_AR_014375 (2022 Section 402.15 MFR) at USACE_AR_014383. The Army Corps made no changes to the JROD on the basis of the 2021 Biological Opinion as the 2021 Biological Opinion did "not affect or change any of the findings and determinations related to threatened and endangered species that the USACE made in the JROD." USACE_AR_014375 at 014381–014383 (2022 Memorandum).

**ESA Consultation with NMFS/Greater Atlantic Region and Action Agency Adoption of its Biological Opinions**

75.    On December 6, 2018, BOEM requested consultation with NMFS's Greater Atlantic Regional Office (NMFS/GAR) under section 7 of the ESA about the proposed Federal actions related to the Project. BOEM_0034553 (December 6, 2018 BOEM ESA Consultation Request to NMFS). In making this request, BOEM was acting as "the lead federal agency for purposes of section 7 consultation," seeking consultation concerning its own approval of the COP and also for the "other action agencies" making decisions about the Project, including the Army Corps and NMFS/OPR. BOEM_0077276 at BOEM_0077279. BOEM also submitted a biological assessment (BA) it had prepared in support of consultation. BOEM_0034553 at BOEM_0034556–688 (December 2018 BA).

76.    NMFS/GAR requested additional information from BOEM in March and April of 2019. *See* NMFS_00016008 (May 01, 2019 NMFS Initiation Letter to BOEM); *see, e.g.*,

NMFS_00016622 (March 14, 2019 Letter to BOEM); NMFS_00062119 (April 10, 2019 Response to NMFS). After receiving the information requested from BOEM, NMFS/GAR agreed with BOEM on May 1, 2019, to initiate formal consultation to consider the effects of the proposed actions on ESA-listed whales, sea turtles, fish, and designated critical habitat that may be present in the action area. NMFS_00016008; NMFS_00017176 at 00017180 (Consultation history in 2021 BiOp).

77.     During the consultation process, NMFS/GAR received additional information from BOEM about the Project. NMFS_00017176 (2021 BiOp) at 00017180-81; NMFS_00062296 (May 12, 2020 email); NMFS_00062297 (May 11, 2020 BA Supplemental Information). NMFS/GAR also considered the supplemental DEIS that was issued on June 12, 2020. NMFS_ 00017176 (2021 BiOp) at 00017180.

78.     On September 11, 2020, NMFS/GAR issued a Biological Opinion (2020 Biological Opinion or 2020 BiOp) pursuant to section 7(a)(2) of the ESA. NMFS_00016027 (September 11, 2020 NMFS BiOp Transmittal Letter to BOEM); NMFS_00016029 (2020 BiOp). NMFS/GAR concluded that the "proposed action may adversely affect but is not likely to jeopardize the continued existence of fin, sei, sperm, and North Atlantic right whales and the Northwest Atlantic distinct population segment (DPS) of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley, and leatherback sea turtles, [and may affect but was] not likely to adversely affect blue whales, the Northeast Atlantic DPS of loggerhead sea turtles, or any DPS of Atlantic sturgeon." NMFS_00016027 (Sept. 11, 2020 Letter). The 2020 Biological Opinion included an incidental take statement (ITS) that specified Reasonable and Prudent Measures (RPMs) and their implementing Terms and Conditions to minimize and document the amount or extent of any incidental taking of protected species. NMFS_00016027 (Sept. 11, 2020

27

Letter); NMFS_00016029 (2020 BiOp) at 00016317-16328. On September 17, 2020, BOEM

distributed the final 2020 BiOp to representatives of the other action agencies. BOEM_0061037

(September 17, 2020 Email from Brian Krevor, BOEM); NMFS_00017176 (2021 BiOp) at

00017180 (Consultation history in 2021 BiOp).

79.    On December 1, 2020, Vineyard Wind temporarily withdrew its COP from

further review and decision-making by BOEM to conduct additional technical and logistical

reviews associated with the inclusion of the GE Electric Haliade-X wind turbine generator.

BOEM_0067649 (Vineyard Wind Letter to withdraw COP 2020); BOEM_0076922 (OCSLA

Compliance Memo) at BOEM_0076926; NMFS_00017176 (2021 BiOp) at 00017180. But

BOEM did not ask NMFS/GAR to withdraw the 2020 Biological Opinion, so it remained in

effect. NMFS_00017176 (2021 BiOp) at 17180; NMFS_00016661 (BOEM Request to

Reinitiate) at 00016662; NMFS_00016665 (BOEM Letter re Reinitiation to NMFS) at

00016666.

80.    On May 7, 2021, BOEM requested reinitiation of ESA consultation with

NMFS/GAR for the Project pursuant to ESA regulations, 50 C.F.R. § 402.16, to consider effects

of monitoring surveys that BOEM proposed to require as conditions of COP approval, and were

not fully assessed in BOEM's 2019 Biological Assessment or NMFS/GAR's 2020 BiOp. NMFS

16661. BOEM also noted that new information regarding the status of the North Atlantic right

whale had become available after the consultation was completed. *Id.* BOEM further explained

that "[r]einitiation of consultation to include monitoring plans as part of the proposed action does

not provide any new information concerning potential effects on threatened or endangered

species resulting from construction, operation, and decommissioning of the project and,

therefore, does not change the determinations of the Opinion per sections 7(a)(2) and 7(d) of the ESA for the rest of the project already considered in the Opinion." BOEM_0076721.

81.    On May 27, 2021, NMFS/GAR advised BOEM that it agreed that consultation must be reinitiated. NMFS_16663 (Response Letter from NMFS to BOEM). NMFS/GAR anticipated that reinitiation of consultation would result in a new biological opinion that would replace the 2020 Biological Opinion. NMFS_00016663; NMFS_00017176 (2021 BiOp) at 00017180. NMFS/GAR said its new Opinion would "consider the changes to the proposed action (i.e., inclusion of surveys as outlined in [BOEM's] May 7, 2021, letter and BA), review any new information on listed species, including North Atlantic right whales, and [would] update the analysis as necessary." NMFS_00016663.

82.    On October 18, 2021, NMFS/GAR concluded the consultation and issued to BOEM a new biological opinion (2021 Biological Opinion, uncorrected, or 2021 BiOp, uncorrected) that replaced the 2020 Biological Opinion. NMFS_00016668 (NMFS Transmittal Letter to BOEM, uncorrected); NMFS_00016670 (2021 BiOp, uncorrected). Soon after identifying several non-substantive errors, NMFS/GAR issued to BOEM and other action agencies a corrected transmittal letter and a corrected Biological Opinion. NMFS_00017172 (November 1, 2021 Letter from NMFS to BOEM re Corrections); NMFS_00017170 (Corrected Transmittal Letter to BOEM); NMFS_00017176 (2021 BiOp, as corrected).

83.    The 2021 BiOp evaluated the actions as taken by BOEM and NMFS/OPR following reinitiation of consultation, including BOEM's requirement that Vineyard Wind conduct monitoring surveys. NMFS 00017181-225.

84.    NMFS/GAR also updated analyses to reflect the best scientific information available and explained whether new information affected the analysis. NMFS 00017686.

85.    The 2021 Biological Opinion, as corrected, concluded that:

a.    "the proposed action is not likely to jeopardize the continued existence of fin, sei, sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback sea turtles, or any DPS of Atlantic sturgeon." NMFS_00017170 (Corrected Transmittal Letter to BOEM); NMFS_00017176 (2021 BiOp) at 00017558;

b.    "the proposed action is not likely to adversely affect blue whales, Oceanic whitetip shark, shortnose sturgeon or the Northeast Atlantic DPS of loggerhead sea turtles; thus, it is also not likely to jeopardize the continued existence of these species." *Id.*; and

c.    "the proposed action will have no effect on critical habitat designated for the North Atlantic right whale, giant manta ray, hawksbill sea turtle, and Gulf of Maine DPS of Atlantic salmon." *Id.*

86.    The 2021 Biological Opinion included an Incidental Take Statement (ITS) to comply with MMPA Section 101(a)(5)—as required by ESA Section 7(b)(4), 50 C.F.R. § 402.14(i)(1)(iii)— and imposed Reasonable and Prudent Measures (RPMs) as well as their implementing Terms and Conditions to minimize and document the take of ESA-listed species. NMFS_00017170 (Corrected Transmittal Letter to BOEM). The 2021 Biological Opinion stated that "the terms of this ITS and the exemption from Section 9 of the ESA" that it confers "become effective only upon the issuance," under the Marine Mammal Protection Act, of "authorization to take the marine mammals identified" in the ITS. NMFS_00017176 (2021 BiOp) at 00017559.

87.     NMFS/OPR adopted the 2021 BiOp, and advised NMFS/GAR of its determination pursuant to 50 C.F.R. § 402.15(a). NMFS_00003557 (December 2021 Memo to Record on 2021 BiOp).

88.     On January 20, 2022, BOEM made its determination pursuant to 50 C.F.R. § 402.15(a): "Because the activities authorized under BOEM's COP approval—including the monitoring surveys—are subject to the terms and conditions and reasonable and prudent measures found in the 2021 BiOp, no further action is required in order for Vineyard Wind to proceed with construction and operation of the Project." BOEM_0077788.

### NMFS/OPR's Issuance of an Incidental Harassment Authorization under the Marine Mammal Protection Act

89.     On September 7, 2018, Vineyard Wind submitted to NMFS/OPR a request under section 101(a)(5)(D) of the MMPA for an incidental harassment authorization (IHA) to take by Level A and Level B harassment marine mammals incidental to impact pile driving during construction of a commercial wind energy project with the capacity to generate approximately 800 megawats (MW) of electricity (Project) in Lease Area OCS-A0591, offshore Massachusetts. NMFS_00014218 (Draft IHA Application); NMFS_00014451 (E-mail Submission). "Level A harassment" is "any act of pursuit, torment, or annoyance" that "has the potential to injure a marine mammal or marine mammal stock in the wild." NMFS_00003408 (Notice of Proposed Incidental Harassment Authorization) (quoting 16 U.S.C. § 1362(18)(A)(i)). "Level B harassment" is "any act of pursuit, torment or annoyance" that "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." NMFS_00003408 ((Notice of Proposed Incidental Harassment Authorization) (quoting 16 U.S.C. § 1362(18)(A)(ii))).

90.     The Project will consist of offshore wind turbine generators (WTGs) and electrical service platforms (ESPs), an onshore substation, offshore and onshore cabling, and onshore operations and maintenance facilities. Vineyard Wind intends to install the WTGs and ESPs in the northeast portion Lease Area, referred to as the wind development area (WDA)—an area of approximately 65,296 acres of the Vineyard Wind lease area, located approximately 14 miles from the southeast corner of Martha's Vineyard and a similar distance from Nantucket. NMFS 00014218.

91.     Vineyard Wind submitted revised IHA applications in October 2018 and January 2019. *See* NMFS_00014457 (October 2018 E-Mail Submission); NMFS_00014581 (January 2019 E-Mail Submission); NMFS_00014737 (January 2019 IHA Application); *see also* NMFS_00003559 (Proposed IHA Decision Memo).

92.     On April 30, 2019, NMFS/OPR published a notice in the Federal Register regarding its proposal to issue an IHA to Vineyard Wind in Lease Area OCS-A 0501. NMFS_00003392 (Notice of Proposed Incidental Harassment Authorization, 84 Fed. Reg. 18,346). The notice identified the species that potentially occur in the Project area and may potentially be taken by harassment incidental to construction of the Project due to in-water noise exposure resulting from pile-driving activities associated with installation of the wind turbine generators and electrical service platforms. NMFS_00003396. The notice invited public comment on the proposal to issue an IHA.

93.     The notice also stated that NMFS/OPR would review the potential impact of issuance of an IHA on the human environment under NEPA by participating in BOEM's NEPA review of the Vineyard Wind COP as a cooperating agency. NMFS_00018265 (84 Fed. Reg. 18,346). NMFS/OPR planned to adopt BOEM's environmental impact statement provided that

NMFS's "independent evaluation of the document finds that it includes adequate information analyzing the effects on the human environment of issuing the IHA." *Id.*

94.     On December 1, 2020, Vineyard Wind notified NMFS/OPR of its temporary withdrawal of the COP before BOEM, but clarified that Vineyard Wind was not withdrawing its IHA application. NMFS_00015737 (Letter). On January 25, 2020, Vineyard Wind notified NMFS/OPR that it had rescinded its temporary withdrawal of the COP before BOEM and had confirmed that no changes to the COP were required. NMFS_00015744 (Letter).

95.     On May 10, 2021, BOEM, the U.S. Army Corps of Engineers (Army Corps), and NMFS/OPR issued a joint Record of Decision (ROD) for the FEIS. BOEM_0076799–76898 (ROD). The ROD stated that NMFS/OPR's final decision to issue the requested IHA would be documented in a separate Decision Memorandum. BOEM_0076799 at BOEM_0076845.

96.     On May 13, 2021, NMFS/OPR issued a memorandum to document and provide an explanation for its adoption of BOEM's 2021 Final Environmental Impact Statement (FEIS). NMFS_00003467 (May 13, 2021 VW Adoption Memo).

97.     On May 21, 2021, Catherine Marzin, Acting Director, Office of Protected Resources, NMFS, provided Rachel Pachter, Vineyard Wind, with a copy of the IHA issued to Vineyard Wind, which is valid May 1, 2023, through April 30, 2024. NMFS_00003514 (May 21, 2021 VW IHA transmittal letter); NMFS_00003489 (IHA).

98.     On June 25, 2021, NMFS/OPR issued notice of its approval of an IHA under the MMPA, 16 U.S.C. § 1361 et seq., for a small number of marine mammals that may be harassed incidental to Project construction. 86 Fed. Reg. 33,810; NMFS 3515. The notice responded to the public comments NMFS/OPR received, explained the basis for the agency's decision, and

described the mitigation, monitoring, and reporting requirements that were imposed by the IHA.
*Id.*

99.    On December 1, 2021, Jolie Harrison, Division Chief, Permits and Conservation

Division (PR1), Office of Protected Resources, NMFS, filed a Memorandum for the Record

regarding the issuance of the 2021 Biological Opinion, as corrected, for the Project pursuant to

50 C.F.R. § 402.15(a). In the Memorandum, PR1 stated that it concurred with the determination

in the 2021 Biological Opinion and had not received any additional information since its

issuance which would undermine the determination. PR1 thus stated that it was adopting and

utilizing the 2021 Biological Opinion for compliance with its obligations under the Endangered

Species Act (ESA). NMFS_00003557 (December 2021 Memo to Record on 2021 BiOp).

DATED:  December 20, 2022

*Of Counsel:*

PEDRO MELENDEZ-ARREAGA
Lead Attorney-Advisor
Offshore Renewable Energy Team
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
(202) 513-7759
pedro.melendez-arrea@sol.doi.gov

MATTHEW J. HARRIS
Assistant District Counsel
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742
 (978) 318-8244
matthew.j.harris@usace.army.mil

LEA TYHACH

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

*/s/ Perry M. Rosen*
PERRY M. ROSEN
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 353-7792
E-mail: perry.rosen@usdoj.gov

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0204
Fax: (202) 305-0275
E-mail: mark.brown@usdoj.gov

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
ANGELA ELLIS

Attorney - Advisor
National Oceanic and Atmospheric
Administration
Office of General Counsel
Northeast Section
55 Great Republic Drive
Gloucester, MA 01930
(978) 281-9242
lea.tyhach@noaa.gov

Trial Attorney
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Attorneys for Federal Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of said filings to the attorneys of

record for Plaintiffs and all other parties, who have registered with the Court's CM/ECF system.

So certified this 20th day of December, 2022 by

<u>/s/ *Luther L. Hajek*</u>
Luther L. Hajek
Counsel for Federal Defendants