**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SEAFREEZE SHORESIDE, INC., *et al.,*

    Plaintiffs*,*

    v.

THE UNITED STATES DEPARTMENT OF
THE INTERIOR, *et al.,*

    Defendants,

 and

VINEYARD WIND 1, LLC,

    Intervenor-Defendant.

Civil Action No. 1:22-cv-11091-IT

**DEFENDANTS' RESPONSE TO PLAINTIFFS SEAFREEZE SHORESIDE, INC. ET
AL.'S STATEMENT OF MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Federal Defendants respectfully submit this Response to Plaintiffs Seafreeze Shoreside, Inc. *et al.*'s Local Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment, ECF No. 68. In a case brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06, the district court acts as a reviewing court and does not act as a fact finder. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985). Instead, "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Id*. Accordingly, Defendants dispute all factual assertions contained in Plaintiff's Statement of Material Facts that are inconsistent with the administrative records filed with the Court or that rely on extra-record evidence. Responses to the individual paragraphs in Plaintiffs' statement are set forth below.[1]

### ***Nature of this Lawsuit***

1.      This is an action for declaratory and injunctive relief against the United States Departments of the Interior, Commerce, and Defense, their subagencies, and their officers acting in their official capacities (collectively, the "Federal Defendants") for violations of the Outer Continental Shelf Lands Act, the Endangered Species Act, the Clean Water Act, the Marine Mammal Protection Act, the National Environmental Policy Act, and their respective rules and regulations (collectively, the "Federal Laws").

**Federal Defendants' Response: Disputed.**

---

[1] "BOEM" refers to the U.S. Bureau of Ocean Energy Management's record; "NMFS" refers to the National Marine Fisheries Service's record, and "USACE_AR" refers to the U.S. Army Corps of Engineers' record.

This paragraph states legal argument rather than materials facts. As set forth in their summary judgment briefing, Federal Defendants dispute that they violated any statutes.

2.      Each of the Federal Defendants violated one or more of the Federal Laws in connection with the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan for a massive offshore wind energy generating facility located in an expansive area of the Outer Continental Shelf off the southern coast of Nantucket, Massachusetts, known as the Vineyard Wind 1 offshore wind energy project (the "Vineyard Wind project"). The Plaintiffs ask this Court to set aside the illegal lease issuance and the approval of the Construction and Operations Plan.

**Federal Defendants' Response: Disputed.**

This paragraph states legal argument rather than material facts. As set forth in their summary judgment briefing, Federal Defendants dispute that they violated any statutes.

3.      Plaintiffs are comprised of commercial fishermen and their trade associations as well as a shoreside business. Their livelihoods and economic futures depend on fishing in the Vineyard Wind project area. The final Record of Decision ("ROD") for the Vineyard Wind project states that approval of the project will likely result in the permanent abandonment of commercial fishing in the entire project area. **AR BOEM_0076837** ("While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the *entire* 75,614 acre area will be *abandoned* by commercial fisheries due to difficulties with navigation.") (Emphasis added). Because the ability to fish in the Vineyard Wind lease area is key to the survival of the Plaintiffs as ongoing businesses, they will be economically ruined by the Federal Defendants' collective action in approving the project.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that Plaintiffs are comprised of commercial fishermen, their trade association, and shoreside business. Federal Defendants lack sufficient information to determine whether Plaintiffs' livelihoods depend on fishing in the Vineyard Wind Project area and whether their business would be economically ruined if they were unable to fish within the project area. Federal Defendants dispute that Plaintiffs and other fishermen will not be able to fish in the project area and that assertion is contradicted by the record. *See*, *e.g.*, BOEM_0076942 ("The navigational risk assessment prepared for the Project shows that it is technically feasible to navigate and maneuver fishing vessels and mobile gear through the [project area]."); BOEM_0076944 ("[T]he Proposed Project would not limit the right to navigate of fish within the Project area."); BOEM_0076944 ("BOEM expects that with time, many fishermen will adapt to spacing and be able to fish successfully within the [Project area]."); *see also* BOEM_0068718-19, 68743-44. Further, the U.S. Army Corps of Engineers ("Corps") clarified that the statement in the Record of Decision ("ROD") cited by Plaintiffs was "based solely upon comments of interested parties submitted to BOEM during the public comment period for the [DEIS]," not based on an independent analysis conducted by the Corps. USACE_AR_014374; *see also*, *e.g.*, BOEM_0069602 (RODA comments asserting that it would not be possible for commercial fishermen to operate within the turbine array).

4.    While greenlighting the Vineyard Wind project, the Federal Defendants failed to adhere to their substantive statutory and regulatory responsibilities, acted in ways that are *ultra vires,* and fell short of complying with mandated procedures, all to the injury of the Plaintiffs.

**Federal Defendants' Response: Disputed.**

This paragraph states legal argument rather than material facts. As set forth in their

summary judgment briefing, Federal Defendants dispute that they violated any statutes.

5.    The violations of the Federal Laws resulted from the Federal Defendants' single-

minded pursuit of their overarching governmental goal of increasing the capacity of renewable

energy generation on the Outer Continental Shelf at any cost.

**Federal Defendants' Response: Disputed.**

This paragraph states legal argument rather than material facts. As set forth in their

summary judgment briefing, Federal Defendants dispute that they violated any statutes.

*<u>Parties</u>*

<u>Plaintiffs</u>

6.    Plaintiff Seafreeze Shoreside, Inc. ("Seafreeze") is one of the largest fish dealers

in Point Judith, Rhode Island, with product sold in both domestic and international markets.

Seafreeze purchases, and processes product—primarily squid—from its own and independent

vessels and sells this product to its sister company, Seafreeze Ltd., and other local wholesalers.

Seafreeze is also a primary ice supplier to squid fishing vessels in Port Judith. Seafreeze services

3 company-owned, federally-permitted vessels (which supply Seafreeze with squid and other

marine species) and additionally services approximately 20 independently-owned vessels, many

of which are federally-permitted squid vessels. Seafreeze employs about 40 people, including

temporary workers. Squid is vital to Seafreeze's business and the vessels it services. In addition

to participating in fishery management processes, Seafreeze has long supported cooperative

research and works to enhance scientific understanding of fisheries' resources in the context of

the wider marine environment. Seafreeze's entire business is injured because the issuance of

Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the

cessation of commercial fishing activities in the Vineyard Wind lease area, on which Seafreeze depends for a substantial portion of its revenues.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute Plaintiffs' characterization of Seafreeze Shoreside, Inc. Federal Defendants lack sufficient information to determine whether Seafreeze depends on fishing in the Vineyard Wind lease area for a substantial portion of its revenue. Federal Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 0068743-44.

7.     Plaintiff Long Island Commercial Fishing Association, Inc. ("LICFA") is a commercial fishing industry group representing New York's commercial fishermen and fishing industry in 11 gear groups in 14 ports on Long Island. LICFA represents owners and operators from over 150 fishing businesses, boats, and fishermen who are home-ported on Long Island, some of which fish in state and federal waters that include the Vineyard Wind Lease area. LICFA and its members support extensive cooperative scientific research aimed at improving understanding of the marine environment, in addition to engaging in fisheries management, public education, and outreach. LICFA members are injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which some LICFA members depend for a substantial portion of their revenues.

**Federal Defendants' Response: Disputed, in part**.

Federal Defendants do not dispute Plaintiffs' characterization of the Long Island Commercial Fishing Association ("LICFA"). Federal Defendants lack sufficient information to

determine whether LICFA's members rely in fishing in the Vineyard Wind lease area for a substantial portion of their revenue. Federal Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 0068743-44.

8.      Plaintiff XIII Northeast Fisheries Sector, Inc. ("Sector XIII") is a private organization of commercial fishermen formed in 2010 with 49 members responsible for monitoring compliance with 60 fishing permits along the Coast of the Northeast United States and supporting the commercial fishing industry in the area. Members of Sector XIII fish the waters of the Vineyard Wind lease area, and their livelihoods depend upon the availability of that area for fishing. Members of Sector XIII are injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Sector XIII members depend for a substantial portion of their revenues.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute Plaintiffs' characterization of the XIII Northeast Fisheries Sector, Inc. Federal Defendants lack sufficient information to determine whether Sector XIII's members fish the waters of the Vineyard Wind lease area and whether their livelihoods depend on fishing in the lease area. Federal Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 68743-44.

9.      Plaintiff Heritage Fisheries, Inc. ("Heritage Fisheries") is a commercial fishing company whose President is Thomas E. Williams, Sr., a commercial fisherman who started fishing commercially in 1967. Heritage Fisheries owns a fishing boat called "FV Heritage" that

fishes the waters of the Vineyard Wind lease area, which provides approximately 30% - 40% of

the annual revenues of the company. FV Heritage is captained by Thomas E. Williams Sr.'s son,

Thomas Williams. The continuing economic viability of Heritage Fisheries depends on its ability

to continue to fish in the Vineyard Wind lease area. Heritage Fisheries is injured because the

issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will

result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which

Heritage Fisheries depends for a substantial portion of its revenues.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute Plaintiffs' characterization of Heritage Fisheries, Inc.

Federal Defendants lack sufficient information to determine whether Heritage Fisheries fishes

the waters of the Vineyard Wind lease area and whether the economic viability of Heritage

Fisheries depends on fishing in the lease area. Federal Defendants dispute that the construction

and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in

the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 0068743-44.

10.     Plaintiff NAT W., Inc. ("NAT") is a commercial fishing company whose

President Thomas E. Williams, Sr. NAT owns a fishing boat called "FV Tradition," which is

captained by Thomas E. Williams' son, Aaron Williams. FV Tradition fishes the waters of the

Vineyard Wind lease area, which provides approximately 50-60% of the revenues of NAT. The

continuing economic viability of NAT depends on its ability to continue to fish in the Vineyard

Wind lease area. NAT is injured because the issuance of Lease OCS-A-0501 and the approval of

the Construction and Operations Plan will result in the cessation of commercial fishing activities

in the Vineyard Wind lease area, on which NAT depends for a substantial portion of its revenues.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute Plaintiffs' characterization of NAT W., Inc. Federal Defendants lack sufficient information to determine whether NAT W., Inc. fishes the waters of the Vineyard Wind lease area and whether the economic viability of NAT W., Inc. depends on fishing in the lease area. Federal Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 0068743-44.

11.     Plaintiff Old Squaw Fisheries, Inc. ("Old Squaw") is a commercial fishing company based in Montauk, New York, whose President is David Aripotch. Old Squaw owns a fishing boat called "FV Caitlin & Mairead," which is captained by David Aripotch. FV Caitlin & Mairead fishes the waters of the Vineyard Wind lease area, which provides approximately 30% of the revenues of Old Squaw. The continuing economic viability of Old Squaw depends on its ability to continue to fish in the Vineyard Wind lease area. Old Squaw is injured because the issuance of Lease OCS-A-0501 and the approval of the Construction and Operations Plan will result in the cessation of commercial fishing activities in the Vineyard Wind lease area, on which Old Squaw depends for a substantial portion of its revenues.

**<u>Federal Defendants' Response: Disputed, in part.</u>**

Federal Defendants do not dispute Plaintiffs' characterization of Old Squaw Fisheries, Inc. Federal Defendants lack sufficient information to determine whether Old Squaw Fisheries fishes the waters of the Vineyard Wind lease area and whether the economic viability of Old Squaw Fisheries depends on fishing in the lease area. Federal Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind lease area. *See* BOEM_0076942-44; BOEM_0068718-19, 0068743-44.

**Defendants**

12.     Defendant The United States Department of the Interior ("Interior") is a federal executive department created in 1849 and responsible for managing and conserving federal lands and natural resources. Interior manages approximately 75% of the United States' federal public land. Interior also administers federal historic preservation programs and oversees federal engagement with Native Americans, Alaska Natives, Native Hawaiians, insular areas, and other federal territories. Among other things, Interior is responsible for implementation of the Outer Continental Shelf Lands Act.

**Federal Defendants' Response: Undisputed.**

13.     Defendant The Hon. Deb Haaland is the current Secretary of the Interior.

**Federal Defendants' Response: Undisputed.**

14.     Defendant Bureau of Ocean Energy Management ("BOEM") is a federal agency within Interior established in 2010 to oversee development of the Outer Continental Shelf. BOEM evaluates the resources of the Outer Continental Shelf and leases portions of it. BOEM also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

**Federal Defendants' Response: Undisputed.**

15.     Defendant Amanda Lefton is the current Director of BOEM.

**Federal Defendants' Response: Undisputed.**

16.     Defendant Laura Daniel-Davis is the Deputy Assistant Secretary, Land and Minerals Management, Department of the Interior.

**Federal Defendants' Response: Undisputed.**

17.    Defendant The United States Department of Commerce ("Commerce") is a federal executive department focused on job creation, promoting economic growth, encouraging sustainable development, and blocking harmful international trade practices. Commerce also gathers a wide array of economic and demographic data to assist in business and government decision-making, and sets industry standards in many major fields. One of Commerce's sub-agencies is the National Oceanic and Atmospheric Administration ("NOAA"). NOAA forecasts weather, monitors a variety of oceanic and atmospheric conditions, charts and explores the oceans, and (notably for this case) manages protection of marine mammals, threatened species, and endangered species in United States territory.

**Federal Defendants' Response: Undisputed.**

18.    Defendant The Hon. Gina M. Raimondo is the current Secretary of Commerce.

**Federal Defendants' Response: Undisputed.**

19.    Defendant The National Marine Fisheries Service ("NMFS" or "NOAA Fisheries") is a federal agency founded in 1871 and placed within NOAA in 1970. NMFS oversees national marine resources and conserves fish species and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. NMFS implements and enforces the Endangered Species Act with regard to marine organisms.

**Federal Defendants' Response: Undisputed.**

20.    Defendant Catherine Marzin is the current Deputy Director of NOAA Fisheries.

**Federal Defendants' Response: Undisputed.**

21.    Defendant The United States Department of Defense ("Defense") is the federal executive department responsible for coordinating and supervising all government functions related to national security and the United States' armed forces.

**Federal Defendants' Response: Undisputed.**

22.    Defendant The Hon. Lloyd J. Austin is the current Secretary of Defense.

**Federal Defendants' Response: Undisputed.**

23.    Defendant The United States Army Corps of Engineers ("Corps") is a division of the United States Army, which is a sub-agency of Defense. The Corps' mission is to serve as combat engineers, oversee military construction, and construct civil works like canals and dams. The Corps is also charged with administering portions of the Clean Water Act.

**Federal Defendants' Response: Disputed in part.**

Federal Defendants dispute that the Corps is charged with administering portions of the Clean Water Act. Section 404 of the Clean Water Act gives the Corps authority to issue permits for the discharge of dredged or fill material into waters of the United States. 33 U.S.C. § 1344(a). However, the Environmental Protection Agency remains charged with administering the Clean Water Act. *See id.* § 1344(b)(1), 1344(c); *see also* 40 C.F.R. Part 230.

24.    Defendant Lt. Gen. Scott A. Spellmon is the current Commander and Chief of Engineers of the Corps.

**Federal Defendants' Response: Undisputed.**

25.    Defendant Col. John A. Atilano II is the current District Engineer of the New England District of the Corps.

**Federal Defendants' Response: Undisputed.**

### *History and Timeline of The Vineyard Wind Project*

26.    In 2009, BOEM began evaluating the possibility of developing wind energy in the Outer Continental Shelf (OCS) offshore Massachusetts pursuant to its authority under the Outer Continental Shelf Land Act (OCSLA). **AR BOEM_0068786, 0069170**.

**Federal Defendants' Response: Undisputed.**

27.    On November 23, 2010, the Obama Administration announced its "Smart From The Start" program, designed to "speed offshore wind energy development off the Atlantic Coast." *Press Release*, U.S. Dept. Of Interior, https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

**Federal Defendants' Response: Undisputed.**

28.    The "Smart From The Start" program was based on a regulatory initiative that purports to allow BOEM to issue, publish, and award offshore wind leases without satisfying its statutory duty of pre-leasing review. *Id.*; *see also* 43 U.S.C. § 1337(p)(4) (outlining required factors for pre-leasing review).

**Federal Defendants' Response: Disputed.**

The "Smart From the Start" was an initiative designed "to accelerate the responsible development of wind energy on the Atlantic OCS." BOEM_0000116. "The purpose of the Smart from the Start initiative is to allow BOEM to move forward with OCS leasing for renewable energy in a manner that allows for viable economic development in an environmentally responsible manner." BOEM_0000380. The factors outlined in 43 U.S.C. § 1337(p)(4) instruct the Secretary to carry out any activity under this subsection in a "manner that provides for" the twelve enumerated goals. BOEM_0072953. Section 1337(p)(4) is not a list of factors directed specifically at pre-leasing review. *Compare* BOEM 0076931 (noting analysis done at the COP-stage of "safety" in 1337(p)(A) *with* BOEM_0076933 (describing how BOEM considered 1337(p)(B), protection of the environment, at both the lease sale and COP stage.)

29.     BOEM's director commented the following: "As part of th[e Smart From The Start] initiative, [BOEM] . . . will prepare environmental assessments, instead of initially preparing an environmental impact statement, in order to analyze the potential environmental impacts" of wind energy leasing in a given area to "produce significant time-savings." *BOEMRE Director Discusses Future of Offshore Renewable Energy at Offshore Wind Power Conference*, Bureau of Ocean Energy Management, Regulation, and Enforcement (accessed October 19, 2022),

https://web.archive.org/web/20110202045325/http://www.boemre.gov/ooc/press/2011/press0201.htm.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that the Director of BOEM's remarks were captured in a press release. Federal Defendants dispute Plaintiffs' characterization of the press release. BOEM will prepare environmental assessments, instead of initially preparing an environmental impact statement, in order to analyze the potential environmental impacts associated with providing access to the OCS to renewable energy developers. BOEM is hopeful that this approach could produce significant time-savings. If the environmental assessment concludes that there are significant impacts, then BOEM will comply with NEPA and prepare an EIS.

30.     The Federal Defendants failed to include any information about the implementation of the "Smart From The Start" regulatory program in the administrative record ("AR"). The Plaintiffs therefore have no choice but to cite to an archival version of BOEM's director's policy announcement posted online.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute the characterization of the Smart From the Start initiative as a "regulatory program." Plaintiffs had the opportunity to request that additional documents relating to the Smart From the Start initiative be added to the administrative record, but they did not do so. Federal Defendants included the *Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Massachusetts: Revised Environmental Assessment* in the administrative record. The Revised EA contains information about the Smart From the Start initiative. (BOEM_0000090; BOEM_0000116; BOEM_0000304; BOEM_0000380).

31.     In December 2010, BOEM published a Request for Interest ("RFI") in the Federal Register to determine if there was commercial interest in wind energy development in an approximately 2,224 square nautical mile area of the OCS offshore Massachusetts. 75 Fed. Reg. 82055. The RFI also invited the public to provide information on environmental issues and data for BOEM to consider in deciding whether to issue leases for wind energy development in the area. *Id*.

**Federal Defendants' Response: Undisputed.**

32.     BOEM amended its leasing on regulations on May 16, 2011, which contributed to its plans to implement the Smart From The Start Policy. *See* 76 Fed. Reg. 28178 (May 16, 2011).

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that BOEM's predecessor issued a notice in the Federal Register on that date of a Final Rule. The preamble to that final rule describes that BOEM's predecessor amended 30 C.F.R. §§ 285.231 and 285.232 to eliminate a procedural step related to determining whether competitive interest existed for unsolicited requests for noncompetitive leases. Moreover, Federal defendants do not dispute that this rulemaking was

14

connected to the Smart from the Start initiative. Federal Defendants dispute the characterization

of the Smart from the Start initiative as a "policy." Federal Defendants also dispute that this fact

is material to the approval of the Vineyard Wind COP. The cited rulemaking only affected

provisions of BOEM's regulations dealing with noncompetitive issuance of a lease, whereas the

lease at issue here was issued competitively. BOEM_0000001 ("The Bureau of Ocean Energy

Management (BOEM) is proceeding with competitive commercial wind energy leasing on the

Outer Continental Shelf (OCS) offshore Massachusetts, as set forth by 30 CFR 585.211 through

585.225.").

33.    On February 6, 2012, BOEM published a notice of intent to prepare an

environmental assessment for siting several "Smart From The Start" wind energy leases located

off the coast of Massachusetts. *See* 77 Fed. Reg. 5830 (Feb. 6, 2012).

**Federal Defendants' Response: Disputed, in part.**

Defendants do not dispute that BOEM published a notice of intent to prepare an EA.

Defendants dispute the characterization of a wind energy lease as a "'Smart from the Start' wind

energy lease." The cited Federal Register notice describes the Smart from the Start initiative:

"The initiative focuses on the identification and refinement of areas on the OCS that are most

suitable for renewable energy development, known as Wind Energy Areas (WEAs), and utilizes

coordinated environmental studies, large-scale planning processes, and expedited review

procedures within these areas to achieve an efficient and responsible renewable energy leasing

process."

34.    On the same day, BOEM published a call for information and nominations "for

commercial leases" off the Massachusetts coast. 77 Fed. Reg. 5820 (Feb. 6, 2012).

**Federal Defendants' Response: Undisputed.**

35.    BOEM made limited efforts to review commercial fishing impacts as part of its siting decision for its "Smart From The Start" leases located off the coast of Massachusetts. *See Site Assessment Plan*, BUREAU OF OCEAN ENERGY MANAGEMENT (Nov. 22, 2017), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/VW-Site-Assessment-Plan.pdf.

**Federal Defendants' Response: Disputed.**

Defendants dispute the characterization of a wind energy lease as a "'Smart From the Start' lease". The Defendants also dispute Plaintiffs' characterization of the Site Assessment Plan (SAP). Vineyard Wind's SAP provided a detailed description of fishing activities and the economic value of fisheries, not a review of impacts to commercial fishing, because a SAP is not a vehicle for assessing commercial fishing impacts. Impacts to commercial fishing are assessed through the environmental review of the lessee's Construction and Operations Plan. According to 30 C.F.R. 585.606, a SAP describes the activities a lessee plans to perform for the characterization of their commercial lease. A SAP includes a description of how resource assessment or technology testing activities will be conducted and includes data from physical characterization surveys (e.g., geological and geophysical surveys or hazard surveys) and baseline environmental surveys (e.g., biological or archaeological surveys). 30 C.F.R. 585.605(a)-(b). BOEM must approve a lessee's SAP before they can begin any approved activities on the lease. 30 C.F.R. 585.605(c). Prior to lease issuance BOEM considered numerous other OCS uses in order to minimize or eliminate interference. BOEM_0076941. During 2011 and 2012, BOEM met five times with state-led working groups, including the Fisheries Working Group on Offshore Renewable Energy. *Id*. In addition, during the NEPA process for the COP,

16

BOEM assessed mitigations and alternatives that could further minimize or mitigate impacts to other OCS uses, such as commercial fishing activities. *Id.*

36.    The Federal Defendants failed to include the Site Assessment Plan for the Vineyard Wind lease in the administrative record ("AR").

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants acknowledge that the Site Assessment Plan ("SAP") is not in the administrative record, but dispute that its omission constitutes a failure on the part of Federal Defendants. There is not claim challenging the SAP, and although the Plaintiffs moved to supplement the record with other documents, *see* Doc. No. 57, they did not request that the SAP be added to the record.

37.    The review in the SAP purports to list state-by-state fishery dollar values based on commercial landings by weight and value for species that contribute over $1 million in Massachusetts for a single year—a highly-limited snapshot of fishing activity in the proposed lease area that is the subject this litigation (the "Vineyard Wind lease area" or "Vineyard Wind site"). *Id.* at 58–59.

**Federal Defendants' Response: Disputed.**

Defendants dispute the characterization of the SAP data. Pursuant to 585.611(b)(7) (requiring lessees to include in their SAP a description of "social and economic resources" that could be affected by the activities proposed in the SAP) the SAP includes a table listing commercial landings data for Massachusetts for 2011 to 2015 for all species with average annual landings valued at greater than $1,000,000. The SAP also includes a table listing recreational landings data for Massachusetts for 2012 to 2016 for all species with annual landings greater than 45, 360 kg (100,000 lbs). Although the SAP tables may provide a "limited snapshot" of

data, Defendants dispute that the SAP is the appropriate vehicle for assessing impacts to fishing activity from construction and operation of the Project. Impacts to fishing activity are more fully assessed through the environmental review of the lessee's Construction and Operations Plan.

38.     BOEM's review lists impacts to the Commonwealth of Massachusetts when discussing sites off of the Massachusetts coast, despite the fact that the proposed sites were in federal waters and impacted fisheries from multiple states—one of several narrow limitations BOEM adopted in its "Smart From The Start" program. *Id*. at 56.

**Federal Defendants' Response: Disputed.**

BOEM's environmental review of the construction and operation of the Project is not reflected in Vineyard Wind's ("VW") SAP. A SAP describes the activities a lessee plans to perform for the characterization of their commercial lease. 30 C.F.R. § 585.606. The lessee is responsible for developing its SAP and submitting the SAP to BOEM for review. Then, upon completion of BOEM's technical, environmental, and other federally required reviews, BOEM may approve, disapprove, or approve with modifications. 30 C.F.R. § 585.613(e). Vineyard Wind's SAP provided a detailed description of fishing activities and the economic value of fisheries, not a review of impacts to fishing, because a SAP is not a vehicle for assessing fishing impacts from the Project. Impacts to commercial fishing are assessed through the environmental review of the lessee's Construction and Operations Plan.

39.     BOEM's review found that "[s]tate commercial fishing effort" was "low to medium in State waters south of Martha's Vineyard, adjacent to the location of the [proposed lease site]." *Id*. (cleaned up). However, the Vineyard Wind lease area is not in "state" waters but is in federal waters on the Outer Continental Shelf. Accordingly, this finding by its own terms does not apply to the Vineyard Wind lease area.

**Federal Defendants' Response: Disputed, in part.**

Defendants do not dispute that the asserted quotations are found in VW's SAP. Defendants also do not dispute that the Vineyard Wind lease area is located on the Outer Continental Shelf. Defendants dispute the statement in the third sentence. Although the SAP describes the fishing effort in state waters, the SAP further states that "the fishing effort inside the WEA is concentrated in the central and western regions. This effort is small compared to that in the regional fishing grounds located outside the WEA." SAP at 57.

40.    The entire review was based on a faulty process which defined the Wind Energy Area (the "WEA") through the BOEM Massachusetts Renewable Energy Task Force, whose primary method of communication with affected stakeholders was through a Massachusetts-based focused group that did not conduct substantial outreach to affected federal fisheries permit holders in states other than Massachusetts, such as Rhode Island and New York, where the bulk of commercial fisheries using the Vineyard Wind lease area are based. *Id.* Failure to reach out to commercial fisheries in Rhode Island and New York during the initial phases of implementing the "Smart From The Start" policy doomed the policy to failure from the start.

**Federal Defendants' Response: Disputed.**

Federal Defendants note that the SAP was not challenged in Plaintiffs' complaint and Plaintiffs never requested that it be added to the record. Moreover, extensive outreach with the fishing industry occurred throughout the Project. *See, e.g.*, BOEM_0012194; BOEM_0012198; BOEM_0013270; BOEM_0013333; BOEM_0013489. In addition, Vineyard Wind expressed its commitment to working with the fishing industry by "voluntarily establishing gear loss and revenue compensation funds for fishing interests based in Rhode Island and Massachusetts totaling approximately $25.4 million," BOEM_0068720, and "Vineyard Wind has developed a

voluntary measure to set aside $3.3 million and establish a fund for claims of direct compensation from other affected states." BOEM_0068720-21.

41.     BOEM awarded Lease OCS-A-0501 (the "Vineyard Wind lease") to a company called Offshore MW LLC in 2015. *See* 79 Fed. Reg. 70545 (Nov. 26, 2014) (FSN); https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/Lease-OCS-A-0501.pdf.

**Federal Defendants' Response: Undisputed.**

Federal Defendants note that the Final Sale Notice was issued before the auction occurred and the lease was awarded. *See* 79 Fed. Reg. 70545 (Nov. 26, 2014). The lease was executed in March 2015 and became effective in April 2015. BOEM_0000764, 770.

42.     The Vineyard Wind lease became effective on April 1, 2015. *See id*., *see also* **AR BOEM_0000764** (Vineyard Wind lease).

**Federal Defendants' Response: Undisputed.**

43.     Offshore MW LLC and Vineyard Power, a Martha's Vineyard energy cooperative, were partners in the bidding and lease award. *See id*.

**Federal Defendants' Response: Disputed.**

Offshore MW LLC alone was qualified and eligible to bid and was awarded Lease OCS-A 0501. BOEM_0000764.

44.     Through several corporate transactions, Offshore MW LLC became Vineyard Wind LLC. *See* **AR BOEM_0000811** (change of name).

**Federal Defendants' Response: Undisputed.**

45.     BOEM awarded Lease OCS-A-0501 under the "Smart From The Start" policy—in other words, without fully considering the requirements set forth in 43 U.S.C. § 1337(p)(4).

**Federal Defendants' Response: Disputed.**

As indicated in Section 1 of the lease itself, the lease was awarded pursuant to OCSLA 8(p) and the regulations at 30 C.F.R. Part 585 (BOEM_0000764) The lease does not refer to the Smart from the Start Initiative. Moreover, the lease does not authorize any activities on the OCS. BOEM_0000765. Moreover, BOEM did consider compliance with the factors in 8(p) at the lease sale stage.

46.     BOEM prepared an environmental assessment ("EA") in connection with the lease award. **AR BOEM_0000090**.

**Federal Defendants' Response: Undisputed.**

47.     BOEM awarded the Vineyard Wind lease without issuing an environmental impact statement ("EIS").

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that BOEM did not prepare an environmental impact statement ("EIS") prior to issuing the Vineyard Wind lease, but dispute that the agency was required to do so at the leasing stage. *See Fisheries Survival Fund v. Haaland*, 858 F. Appx. 371, 372-73 (D.C. Cir. 2021).

48.     BOEM received multiple public comments before awarding this lease, some of which specifically objected to BOEM's issuance of the lease without first complying fully with the requirements of 43 U.S.C. § 1337(p)(4) and NEPA. *See, e.g.* **AR BOEM_0110382, 0069488, BOEM_0111443–0111444**.

**Federal Defendants' Response: Disputed.**

The referenced comments are BOEM's responses to comments on the Draft Environmental Impact Statement ("DEIS"), BOEM_0069488, Seafreeze's comments on the

Supplemental DEIS, BOEM_0110382, and RODA's comments on the Supplemental DEIS.

BOEM_0111443-44, not comments that were submitted prior to BOEM's issuance of the lease.

49.     On December 19, 2017, Vineyard Wind LLC (hereinafter "Vineyard Wind") submitted the COP to BOEM for review. **AR BOEM_0001360–0006005** (original COP); **0006293–0010959** (revised COP).

     **Federal Defendants' Response: Undisputed.**

50.     The COP did not provide sufficient data to demonstrate that its planned construction or operation would ensure safe passage and navigation for commercial fishing boats, safe operations for bottom trawl vessels, or a safe environment for emergency rescue operations or marine life.

     **Federal Defendants' Response: Disputed.**

     As required by BOEM's regulations, the submitted COP must contain detailed information describing resources, conditions, and activities that could be affected by the activities proposed in the COP. 30 C.F.R. § 585.627. Once the COP is submitted, BOEM will review the information provided pursuant to § 585.627 to determine if the COP contains all the required information necessary to conduct its technical and environmental reviews, and upon completion of BOEM's review process, BOEM may approve, disapprove, or approve with modifications the submitted COP. 30 C.F.R. § 585.628. Specifically, COP Volume III, Section 7.6 contains data regarding commercial fisheries (BOEM_0008079-116). COP Volume III, Section 7.8 contains information regarding navigation and vessel traffic, including emergency rescue operations (BOEM_0008142-55), and a detailed Navigational Risk Assessment is included as Appendix III-1 (BOEM_0010638-873).

51.     Shortly after receiving the COP, BOEM published a Notice of Intent to prepare a Draft EIS in connection with its review of the COP. *See* 83 Fed. Reg. 13777 (Mar. 30, 2018); *see also* **AR BOEM_0012028**.

**Federal Defendants' Response: Undisputed.**

52.     BOEM published the Draft EIS on December 7, 2018 and requested public comment. *See* 83 Fed. Reg. 63184, *see also* **AR BOEM_0034695**.

**Federal Defendants' Response: Undisputed.**

53.     Among other things, the Draft EIS found that the turbines Vineyard Wind originally planned to use would not be able to survive a category 3 hurricane. **AR BOEM_0034754**; *see also The Worst Massachusetts Hurricanes of the 20th Century*, MASS.GOV (accessed Oct. 6, 2022), https://www.mass.gov/service-details/the-worst-massachusetts-hurricanes-of-the-20th-century.

**Federal Defendants' Response: Disputed.**

Plaintiffs' allegations reference a portion of the DEIS that discusses severe weather and natural events. BOEM_0034754. This portion of the DEIS explains that the proposed Project components were designed to withstand severe weather events and lists the wind speeds and gusts the components were designed to endure. This portion of the DEIS does not state that the turbines would be unable to withstand a category 3 hurricane. Instead, it states that the turbines would be designed to withstand sustained wind speeds up to 112 mph and gusts up to 157 mph. *Id.* Hurricane magnitude and frequency information for severe weather that has occurred in Massachusetts and the WDA can also be found in DEIS Appendix B (BOEM_0035041).

54.    The Site Assessment Plan that the Federal Defendants did not include in the AR contains relevant scientific information regarding hurricane tracks, wave height, and severe weather frequency that relate to the above fact, but much of it has been redacted.

**Federal Defendants' Response: Disputed, in Part.**

Federal Defendants dispute that the insinuation that it BOEM was at fault for not including the SAP in the administrative record. The SAP was not challenged in Plaintiffs' complaint and Plaintiffs never requested that it be added to the record. Federal Defendants do not dispute that it contains information regarding hurricane tracks and wave heights, and a small portion of the information is redacted in the public facing version. *See* SAP at 15-18.[2]

55.    Shortly after its issuance of the Draft EIS, BOEM initiated ESA consultation with the National Marine Fisheries Service ("NMFS") pursuant to the requirements of the ESA. *See* **AR NMFS_1** (detailing all communications between BOEM and NMFS); *see also* **AR BOEM_0077280–0077281**.

**Federal Defendants' Response: Disputed.**

Although BOEM submitted a request for initiation of ESA consultation on December 6, 2018, concurrent with its issuance of the DEIS, ESA consultation was not initiated until April 10, 2019. BOEM_0077280. *See also* BOEM_0039527.

56.    The Corps of Engineers announced its public-interest review of Vineyard Wind's Clean Water Act permit application for the Vineyard Wind site on December 26, 2018, and closed the comment period on January 28, 2019. *See* **USACE_AR_003386**.

---

[2] The SAP is attached to Federal Defendants' Memorandum in Support of Motion their Motion for Summary Judgment as Exhibit 2 and is available at: https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/VW-Site-Assessment-Plan.pdf.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants agree that on December 26, 2018, the Corps issued its public notice of Vineyard Wind's application for a permit under Section 404 of the CWA, and that the Corps public comment period ended on January 28, 2019. USACE AR 003865, 003868. However, Plaintiffs cited record page is irrelevant to the public notice. Plaintiffs cite to the third and final page of BOEM's December 6, 2018 letter requesting formal consultation with NMFS under Section 7 of the Endangered Species Act, not the Corps public notice. USACE AR 003384-003386.

57.      On July 18, 2018, months before the DEIS was published for public comment and months before consultation with NMFS was commenced, Vineyard Wind filed power purchase agreements with several Massachusetts electric companies for offshore wind energy and renewable energy certificates. **AR BOEM_0038223**.

**Federal Defendants' Response: Disputed.**

Plaintiffs' allegations reference a portion of Vineyard Wind's November 9, 2018, submission to the Rhode Island Coastal Resources Management Council stating that Vineyard Wind was awarded power purchase agreements totaling 800 MW of wind generation capacity. The long-term contracts with the Massachusetts electric distribution companies were executed and filed with the Massachusetts Department of Public Utilities (DPU) for review and approval. Additionally, the Massachusetts Department of Energy Resources submitted a letter to DPU urging approval of Vineyard Wind's contracts because of the significant benefits the project would generate for both Massachusetts and Rhode Island.

58.      In February 2019, the comment period closed for the Draft EIS.

**Federal Defendants' Response: Undisputed.**

59.    Shortly afterward, the Massachusetts Department of Public Utilities approved Vineyard Wind's power purchase agreements and issued the requested renewable energy certificates. *Id*.

**Federal Defendants' Response: Undisputed.**

Federal Defendants note that the Massachusetts Department of Public Utilities' approval of Vineyard Wind's power purchase agreements is reflected in the record at BOEM_0066391.

60.    In March 2019, NMFS refused to concur with BOEM's Draft EIS, citing concerns over the impact of the Vineyard Wind project on marine species, marine habitat, and socioeconomic resources. **AR BOEM_0037615**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that NMFS sent a letter dated March 15, 2019 to BOEM with comments on the DEIS. BOEM_0037615. Federal Defendants dispute that      that NMFS "refused to concur with the DEIS" in the letter. The letter provides cooperating agency comments on the DEIS which address, among other things, impact of the Vineyard Wind project on marine species, marine habitat, and socioeconomic resources.

61.    Among other concerns, NMFS identified the Vineyard Wind lease area and cable route as "one of the primary documented spawning locations for longfin squid" and pointed out that the draft EIS lacks "adequate study on the effects of electrical and electromagnetic frequency "EMF" and heat from transmission cables on invertebrates . . . ." Noah Asimow, *NOAA Raises Concerns About Effects of Wind Farm and Undersea Cables*, Vineyard Gazette (Mar. 26, 2019), https://vineyardgazette.com/news/2019/03/26/noaa-raises-concerns-about-effects-wind-farm-and -undersea-cables.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that the attachment to NMFS's cooperating agency letter, dated March 15, 2019, states that "[t]he WDA and cable route are known to support a number of shellfish species and represents one of the primary documented spawning locations for longfin squid" and that "[t]he DEIS should evaluate existing literature and recognize information that remains unknown around EMF. Without adequate study on the effects of EMF and heat from transmission cables on invertebrates, the conclusion that impacts would be negligible for demersal species and life stages is not supported." BOEM_0037615. The content of the referenced letter speaks for itself and to the extent that Plaintiffs' characterization of that letter deviates from the precise content of the letter, Federal Defendants dispute the statement of fact. Federal Defendants were unable to access the referenced hyperlink and therefore lack sufficient knowledge or information to dispute or not dispute the content of the referenced article. Further, the information in the document is not in the administrative record filed with the court for review of the challenged actions and should therefore not be considered material facts. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015).

62.    In April 2019, despite these concerns, Vineyard Wind submitted a request to NMFS for an Incidental Harassment Authorization ("IHA") to allow non-lethal takes of marine mammals, including endangered North Atlantic right whales ("NARWs"). *See* **AR NMFS_3144**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that Vineyard Wind submitted a request to NMFS for an Incidental Harassment Authorization to allow non-lethal takes of marine mammals, including North Atlantic Right Whales. Federal Defendants, however, dispute the "concerns" raised in paragraphs 60-61. Federal Defendants further aver that Plaintiffs' characterization of NMFS's concerns do not serve as a basis that would prevent Vineyard Wind submitting its request for

IHA. NMFS determines whether to grant or deny an IHA based on criteria set forth in Section 101(a)(5)(D) and 50 C.F.R. part 216, which is different from the criteria used to determine the adequacy of the DEIS, SEIS, and FEIS. Any comments NMFS made during the NEPA process were ultimately addressed by BOEM, as evidenced by NMFS's decision to adopt the BOEM 2021 FEIS and issue a joint record of decision. NMFS_1607, at 1656-1658, NMFS_3467, at 3478-3479.

63.    Potential biological removal ("PBR") refers to "the maximum number of animals . . . that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." *Strahan v. Secretary*, 458 F.Supp.3d 76, 93 (D. Mass. 2020).

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants aver that the content of the Federal case speaks for itself and to the extent that Plaintiffs' characterization in paragraph 63 deviates from the precise content of the case, Federal Defendants dispute the statement of fact. Federal Defendants further aver that "Potential Biological Removal" is defined in Section 3 of the MMPA at 16 U.S.C. § 1362(20), which serves as the best evidence of the definition.

64.    The current PBR for the NARW is 0.8. **AR NMFS_33684**.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute that the "current" PBR for the NARW is 0.8. However, it is undisputed that the draft 2020 Stock Assessment Report (SAR) established that the PBR for the NARW is 0.8. which served as the basis for the abundance estimates for the VW project. NMFS 3515, at 3530; NMFS_51839.

65.    NMFS published a notice in the Federal Register on April 30, 2019, proposing to issue an IHA to Vineyard Wind and inviting public comment. *See* **AR NMFS_3392, 3427**.

**Federal Defendants' Response: Undisputed.**

66.    On May 30, 2019, the period of public comment on the proposed IHA closed. *See* **AR NMFS_3392.**

**Federal Defendants' Response: Undisputed.**

67.    On July 29, 2019, Massachusetts Governor Charlie Baker traveled to Washington, DC to lobby BOEM to approve the Vineyard Wind COP despite NMFS's concerns. Douglas Hook, *Gov. Charlie Baker is in Washington D.C. to push for the wind farm off the coast of Martha's Vineyard*, MassLive (Jul. 29, 2019), https://www.masslive.com/capecod/2019/07/gov-charlie-baker-is-in-washington-d-c-to-push-for-the-wind-farm-off-the-coast-of-marthas-vineyard.html.

**Federal Defendants' Response: Disputed, in part.**

Based on the article, Federal Defendants do not dispute that the referenced article states that "Governor Charlie Baker traveled to Washington DC for talks with key White House officials to discuss plans to install a long-anticipated wind farm proposed in Martha's Vineyard;" and quotes governor Baker as stating "[o]ur goal is going to be to get as much clarity as we can over the next several days and then work with Vineyard Wind to put together a cure plan because we really want this project to happen." Federal Defendants dispute that the article states that "Governor Charlie Baker traveled to Washington, D.C. to lobby BOEM to approve the Vineyard Wind COP despite NMFS's concerns." The referenced article speaks for itself and to the extent that Plaintiffs' characterization of the article in paragraph 67 deviates from the precise text of that article, Federal defendants dispute those facts. Federal Defendants further dispute that the

statements or characterization of statements supported by this news article are material facts as it is not in the administrative record filed with the court for review of the challenged actions.

68.     At NMFS's urging, on August 9, 2019, BOEM delayed approval of the Vineyard Wind project to conduct an expanded "cumulative impacts analysis" before issuing its final environmental impact statement ("Final EIS"). Colin A. Young, *Federal Review Will Further Delay Vineyard Wind*, WBUR (Aug. 9, 2019), https://www.wbur.org/news/2019/08/09/vineyard-wind-project-delayed.

**Federal Defendants' Response: Disputed, in part.**

The characterization of the article is disputed. NMFS is not specifically named in the article. Federal Defendants do not dispute that the referenced article states, "BOEM said it had received comments from stakeholders and other federal agencies requesting 'a more robust cumulative analysis' and decided to launch a more comprehensive look at offshore wind projects after federal officials 'determined that a greater build out of offshore wind capacity is reasonably foreseeable than was analyzed in the initial draft EIS' for Vineyard Wind." Federal Defendants dispute that the referenced article states: "[a]t NMFS's urging, on August 9, 2019, BOEM delayed approval of the Vineyard Wind project . . . ." Further, the referenced article speaks for itself and to the extent that Plaintiffs' characterization of the article in paragraph 68 deviates from the precise text of that article, Federal Defendants dispute those facts. In addition, Federal Defendants dispute that the statements or characterization of statements supported by this news article are material facts as it is not in the administrative record filed with the court for review of the challenged actions.

69.     Governor Charlie Baker's office called BOEM's delay "a step in the wrong direction." *Id.*

**<u>Federal Defendants' Response: Disputed, in part.</u>**

Federal Defendants do not dispute that in Colin A. Young, Federal Review Will Further

Delay Vineyard Wind, WBUR (Aug. 9, 2019), Governor Charlie Baker's office called BOEM's

"latest delay 'a step in the wrong direction.'" The referenced article speaks for itself and to the

extent that Plaintiffs' characterization of the article in paragraph 69 deviates from the precise text

of that article, Federal defendants dispute those facts. In addition, Federal Defendants dispute

that the statements or characterization of statements supported by this news article are material

facts as it is not in the administrative record filed with the court for review of the challenged

actions.

70.    In 2019, NMFS promulgated a set of interagency consultation regulations that:

a.    limit when agency action would be deemed to adversely modify

designated critical habitat by requiring the action to affect habitat as a whole;

b.    alter the definitions of "effects of the action" and "environmental

baseline" to limit the scope of analysis of effects;

c.    require that the effects be:

i.    a but-for result of agency action;

ii.    reasonably certain to occur; and

iii.    based on clear and substantial information;

d.    limit when changed circumstances would require new consultation;

e.    limit agencies' duties to ensure mitigation of adverse effects;

f.    unlawfully delegate to other agencies the ability to make biological

determinations that NMFS is required to make; and

g.      allow for rote, slapdash consultations that replace legally required site-specific, in-depth analysis of proposed agency action.

*See* 84 Fed. Reg. 44976 (Aug. 27, 2019).

**Federal Defendants' Response: Disputed.**

NMFS issued a final rule revising the ESA Section 7 implementing regulations at 50 C.F.R. Part 402 on August 27, 2019, which is the best evidence of its content; any allegations contrary to its plain language, meaning, and context are disputed. 84 Fed. Reg. 44976. In addition, Plaintiffs' allegations in paragraph 70 state legal conclusions to which no response is required. Plaintiffs' assertions are not material facts under Federal Rule 56 or Local Rule 56.1 as they are not relevant to the claims or defenses of any party.

71.      NMFS's consultation with BOEM regarding the Vineyard Wind COP resulted in several errors:

a.      NMFS did not provide BOEM with any alternative lease sites in connection with any endangered species, despite the lease area encompassing a large area of habitat for the endangered North Atlantic Right Whale.

b.      NMFS issued a biological opinion that (1) does not properly establish the environmental baseline, (2) excludes a number of effects the Vineyard Wind project will have on the endangered North Atlantic Right Whale, (3) fails to properly consider the impact of the project on the survival and recovery of endangered species in the area, (4) fails to consider research studies showing the short-term harms to the marine habitat of endangered species caused by the construction and operation of wind farms, and (5) is additionally flawed for the

reasons set forth in items 1 through 49 of the 60-Day Notice letter dated May 24,

2021, sent on behalf of the Nantucket Residents Against Turbines.

c.      NMFS issued inadequate incidental take statements that failed to take into

account all effects to endangered species, especially to the North Atlantic Right

Whale.

d.      BOEM failed to reinitiate consultation after receiving new data that would

have affected the biological opinion and incidental take statement, or after

Vineyard Wind altered its project to include large new Haliade-X turbines.

**Federal Defendants' Response: Disputed.**

This paragraph, including subparagraphs, states legal arguments rather than material

facts.

As to subaragraph (a), Federal Defendants state that there was no legal requirement

pursuant to the ESA for NMFS to provide alternative lease sites to BOEM. NMFS concluded the

actions were not likely to jeopardize the continued existence of the North Atlantic right whale;

therefore, no Reasonable and Prudent Alternatives to the actions were required. NMFS 17558

(BiOp conclusion section), 50 C.F.R. § 402.14(g)(5). "Under the ESA, Reasonable and Prudent

Alternatives are only developed upon reaching a 'jeopardy' or 'destruction/adverse modification

conclusion.' Because no such conclusions were reached, there was no requirement to develop

any RPA(s). The Foundation presents no information or analysis on which they have based a

determination that a jeopardy or destruction/adverse modification conclusion should have been

reached." NMFS 17716.

As to subparagraph (b), the BiOp properly considered the environmental baseline (NMFS

17291-17321); fully considered all relevant effects of the action on the North Atlantic right

whale (NMFS 17321-17504); properly considered the impact of the project on both the survival and recovery of endangered and threatened species in the action area (NMFS 17505-17558). Plaintiffs did not specify the research studies to which they refer, nonetheless, NMFS/GAR considered the best available scientific information; and properly considered and addressed not only each of the items 1 through 49 of the purported 60-Day Notice letter dated May 24, 2021, sent on behalf of the Nantucket Residents Against Turbines, but also other letters purporting to be ESA 60-Day Notices sent by Plaintiff Thomas Melone and sent by Texas Public Policy Foundation on behalf of the Seafreeze et al plaintiffs. (NMFS 17687, 17687-17733).

As to subparagraph (c), NMFS properly considered effects of the action on endangered species, including the North Atlantic Right Whale, and issued an appropriate Incidental Take Statement. NMFS 17558-17579.

As to subparagraph (d), BOEM requested reinitiation of consultation after receiving new information on right whales and to add particular survey/monitoring activities to the proposed action on May 7, 2021, which was after Vineyard Wind decided it would use the large, new Haliade-X turbines. (NMFS 16661-16662, 17681-17682). "It is not at all clear what is being implied, or referred to, here. It is possible they are saying that when the COP was withdrawn by Vineyard Wind in January 2021, BOEM should have requested reinitiation. However, BOEM ultimately concluded that no changes to the COP or PDE were necessary, and we are not aware of any triggers for reinitiation that were met at that time. Regardless, consultation was reinitiated in May 2021." NMFS 17719 (NMFS transmittal memo to RA and responses to ESA 60-day NOI).

72.    On June 12, 2020, BOEM issued a notice of availability of a supplemental draft environmental impact statement ("Supplemental Draft EIS") that analyzed "reasonably

foreseeable effects from an expanded cumulative activities scenario for offshore wind development, previously unavailable fishing data, a new transit lane alternative, and changes to the COP since publication of the Draft [EIS]." 85 Fed. Reg. 35952 (June 12, 2020); *see also* **AR BOEM_0057578.**

**Federal Defendants' Response: Undisputed.**

73.    BOEM closed comments on the Supplemental Draft EIS on July 27, 2020. *Id*.

**Federal Defendants' Response: Undisputed.**

74.    The Supplemental Draft EIS confirmed that the Vineyard Wind project would likely harm the local ecosystem, local marine species, commercial fisheries, scientific research and surveys, and military and national security uses. Specifically, the Supplemental Draft EIS shows that:

a.    Special aquatic sites for coral, eel grass, and wetlands are located within the impact zone for the Vineyard Wind project. *See* **AR_BOEM_0057214, 0057220, 0057226.**

b.    Construction on the Project would likely kill, displace, or disturb local species, including endangered species. *See* **AR BOEM_0057071–0057072**.

c.    There would be "major" adverse cumulative impacts on commercial fisheries, scientific research and surveys, and military and national security uses. *See* **AR BOEM_0056958**.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs' characterization of the Supplemental DEIS. BOEM_0056950.

(a) Plaintiffs' allegations reference tables in the SEIS that discuss portions of the summary of activities and associated impact-producing factors for terrestrial and coastal fauna, benthic resources, and finfish, invertebrates, and essential fish habitat. BOEM_0057214, 0057220, 0057226. The SEIS does not use the term "special aquatic sites" or "impact zones."

(b) Plaintiffs do not identify pages which demonstrate construction on the Project would likely kill, displace, or disturb local species. Rather, Plaintiffs identified pages which discuss future offshore wind development activities that may affect commercial fisheries and for-hire recreational fishing through the following IPFs: noise, port utilization, and presence of structures. BOEM_0057071-0057072.

(c) The SEIS comparison of impacts by action alternative stated that there *could be* major cumulative impacts could occur on commercial fisheries and scientific research and surveys as a result of the Proposed Action and all action alternatives (emphasis added). "Major cumulative impacts on military and national security uses would occur as a result of the Proposed Action and Alternatives B, C, D1, E, and F." BOEM_0056958.

75.     Three months after BOEM issued the Supplemental Draft EIS, NMFS issued its Biological Opinion, dated September 11, 2020. *See* **AR BOEM_0060638**.

**Federal Defendants' Response: Disputed, in part.**

NMFS issued the first of two Biological Opinions on September 11, 2020 (NMFS 16029-16354). The second biological opinion was issued on October 18, 2021, and corrected on November 1, 2021, but still referred to as the October 18, 2021 Biological Opinion. NMFS 16670-17169 (uncorrected BiOp); NMFS 17176-17680 (corrected BiOp); NMFS 17172-17175 (NMFS Nov. 1, 2021, letter to BOEM re corrections).

76.     BOEM planned to issue a Final EIS on the Vineyard Wind project by December 11, 2020 and a decision on the COP by January 15, 2021. *See* **AR BOEM_0067694**.

**Federal Defendants' Response: Undisputed.**

Defendants note that the cited Federal Register notice announces the temporary termination of the NEPA process. BOEM_0067694.

77.     On December 1, 2020, Vineyard Wind withdrew its COP from federal review. Vineyard Wind characterized this withdrawal as "temporary" and claimed it was necessary "to allow the project team to conduct a final technical review associated with the inclusion of General Electric Company's ("GE's") 13-14 MW Haliade-X into the final project design." *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, VINEYARD WIND (accessed Nov. 17, 2021), https://www.vineyardwind.com/press-releases/2020/12/14/vineyard-wind-statement-on-boems-acknowledgement-of-temporary-cop-withdrawal; *see also* **AR BOEM_0067649**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that Vineyard Wind temporarily withdrew its COP from federal review on December 1, 2020. Federal Defendants dispute the accuracy of the quotation in the second sentence of the allegation. The press release states, "inclusion of GE's 13 MW Haliade-X into final project design." *See also* BOEM_0067870.

78.     GE's 13-14 MW Haliade-X is an enormous prototype wind turbine that BOEM had never before analyzed in any context for use on the Outer Continental Shelf before the Vineyard Wind project review.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute the characterization of the turbines as enormous.

79.     GE's website story on the Haliade-X turbine begins with the sentence: "It's hard to conceive of just how large it is." *Meet the Haliade-X – Powering 16,000 Homes*, GE Renewable Energy, last accessed Nov. 17, 2021,

https://www.ge.com/renewableenergy/stories/new-wind-turbine-to-increase-efficiency-in-offshore-wind-farms.

**Federal Defendants' Response: Disputed.**

The cited sentence is a vague characterization, which the Court should disregard.

80.     The 13-14 MW Haliade-X turbine stretches 260 meters in height (approximately 853 feet), which is the approximate height of San Francisco's Transamerica Pyramid, with blades "as long as a football field." *Id*. The turbine's blades are 107 meters long and the rotor is 220 meters. *Haliade-X offshore wind turbine*, GE Renewable Energy, last accessed December 6, 2021, https://www.ge.com/renewableenergy/wind-energy/offshore-wind/haliade-x-offshore-turbine; *see also* **AR BOEM_0067871.**

**Federal Defendants' Response: Undisputed.**

81.     The Vineyard Wind project includes sixty-two 13-14 MW Haliade-X units in its final design. Michelle Lewis, *It gets real – Vineyard Wind orders its Haliade-X wind turbines*, Electrek (Oct. 13, 2021), https://electrek.co/2021/10/13/egeb-it-gets-real-vineyard-wind-orders-its-haliade-x-wind-turbines/; *see also* **AR BOEM_0067871**.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute that the cited webpage is representative of the Vineyard Wind project's final design. The webpage cited states that Vineyard Wind has ordered 62 13 MW wind turbines. The January 22 letter cited notes that the project "requires only 62 WTGs to deliver 800

MW of power to the electrical grid." The letter further states that the final engineering design is ongoing. BOEM_0067871-72.

82.     When Vineyard Wind began reviewing the Haliade-X turbine, the only operating 13-14 MW Haliade-X turbine in the world was located on land at the Port of Rotterdam, Netherlands. **AR BOEM_0193460**.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs characterization of the press release. The July 2019 press release states that "a second Haliade-X 12 MW nacelle is currently being assembled at Saint-Nazaire, prior to dispatch to the ORE Catapult test centre at Blyth, in the United Kingdom, in the coming months." BOEM_0193460.

83.     The Rotterdam Haliade-X turbine had been in operation for less than a year when Vineyard Wind began reviewing it for inclusion in its project pursuant to the notice dated December 1, 2020. *See id.*

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs characterization of the press release. The July 2019 press release states "[t]he first nacelle revealed today will be shipped from Saint-Nazaire to Rotterdam-Maasvlakte in the Netherlands over the coming weeks, where its components will be assembled into the Haliade-X 12 MW prototype to be tested there." The press release itself does not state when the Rotterdam Haliade-X turbine became operational. BOEM_0193460.

84.     In its statement on withdrawal, Vineyard Wind stated that it "look[s] forward to working together [with BOEM] again after we notify [BOEM] to resume its review." *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, Vineyard Wind (accessed Nov. 17, 2021), https://www.vineyardwind.com/press-releases/2020/12/14/vineyard-wind-statement-

on-boems-acknowledgement-of-temporary-cop-withdrawal This statement misrepresents what it means to withdraw a COP from review, as opposed to seeking a suspension of review.

**Federal Defendants' Response: Dispute, in part.**

Federal Defendants do not dispute that the quote is an accurate representation of a singular sentence in the press release. Federal Defendants dispute Plaintiffs' characterization of the webpage. The webpage and the record (BOEM_0067649-50) demonstrate Vineyard Wind's intention of a temporary withdrawal of its COP from review.

85.     BOEM published notice that it had terminated (and not merely suspended) review of the Vineyard Wind COP on December 16, 2020. 85 Fed. Reg. 81486 (Dec. 16, 2020); *see also* **AR BOEM _0067694**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that the published notice states that preparation of an EIS for the VW COP is no longer necessary and "the process is hereby terminated." BOEM_0067694. Federal Defendants dispute that the notice states that the process was "not merely suspended."

86.     BOEM's notice of termination stated that "[s]ince the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, *nor is there a decision pending before BOEM*." *Id*. (emphasis added).

**Federal Defendants' Response: Undisputed.**

Federal Defendants do not dispute the federal register notice contains the above-quoted sentence. BOEM_0067694.

**BOEM Resurrects The Vineyard Wind COP**

87.     Shortly after the Biden Administration entered office, Vineyard Wind asked BOEM via letter dated January 22, 2021, to resume review of its terminated COP, indicating that it "had completed its technical and logistical due diligence review and had concluded that inclusion of the Haliade-X turbines did not warrant any modifications to the COP." 86 Fed. Reg. 12495 (Mar. 3, 2021).

**Federal Defendants' Response: Undisputed.**

88.     Vineyard Wind's letter did not provide detailed documentation of its review of the 13-14 MW Haliade-X turbines. **AR BOEM_0067698**.

**Federal Defendants' Response: Disputed.**

Vineyard Wind's letter provides a summary of the documentation of its review. The letter explains that Vineyard Wind previously expanded its project envelope to allow the project to select up to a 14 MW WTG; therefore, detailed documentation of the inclusion of a 13 MW WTG was included in the updated COP submission and evaluated in the SEIS. BOEM_0051598-611; BOEM_0056957-58, 0056972; *see also* BOEM_0067702.

89.     Nothing in Vineyard Wind's letter indicates that Vineyard Wind solicited public input on the safety, efficacy, or environmental impact of using the large 13-14 MW Haliade-X turbines during its review from December 16, 2020, to January 22, 2021.

**Federal Defendants' Response: Disputed.**

Vineyard Wind's letter explains that in December 2019, Vineyard Wind expanded its project envelope to include up to a 14 MW WTG. BOEM_0067698. As such, BOEM's SEIS evaluated impacts of using up to a 14 MW WTG and the public had an opportunity to comment on the SEIS. BOEM_0056950; BOEM_0057578.

90.    BOEM published the following notice in the Federal Register: "Vineyard Wind . . . . informed BOEM that it was rescinding its temporary withdrawal and asked BOEM to resume its review of the COP. Because Vineyard Wind has indicated that its proposed COP is a 'decision pending before BOEM', BOEM is resuming its review of the COP under NEPA." 86 Fed. Reg. 12495 (Mar. 3, 2021).

**Federal Defendants' Response: Disputed, in part.**

While Federal Defendants do not dispute that BOEM published a Federal Register notice on March 3 informing the public that the BOEM's review of the COP and preparation of the FEIS had resumed. However, the March 3 Federal Register notice indicates that BOEM resumed those activities after its independent review of Vineyard Wind's January 22 letter, not on March 3.

91.    BOEM resumed review of the terminated Vineyard Wind COP because Vineyard Wind falsely claimed that the COP was pending review. *Id*.

**Federal Defendants' Response: Disputed.**

Upon submittal of the January 22 letter (BOEM_0067698), Vineyard Wind informed BOEM that it was rescinding its temporary withdrawal of its COP and asked BOEM to resume its review of the COP. "After conducting an independent review of the information provided by Vineyard Wind, BOEM has confirmed that (i) the Haliade-X WTG fall within the design envelope analyzed in the June 2020 Supplement to the Draft Environmental Impact Statement (SEIS); (ii) Vineyard Wind's already-submitted COP contains all the necessary information to complete the final EIS; and (iii) no additional supplemental EIS is needed under 40 C.F.R. § 1502.9." BOEM_0067839-40. Based on this information, BOEM resumed the process of review. *Id.*

92.     BOEM resumed review of the terminated Vineyard Wind COP without requiring Vineyard Wind to update the agency with details describing studies, surveys, and other project-specific information Vineyard Wind gathered during its 13-14 MW Haliade-X review between December 1, 2020 and January 22, 2021.

**Federal Defendants' Response: Disputed.**

Following the submittal of information submitted by Vineyard Wind on January 22, 2021, including the assertion that the selected tower's parameters fall within the project design envelope analyzed in the SEIS and September 2020 COP, BOEM conducted an independent review of the information which compared "the relevant parameters of the project design envelope (PDE) with the parameters of the Vineyard Wind 1 GE Haliade-X . . . in order to determine whether any updates are warranted to BOEM's prior analysis." BOEM_0067702-0067703. *See also* BOEM_0067868; BOEM_0067874.

93.     Nine days after officially resuming review of the COP, BOEM published the Vineyard Wind site Final EIS. 86 Fed. Reg. 14153 (Mar. 12, 2021).

**Federal Defendants' Response: Disputed, in part.**

While Federal Defendants do not dispute that BOEM published a Notice of Availability of the Final EIS in the Federal register on March 12, 2021 (BOEM_0071036) nor that BOEM published a Federal Register notice on March 3, 2021, informing the public that the BOEM's review of the COP and preparation of the FEIS had resumed. However, the March 3, 2021 Federal Register notice indicates that BOEM resumed those activities after its independent review of Vineyard Wind's January 22, 2021 letter, not on March 3, 2021.

94.     The Final EIS confirmed that the Vineyard Wind project would significantly harm the ecosystem, marine life, the fishing industry, shoreside businesses, and other statutorily-

protected interests such as scientific research and navigational radar. Specifically, the Final EIS found that:

a.      The Vineyard Wind project will increase the risk of collision between marine vessels. *See* **AR-BOEM_0068749.**

b.      The project will result in massive devastation of the marine environment if severe weather or a hurricane fells Vineyard Wind's large Haliade-X turbines, which have never before been tried or tested anywhere other than at the Port of Rotterdam. *See id.* at **0068497, 0068722**.

c.      The project will disturb the coastal breeding grounds of the horseshoe crab, a species whose blood is an essential ingredient for life-saving medical tests and treatments. *See id*. at **0068531**.

d.      The project will likely permanently harm, displace, and disturb existing fish, sea turtle, and mammal populations. *See id.* at **0068546, 0068549, 0068578–0068579, 0068606, 0068608**.

e.      The proposed spacing between wind turbines will make it nearly impossible for commercial fishing trawl and dredge vessels to operate in the lease area, especially at night and in severe weather. *See id.* at **0068710**.

f.      The wind turbines will interfere with navigational radar. *See id*. at **0068717**; *see also, e.g.,* Report to the Congressional Defense Committees, "The Effect of Windmill Farms on Military Readiness," Department of Defense Office of the Director of Defense and Research Engineering (2006) at 4.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs' characterization of the Final EIS, as set forth below.

a. Plaintiffs' allegations reference only a portion of Alternative C, D1, and E, a portion of Alternative F, and the entirety of Alternative D2's consequences on navigation and vessel traffic. Under the consequences of Alternative D2, BOEM found that "[i]n context of reasonably foreseeable environmental trends, impacts resulting from individual IPFs associated ongoing and planned action impacts, including Alternative D2, on navigation and vessel traffic would be negligible to moderate. . . . The overall impacts of Alternative D2 on navigation and vessel traffic within the geographic analysis area would be lower than under Alternative A—moderate—due to improved SAR access and reduced loss of life. These impact ratings are driven by the construction, installation, and presence of offshore wind structures, and the increased risk of vessel allision and collision." BOEM_0068749. Impact findings under one alternative are not necessarily representative of the Project as a whole.

b. Plaintiffs' allegations reference a description of non-routine activities and low probability events (BOEM_0068497) and a discussion regarding commercial fisheries and for-hire fisheries (BOEM_0068722). Although the non-routine events section includes "severe weather and natural events," the section discusses how Vineyard Wind designed the Project and its components to withstand severe weather events and if severe weather did cause a spill or release, other actions outlined would help reduce potential impacts. BOEM_0068497.

c. At the referenced page, the FEIS discusses horseshoe crabs, but the discussion does not support Plaintiffs' allegation. BOEM_0068531. The FEIS states, "the potential exists

during May for the landfall transition to overlap with the spawning season for horseshoe crabs. Horseshoe crabs use Covell's beach as a spawning site . . . ; however [horizontal directional drilling] would not affect the beach itself and would therefore not likely affect horseshoe crab spawning." *Id.*

d. Plaintiffs' allegation indicating likely permanent harm, displacement, and disturbance is not supported by the cited record pages.

e. "Trawl and dredge vessel operators have commented that less than 1-nm spacing between WTGs may" impact maneuverability, however, "[m]aneuverability within WDAs would vary depending on many factors, including vessel size, fishing gear or method used, and weather conditions. Navigating through the WDAs would not be as problematic for for-hire recreational fishing vessels, which tend to be smaller than commercial vessels and do not use large external fishing gear (other than hook and line) that makes maneuverability difficult. However, trolling for highly migratory species (bluefin tuna, swordfish) may involve deploying many feet of lines and hooks behind the vessel, and then following large pelagic fish once they are hooked, which pose additional navigational and maneuverability challenges around WTGs. The orientation of vessels transiting and fishing within the southern New England lease areas varies by activity. . . ." BOEM_0068710.

f. This section of the FEIS states that "[t]ransiting through the WDA *could* also create challenges associated with using navigational radar when there are many radar targets that may obscure smaller vessels and where radar returns may be duplicated under certain meteorological conditions like heavy fog." (emphasis added). BOEM_0068717.

95.    The Final EIS lacked any findings on whether Vineyard Wind's new prototype Haliade-X turbines could survive an adverse weather event with high winds and surf, such as a major hurricane.

**Federal Defendants' Response: Disputed.**

The FEIS states that "Vineyard Wind designed the proposed Project components to withstand severe weather events. The WTGs would be designed to endure sustained wind speeds of up to 112 mph (182.2 kph) and gusts of 157 mph (252.7 kph). WTGs would also automatically shut down when wind speeds exceed 69 mph (111 kph). In addition, the structures would be designed for maximum wave heights greater than 60 feet (18.3 meters) (Vineyard Wind 2018b)." BOEM_0068497. Note, BOEM determined through its independent review that the design parameters of the Haliade-X turbine fell within the PDE. BOEM_0067702-0067703.

96.    The Final EIS concluded that "approximately 22 GW of Atlantic offshore wind development is reasonably foreseeable." **AR BOEM_0068469**. This figure is inconsistent with the Administration's stated goal of "deploy[ing] 30 gigawatts (GW) of offshore wind in the United States by 2030 . . . Achieving this target also will unlock a pathway to 110 GW by 2050 . . . ." *FACT SHEET: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs*, The White House (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/.

**Federal Defendants' Response: Disputed, in part.**

Undisputed that, in March 2021, the Final EIS concluded approximately 22 GW of offshore wind power projects were reasonably foreseeable at that time for purposes of BOEM's cumulative impacts analysis. BOEM_0068801. Disputed that BOEM's methodology for

analyzing cumulative impacts in connection with the Vineyard Wind project was "inconsistent" with any administration goals. As BOEM explained in the FEIS, at the time the FEIS was released, state pledges for offshore wind capacity totaled "about 29 GW"— a figure that included "awarded, scheduled, and planned but unscheduled procurements." BOEM_0068800-01. BOEM further explained that "[s]tate goals that are planned but do not have a scheduled award or procurement dates could occur as a series of procurements, or simply not be met if future cost reductions do not meet the states' award criteria," or if there is a "lack of available lease area or technical capacity." BOEM_0068801. As a result, BOEM decided to consider only 22 GW of state capacity commitments to be reasonably foreseeable for purposes of its cumulative impacts analysis. *Id.*

97.     The Final EIS did not disclose that NARW hotspots overlap and surround the Vineyard Wind lease area. **AR BOEM_0068571–0068603; AR NMFS_53326**.

**Federal Defendants' Response: Disputed.**

The Final EIS states that "The BO issued by NMFS includes distribution maps of the ESA-listed species and details regarding their seasonal occurrence (NMFS 2020b). The distribution maps present species occurrence using a combination of habitat-based density estimates that represents a compilation of data from various sources (Roberts et al. 2016a, 2016b) and sightings data overlaid as density dots (circles representing the number of animals sighted over the time period; Right Whale Consortium 2018). These datasets provide a comprehensive assessment of distribution based on available data." BOEM_0068572. The Final EIS does not use the term "hot spots."

98.     The Final EIS incorrectly found that NARWs will not be exposed to pile driving noise that will lead to serious harassment. **AR BOEM_0008593–0008594**.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs' characterization of the Final EIS. The Final EIS

explains that BOEM found that "[t]here is a potential risk of noise impacts on marine mammals

from pile-driving activities for the proposed Vineyard Wind 1 Project due to the large radial

distance to PTS and behavioral harassment thresholds over the maximum total of 102 days that

pile driving may occur. However, Vineyard Wind has committed to implement measures,

including soft start, a noise attenuation system, PSOs, and PAM, which are designed to reduce

the potential impacts on marine mammals. Further, no pile driving would occur during the peak

season of NARW occurrence in the WDA (between January 1 and April 30); therefore, impacts

on this species would be completely avoided during this time, as no pile driving would occur."

BOEM_0068592. Moreover, "[i]f all three projects (Vineyard Wind 1, Revolution Wind, and

Sunrise Wind) are constructed concurrently, a total of 90 days of concurrent pile-driving days

could occur under a three-piles-per-day scenario (one pile per day for each project). Under this

maximum-case scenario, three areas with diameters of 5.12, 9.26, and 9.26 miles (8.24, 14.90,

and 14.90 kilometers) for Vineyard Wind 1, Revolution Wind, and Sunrise Wind, respectively,

could have increased underwater noise that could be result in behavioral disturbance to marine

mammals present in those areas. However, pile driving would not occur if marine mammals are

observed within clearance zones prior to initiation of pile-driving activities, and many marine

mammals would be expected to avoid those areas with increased sound levels once pile driving

commences. This is considered very conservative because it is expected that noise attenuation

greater than 6 dB, assumed to be required by agency permit conditions, would be achieved for

piles driven for all three projects; therefore, actual isopleth distances corresponding to relevant

harassment thresholds are expected to be less than those described above." BOEM_0068593-94.

99.     The Final EIS failed to consider a reasonable range of alternatives to the COP that were located outside of the lease area covered by Lease OCS-A-0501 because BOEM's application of the "Smart From The Start" program impermissibly and effectively limited all alternatives to only those that were within the lease area. **AR BOEM_0068472–0068474** (detailing alternatives considered); **0069186–0069190** (detailing alternatives "considered but not analyzed in detail").

**Federal Defendants' Response: Disputed.**

This paragraph states legal argument rather than material facts. As set forth in their summary judgment briefing, Federal Defendants dispute that they violated any legal requirements with respect to identifying a reasonable range of alternatives.

100.    Although the Draft Supplemental EIS considered some cumulative impacts, the Final EIS curiously removed most of the cumulative impacts analysis and failed to properly analyze the foreseeable, cumulative ecological impacts that implementation of BOEM's pledged plans to approve multiple wind farms near the Vineyard Wind project would have, including:

        a.      the oil spill risks associated with wind turbines;

        b.      the cumulative environmental risks associated with pile-driving installation of the turbines;

        c.      the cumulative impact that operational underwater sound associated with the installation and operation the turbines will have on marine life and resources;

        d.      the cumulative impact of electrical and electromagnetic frequency ("EMF") discharge from generators and cabling will have on the marine environment; and

e.    the cumulative impact on commercial fishermen, small harvester fishing

businesses, onshore seafood processors, and other point of service seafood sales

and businesses.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs allegation that the Final EIS removed most of the

cumulative impacts analysis. The supplemental Draft EIS ("SDEIS") describes how BOEM

developed its cumulative impacts analysis, beginning at BOEM_0056977; *see also* SDEIS

Appendix B, BOEM_0057214-39 (analyzing various impact producing factors associated with

offshore wind facilities). That information was carried over to the FEIS, which expressly

analyzes potential cumulative effects of other reasonably foreseeable future offshore wind

projects. *See, e.g.*, BOEM_0068858 (assessing risk of accidental releases of fuel, fluids or

hazmat, including "impacts from ongoing and planned actions, including the Proposed Action");

BOEM_0069000 (assessing impacts associated with noise from pile driving); BOEM_0068989

(assessing impacts associated with EMF); BOEM_0068707-14 (assessing impacts to commercial

fisheries). FEIS Appendix A explains BOEM's methodology for analyzing cumulative impacts.

BOEM_0068796-0068975. The main body of the FEIS discusses cumulative impacts for each

resource for which the Project may have greater than minor impacts, including to commercial

and for-hire fisheries. FEIS Section 3.10.1.1, BOEM_0068707-14.

101.    After resuming review of the COP, BOEM did not engage with commercial

fishermen, shoreside businesses, or the general public when preparing the Final EIS, including

on such crucial issues as environmental and economic impacts.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs' allegation. After resuming review of the COP, BOEM independently conducted a review of the information provided by Vineyard Wind, BOEM confirmed that (i) the Haliade-X WTG fell within the design envelope analyzed in the June 2020 Supplement to the Draft Environmental Impact Statement (SEIS); (ii) Vineyard Wind's already-submitted COP contained all the necessary information to complete the final EIS; and (iii) no additional supplemental EIS was needed under 40 C.F.R. § 1502.9. Based on that information, BOEM stated that it intended to resume the process of completing the Final EIS. BOEM also stated that it intended to update the pile driving schedule and associated analysis in the Final EIS in coordination with NMFS. BOEM_0067839-840. Federal Defendants note that Fisheries Working Group meetings continued after BOEM resumed review of the Vineyard Wind COP. BOEM_0071748.

102.    After BOEM resumed its review, affected states gathered no substantial input from the plaintiff commercial fishermen or other similarly situated businesses that use the Vineyard Wind lease area with regard to the environmental and economic impacts of the Vineyard Wind project.

**Federal Defendants' Response: Disputed.**

Federal Defendants lack knowledge or information about what states did after BOEM resumed the review process in January 2021, but that is not material. BOEM gathered substantial input from commercial fishermen and similarly situated businesses prior to making a decision to approve the project. *See*, *e.g.*, BOEM_0069601-23 (response to RODA's comments on DEIS); BOEM_0069631-32, 69760-72 (response to Seafreeze's comments on the DEIS); BOEM_0070468-96 (response to Seafreeze's comments on the SDEIS); BOEM_0070704-24 (response to RODA's comments on the SDEIS).

103.    Throughout the process, BOEM, affected states, and Vineyard Wind provided a meager opportunity for financial mitigation to certain limited fishing interests and shoreside businesses without consulting with or mitigating the impact of the COP on other fishing interests, thereby favoring some commercial fishing businesses over others, without adequate explanation.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute Plaintiffs' characterization of fisheries mitigation funds. The Final EIS broadly defines fishing interests to include owners and operators of vessels, vessel crews, shoreside processors, vessel supplier and support services, and other entities that can demonstrate losses directly related to the Vineyard Wind 1 Project. BOEM_0068720. The establishment of a $4.2 million direct compensation fund could potentially decrease the expected moderate to major impacts on commercial fisheries to minor to moderate by allowing for financial compensation for direct impacts on Rhode Island vessels and fishing interests. BOEM_0069223. The establishment of a $19,185,016 direct compensation fund could potentially decrease the expected moderate to major impacts on commercial fisheries to minor to moderate by allowing for financial compensation for direct impacts on Massachusetts vessels and fishing interests. BOEM_0069224. A $3.3 million direct compensation fund to be held in escrow to compensate for any claims of direct, downstream, and cumulative (upstream) impacts from others affected states including Connecticut, New Jersey, and New York vessels or fisheries interests in the Project area for the thirty-year life of the Project. *Id.* Moreover, the establishment of the Rhode Island Fisherman's Future Viability Trust could potentially decrease the expected moderate to major impacts on commercial fisheries to minor to moderate by providing funds to allow for improving fishing vessels, gear, and other equipment as well as to

fund to address concerns about safety and effective fishing around the Project area specifically and wind energy facilities in general. *Id.* The establishment of the Massachusetts Fisheries Innovation Fund could potentially decrease the expected moderate to major impacts on commercial fisheries to minor to moderate by providing funds to allow for technology and innovation upgrades for fishery participants (and vessels) actively fishing within a wind energy area. *Id.* It would also fund studies on the impacts of offshore wind development on fishery resources and the recreational and commercial fishing industries. *Id.*; *see also* BOEM_0068720-0068721.

104.    On May 7, 2021, two months after issuing the final EIS, BOEM submitted a request to NMFS to reinitiate consultation to consider new information regarding the impacts of the Vineyard Wind Project on endangered species. **AR_BOEM_0076721**.

**Federal Defendants' Response: Undisputed.**

105.    Three days later, and before NMFS had the opportunity to analyze the new information submitted by BOEM, on May 10, 2021, BOEM issued its Joint Record of Decision under NEPA with NMFS and the Corps of Engineers approving the Vineyard Wind COP and clearing the way for construction to begin. *See* 86 Fed. Reg. 26541 (May 14, 2021); *see also* **AR BOEM_0076799**.

**Federal Defendants' Response: Disputed in part.**

It is undisputed that BOEM issued its Joint Record of Decision on May 10, 2021. Federal Defendants dispute the assertion that NMFS had not "had the opportunity to analyze the new information submitted by BOEM" at that time because it is unsupported by the Federal Register notice and administrative record cited by Plaintiffs. It is undisputed that NMFS did not finalize its analysis until October 18, 2021, when the BiOp was signed. NMFS 17683-17733 (Transmittal

memo to RA), 17176-17680 (final signed BiOp). The Corps of Engineers ultimately approved a permit for limited activities in limited portions of the project area. The Corps did not approve the COP, either in the Joint Record of Decision or otherwise. Federal Defendants dispute that the approval of the COP "clear[ed] the way for construction to begin" because Vineyard Wind still need to submit a facility design report ("FDR") and facility installation report ("FIR") for BOEM's approval. *See* 30 C.F.R. §§ 585.632, 585.700; BOEM_0068468 (section 1.5 of the FEIS explain the FDR and FIR).

106.    Among other things, the ROD states the following:

a.    "The purpose of the [agency action on the Vineyard Wind COP] is to determine whether to approve, approve with modifications, or disapprove the COP . . . to meet New England's demand for renewable energy. More specifically, the proposed Project would deliver power to the New England Energy grid to contribute to Massachusetts' renewable energy requirements—particularly, the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation . . . ." **AR BOEM_0076808–0076809.**

b.    "BOEM's decision on Vineyard Wind's COP is needed to carry out its duty to approve, approve with modifications, or disapprove the proposed Project in furtherance of the United States policy to make OCS energy resources available for expeditious and orderly development . . . ." **AR BOEM_0076809**.

**Federal Defendants' Response: Disputed, in part.**

Plaintiffs have correctly quoted the ROD, but they have done so selectively. Without the omissions, the paragraph quoted by Plaintiffs reads:

> The purpose of the Federal agency action in response to the Vineyard Wind Project COP (Epsilon 2018, 2019, 2020a, 2020b) is to determine whether to approve, approve with modifications, or disapprove the COP to construct, operate and decommission an approximately 800 MW, commercial-scale wind energy facility within the area of Lease OCS-A 0501 to meet New England's demand for renewable energy. More specifically, the proposed Project would deliver power to the New England Energy grid to contribute to Massachusetts' renewable energy requirements—particularly, the Commonwealth's mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation (220 Code of Massachusetts Regulations § 23.04(5)). BOEM's decision on Vineyard Wind's COP is needed to carry out its duty to approve, approve with modifications, or disapprove the proposed Project in furtherance of the United States policy to make OCS energy resources available for expeditious and orderly development, subject to environmental safeguards (43 U.S.C. § 1332(3)), including consideration of natural resources and existing ocean uses.

BOEM_0076808-09.

107.    The ROD shows that BOEM dismissed several alternatives to locating the Vineyard Wind project in the lease area in the ROD. Such alternatives included:

a.    proposals made by Seafreeze that the COP should not be approved until the agencies could fully analyze radar interference caused by Vineyard Wind with search-and-rescue operations;

b.    comments showing that the COP's structural analysis was flawed and should be changed;

c.    concrete proposals to eliminate certain important fisheries areas of the lease from the COP;

d.    concrete proposals showing that Vineyard Wind's decision to use larger turbines would have cumulative impacts necessitating further analysis;

e.    comments urging consideration of the devastating impact the Vineyard Wind project would have on fisheries, specifically the longfin squid fishery;

f.    concrete proposals regarding compensation for commercial fishermen and shoreside industries negatively impacted by the Vineyard Wind Project;

g.      the proposal of the High Frequency Radar Wind Turbine Interference

Community Working Group dated June 2019; and

h.      the proposal of a reasonable alternative that set forth proposed transit lanes

in the lease area to ensure safety and viability of commercial fishing operations

put forward by the Responsible Offshore Development Alliance ("RODA").

*See* **AR BOEM_0078764, 0078089, 0079009, 0079229, 0111234, 0111427, 0110382, 0195688,**

**0202213**.

**Federal Defendants' Response: Disputed.**

The ROD refers to the FEIS for a discussion of the alternatives that BOEM considered

but did not analyze in detail: "The FEIS considered a reasonable range of alternatives to the

Proposed Action. BOEM considered a total of 20 alternatives during the preparation of the EIS

and carried forward 6 for detailed analysis in the FEIS. The alternatives carried forward included

five action alternatives (one of which has two sub-alternatives) and the no action alternative. The

other 14 alternatives were not further analyzed because they did not meet the purpose and need

or did not meet other screening criteria. See FEIS Appendix C.5." BOEM_0076809

a.      Seafreeze's proposal that the COP should not be approved (BOEM_0078764) is

equivalent to the No Action Alternative. BOEM considered the No Action alternative.

E.g., BOEM_0076810-11 (list of fully analyzed alternatives in the ROD).

b.      The assertion in paragraph b does not appear to describe an alternative. The FEIS

responds to Seafreeze's DEIS comments starting at BOEM_0069537.

c.      The assertion in paragraph c is not specific enough to know whether it concerned an

alternative to the proposed action or not. The FEIS discussion of alternatives that

were not analyzed in detail includes several that involve eliminating turbines from various areas in the lease. BOEM_0069187-90.

d.  This doesn't appear to describe an alternative. Seafreeze's SDEIS comments do refer to larger turbine sizes at BOEM_0110436. The FEIS considered these comments, BOEM 0070488. The range of turbine sizes analyzed in the SDEIS and FEIS was consistent with the range of turbine sizes proposed in the COP and the turbine that VW ultimately selected was within that range.

e.  This doesn't appear to describe any alternative. BOEM's FEIS analyzed impacts on squid fisheries extensively. BOEM_0068700-35 (FEIS section. 3.10).

f.  This assertion doesn't seem to describe any alternative. Rhode Island and Massachusetts both conditioned their consistency determinations on VW providing funding to impacted fishers BOEM_0055024 (Mass. consistency concurrence) and BOEM_0036883 (RI consistency concurrence). BOEM's FEIS considered these measures. *E.g.*, BOEM_0068720.

g.  This does not appear to describe an alternative. Seafreeze's SDEIS comment letter makes assertions about the conclusions of the referenced working group, but I don't see any suggestion for an alternative that BOEM should consider. BOEM_0110382.

h.  The SDEIS and the FEIS did consider this alternative. BOEM_0068491-96. This was not the alternative that BOEM selected in the ROD, but it was not "dismissed."

108.    BOEM and the other agencies involved in compiling the ROD did not adequately cite sources or sufficiently explain why the following comments do not warrant further response:

a.    Comment 1063-002, which concerned fisheries mitigation and compensation, *see* **AR BOEM_0034437**;

b.      Comment 0076-004, which questions the sufficiency of the purpose and need statement for the purposes of NEPA, *see* **AR BOEM_0034404**;

c.      Comment 13185-017, which pointed out BOEM's failure to consider the cumulative impact of fisheries mitigation plans and associate compensation, *see* **AR BOEM_0034452, 0034453**;

d.      Comment 13185-018, which addressed BOEM's failure to fully analyze impacts to shoreside businesses or gather enough peer review or public input, *see* AR **BOEM_0034453, 0034456**;

e.      All comments made by Seafreeze regarding the last-minute increase in megawatt capacity for each wind turbine generator without adequate analysis; *see, e.g.* **AR BOEM_0110436**; and

f.      Comments 0116-001 through 05, which concerns the fact that New York was not given factual consistency review, was not included in the task force, and accordingly had no way to negotiate compensation to New York squid fishermen, **AR BOEM_0111225**.

**<u>Federal Defendants' Response: Disputed.</u>**

Federal Defendants note that Plaintiffs' allegations constitute legal arguments rather than material facts. Since Plaintiffs' allegations are not material facts, they are not relevant to any claim or defense in this litigation. Further, Federal Defendants responded to Plaintiffs' comments. BOEM_0070468-96.

109.      BOEM approved Vineyard Wind's terminated, insufficient, and out-of-date COP without any further environmental impact assessment, despite material and significant

discrepancies involving the Vineyard Wind project envelope and project material parameters from the Draft EIS, to the Supplemental Draft EIS, and through the Final EIS.

**Federal Defendants' Response: Disputed.**

BOEM approved the COP with modifications as described in the ROD and the COP approval letter to VW. BOEM_0076821; BOEM_0077150. Federal Defendants dispute the characterization of the COP. BOEM evaluated changes to the COP's proposed project design envelope in the SDEIS and the FEIS and BOEM evaluated whether new information about Vineyard Wind's turbine selection was consistent with its environmental analysis. BOEM_0068474.

110.    BOEM approved this terminated and out-of-date COP without public notice or opportunity for comment on the choice of a large prototype wind turbine for the Vineyard Wind project made during the period December 1, 2020, to January 22, 2021.

**Federal Defendants' Response: Disputed.**

BOEM solicited public comment on the SDEIS, which analyzed a project design envelope that included the turbine that Vineyard Wind selected. BOEM provided public notice of the availability of the SDEIS (BOEM_0057578), of BOEM's termination of review of the COP (BOEM_0067694), of the resumption of BOEM's review of the COP (Notice to Resume FEIS Prep., 86 Fed. Reg. 12,494 (Mar. 3, 2021)), and of the availability of the ROD (BOEM_0077062).

111.    BOEM approved this terminated and out-of-date COP in disregard of adverse impacts to endangered species, or approved it despite knowing it would harm endangered species.

**Federal Defendants' Response: Disputed.**

BOEM analyzed impacts to endangered species in the FEIS. BOEM_0068553; BOEM_ 0068558-61; BOEM_0068570-75; BOEM_0068577-80; BOEM_0068590; BOEM_0068592-93: BOEM_0068756; BOEM_0068773.

112.    BOEM approved this terminated and out-of-date COP without accounting for its own plans for widespread development of wind farms on the outer Continental Shelf, or any foreseeable cumulative impacts.

**Federal Defendants' Response: Disputed.**

BOEM analyzed the cumulative impacts of reasonably foreseeable offshore wind projects. BOEM_0068438; BOEM_0068441; BOEM_0068468-70; BOEM_ 0068503-783 (FEIS, Ch. 3 which discusses the affected environment for each resource area the impact of the alternatives when combined with other past, present, or reasonably foreseeable planned actions); BOEM_0068794-975 (FEIS, Appendix A).

113.    The Corps of Engineers' final decision regarding Vineyard Wind's Clean Water Act permit application was included in the ROD. *See* **AR BOEM_0076828**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants agree that the Corps' decision to issue Vineyard Wind a permit under Section 404 of the Clean Water Act is documented in the ROD, as supplemented on August 6, 2021, and January 14, 2022. BOEM_0076828-47; USACE AR 11889, USACE AR 14373. The Corps took actions after issuance of the ROD, including issuance of the Corps permit.

114.    Among other things, the ROD states the following regarding the Corps' permit grant:

> a.    "Vineyard Wind's contractual obligation with the Commonwealth of
>
> Massachusetts to deliver the generated energy to the Massachusetts power grid

was used as criteria for the evaluation of alternatives as the ability to deliver to the power grid limits where the project can be located geographically." *See id*. at **0076830**.

b.      "[D]ue to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation. The extent of impact to commercial fisheries and loss of economic income is estimated to total $14 million over the expected 30-year lifetime of the project. . . . When considering these factors, the project as proposed is anticipated to have a negligible beneficial effect to local economics." *Id.* at **0076837**.

**Federal Defendants' Response: Disputed, in part.**

Undisputed as to the cited quotations from the Joint ROD. However, Federal Defendants object to taking the quotations out of context from the ROD. The full quote from paragraph 114.a is:

Criteria for evaluating alternatives as evaluated and determined by the USACE: USACE has determined that the following criteria apply to any proposed alternative:

1.      Type of energy. Any proposed alternative must be renewable energy. Vineyard Wind is under contractual obligation with the Commonwealth of Massachusetts to deliver renewable energy to the Massachusetts power grid.

2.      The production of renewable energy must be from the use of wind turbines. BOEM has designated these offshore development areas specifically for renewable wind energy, therefore, to evaluate alternatives all alternatives must consider only renewable wind energy and no other renewable energy producing projects such as solar or hydropower.

3.      Vineyard Wind's contractual obligation with the Commonwealth of Massachusetts to deliver the generated energy to the Massachusetts power grid was used as criteria for the evaluation of alternatives as the ability to deliver to the power grid limits where the project can be located geographically.

4.      In addition to supplying power to Massachusetts, the project must also deliver a minimum of 800 MW to the Massachusetts power grid to meet pre-established agreements.

BOEM 0076830.

The full quote from paragraph 114.b is:

Economics

It is anticipated that the construction, operation, and eventual decommissioning of the wind energy facility will provide job opportunities for local businesses. It is estimated that the project will result in employment for workers from the southeast Massachusetts area. It is also anticipated that local ports within New England will benefit financially from the presence of offshore wind facilities. Vineyard Wind is currently under an 18-month lease with the New Bedford Marine Commerce Terminal that totals $9 million and allows use of terminal space in New Bedford. Additional leases in other ports similar to that seen in New Bedford are anticipated as a result of project authorization. For example, Tisbury Marine Terminal on Martha's Vineyard is performing upgrades in hopes that Vineyard Wind will utilize their terminal for offshore wind maintenance operations. Where practicable, construction materials and other supplies are being sourced from within the region. It is estimated that the project will generate $14.7 to $17 million in state and local taxes. Additional tax and host community agreement payments are also anticipated. While Vineyard Wind will have beneficial impacts to the local economy, it is anticipated that there will be negative economic impacts to commercial fisheries. While Vineyard Wind is not authorized to prevent free access to the entire wind development area, due to the placement of the turbines it is likely that the entire 75,614 acre area will be abandoned by commercial fisheries due to difficulties with navigation. The extent of impact to commercial fisheries and loss of economic income is estimated to total $14 million over the expected 30-year lifetime of the Project. Vineyard Wind has established compensation funds for Massachusetts and Rhode Island fishermen to mitigate for the potential loss in economic revenue associated with the potential loss of fishing grounds. When considering these factors, the project as proposed is anticipated to have a negligible beneficial effect to local economics. Additional information on impacts to economics can be found in section 3.6 of the EIS.

BOEM 0076837. This statement was made in the context of the Corps' public interest review, in which the Corps balances the benefits which reasonably may be expected to accrue from a proposal against its reasonably foreseeable detriments. *See* 33 C.F.R. § 320.4(a). The Corps found that even if the entire Vineyard Wind lease area was abandoned by commercial fisheries,

as commenters asserted would occur, the Vineyard Wind project as a whole would still have a negligible beneficial effect on local economics.

Additionally, on January 14, 2022, the Corps issued a ROD Supplement clarifying the statement in the ROD regarding the likelihood of abandonment of the wind development area by commercial fisheries. *See* USACE AR 014374. The January 14 ROD Supplement clarified that the statement was based solely upon comments of interested parties submitted to BOEM as summarized in Appendix K to the FEIS. *Id.* The Corps clarified that this statement was not based on any separate or independent evaluation or study by the Corps or any other federal agency and did not represent the position of the Corps regarding the status of commercial fisheries due to difficulties of navigation that may or may not result from the placement of the turbines. *Id.*

115.    As part of its review, the Corps found no jeopardy to endangered species and recommended no adverse modification to the NMFS. *Id*. at **0076846**.

**Federal Defendants' Response: Disputed in part.**

Federal Defendants agree that the Corps determined, through consultation with the U.S. Fish and Wildlife Service and NMFS, that the proposed discharge of dredged or fill material regulated under Section 404 of the CWA would not jeopardize the continued existence of threatened or endangered species or destroy or adversely modify their critical habitat. BOEM 0076836. Additionally, the Corps accepted and adopted NMFS' biological opinion (BO), including its incidental take statement (ITS), which stated that the federal actions regarding Vineyard Wind's proposed action were not likely to jeopardize listed species or destroy or adversely modify critical habitat under NMFS' jurisdiction. *Id.* at 0076844. Special Condition 5 of the Corps' permit required compliance with the terms of the ITS associated with the NMFS BO, or any future BO that replaced it. *Id.*; USACE AR 012636. Following the conclusion of

BOEM's reinitiated ESA consultation, the Corps reviewed the NMFS superseding BO and found that it did not affect or change any of the findings related to threatened and endangered species that the Corps made in the ROD. USACE AR 014381-83. The Corps additionally determined that, per Special Condition 5 of the Corps' permit, the permittee would be required to adhere to the terms and conditions associated with the ITS of the superseding BO. *Id.* at 014383.

Federal Defendants dispute that the Corps "recommended no adverse modification to the NMFS," as Plaintiffs allege. The Corps made no such "recommendation." Instead, the Corps relied on BOEM's lead-agency ESA consultations and found that Vineyard Wind's proposal would not adversely modify endangered species' critical habitat. BOEM 0076836, 0076844. Plaintiffs' record citation in support of their statement points to an irrelevant page of the ROD. *See* BOEM_0076846.

116.    The Corps did not sufficiently consider practicable alternative locations for the Vineyard Wind project outside the lease area in the public-interest review portion of the Record of Decision.

**Federal Defendants' Response: Disputed.**

Federal Defendants dispute that the Corps did not sufficiently consider practicable alternative locations for the Vineyard Wind project outside the lease area in the public-interest review portion of the ROD. As an initial matter, Plaintiffs provide no record citation in support of this statement. Instead, this assertion is blatantly contradicted by the record. The Corps' alternative analysis considered two alternatives outside the lease area. BOEM_0076830. The Corps' Off-Site Alternative 1 was construction of an 800 MW wind energy facility in an area not consisting solely of waters of the United States (i.e., a majority upland area). *Id.* The Corps' Off-Site Alternative 2 considered relocation of the proposed project to a different offshore lease site.

*Id.* The Corps determined that neither off-site alternative was practicable. *Id.* at 0076830-0076831.

117.    The Corps admitted that "[Vineyard Wind] does not require access or proximity to or siting within a special aquatic site to fulfill its basic project purpose . . . [and] is not water dependent." *Id.* at **0076829**. Yet the Corps also restricted analysis of practicable alternatives to areas in the water because the existing Vineyard Wind lease was in the ocean.

**Federal Defendants' Response: Disputed, in part.**

Undisputed as to the cited quotations from the Joint ROD. However, Federal Defendants object to taking the quotations out of context from the ROD. The full quote, in context, is:

> This activity does not require access or proximity to or siting within a special aquatic site to fulfill its basic project purpose. Therefore, it is not water dependent. Under the 404(b)(1) Guidelines, 40 C.F.R. § 230.10(a)(3), if a proposed activity is not water dependent, practicable alternatives not involving special aquatic sites are presumed to be available unless the applicant clearly demonstrates otherwise. Here, as discussed in the 404(b)(1) Guidelines evaluation below, the preferred alternative (combining FEIS Alternatives C, D2, and E) does not involve a discharge into a special aquatic site.

BOEM_0076829.

Federal Defendants additionally dispute that the Corps restricted analysis of practicable alternatives to areas in the water. The Corps analyzed as an alternative the construction of an 800 MW wind energy facility in an area not consisting solely of waters of the United States (i.e., a majority upland area). BOEM_0076830.

118.    The Corps also erroneously concluded in its public-interest review that the Vineyard Wind project would not discharge into a special aquatic site, even though environmental impact analysis showed it would. *See id.*, *see also* **AR BOEM_0057214, 0057220, 0057226**. Specifically, the public-interest review found that "[t]he project does not

propose impacts to wetlands and therefore, the project will have no effect on wetlands." **AR**

**BOEM_0076838**.

>  **Federal Defendants' Response: Disputed, in part.**

Undisputed as to the cited quotations from the Joint ROD. However, Federal Defendants

object to taking the quotations out of context from the ROD. The full quote, in context, is:

> Wetlands
>
> The proposed project is located wholly in subtidal waters, intertidal waters, and uplands. There are no tidal or non-tidal wetlands located within the project area. Appropriate erosion controls will be utilized in upland project areas to be impacted as a result of the Barnstable switching station expansion to prevent potential secondary effects to adjacent wetlands and waterways from erosion and sedimentation on work sites. The project does not propose impacts to wetlands and therefore, the project will have no effect on wetlands.

BOEM 0076838. This statement was made in the context of the Corps' public interest review,

and determined that the project would have no effect on wetlands, which are a special aquatic

site. *See* 40 C.F.R. § 230.41.

The Corps properly concluded that the Vineyard Wind project did not propose any

discharge of dredged or fill material into a special aquatic site. "Special aquatic sites" under the

CWA are identified in 40 C.F.R. Part 230 Subpart E, and include sanctuaries and refuges,

wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes. 40 C.F.R §§

230.3(m), 230.40-230.45. However, special aquatic sites are only relevant to the Corps' CWA

evaluation when a discharge of dredged or fill material is "proposed for a special aquatic site,"

*i.e.*, a permit applicant proposes to discharge material into a special aquatic site. *Id.* §

230.10(a)(3). The mere presence of special aquatic sites within a greater NEPA review does not

mean there is a regulated a discharge of dredged material *into* a special aquatic site.

In support of their assertion that the Vineyard Wind project would discharge into a special aquatic site, Plaintiffs cite to the same pages of the SDEIS (not the FEIS) as they did in Paragraph 74.a, *supra*, which Plaintiffs allege show that coral, eelgrass, and wetlands are all located within the "impact zone" for the Vineyard Wind project. However, the BOEM's NEPA review, including the cited SDEIS pages and the eventual FEIS, instead demonstrates that the Vineyard Wind project does not involve a discharge of dredged or fill material into a special aquatic site.

Regarding wetlands, the cited pages of the SDEIS state that although the Vineyard Wind project "would have the potential to deliver sediment into nearby wetlands and/or a stream . . . . With [best management practices] and the proposed avoidance and minimization measures, BOEM anticipates the Proposed Action would cause a **negligible** impact on terrestrial and coastal fauna through erosion and sedimentation." BOEM_0057214. Vineyard Wind's submittals to the Corps additionally show no impacts to wetlands. USACE AR 000046, 000053, 000124 (Corps Application); USACE AR 000991-000993 (COP Vol. 3, attached to Corps permit application); USACE AR 005872-005874 (COP Vol. 3, June 2020 version).

Regarding eelgrass, the cited pages of the SDEIS only state that Vineyard Wind's proposed action would not anchor in or install cables through eelgrass. BOEM_0057220, 57226. BOEM's FEIS subsequently determined that Vineyard Wind would avoid all eelgrass, that there was no eelgrass in the offshore export cable corridor, and that there would be no dredging, anchoring, or cable installation through eelgrass beds. USACE AR 008578, 008591, 008599, 008600, 008605 (FEIS Vol. 1); USACE AR 009062, 009063, 009066, 009069, 009070, 009074, 009079, 009085, 009086 (FEIS Vol. 2). The FEIS further evaluated whether sedimentation could

negatively impact eelgrass beds, but determined that the closest eelgrass would be too far from the cables to be affected. USACE AR 008584, 008587 (FEIS Vo. 1).

Regarding coral, Plaintiffs' cited SDEIS pages only state that ongoing anchoring activities (i.e., those that would occur even without construction of the Vineyard Wind project) causes temporary to permanent impacts on slow-moving species such as coral. BOEM_0057226. But anchoring is not the discharge of dredged or fill material and anchoring in coral would not constitute the discharge of dredged or fill material into a special aquatic site. *See* 33 C.F.R. § 323.2(d) (defining "discharge of dredged materal") and 323.2(f) (defining "discharge of fill material"). Moreover, the FEIS determined that there was no coral in the Vineyard Wind Project's wind development area or offshore export cable corridor. USACE AR 008590, 008606.

119.    The Corps did not take other planned outer Continental Shelf wind energy projects into account when considering the possible cumulative impact of Vineyard Wind.

**Federal Defendants' Response: Disputed.**

The Corps considered cumulative impacts as part of its permit evaluation. BOEM_0076828-29 ("[R]easonably foreseeable activities within the larger overall wind lease area were considered to account for potential cumulative effects.") Additionally, the Corps adopted BOEM's cumulative impacts analysis performed during BOEM's NEPA review, specifically with regard to cumulative effects in the context of fill associated with the cable corridor. *See* BOEM_0076807; *see, e.g.*, USACE AR 008677, 008685, 008699, 008703 (considering, for instance, sediment suspension during cable-laying for other projects).

120.    The Corps' review documentation does not address:

a.    the rise in temperatures at and near the project area due to the project's turbines;

    b.      the potential vulnerabilities to the electrical grid caused by relying on so much energy from one source (namely offshore wind power);

    c.      the impact on the commercial fishing industry;

    d.      harm to endangered species and their critical habitat; or

    e.      adverse impacts on food supply.

**Federal Defendants' Response: Disputed.**

The Corps' review documentation addressed each of these items.

- The FEIS, which was adopted by the Corps, addressed wind projects' effects on water temperature. USACE AR 008597 (effects of cables on water temperature); USACE AR 008620-008621 (effects of the presence of offshore structures on bottom temperature).

- The Corps' public interest review evaluated the effects of the Vineyard Wind project on the reliability of the electrical grid, finding "The addition of reliable, renewable energy to the Massachusetts power grid is anticipated to have beneficial effects on energy needs." BOEM_0076842.

- The Corps' ROD and the FEIS extensively discussed impacts to commercial fisheries. BOEM_0076833-34 (discussing impacts of discharge of fill material on fish); BOEM_0076837 (discussing impacts to commercial fisheries); USACE AR 008784-805 (FEIS review of potential effects of the Project on commercial fishing).

- The Corps' permit evaluation extensively discussed impacts on endangered species and their critical habitat. *See*, *e.g*., BOEM_0076833 (discharge of fill associated with the project would have negligible effects on threatened or

endangered species); BOEM_0076836 (determining that the proposed discharge

would not jeopardize the continued existence of endangered or threatened species

or destroy or adversely modify their critical habitat); BOEM_0076844

(referencing and accepting BOEM's ESA consultation and incorporating its ITS

into the Corps permit); USACE AR 014375-83 (considering effects of NMFS'

superseding biological opinion on Corps permit decision).

- The Corps' public interest review evaluated the Project's effects on food and fiber

  production and determined that the project would have no effect. BOEM

  0076843; USACE AR 008784-805 (FEIS review of potential effects of the

  Project on commercial fishing).

121.    The Corps never appropriately analyzed the impact that the Vineyard Wind

project would likely have on horseshoe crabs—a marine species whose blood contains

compounds used for gold-standard endotoxin testing, which is required for all drugs and

vaccines, and many implantable medical devices. **AR BOEM_0067602–0067609**.

**<u>Federal Defendants' Response: Disputed.</u>**

The FEIS, which was adopted by the Corps, evaluated the impacts of the project on

horsehoe crabs. USACE AR 008601. According to the FEIS:

> [T]he potential exists during May for the landfall transition to overlap with the
> spawning season for horseshoe crabs. Horseshoe crabs use Covell's Beach as a
> spawning site (Section 3.3); however, HDD would not affect the beach itself and
> would therefore not likely affect horseshoe crab spawning. Therefore, BOEM
> anticipates **negligible** impacts on benthic resources from the landfall transition at
> Covell's Beach. Section 2.3 describes the non-routine activities associated with
> the proposed Project. These activities, if they were to occur, would generally
> require intense, temporary activity to address emergency conditions. Non-routine
> activities that could impact benthic resources include intensive corrective
> maintenance that would require exposing the cable or foundations for
> maintenance, or require extensive anchoring. This would require the same tools
> used in installation and would have similar impacts via disturbance to the seafloor

(e.g., mortality, sedimentation). However, the disturbance would not exceed that caused by the initial installation, and the impacted area should be substantially smaller. If corrective maintenance (i.e., cable repairs) were necessary for the landfall transition to Covell's Beach, this could affect spawning horseshoe crabs. Due to the brief duration and limited area of maintenance activities, BOEM expects **minor** impacts.

USACE AR 008601.

The FEIS further evaluated the effects of sediment deposition during construction of the project on horseshoe crabs. *Id.* at 008634-008635. The FEIS found that horseshoe crabs may not be able to escape areas affected by sediment deposition, but would likely be able to uncover themselves during and after sedimentation. *Id.* at 008635.

122.    Shortly after the ROD's publication, on May 21, 2021, NMFS issued an IHA for marine mammals to Vineyard Wind. **AR NMFS_3489–3509, 3514**.

**Federal Defendants' Response: Undisputed.**

123.    The notice of IHA was published in the Federal Register on June 25, 2021. AR NMFS_3515. The IHA states that it is valid from May 1, 2023 through April 30, 2024. *Id*.

**Federal Defendants' Response: Undisputed.**

124.    When issuing the IHA, NMFS only examined harm to marine mammals caused by noise from pile-driving. **AR NMFS_3489**. It did not examine the risk of vessel strikes caused by Vineyard Wind's boats, or vessel strikes caused by Vineyard Wind's pile driving chasing NARWs into areas with higher vessel traffic, even though the scientific data it examined stated that oceanographic changes could cause whales to "move into areas with little or no protective measures," leading to "increased exposure to anthropogenic impacts." **AR NMFS_53319**. Additionally, NMFS did not account for scientific data showing that Vineyard Wind's crew transfer vessels, which travel in excess of 15 knots, would kill NARWs if they struck them. **AR BOEM_0034861, 0129897, 0129902**.

**<u>Federal Defendants' Response: Disputed in part.</u>**

It is undisputed that the IHA examined harm to marine mammals from pile driving associated with the installation of wind turbine generators and electrical service platform foundations. However, Federal Defendants dispute the remaining allegations. The record shows that Vineyard Wind did not request authorization for takes from vessel strikes, and NMFS has not authorized any. NMFS_3515, at 3522. NMFS analyzed the potential for vessel strikes to occur during construction and determined that vessel strike is unlikely to occur based on a combination of the low probability of a ship strike generally, and the extensive mitigation and monitoring included therein. Vineyard Wind is planning on running a limited number of crew transfer vessels during construction and proposed a very conservative suite of mitigation measures related to vessel strike avoidance, including measures specifically designed to avoid impacts to right whales. NMFS_3392, at 3421-3422; NMFS_3515, at 3522 and 3545-3547. Section 4(l) in the IHA contains a suite of non-discretionary requirements pertaining to ship strike avoidance, including vessel operational protocols and monitoring. NMFS 3522.

125. When examining the impact of noise from pile-driving, NMFS did not account for:

    a.    Protected Species Observers ("PSOs") failing to accurately detect and identify NARWs when scanning the ocean from ship decks, **AR BOEM_0077457–0077458**;

    b.    PSOs only being able to detect NARWs at the water's surface and in ideal conditions, and even then unreliably because NARWs have no dorsal fin, **AR BOEM_0077330**;

c.    The BiOp's decision to allow pile driving to continue despite the presence

of NARWs if Vineyard Wind's lead engineer believes halting pile driving will

adversely affect the pile driving effort, **AR BOEM_0077454**;

d.    The BiOp's decision to allow pile driving after sunset, when PSOs cannot

see, **AR BOEM_0077307, 0077454**; or

e.    Scientific evidence demonstrating that sound impacts to benthic species

caused by pile driving and wind turbine operation will have an "unknown" impact

to benthic species, necessitating further study, **AR NMFS_57132**; or

f.    Scientific evidence demonstrating that elevated levels of low-frequency

noise like that created by offshore wind turbines reduces NARW communication

space by over 65 percent, affecting their ability to navigate, detect prey, and

interact, **AR NMFS_8751–8760, 57132**.

**Federal Defendants' Response: Disputed.**

As to subparagraph (a), NMFS accounted for the possibility of PSOs not being able to

identify a whale: "At all times of the year, any unidentified whale sighted by a PSO within 3,281

feet (1,000 meters) of the pile must be treated as if it were a NARW." BOEM_77311. Regarding

detection of right whales, the BiOp considered the suite of conditions designed to ensure right

whale detection through a variety of means, such as PSOs and PAM, among others.

BOEM_0077457. "Based on consideration of these measures and their anticipated

effectiveness," NMFS/GAR agreed "with the conclusion reached by OPR in the notice of

proposed and issued IHA that exposure of any right whales to noise above the Level A

harassment threshold will be avoided." *Id.* NMFS noted that at "distances more than 1,500 m

from the pile the observers ability to detect whales is reduced and observations beyond this

distance may be unreliable and incomplete (Roberts et al. 2016), however, this is highly

dependent on the elevation and visibility provided by the PSO platform and visibility may be

such that monitoring a significantly larger area is possible." BOEM_0077458. NMFS accounted

for the fact that:

> [t]he lead PSO must determine when sufficient light exists to allow effective
> visual monitoring in all cardinal directions. If conditions (e.g., darkness, rain, fog,
> etc.) prevent the visual detection of marine mammals in the clearance zones,
> Vineyard Wind must not initiate construction activities until the full extent of all
> clearance zones are fully visible as determined by the lead PSO. Vineyard Wind
> must develop and implement measures for enhanced monitoring in the event that
> poor visibility conditions unexpectedly arise and stopping pile driving would risk
> human safety or pile instability . . . . Extended clearance zones would be
> maintained through passive acoustic monitoring (PAM) as well as by visual
> observation conducted on aerial or vessel-based surveys as described below. PAM
> systems are designed to detect the vocalizations of marine mammals, allowing for
> detection of the presence of whales underwater or outside of the range where a
> visual observer may be able to detect the animals . . . . Vessel-based surveys
> would not begin until the lead PSO on duty determines there is adequate visibility.

BOEM 77454-77455.

As to subparagraph (b), NMFS does not dispute that right whales have no dorsal fin.

BOEM_0077330. However, NMFS disputes the remaining allegations and states that it

accounted for any difficulties in detecting right whales by relying not just on PSOs, but also on a

variety of other measures designed to ensure right whale detection. BOEM_0077457.

As to subparagraph (c), the lead engineer doesn't make the decision based on whether

stopping would merely "adversely affect the pile driving effort." Rather, the decision is made

based on technological/engineering feasibility and human safety needs. BOEM 77454.

As to subparagraphs (c) and (d), the BiOp contained no "decision to allow" pile driving

to continue despite the presence of right whales if Vineyard Wind's lead engineer believes

halting pile driving will adversely affect the pile driving effort or to allow pile driving after

sunset. The conditions for shutting down (or continuing) pile driving are outlined as conditions

of the IHA and the COP; therefore, these conditions were part of the proposed action that NMFS/GAR analyzed in the BiOp. BOEM_0077302-06.

As to the allegation in subparagraph (d) that PSOs can't see after sunset, Vineyard Wind is required to develop an Alternative Monitoring Plan that includes measures for enhanced monitoring capabilities in poor visibility conditions, including use of night vision goggles. BOEM_0077309, 77665.

As to subparagraphs (e) and (f), Plaintiffs refer to the Stober and Thomsen 2021 study but actually misrepresent what it is saying is "unknown." To justify the publication of their paper, the authors stated that increased information "on operational noise levels has not been used in extrapolations, and impact assessments for turbines larger than 6 MW have not been performed. Thus the potential impacts of planned offshore wind farms on marine life are unknown." NMFS 57132. NMFS/GAR determined the paper was not the best available scientific information for a variety of reasons, and noted that "context is critical . . . . Without information on soundscape, water depth, sediment type, wind speed, and other factors, it is not possible to determine the reliability of any predictions from the Stober and Thomsen paper to the Vineyard Wind project." NMFS 17709-17710.

As to subparagraph (f), Plaintiffs mischaracterize Hatch et al 2012 (NMFS 8751-8762) by attributing the potential limitation of communication space to offshore wind farms, when the paper drew conclusions about the noise produced by large commercial shipping vessels in a particular area compared to historically lower sound conditions. *See* NMFS 8758. Nevertheless, NMFS adequately considered the scientific evidence cited by Plaintiffs in Hatch et al 2012 and in other papers on effects of operational noise on right whales. *See*, *e.g.,* NMFS 17235-17236 (right whale vocalization and hearing) and 17323-17374 (underwater noise), including NMFS

17338-17339 (information on acoustics and whales), 17463 ("operational noise will not result in masking of any whale communications" and given any effects of operational noise will be extremely unlikely and insignificant, we do not expect that the physical presence of the foundations will affect the distribution of whales or sea turtles in the action area or affect how these animals move through the area."); NMFS 17709 ("Tougaard et al. (2020) and Stober and Thomsen (2021) both note that operational noise is less than shipping noise; this suggests that in areas with consistent vessel traffic, such as the Vineyard Wind lease area, operational noise may not be detectable above ambient noise"), NMFS 17371 ("[W]e do not anticipate the underwater noise associated with the operations noise of the direct-drive WTGs to exceed ambient noise at a distance of more than 50m from the WTG foundation. As such, even if ESA-listed marine mammals avoided the area with noise above ambient, any effects would be so small that they could not be meaningfully measured, detected, or evaluated, and are therefore insignificant").

126.    By failing to examine the risk of vessel strikes in their issuance of the IHA, NMFS ignored its own conclusions that "[r]educing vessel speed is one of the most effective, feasible options available to reduce the likelihood of lethal outcomes from vessel collisions with right whales." **AR NMFS_46923**.

**Federal Defendants' Response: Disputed.**

NMFS considered the potential for vessel strikes and recognizes that entanglement and vessel strikes are the primary causes of mortality and serious injury. NMFS 3531. In fact, the IHA contains numerous vessel strike avoidance measures. NMFS 3525-3526, 3528-3529, and 3545-3547.

127.    NMFS also ignored its statement that current speed limits and "other vessel strike mitigation efforts are insufficient to reduce the level of lethal right whale vessel strikes to sustainable levels in U.S. waters." **AR NMFS_46926.**

**Federal Defendants' Response: Disputed.**

The IHA includes several scenarios under which vessels are required to travel at 10 kts or less. NMFS 3525.

128.    When issuing the IHA, NMFS did not consider the best scientific data available, because it ignored the fact that NARWs return year-round to their feeding and mating grounds, which include the Vineyard Wind lease. *See* **AR NMFS_6117–6118, 53318–53335**; *see also* O. O'Brien, D. E. Pendleton, L. C. Ganley, K. R. McKenna, R. D. Kenney, E. Quintana-Rizzo, C. A. Mayo, S. D. Kraus & J. V. Redfern, *Repatriation of a historical North Atlantic right whale habitat during an era of rapid climate change* (July 20, 2022), https://www.nature.com/articles/s41598-022-16200-8 (map showing location of NARW feeding and mating grounds).

**Federal Defendants' Response: Disputed.**

NMFS acknowledged that North Atlantic right whale ranges from calving grounds in the southeastern United States to feeding grounds in New England waters and into Canadian waters. NMFS 3397. However, NMFS further noted in the IHA that there are no known NARW mating or calving areas within the project area; however, it is as part of a larger core foraging area (Oleson et al., 2020). NMFS 3552. Regarding the O'Brien study, that study was issued a full year after the Vineyard Wind IHA was issued; therefore, it could not have been part of the best scientific data available at the time the Vineyard Wind IHA was issued.

129.    When issuing the IHA, NMFS did not account for multiple other IHAs it had issued authorizing NARW takes. *See* Case No. 1:21-cv-11171-IT, Doc. No. 145 Exhibit 1, at 16–17 (chart detailing all NARW takes).

**Federal Defendants' Response: Disputed.**

The impacts from other past and ongoing anthropogenic activities are to be incorporated into the negligible impact analysis via their impacts on the baseline. Section 101(a)(5)(D) of the MMPA requires NMFS to modify, suspend, or revoke the IHA if it finds that the activity is having more than a negligible impact on the affected species or stocks of marine mammals. NMFS will closely monitor baseline conditions before and during the period when the IHA is effective and will exercise this authority if appropriate. NMFS 3521.

130.    When issuing the IHA, NMFS did not account for scientific data showing that the construction and maintenance of multiple wind turbines could change NARW habitat by influencing oceanographic conditions. **AR NMFS_53319–53320**.

**Federal Defendants' Response: Disputed.**

The record shows NMFS considered the potential impacts on marine mammals, including their habitat. NMFS 3407-3408.

131.    When issuing the IHA, NMFS did not consider that little scientific data exists as to how construction and operation of projects like the Vineyard Wind project will affect large marine mammals like NARWs. **AR NMFS_53319.**

**Federal Defendants' Response: Disputed.**

The administrative record shows that NMFS considered the impacts of the pile driving activities associated with installation of the offshore wind turbine generators and electrical

service platforms to large marine mammals, including NARW. NMFS 3395-3418, and 3529-3542.

132.    BOEM's official letter informing Vineyard Wind that the COP was approved was dated July 15, 2021, and was the result of a cascade of events stemming from the illegitimate "Smart From The Start" program in connection with the Vineyard Wind project. **AR BOEM_0077150**.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that BOEM issued a letter approving the COP on July 15, 2021. BOEM_0077150. The remainder of the paragraph states legal argument rather than material facts. As set forth in their summary judgment briefing, Federal Defendants dispute that they violated any legal requirements.

133.    On August 4, 2021, the Federal Defendants issued a purported "supplement" to the ROD. The ROD was based in part on the Biological Opinion dated September 11, 2020 ("Original BiOp") of the National Marine Fisheries Service ("NMFS"), which was current and in effect as of the time the ROD was issued on May 10, 2021. The ROD stated that the Vineyard Wind Project included:

- a 23.3 mile-long export cable corridor; and

- 15 total acres of cable scour protection with 2 acres within three nautical miles.

*See* ROD at **USACE_AR_011470, 011474, 011475, 011477**, and **011486**.

**Federal Defendants' Response: Disputed in part.**

ESA consultation was reinitiated on May 7, 2021. NMFS 16662. The ROD stated that "any mitigation measures requiring additional consultation under the ESA will not be authorized to be conducted until said consultation is completed." BOEM_0076852.

Federal Defendants agree that on August 6, 2021, the Corps issued a ROD Supplement correcting several clerical errors in the Corps' section of the ROD. USACE AR 011889-011893. Although the top of the ROD Supplement was dated August 4, the document was signed on August 6. *Id.* at 011889, 011893. Federal defendants further agree that the JROD stated that the Vineyard Wind project include a 23.3-mile-long offshore export cable corridor, with 15 acres of scour protection regulated under Section 10 of the Rivers and Harbors Act of 1899 and two acres regulated under Section 404 of the CWA. BOEM_0076828. However, as explained in the Corps' August 6, 2021 ROD Supplement, these incorrect figures were included in the JROD due to a clerical error. USACE AR 011889-93.

134.    But in June 2021, a month after the ROD was issued, Vineyard Wind LLC ("Vineyard Wind") informed the United States Army Corps of Engineers (the "Corps"), a signatory of the ROD, that those two measurements of environmental impacts set forth in the ROD were significantly understated and therefore incorrect. *See* **USACE_AR_011772** (phone log of conversation between Vineyard Wind and the Corps). Rather than rescinding the ROD and reopening inter-agency consultation with NMFS due to the increased environmental impacts projected by Vineyard Wind, the Corps published the August 2021 Supplement, which indicates that the project will actually require:

- An export cable corridor up to 49 miles long; and

- 35 total acres of cable scour protection, with 17 acres within three nautical miles.

**USACE_AR_011891-92**.

**Federal Defendants' Response: Disputed.**

On June 25, 2021, following review of a draft permit, Vineyard Wind informed the Corps that "the impacts to be authorized [by the Corps] were incorrect and did not reflect the proposed impacts submitted as part of the project application and supporting materials." USACE AR 011772. Following receipt of this information, the Corps reviewed the ROD and administrative record to evaluate whether the impact areas specified in the JROD were incorrect. USACE AR 011890-92.

The Corps determined that Vineyard Wind's permit application repeatedly and consistently proposed a 23.3-mile-long offshore export cable corridor within the Corp's Section 404 jurisdiction, which would require 17 acres of scour protection regulated by the Corps under Section 404. USACE AR 011891; *see* USACE AR 000044, 000093, 000099, 000106 (USACE Permit application).

The Corps also reviewed the proposed COP, portions of which had been incorporated into the Corps permit application, finding that the maximum length of offshore export cables (including areas outside of the Corps' Section 404 jurisdiction) was 98 miles, resulting in a total of 49 miles of offshore export cable corridor, with a total of 35 acres of scour protection for the entire offshore export cable corridor. USACE AR 011891-011892; *see* USACE AR 000237, 000260, 000289, 000297 (COP Vol. 1, attached to Corps permit application); USACE AR 000866, 000868, 000873, 001096-001097, 001105, 001131, 001139 (COP Vol. 3, attached to Corps permit application); USACE AR 005741, 005743, 005748, 005976-005977, 005985, 006011, 006019 (COP Vol. 3, June 2020 version); USACE AR 008178, 008201, 008206, 008227, 008235 (COP Vol 1, September 2020 version).

The Corps further reviewed the FEIS, which the Corps had adopted, and found that BOEM had evaluated the effects of the entire export cable corridor. USACE AR 011892; *see* USACE AR 008514, 008585-87, 008604, 008632 (FEIS Vol 1); USACE AR 008945, 008953, 009061, 009156 (FEIS Vol. 2).

Based on this review, the Corps determined it had evaluated the following jurisdictional impacts when conducting its permit review: (1) an offshore export cable route up to 49 miles long; (2) 17 acres of offshore-export-cable scour protection requiring authorization under both Section 10 and Section 404; and (3) 35 acres of offshore-export-cable scour protection requiring authorization under Section 10, inclusive of the 17 acres under the Corps' concurrent Section 10/404 jurisdiction. USACE AR 011892. The Corps determined that contrary figures in the JROD only appeared due to a clerical error and supplemented the ROD by correcting the error. *Id.* at 011892-011893.

Accordingly, the June 2021 call from Vineyard Wind did not indicate any increased environmental impacts. Instead, the call notified the Corps of clerical errors in the ROD, which were then corrected so that the ROD reflected what the Corps actually evaluated.

135.    On September 17, 2021, counsel for the Plaintiffs sent the Federal Defendants (among others) a 60-day notice letter informing the Defendants of their intent to sue.

**Federal Defendants' Response: Disputed, in part.**

Defendants do not dispute that by a letter dated September 17, 2021, the Texas Public Policy Foundation, acting on behalf of certain plaintiffs in Case No. 1:22-cv-11091-IT (*Seafreeze*), submitted a Notice of Violation to the Federal Defendants under certain enumerated statutes. *See* Doc. No. 1-1. Federal Defendants dispute that the letter notified BOEM of a potential OCSLA claim challenging the Site Assessment Plan. *See id.* at 4-23. Federal

Defendants also dispute that the letter notified Federal Defendants of a potential ESA citizen-suit claim concerning Federal Defendants' reliance on the 2021 BiOp.

136.    On October 18, 2021, months after BOEM approved the Vineyard Wind COP, NMFS completed the reinstituted ESA consultation process and published major revisions to the Biological Opinion, which addressed serious risks to endangered species from noise, vessel traffic, and critical habitat and environmental conditions during construction, operation, and decommissioning activities in connection with the Vineyard Wind project. The revisions to the Biological Opinion were issued in two different versions, the "Revised BiOp," **USACE_AR_013363–013862**, and the "Corrected Revised BiOp," **USACE_AR_ 013869– 014372.** To date, BOEM has not reopened the Final EIS or ROD to address the two versions of the revised Biological Opinion, has not rescinded its approval of the COP, and has not required Vineyard Wind to halt construction of the project pending BOEM's review of the either version of the revised Biological Opinion.

**Federal Defendants' Response: Disputed.**

On October 18, 2021, NMFS/GAR concluded the consultation and issued to BOEM a new biological opinion (2021 Biological Opinion, uncorrected, or 2021 BiOp, uncorrected) that replaced the 2020 Biological Opinion. NMFS_00016668 (NMFS Transmittal Letter to BOEM, uncorrected); NMFS_00016670 (2021 BiOp, uncorrected). Soon after identifying several non-substantive errors, NMFS/GAR issued to BOEM and other action agencies a corrected transmittal letter and a corrected Biological Opinion. NMFS_00017172 (November 1, 2021 Letter from NMFS to BOEM re Corrections); NMFS_00017170 (Corrected Transmittal Letter to BOEM); NMFS_00017176 (2021 BiOp, as corrected). Each referenced document is the best evidence of its content; any allegations contrary to its plain language, meaning, and context are

disputed. Federal Defendants specifically dispute Plaintiffs' characterizations concerning

"major revisions" and "serious risks." On January 20, 2022, BOEM made its determination

pursuant to 50 C.F.R. § 402.15(a): "Because the activities authorized under BOEM's COP

approval—including the monitoring surveys—are subject to the terms and conditions and

reasonable and prudent measures found in the 2021 BiOp, no further action is required in order

for Vineyard Wind to proceed with construction and operation of the Project."

BOEM_0077789.

137.    On January 14, 2022, the Federal Defendants issued a "Correction of Clerical

Error and Clarification" to the ROD. **USACE_AR_014373–014374**.

### Federal Defendants' Response: Undisputed.

138.    Rather than correcting a clerical error, this document changed the substantive

meaning of a sentence in the ROD stating that the entire Vineyard Wind lease would likely be

abandoned by commercial fishermen "due to difficulties with navigation" if the COP was

approved. *Id*.

### Federal Defendants' Response: Disputed.

The Corps' January 14, 2022 ROD Supplement did not change the substantive meaning

of the ROD. To the contrary, the ROD Supplement clarified that a statement in the ROD, "While

Vineyard Wind is not authorized to prevent free access to the entire wind development area, due

to the placement of the turbines it is likely that the entire 75,614-acre area will be abandoned by

commercial fisheries due to difficulties with navigation," was based solely upon comments of

interested parties submitted to BOEM as summarized in Appendix K to the FEIS. USACE AR

014374. The January 14, 2022 ROD Supplement further clarified that the statement was not

based upon any separate or independent evaluation or study by the Corps or other agency, and

did not represent the Corps' position regarding the status of commercial fisheries due to difficulties of navigation that may or may not result from the placement of the turbines. *Id.*

Instead, BOEM conducted an in-depth analysis of the potential effects of the Project on commercial fishing, concluding that full abandonment was not likely and that impacts would be moderate. *See* USACE AR 008784-008805. Nevertheless, the Corps reported that "abandonment" by commercial fishing would result in a $14 million impact to commercial fisheries, that Vineyard Wind has established compensation funds to address those impacts, and that the project as a whole would have a negligible effect on the local economy. BOEM_0076837. Thus, the Corps formulated its conclusion on the economic impacts of the Project to commercial fishermen, not based on the actual level of impacts described in BOEM's analysis, but rather on a worst-case scenario, i.e., based on abandonment of the entire project area by commercial fishing interests.

The January 14, 2022 ROD Supplement also corrected a clerical error in the ROD unrelated to the statement regarding fisheries. USACE AR 014373-014374. Due to a clerical error when the JROD was complied, the Corps' public interest determination was cut off mid-sentence. *See* BOEM_0076846. The January 2022 ROD Supplement corrected this error in addition to clarifying the separate statement regarding fisheries. USACE AR 014373-014374.

139.    The "Correction of Clerical Error and Clarification" was published less than a month after the Plaintiffs filed their Complaint, which referred to the sentence mentioned *supra* at ¶ 130.

**Federal Defendants' Response: Undisputed.**

140.    On January 20, 2022, BOEM clarified that the ROD constituted final agency action regarding the Vineyard Wind COP. *See* **AR BOEM_0077788**.

**Federal Defendants' Response: Disputed.**

On January 20, 2022, BOEM finalized the memorandum documenting its determination under 50 C.F.R. § 402.15(a) that no further action was required by BOEM for VW in light of the October 18, 2021 Biological Opinion. That memorandum does not use the term "final agency action."

### *Physical Description of the Vineyard Wind Project*

141.    The Vineyard Wind offshore wind energy project (the "Vineyard Wind project"), along with six other offshore wind farms, will be constructed and operated in an area of the Outer Continental Shelf ("OCS") that is roughly 15 miles south of Martha's Vineyard and Nantucket Island. **AR BOEM_0077321, 0077285, 0068465**.

**Federal Defendants' Response: Disputed, in part.**

While defendants do not dispute that the cited maps show that the wind development area proposed by Vineyard Wind are roughly 15 miles south of Martha's Vineyard and Nantucket Island, the cited maps and text do not depict "six other offshore wind farms" and not all six lease areas depicted on the map at BOEM_0068465 are the same distance south of those islands.

142.    The Vineyard Wind project is located in BOEM Lease Area OCS-A-0501. **AR BOEM_0077285**.

**Federal Defendants' Response: Undisputed.**

143.    The Vineyard Wind project would include up to 84 wind turbines, known as wind turbine generators ("WTGs"), each designed to generate 14 MW of electricity. **AR BOEM_0076799, 0077285–0077286**.

**Federal Defendants' Response: Disputed, in part.**

Vineyard Wind's Construction and Operations plan proposed to construct turbines ranging in capacity between 8 to 14 MW at up to 106 locations. BOEM_0065022. BOEM's decision announced in the ROD, allowed 84 turbines to be installed in 100 of the 106 proposed positions. BOEM_0076821.

144.    Most of the WTGs will be monopiles, but up to 12 may be jacket foundations, which require more pile driving and thus produce more underwater noise and a larger noise footprint. **AR BOEM_0077286, 00773000, 0068443**.

### Federal Defendants' Response: Disputed, in part.

Vineyard Wind's Construction and Operations plan proposed that "Up to 12 jacket foundations may be used for the Project (up to ten jackets for WTG foundations and up to two jackets for ESP foundations)." BOEM_0065022. The term "noise footprint" is vague, and the cited table at BOEM_0077300 shows how the distance of the level-A exposure thresholds vary based on whether pile driving is for a monopile or a jacket foundation. BOEM's analysis in the FEIS differentiated between the impacts of jacket and monopile installation. BOEM_0068589.

> The potential acoustic impacts on marine mammals differ among the WTG foundation types that Vineyard Wind would use: either 100 monopiles (34 foot-diameter [10.3-meter]) and up to two ESP jacket foundations (Scenario 1) or a combination of 90 monopiles and up to 12 jacket foundations (Scenario 2). Although monopile foundations have a higher source level than jacket-type piles, more jacket-type piles would be installed per day (up to four 9.8-foot [3-meter] pin piles per jacket), increasing the risk of PTS to marine mammals (Pyc et al. 2018). Consequently, cumulative sound exposure levels are higher for marine mammals under Scenario 2 than under the Scenario 1 (Pyc et al. 2018).

*Id.*

145.    Construction of the Project will take approximately two years to complete, and the Project will have an approved operational life of 33 years, after which it must be "decommissioned" (i.e., dismantled). **AR BOEM_0077286, 0077293, 0077295**.

### Federal Defendants' Response: Disputed, in part.

The FEIS indicates that construction of the project would last from 2021 to 2024. BOEM0068475. The FEIS and the COP indicate that the operational life of the project will be up to 30 years, not 33 years. BOEM_0065025; BOEM_0068485. The cited discussion in the 2021 BiOp (*i.e.*, BOEM_0077295) refers to the operations term of the lease, not the operational life of the project. (On June 22, 2021, BOEM extended the operations term of the lease from 25 to 33 years. BOEM_0077132. BOEM's regulations state that the operations term of a commercial lease commences upon COP approval. 30 C.F.R. § 585.235(a)(2).)

### *The Procedural History of this Lawsuit*

146.    Pursuant to the citizen suit provisions of OCSLA, ESA and CWA, Plaintiffs sent a 60-day notice of intent ("NOI") to sue the Federal Defendants over their respective failures to comply with OCSLA, ESA and CWA in reviewing and approving the Vineyard Wind Construction and Operations Plan. The NOI was sent to all Federal Defendants and certain other addressees required by statute on September 17, 2021, and was received by the last of them on September 20, 2021.

### **Federal Defendants' Response: Disputed, in part.**

Defendants do not dispute that by a letter dated September 17, 2021, the Texas Public Policy Foundation, acting on behalf of certain plaintiffs in Case No. 1:22-cv-11091-IT (*Seafreeze*), submitted a Notice of Violation to the Federal Defendants under certain enumerated statutes. *See* Doc. No. 1-1. Federal Defendants dispute that the letter notified BOEM of a potential OCSLA claim challenging the Site Assessment Plan. *See id.* at 4-23. Federal Defendants also dispute that the letter notified Federal Defendants of a potential ESA citizen-suit claim concerning Federal Defendants' reliance on the 2021 BiOp.

147.    On December 15, 2021, the Plaintiffs filed their complaint against the Federal Defendants in the United States District Court for the District of Columbia.

**Federal Defendants' Response: Undisputed.**

148.    On January 14, 2022, the Federal Defendants issued a "Correction of Clerical Error and Clarification" to the ROD dated January 14, 2022. **USACE_AR_014373–014374**.

**Federal Defendants' Response: Undisputed.**

149.    On January 18, 2022, the Federal Defendants moved to transfer the case to this court.

**Federal Defendants' Response: Undisputed.**

150.    On January 19, 2022, the district court in the District of Columbia granted the motion of Vineyard Wind, LLC, to intervene as a defendant in this case. On the same date, Vineyard Wind filed its answer to the complaint.

**Federal Defendants' Response: Undisputed.**

151.    On March 3, 2022, the Federal Defendants filed their answer to the complaint.

**Federal Defendants' Response: Disputed.**

Federal Defendants field their answer to the complaint on March 11, 2022. Doc. No. 25.

152.    On April 11, 2022, the Federal Defendants filed the certified index to Administrative Record ("AR"), on May 19, 2022, they filed an addendum to the AR, on June 13, 2022, they filed a second addendum to the AR, and on July 1, 2022, they filed a third addendum to the AR. The two revised biological opinions, the August Supplement 4, 2021, Supplement and the January 14, 2022, Supplement were included in the AR without any effort to reopen the ROD or the EIS.

**Federal Defendants' Response: Disputed, in part.**

Federal Defendants do not dispute that they filed: certified indices to the BOEM and NMFS administrative record ("ARs") on April 11, 2022, Doc. No. 26; an addendum to the NMFS AR on May 19, 2022, Doc. No. 30; a second addendum to the NMFS AR on June 13, 2022, Doc. No. 34; and an addendum to the BOEM AR on July 1, 2022, Doc. No. 36. Federal Defendants dispute the allegation that NMFS issued "revised biological opinions." NMFS issued the first of two Biological Opinions on September 11, 2020 (NMFS 16029-16354). The second biological opinion was issued on October 18, 2021, and corrected on November 1, 2021, but still referred to as the October 18, 2021 Biological Opinion. NMFS 16670-17169 (uncorrected BiOp); NMFS 17176-17680 (corrected BiOp); NMFS 17172-17175 (NMFS Nov. 1, 2021, letter to BOEM re corrections). Federal Defendants dispute the suggestion that it was necessary to reopen the ROD or the EIS, and that point is addressed in Federal Defendants' summary judgment brief.

153.    On June 27, 2022, the district court in the District of Columbia transferred this case to this court.

**Federal Defendants' Response: Disputed, in part.**

On June 27, 2022, the district court in the District of Columbia issued an opinion granting Federal Defendants' motion to transfer. Doc. No. 35. The case was transferred on July 7, 2022. Doc. No. 37.

154.    On August 30, 2022, this court issued the Scheduling Order, Doc. No. 55, and by order dated October 25, 2022, the Court issued an order extending the page limits for the parties' memoranda of points and authorities, Doc. No. 65.

**Federal Defendants' Response: Undisputed.**

155.    On September 2, 2022, the Plaintiffs filed a motion to strike the two revised

biological opinions, the August 4, 2021 Supplement to the ROD, and the January 14, 2022,

Supplement from the AR. In that motion, the Plaintiffs also sought to add certain documents to

the AR. That motion is pending before the court. Doc. No. 56.

**Federal Defendants' Response: Undisputed.**

156.    On September 16, 2022, the Federal Defendants and the Defendant-Intervenor

Vineyard Wind filed oppositions to Plaintiffs motion to strike/add documents from and to the

AR. Doc. Nos. 58, 59.

**Federal Defendants' Response: Undisputed.**

157.    On September 27, 2022, the Plaintiffs filed a motion for leave to file a reply to the

oppositions of the Federal Defendants and the Defendant-Intervenor to Plaintiffs motion to

strike/add documents from and to the AR, Doc. No. 60, which was opposed by the Federal

Defendants and the Defendant-Intervenor Vineyard Wind, Doc Nos. 61, 62. That motion was

denied by the court. Doc. No. 64.

**Federal Defendants' Response: Undisputed.**

**_The Commercial Fishing Industry In The Vineyard Wind Area and the Effects of the_**
**_Vineyard Wind Project on That Industry_**

158.    All commercial longfin squid fishing in federal waters on the East Coast of the

United States is harvested using small mesh bottom trawls. *See* NOAA Fisheries: "The majority

of longfin squid is harvested year-round using small-mesh bottom trawls. There are now only a

few fishermen that use pound nets and fish traps during the spring and early summer when squid

migrate inshore." *Longfin squid*, NOAA FISHERIES, https://www.fisheries.noaa.gov/species/long

fin-squid. Pound nets and fish traps are all in state waters. Lapp Decl. ¶ 31. Trawl fisheries are

the only practical and commercially viable way to harvest longfin squid in the Greater Atlantic

Region and have existed for decades in the Vineyard Wind lease area. The squid fishery uses custom made and manufactured trawl nets that are designed to capture squid and are fitted to a vessel's specific size and horsepower. Trawl nets are made from fine mesh that can easily tear on underwater obstructions, making any such obstructions, commonly referred to as "hangs," destructive to the harvesting of fish and vessel operation. *See* **AR_BOEM_0068722**. The mouth of the trawl net is held open by two steel otter boards known as "doors" which are attached to the sides, known as the "wings" of the net, by steel cables. These doors function to spread the mouth of the net wider and "door spread" significantly affects how well the net functions to catch target species. The doors are connected to winches on the vessel by steel wire. The boat slowly tows the net behind the vessel through ocean bottom depth contours following the target species using electronic bottom sounders, all while avoiding existing hangs, such as rocks and shipwrecks, plus other vessels nearby. A net may be towed up to ¼ to ½ mile behind the vessel itself depending on location and individual vessel operations, while vessel position is affected by tides, currents, wind etc. Therefore, the position of the vessel above the water line may often not indicate the position of the net below the water line. Rather, the vessel maneuvers as necessary to maintain its course along the duration of a "tow" to position its net so as to harvest fish efficiently and safely. Brady Decl. ¶ 12; Aripotch Decl. ¶ 10; Thomas H. Williams Decl. ¶¶ 10, Lapp Decl. ¶ 32; *see also* **AR BOEM_0130447–0130449**.

    **Federal Defendants' Response: Disputed, in part.**

    The references to a news article and Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Federal Defendants dispute Plaintiffs' characterization of the two page of

the record that they cite. As to the first, Federal Defendants dispute Plaintiffs characterization of

the Vineyard Wind Project's effects on the commercial fishing industry with respect to gear type.

Although the conversion of soft sediment habitat to hard bottom *could* impact the bottom trawl

industry by decreasing trawlable habitat and increasing the risk of net hangs, the following

additional mitigation measures "address accessibility to, and availability of, fishing resources:

long-term monitoring of cable placements to confirm cables remain buried and that rock

placement and concrete mattresses remain secured and undamaged; and communicating with

fishermen over the life of the Project to address changes in access to and availability of fish."

BOEM_0068722. In addition, "Vineyard Wind is developing a framework for pre- and post-

construction fisheries monitoring to measure Project impacts on fisheries." *Id.* The second

citation to the record is to a technical report regarding the environmental effects of wind farms.

BOEM_130419. Federal Defendants dispute that the cited pages support Plaintiffs' assertions

vessel maneuvering and fish harvest. *See* BOEM_0130447-49.

159.    A fishing vessel's restriction in ability to maneuver while fishing has long been a

recognized aspect and standard of maritime protocol. The International Maritime Organization's

Convention on the International Regulations for Preventing Collisions at Sea 1972, commonly

referred to as COLREGS, sets forth the rules of the road for professional mariners and is

promulgated in the United States by the US Coast Guard. See

https://www.imo.org/en/About/Conventions/Pages/COLREG.aspx and https://www.google.com/

url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi8_PHrhNj2AhUdknIEHWYhA

EoQFnoECA8QAQ&url=https%3A%2F%2Fwww.navcen.uscg.gov%2Fpdf%2Fnavrules%2Fna

vrules.pdf&usg=AOvVaw0GM6Ptxf6cF44wPNxwomXK. For example, Rule 18 of the

COLREGS states that power driven vessels and sailing vessels underway "shall keep out of the

way of….a vessel engaged in fishing." This is due to the fishing vessel's lack of maneuverability when gear is deployed. When a trawl fishing vessel is towing, its speed is generally limited to a maximum of 2-4 kts due to the drag of the net, and hauling back the net is not an instant process but typically takes about a half hour. Therefore fishing vessel response to a navigational emergency is delayed by de facto speed restrictions and the time it takes to get the gear back onboard the vessel. Lapp Decl. ¶ 33; Brady Decl. ¶ 13; Aaron Williams Decl. ¶ 10; *see also* **AR BOEM_0110424**.

**Federal Defendants' Response: Disputed, in part.**

The references Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Federal Defendants do not dispute the existence of the Convention on the International Regulations for Preventing Collisions at Sea of 1972 ("COLREGS") or their contents. Federal Defendants do not dispute that Rule 18 of the COLREGS deals with responsibilities between vessels and includes requirements for vessels which shall keep out of the way of others. Federal Defendants not that Plaintiffs' singular citation to the administrative record does not support their allegations. Plaintiffs cite their comments on the Supplemental DEIS, BOEM_0110424, but that page does not support their assertions regarding vessel speed and maneuverability. BOEM responded to their comments in Appendix K of the FEIS. BOEM_0070468-96. Specifically, BOEM addressed their comments regarding vessel maneuverability and the use of trawl gear. BOEM_0070483-87. Further, the project layout selected by BOEM will allow fishing vessels operating within the project area to comply with the COLREGS. BOEM_0076942; BOEM_0054808.

160.    A trawl vessel will make several tows a day, and many over the course of a multi-day trip, with each tow typically requiring one to three hours of tow time to be effective at herding the squid into the net. At the completion of a tow, the vessel will haul back the wires onto its winches and bring the doors and net to the vessel to unload the harvest and ice or chill in the vessel hold(s) as appropriate. Some vessels use ice to chill product, some use a refrigerated seawater system. Lapp Decl. ¶ 34; Brady Decl. ¶ 14, *see also* **AR BOEM_0141385**.

**Federal Defendants' Response: Disputed, in part.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Plaintiff cite a page from Amendment 11 to the Atlantic Mackerel, Squid, and Butterfish Fishery Management Plan, dated May 2011, which discusses the typical size of certain vessels. BOEM_0141385. It does not support any of the assertions in Paragraph 160.

161.    While the vessel gear is deployed and fishing, the vessel experiences restricted maneuverability, and underwater obstructions from cable armoring and turbine foundations combined with fixed structure of the wind turbines present significant safety and navigational hazards while trawl fishing. When a vessel's net/doors/gear become entangled on an underwater cable or cable armoring, or turbine foundation, or boulder relocated by the developer, the vessel is placed in a hazardous situation. *See* **AR BOEM_0034945–0034946; 0034955**. This will be compounded by the further restricted maneuverability due to the wind turbines themselves and could result in vessel capsize and/or collision with a wind turbine. For example, at present, without offshore wind in US federal waters, if a vessel's gear becomes entangled on a "hang" the vessel must try to maneuver its gear off the hang safely and with minimal damage. This requires

space, and particularly space for maneuverability in the right direction taking into account the

wind, current, and the tide at the time. The vessel when "hung up" is essentially tethered to the

ocean floor by its gear, and wind/tide have the ability to capsize the vessel if strong enough and

the vessel loses maneuverability. When fixed structure is added to the equation in the form of

turbines, the vessel loses the space for maneuverability and may simply be swung into a turbine

by wind/tide/current or failed attempts at breaking free. Offshore wind will introduce both

significant new underwater hangs as well as fixed structure in the form of turbines. Lapp Decl. ¶

35*, see also* **AR BOEM_0057072**. Towing over electrical inter-turbine cables and/or export

cables themselves (particularly should cables become exposed due to shifting sands in a dynamic

environment such as the ocean) present substantially increased hazards, which has been made

clear to United Kingdom fisheries operating in the vicinity of wind farms. Brady Decl. ¶ 15;

Aripotch Decl. ¶¶ 16-18; Thomas E. Williams, Sr. Decl. ¶ 15, *see also* **AR BOEM_0057000**.

> ### **Federal Defendants' Response: Disputed, in part.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling

on the merits of Plaintiffs' claims because they are not part of the administrative record. *See*

*Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015).

Plaintiffs also cite the DEIS, BOEM_0034945-46, 34955, and the Supplemental DEIS,

BOEM_0057000, 57072. The cited pages discuss potential impacts on fishing and the fishing

compensation fund. Federal Defendants dispute Plaintiffs' characterizations of those documents,

and refer the Court to the BOEM's full analysis of impacts to fishing in the DEIS, SDEIS, and

FEIS. BOEM_0068700-35. Federal Defendants do not dispute that Trawl and dredge vessels

require a relatively large space between turbines to maneuver their gear. However, the

administrative record material cited by Plaintiffs further explain that Vineyard Wind has

committed to implementation of mitigation measures (FEIS, Appendix D (BOEM_0069192)) which would reduce the impacts on commercial fisheries. BOEM_0034945-46.

162.    The Vineyard Wind lease and approval of the Vineyard Wind Construction and Operations Plan ("COP") will result in the construction and operation of a large number of offshore wind turbines — between 60 and 80 in total — with each turbine reaching the height of San Francisco's Transamerica Pyramid, utilizing blades as long as a football field, and containing large quantities of oil and environmentally unsafe chemicals. *See* **AR BOEM_0193461**. The turbines will be pile-driven into the Outer Continental Shelf within the Vineyard Wind lease area, producing low-frequency noise, and the continuous operation of the turbines will produce further noise and electromagnetic energy that will disturb existing marine life, including squid. These construction and operational activities will make it impossible as a practical matter for squid fishing to continue in the Vineyard Wind lease area. All whiting and squid caught in the Vineyard Wind lease area come from commercial trawl fishing. As the Final Environmental Impact Statement issued by the Federal Defendants acknowledges, trawl fishing gear will likely become "entangled in protections placed over cables or around foundations" of turbines and related infrastructure, making commercial fishing in the Vineyard Wind lease area untenable. *See* **AR BOEM_0068718, 0068722, 0068724, 0068725**. Additionally, the wind turbines will interfere with vessel and air radar and impact transit corridors, and will therefore make navigation impossible for commercial fishing vessels and will make rescue efforts problematic or untenable in case of wreck. *See* **AR BOEM_0068717, 0068722**; *see also* **AR NMFS 34415–34416, 34422–34424, 34425**. Ventrone Decl. ¶¶ 6-9; Lapp Decl. ¶¶ 27-28; Aaron Williams Decl. ¶¶ 13-15; Haran Decl. ¶¶ 11-12; Thomas E. Williams, Decl. ¶¶ 19-20; Thomas H. Williams Decl. ¶¶ 15-17.

**Federal Defendants' Response: Disputed.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Plaintiffs' assertions regarding the number and dimensions of the turbines Vineyard Wind will construct and operate are incorrect. They cite a July 2019 GE press release regarding the 12 megawatt Haliade-X turbine. BOEM_0193461. Vineyard Wind will construct 62 turbines, each with a 13 megawatt capacity, BOEM_0067698-99, not 60 to 80 12 megawatt turbines as Plaintiffs assert. The assertion that the turbines will contain "large quantities of oil and environmentally unsafe chemicals" is not supported by the record. Further, Federal Defendants dispute Plaintiffs' characterizations of the analysis of fishing impacts in the FEIS. BOEM_0068700-35. Specifically, Federal Defendants dispute that the assertion that commercial fishing in the project area would be untenable. *See* BOEM_0068717-19. Federal Defendants also dispute the assertion that the turbines will interfere with radar and therefore make navigation for fishing vessels impossible and rescue efforts untenable. *See* BOEM_0068717, 68739; BOEM_0054795. Plaintiffs also cite their September 17, 2021 notice letter. NMFS 34415-25. BOEM responded to similar points in its responses to Seafreeze's comments on the Supplemental DEIS. BOEM_0070468-96.

163.    Towing over electrical export cables themselves, particularly should cables become exposed due to oceanic processes, present substantially increased hazards, which has been made clear to UK fisheries operating in the vicinity of wind farms. For example, in one notice to U.K. fishermen regarding the Westernmost Rough Offshore Wind Farm from offshore wind developer DONG Energy (now Orsted) and the Kingfisher Information Service, a fisheries

information service providing fishermen the location of subsurface and subsea hazards around

the U.K., reads, "The closer to the surface a subsea cable is lifted when fouled by fishing gear,

the more damage there is to the fishing vessel. In the interests of fishing safety and to prevent

damage to subsea structures fishermen are advised to exercise caution when fishing in the

vicinity of subsea cables and renewable energy structures. Loss of gear, fishing time, and catch

can result if a trawler snags a subsea structure and there is serious risk of loss of life." This notice

is quoted and pictured in a comment letter submitted by Seafreeze on the Vineyard Wind SEIS.

*See* **AR BOEM_0110419–0110420**. Other similar notices etc., are found throughout that

comment letter. AR BOEM_0110419–0110424; Lapp Decl. ¶ 36.

**Federal Defendants' Response: Disputed, in part.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling

on the merits of Plaintiffs' claims because they are not part of the administrative record. *See*

*Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015).

Plaintiffs cite their comment letter on the Supplemental DEIS, which includes a reference to a

notice to fishermen in the United Kingdom. BOEM_0110419-20. Federal Defendants do not

dispute that the notice exists and was referenced in Plaintiffs' comments. Federal Defendants

responded to Seafreeze's comments regarding vessel maneuverability and the use of trawl gear.

BOEM_0070483-87. Federal Defendants refer the Court to BOEM's full analysis of impacts to

fishing in the FEIS. BOEM_0068700-35. Federal Defendants do not dispute that the analysis

shows that if electrical cables become exposed (unburied), then towing over electrical export

cables increases the risk of fishing gear entanglement, but dispute that entanglement is likely or

certain to occur.

164.    The spacing of the turbines will not allow for safe transit lanes in the Vineyard Wind area for trawl fishing vessels. Additionally, the wind turbines will interfere with marine vessel radar, and will therefore make navigation for fishing vessels more dangerous in the Vineyard Wind lease area. This marine radar interference will also affect the capabilities of USCG rescue vessels, and the turbines themselves will affect helicopter rescue capabilities. Furthermore, trawl fishing gear will become "entangled in protections placed over cables or around foundations" of turbines and related infrastructure, making commercial fishing by trawl fishing untenable in the Vineyard Wind lease area. *See* Final EIS at 3-214, 215, 219, 221, 222. Lapp Decl. ¶¶ 37-38; Brady Decl. ¶¶ 18-19; Haran Decl. ¶¶ 11-12; 18-20; Thomas E. Williams, Sr. Decl. ¶¶ 15, 20. *See* **AR BOEM_0193461, 0068718, 0068722, 0068724, 0068725**.

**Federal Defendants' Response: Disputed.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Federal Defendants dispute Plaintiffs' assertions that "[t]he spacing of the turbines will not allow for safe transit lanes in the Vineyard Wind area for trawl fishing vessels." The U.S. Coast Guard concluded that the project design required by BOEM would allow for safe transit between the turbines. BOEM_0076942; BOEM_0054808. Federal Defendants also dispute Plaintiffs' assertions regarding the impact on marine navigation and U.S. Coast Guard search and rescue operations. The Coast Guard evaluated the potential impacts of the turbines on radar and concluded that there were not authoritative scientific studies showing that the presence of wind turbines would degrade marine vessel radar. BOEM_0068739; BOEM_0054795. And the project design selected by BOEM will allow U.S. Coast Guard search and rescue operations.

BOEM_0068783; BOEM_0076942; BOEM_0054808. Specifically, as the FEIS explains, "Alternative D2 would increase navigational safety, particularly for USCG SAR operations by implementing a 1 x 1 nautical mile layout and arranging WTGs with east-west rows and north-south columns, as recommended in the Final MARIPARS (USCG 2020b)." BOEM_0068783.

Federal Defendants also dispute the assertions that "trawl fishing gear will likely become" entangled and that commercial trawl fishing within the project area is "untenable." BOEM agrees that fishing gear entanglement with cable protection measures is a *potential* impact impacts to commercial fisheries, but "[a]s described in the approved COP, the use of cable protection measures will not exceed 10 percent of the total cable routing." BOEM_0077163-64. The *potential* for entanglement with only 10% of the total cable routing (assuming VW uses the entire 10%) seems far from the type of impact that would render commercial trawling fishing within the project "untenable."

165.     These impediments to commercial trawl fishing in the Vineyard Wind lease area resulting from the Federal Defendants' issuance of the lease and the approval of the COP will severely impede and make trawl fishing extremely dangerous in the Vineyard Wind lease area, making future squid fishing trips in the area impossible as a practical matter. *See* **AR BOEM_0068710–0068711**; Lapp Decl. ¶ 40; Brady Decl. ¶¶ 20-21; Aaron Williams Decl. ¶¶ 13-15; Aripotch Decl. ¶¶ 17-20; Haran Decl. ¶¶ 19-20; Thomas H. Williams Decl. ¶ 17.

**Federal Defendants' Response: Disputed.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015).

Federal Defendants' dispute Plaintiffs' characterization of the analysis in the FEIS and refer the Court to full analysis set forth in the FEIS. BOEM_0068700-35.

166.    In addition, the presence of the wind turbines and associated cables in connection with pile driving and associated dredging and filling operations during construction will adversely impact the marine water quality of the Vineyard Wind lease area, thereby disrupting and displacing not only squid but also other marine life. This includes permanent destruction and replacement of squid's preferred sandy bottom habitat with the hard structure of turbine bases and scour protection. **AR BOEM_0110388–0110389**. Furthermore, the type of underwater low frequency sound produced by both pile driving and construction of offshore wind turbines in the marine environment has been shown to cause acoustic trauma and even death in squid and related species. **AR BOEM_0110392–0110393** (citing studies). These adverse ecological impacts attributable to the Vineyard Wind project constitute the pollution of those waters and the degradation of the local ecosystem, to the detriment of the living things in those waters, thereby adversely impacting Seafreeze's ability to purchase, process, and sell squid caught in the area. These adverse environmental and ecosystem impacts are directly attributable to the Vineyard Wind lease issuance and COP approval. Lapp Decl. ¶¶ 42-51; Brady Decl. ¶¶ 22-23; Aripotch Decl. ¶ 20; Haran Decl. ¶ 21; Thomas E. Williams, Sr. Decl. ¶ 24; Thomas H. Williams Decl. ¶¶ 19-20.

**Federal Defendants' Response: Disputed.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). To support their assertions, Plaintiffs cite Seafreeze's comments on the Supplement DEIS. Federal

Defendants dispute their assertions for the reasons set forth on their responses to Seafreeze's comments. BOEM_0070468-96.

167.    Specifically with regard to the North American Right Whale, the issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will result in harm to that endangered species and the devastation of its critical habitat through conversion of the Outer Continental Shelf environment into a hard surface pockmarked with pile-driven turbines, cabling spewing electromagnetic energy, and constant low-frequency noise. The North Atlantic Right Whale will be forced to flee the Vineyard Wind lease area, or will perish due to the destruction of its critical habitat. *See* **AR BOEM_0110396–0110409**; Lapp. Decl. ¶ 53; Brady Decl. ¶ 26; Aripotch Decl. ¶¶ 28-29; Haran Decl. ¶ 24; Thomas E. Williams, Sr. Decl. ¶ 28; Thomas H. Williams Decl. ¶¶ 25-27.

**Federal Defendants' Response: Disputed.**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). NMFS concluded that the proposed action will result in temporary harassment of a small number of NARWs due to exposure to pile driving noise. NMFS 17530. No other adverse effects are anticipated. NMFS 17530-31. The action area does not overlap with NARW critical habitat and there will be no effects on NARW critical habitat. NMFS 17229-30.

168.    The Federal Defendants' issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will decrease the availability of horseshoe crab blood by allowing the Vineyard Wind project to disturb the delicate marine ecosystem, causing the migration or death of many horseshoe crabs, which are the only known source of life-saving fluids necessary for a

variety of important medications and vaccines. For example, Limulus Amebocyte Lysate ("LAL"), a substance derived from horseshoe crab blood is the only FDA-licensed product to protect the safety of injectable and implantable medical devices in the United States via endotoxin testing. All injectable and implantable medical devices are required by law to be tested for endotoxins with this substance. *See* **AR BOEM_0067602–0067609**; Lapp. Decl. ¶ 54; Brady Decl. ¶ 25; Haran Decl. ¶ 26; Thomas E. Williams, Sr. Decl. ¶ 29.

**<u>Federal Defendants' Response: Disputed, in part.</u>**

The references to Plaintiffs' declarations should not be considered for purposes of ruling on the merits of Plaintiffs' claims because they are not part of the administrative record. *See Boston Redevelopment Auth. v. Nat'l Park Serv.*, 125 F. Supp. 3d 325, 330 (D. Mass. 2015). Federal Defendants do not dispute the second and third sentence of Plaintiffs allegation, but note that these facts are not material to any claims in the case. Federal Defendants dispute Plaintiffs statement that issuance of the Vineyard Wind lease and approval of the Vineyard Wind COP will decrease the availability of horseshoe crab blood. The letter cited by Plaintiffs expresses concern over the potential impact offshore wind may have on the habitat of the North American Horseshoe Crab. BOEM_0067604. The FEIS does not support Plaintiffs allegation. The FEIS explains that "[h]orseshoe crabs use Covell's Beach as a spawning site (Section 3.3); however, HDD would not affect the beach itself and would therefore not likely affect horseshoe crab spawning." BOEM_0068531. Further, horseshoe crabs may not be able to escape sediment deposition and burial, but being mobile allows the horseshoe crab to uncover themselves during and after sedimentation. BOEM_0068565.

Respectfully submitted,

DATED: December 20, 2022                    TODD KIM
                                                                   Assistant Attorney General

*Of Counsel:*

PEDRO MELENDEZ-ARREAGA
Lead Attorney-Advisor
Offshore Renewable Energy Team
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
(202) 513-7759
pedro.melendez-arrea@sol.doi.gov

MATTHEW J. HARRIS
Assistant District Counsel
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742
 (978) 318-8244
matthew.j.harris@usace.army.mil

Lea Tyhach
Attorney - Advisor
National Oceanic and Atmospheric
Administration
Office of General Counsel
Northeast Section
55 Great Republic Drive
Gloucester, MA 01930
(978) 281-9242
lea.tyhach@noaa.gov

Environment & Natural Resources Division

*/s/ Perry M. Rosen*
PERRY M. ROSEN
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 353-7792
E-mail: perry.rosen@usdoj.gov

*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0204
Fax: (202) 305-0275
E-mail: mark.brown@usdoj.gov

*/s/ Luther L. Hajek*
LUTHER L. HAJEK
ANGELA ELLIS
Trial Attorney
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Attorneys for Federal Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filings to the attorneys of record for Plaintiffs and all other parties, who have registered with the Court's CM/ECF system.

So certified this 20th day of December, 2022 by

<u>/s/ <em>Luther L. Hajek</em></u>
Luther L. Hajek
Counsel for Federal Defendants
