**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SEAFREEZE SHORESIDE, INC., *et al.*,

              Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

              Defendants,

    v.

VINEYARD WIND 1 LLC,

              Intervenor-Defendant

Civil Action No. 1:22-cv-11091-IT

Hon. Indira Talwani

ORAL ARGUMENT REQUESTED

**VINEYARD WIND 1 LLC'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF
ITS CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
SEAFREEZE SHORESIDE, INC.'S MOTION FOR SUMMARY JUDGMENT**

Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

*Counsel for Vineyard Wind 1 LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

I.      Plaintiffs Lack Article III Standing for Environmental Claims ............................... 1

     A.     There is No Admissible Evidence of Environmental Injuries to Plaintiffs
            Themselves ................................................................................................ 2

     B.     Plaintiffs' Opinions on Harm to the Marine Environment are Inadmissible ......... 3

     C.     Plaintiffs Have no Theory to Save Their ESA, MMPA, or Clean Water Act
            Claims or Other Claims Where Plaintiffs Have Asserted no Cognizable Injury .... 5

     D.     Environmental Interests are not Germane to the Association Plaintiffs' Purpose .. 7

II.     Plaintiffs Lack Standing to Challenge the Smart From the Start Policy ........................... 7

III.    Plaintiffs' OCSLA Claims Have no Legal or Record Basis ................................. 9

     A.     BOEM's Approval of the Lease and Site Assessment Plan Complied with
            OCSLA ..................................................................................................... 9

     B.     Resuming Review of the Construction and Operations Plan and the Draft Final
            EIS did not Violate OCSLA or NEPA .................................................... 10

     C.     BOEM's Review of the Haliade-X Turbine Did Not Violate OCSLA ............... 11

     D.     Plaintiffs OCSLA Statutory Construction Arguments Have No Legal Support ... 12

     E.     Plaintiffs Have No Evidence Supporting an Improper "Pre-Determination" Claim
            ................................................................................................................ 13

IV.    Plaintiffs' Endangered Species Claims are Procedurally Barred and Otherwise Fail on the
     Merits ..................................................................................................................... 14

V.     Federal Defendants Complied With NEPA ......................................................... 15

     A.     BOEM Examined Alternative Locations .......................................................... 15

     B.     BOEM's Reasonably Rejected Alternative F ..................................................... 16

     C.     The Purpose and Need Statement is Valid .......................................................... 17

     D.     The Final EIS Properly Analyzed Impacts to Commercial Fishing ..................... 18

     E.     The Final EIS Appropriately Analyzed Other Potential Environmental Impacts .. 19

     F.     Federal Defendants Had no Obligation to Wait Until NMFS Completed the
            October 2021 Biological Opinion ....................................................................... 19

VI.    Vineyard Wind and the Federal Defendants are Entitled to Summary Judgment on All
     Claims Not Raised in Plaintiffs' Motion for Summary Judgment ..................................... 20

VII.   Plaintiffs Failed to Comply with Federal Rule 56(c) or Local Rule 56.1 ........................ 22

VIII.  Disclosure and Report Requirements Do Not Apply to Mr. Scott's Declaration ............. 22

CONCLUSION .................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Nat'l Insts. of Health,*
    974 F. Supp. 2d 18 (D. Mass. 2013) .................................................................................17, 18

*Calvi v. Knox Cnty.,*
    470 F.3d 422 (1st Cir. 2006) ..............................................................................................21

*City of New York v. U.S. Dep't of Transp.,*
    715 F.2d 732 (2d Cir. 1983) ...............................................................................................18

*Davis v. Mich. Dep't of Treas.,*
    489 U.S. 803 (1989) ............................................................................................................12

*Dep't of Homeland Sec. v. MacLean,*
    135 S. Ct. 913 (2015) ..........................................................................................................13

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n,*
    426 U.S. 776 (1976) ............................................................................................................15

*Garside v. Osco Drug, Inc.,*
    895 F.2d 46 (1st Cir. 1990) ..................................................................................................4

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ..............................................................................................................7

*Lead Indus. Ass'n v. EPA,*
    647 F.2d 1130 (D.C. Cir. 1980) ..........................................................................................13

*Roberts v. Crowley,*
    538 F. Supp. 2d 413 (D. Mass. 2008) .................................................................................21

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) .......................................................................................................18, 19

*Sanofi Aventis U.S. LLC v. U.S. Dep't of Health & Human Servs.,*
    58 F.4th 696 (3d Cir. 2023) ................................................................................................10

*Shahzade v. Gregory,*
    923 F. Supp. 286 (D. Mass. 1996) .......................................................................................4

*Vazquez-Rijos v. Anhang,*
    654 F.3d 122 (1st Cir. 2011) ..............................................................................................22

*Wade v. Touchdown Realty Grp., LLC,*
 386 F. Supp. 3d 56 (D. Mass. 2019) ...................................................................4

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
 208 F.3d 288 (1st Cir. 2000) ....................................................................11, 15

**Statutes**

42 U.S.C. § 4332 ........................................................................................................15

43 U.S.C. § 1337 .......................................................................................11, 12, 13

**Other Authorities**

40 C.F.R. § 1501.5 .......................................................................................................9

40 C.F.R. § 1502.13 ...................................................................................................17

40 C.F.R. § 1503.4 ....................................................................................................16

40 C.F.R. § 1506.6 ....................................................................................................16

74 Fed. Reg. 19,638 (Apr. 29, 2009) ....................................................................14

75 Fed. Reg. 82,055 (Dec. 29, 2010) ....................................................................10

Fed. R. Civ. P. 15 ......................................................................................................21

Fed. R. Civ. P. 26 ................................................................................................22, 23

Fed. R. Civ. P. 56 ..................................................................................................4, 22

Fed. R. Evid. 701 .........................................................................................................4

Fed. R. Evid. 702 .........................................................................................................4

Local Rule 56.1 .........................................................................................................22

Webster's II New Riverside University Dictionary (1988) ...............................12

## INTRODUCTION

The Cross-Motions for Summary Judgment filed by Vineyard Wind and the Federal Defendants established that Plaintiffs lack Article III standing or prudential standing for all of their claims except those under the Outer Continental Shelf Lands Act ("OCSLA"). Even if the claims for which Plaintiffs lack standing were considered on the merits, there is no support for them in either the applicable law or the administrative record. The same is true for Plaintiffs' OCSLA claims. Therefore, the Court should deny summary judgment to Plaintiffs and grant summary judgment to Vineyard Wind and the Federal Defendants.[1]

## I.   Plaintiffs Lack Article III Standing for Environmental Claims

As Vineyard Wind demonstrated in its opening brief, established caselaw prohibits the corporate commercial fishing plaintiffs and the associations that represent them from invoking the recreational, aesthetic, or spiritual injuries allegedly suffered by non-party individuals to satisfy Plaintiffs' Article III standing requirements. Similarly, Plaintiff associations cannot establish associational standing where alleged environmental interests are not germane to the association's purpose. *See* Doc. No. 87 at 3-7. Realizing their error, Plaintiffs now abandon their opening brief's theory of Article III standing and instead seek to reengineer their standing theory through isolated statements in the declarations purportedly showing environmental injuries to the corporate plaintiffs directly.

This alternative approach creates new obstacles for Plaintiffs. First, the declarations say little about environmental injuries to the corporate and association Plaintiffs themselves, focusing on non-party individuals instead. Second, by shifting the focus away from attestations of

---

[1] To avoid unnecessary duplication, Vineyard Wind adopts by reference, as if fully incorporated herein, the arguments raised in the Federal Defendants' Reply in Support of Motion for Summary Judgment, Doc. No. 93, and presents the arguments here as a supplement.

recreational, aesthetic, and spiritual injuries to opining on the Project's purported impacts on the marine environment, the declarations become inadmissible under the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Third, Plaintiffs' abandonment of purported aesthetic, recreational, and spiritual injuries means they have no Article III standing for their Endangered Species Act ("ESA"), Marine Mammal Protection Act ("MMPA"), and Clean Water Act claims. In addition, Plaintiffs failed to respond to arguments challenging their standing for various other claims, such as those related to the 2020 Biological Opinion ("BiOp") or horseshoe crabs. *See* Section I.C, *infra*. Lastly, Plaintiffs offered no evidence that environmental interests are germane to the associational plaintiffs' mission and purpose. Therefore, Plaintiffs' standing is limited to their OCSLA claims.

A. There is No Admissible Evidence of Environmental Injuries to Plaintiffs Themselves

Rightfully, Plaintiffs have abandoned their opening brief's theory of Article III standing that relied on the aesthetic, recreational, and spiritual interests of non-party individuals.[2] Plaintiffs' reply attempts to re-cast their approach by suggesting that Mr. Aripotch's personal environmental interests and those of the corporate plaintiffs are indistinguishable. In support of this new position, Plaintiffs' brief resorts to paraphrasing Mr. Aripotch's declaration in a way that misrepresents his actual statements. *Compare* Doc. No. 90 at 1-2 *with* Doc. No. 66-1 ¶¶ 13 (Mr. Aripotch's "understanding" of the Project and unsupported opinions on environmental impacts, such as noise and electromagnetic energy), 20 (alleging injuries from entanglement and radar interference, not environmental impacts), 21 (Mr. Aripotch's "aesthetic and spiritual pleasures of fishing"), 24

---

[2] *See, e.g.*, Doc. No. 66-1, Aripotch Decl. ¶¶ 21-23, 25-29, 31-34 (pleasures of being at sea and viewing right whales); Doc. No. 66-2, Williams, Sr. Decl. ¶¶ 25-28, 32-34 ("aesthetic and emotional pleasures" from fishing and its lifestyle); Doc. No. 66-8, Lapp Decl. ¶¶ 52-54, 56-57, 59, 61-63 (asserting "aesthetic, psychological, emotional, and spiritual" injuries on behalf of Seafreeze employees and herself due, in part, to purportedly forcing right whales to "flee").

(unsupported opinion that fish will leave the area, be unable to spawn, and exposed to "almost 100,000 gallons of oil"), 27 ("amazing experience" of viewing right whales and opining that they will be deafened and driven into shipping lanes), 28 (unsupported "understanding" that Project will cause "devastation" of right whale "critical habitat" and electromagnetic frequencies and noise will harm whales), 29 (unsupported "understanding" that Project "will result in harm, injury, and death" to marine species "that I enjoy"), 31-33 (asserting aesthetic and psychological harms to Mr. Aripotch, not plaintiff Old Squaw Fisheries). Each of these paragraphs involves either Mr. Aripotch discussing <u>his</u> environmental interests or providing inadmissible opinion testimony, as discussed further below. The named Plaintiffs are not mentioned.

B. <u>Plaintiffs' Opinions on Harm to the Marine Environment are Inadmissible</u>

By re-characterizing their declarations as opining on purported harms to the marine environment instead of alleged injuries to personal aesthetic, recreational, or spiritual interests, Plaintiffs' statements became inadmissible for summary judgment purposes. Plaintiffs cite to Mr. Aripotch's unsupported opinions as evidence that Old Squaw Fisheries will be harmed by, "among other things, pile driving, jet plow, and creating excessive underwater noise," harm to unspecified marine species, destabilization of "the marine ecosystem," and generally "making the Vineyard Wind area unfishable." Doc. No. 90 at 5. In fact, Mr. Aripotch freely opines on complex scientific and technical matters to allege injuries, such as "I think offshore wind is going to change the way the fish migrate," "destroy the larvae of squid and eels," harm "squid and other bait fish" through "the electromagnetic frequency in the cables," and that "the fish aren't going to like the noise and sound from the turbines," meaning they "likely will be unable to spawn as they normally do," adversely affecting "all the animals in the food chain." Doc. No. 66-1 at 24. None of these opinions is supported by first-hand knowledge, expertise, or citations to the administrative record.

"An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990) (party must adduce admissible evidence to defeat summary judgment and opinions "may defeat summary judgment only where it appears the affiant is competent to give an expert opinion."). Each of the opinions described above, and similar opinions in Mr. Aripotch's declaration, are barred by Federal Rule of Evidence 701, as they are not based on personal perception,[3] and by Rule 702 as the opinions require "scientific, technical, or other specialized knowledge," such as in marine biology, that Mr. Aripotch does not possess. *See Wade v. Touchdown Realty Grp., LLC*, 386 F. Supp. 3d 56, 63 (D. Mass. 2019) (Rule 701 testimony limited to "opinion testimony based on their 'experiential expertise' so long as it is 'well founded on personal knowledge and susceptible to cross-examination.'") (quoting *United States v. Vega*, 813 F.3d 386, 394 (1st Cir. 2016)); *Shahzade v. Gregory*, 923 F. Supp. 286, 287 (D. Mass. 1996) (Rule 702 testimony is limited to "scientific knowledge," meaning it must be reliably "grounded in the methods and procedures of science" and "more than subjective belief or unsupported speculation").

This is true for all of the declarants' opinions on the Project's alleged harms to the marine environment. *See*, *e.g.*, Doc. No. 66-2, Thomas E. Williams, Sr. Decl. ¶ 24 (construction and operations will disrupt and displace squid and "other marine life, throwing the local marine ecosystem out of balance"); Doc. No. 66-3, Thomas H. Williams Decl. ¶ 14 (pile driving will produce "low frequency noise and vibration and the continuous operation of the turbines will

---

[3] Mr. Aripotch bases his knowledge of the Project and its purported harms to the environment on "[m]y understanding" without explaining how he formed that understanding. *See* Doc. No. 66-2 ¶¶ 19, 29, 30.

produce further noise and vibration and electromagnetic energy that will disturb existing marine life, including squid"); Doc. No. 66-5, Haran Decl. ¶ 21 ("adverse ecological impacts attributable to the Vineyard Wind project constitute the pollution of those waters and the degradation of the local ecosystem, to the detriment of all living things in those waters"); Doc. No. 66-6, Brady Decl. ¶ 26 (Project will result in "the devastation of" right whale "critical habitat through conversion" to "a hard-bottom substrate … often exposing cabling spewing electromagnetic energy, and constant low-frequency noise" forcing right whales "to flee the Vineyard Wind lease area"). None of these unsupported, unqualified opinions is admissible. Because Plaintiffs provide no admissible evidence of the Project's potential effects on the marine environment, they have no competent evidence of environmental injuries to the corporate and associational plaintiffs necessary to establish standing to advance these claims.[4]

C.   Plaintiffs Have no Theory to Save Their ESA, MMPA, or Clean Water Act Claims or Other Claims Where Plaintiffs Have Asserted no Cognizable Injury

Even if the Court accepts Plaintiffs' unsupported lay opinions, Plaintiffs lack standing for their ESA and MMPA claims because they have not demonstrated that they will be injured by any potential harm to a right whale. Plaintiffs never even try to establish a relationship between right whales and the species they harvest, and, as these corporations are in the business of commercial fishing, they have no aesthetic, recreational, or spiritual interests in the whales. Consequently, Plaintiffs lack Article III standing for their ESA or MMPA claims.  Similarly, Plaintiffs offer no

---

[4] Vineyard Wind did not contest the admissibility of these statements previously because Plaintiffs relied on claims of injury to individuals' aesthetic, recreational, and spiritual interests in their motion for summary judgment. Thus, the various inadmissible opinions were not material to Plaintiffs' standing argument at that time. Plaintiffs' reply, however, presents these inadmissible opinions front-and-center.

explanation as to how the corporate plaintiffs are injured by the Corps' issuance of a Clean Water Act permit to Vineyard Wind.[5]

Vineyard Wind demonstrated that Plaintiffs failed to show any cognizable injury from (1) the superseded 2020 BiOp, (2) re-initiation of ESA consultation, (3) BOEM's resumption of work on the Final Environmental Impact Statement ("EIS"), (4) approval of Vineyard Wind's Site Assessment Plan, or (5) BOEM's use of the pre-2020 NEPA regulations. Doc. No. 86 at 8-11. Plaintiffs declined to address these arguments, claiming instead that the alleged violations "resulted from" the Smart From the Start Policy. Doc. No. 90 at 39. Plaintiffs have now twice failed to identify any injuries from these alleged violations and therefore, this Court should hold that they lack Article III standing to raise them.

Lastly, Vineyard Wind explained that Plaintiffs lack standing to bring various claims related to horseshoe crabs, sea turtles and other unidentified marine mammals, military radar, unspecified "national security issues," and unexplained "food supply" concerns were non-justiciable generalized grievances. Doc. No. 86 at 11-12. Plaintiffs simply deny, without explanation, that these are generalized grievances and stand on their opening brief. Doc. No. 90 at 40 (citing Doc. No. 67 at 12, 30-31, 34, 41). The cited pages of Plaintiffs' opening brief, however, only allege potential injuries to horseshoe crabs, sea turtles, *etc.*, without attempting to show injuries to the Plaintiffs. Thus, Plaintiffs lack Article III standing for these claims.

---

[5] Vineyard Wind did not contest Clean Water Act standing in particular in the *Responsible Offshore Development Alliance* because the plaintiff at least generally described how the Corps' actions could harm its members. Plaintiff's Reply Memorandum in Support of Summary Judgment and Response in Opposition to the Federal Defendants' and Defendant-Intervenor's, Vineyard Wind, LLC, Motions for Summary Judgment, Doc. No. 77 (Jan. 31, 2023) at 4-7. In this litigation, however, despite having the burden to establish Article III standing, the Plaintiffs have never explained how they would be injured by the Corps' issuance of the Section 404 permit they are challenging.

D.  <u>Environmental Interests are not Germane to the Association Plaintiffs' Purpose</u>

The associational Plaintiffs, Long Island Commercial Fishing Association and Sector XIII, have still failed to show that environmental interests, *i.e.*, aesthetic or recreational interests in observing species or environmental recreation, "are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs cite to generalized statements in Ms. Brady's Declaration that Long Island Commercial Fishing Association supports "clean, fishable waters free from pollution and navigational obstructions," Doc. No. 90 at 12 (citing Brady Decl. ¶ 4).[6] A second declaration by Mr. Aripotch states only, "[m]y economic and environmental interests as a commercial fisherman are represented by LICFA." But <u>no</u> declaration establishes that environmental protection is part of either plaintiff's purpose or mission. Neither plaintiff provided evidence of its purpose or mission, such as  charters or bylaws, a history of environmental advocacy, or even a clear statement that the organizational mission includes regularly advocating on behalf of their members' interests in the aesthetic, recreational, or spiritual enjoyment of the marine environment. Without evidence that these organizations exist, and have existed, to further the environmental interests of their members, they lack associational standing.

## II.    Plaintiffs Lack Standing to Challenge the Smart From the Start Policy

Vineyard Wind's summary judgment brief showed that Plaintiffs could not be harmed by the Smart From the Start Policy ("Policy") or the 2011 regulations for non-competitive leases. Doc. No. 87 at 13-15. Plaintiffs ignored these arguments and now claim that the Final EIS harmed them because the Policy caused BOEM to "refuse[ ] to consider any reasonable alternatives outside of the Vineyard Wind lease area." Doc. No. 90 at 33. But Plaintiffs cite no evidence that the Policy

---

[6] Mr. John Haran's declaration, submitted on behalf of Section XIII, uses the same cut-and-paste statement as Ms. Brady's declaration. *See* Doc. No. 66-5 ¶ 4 ("clean, fishable waters free from pollution and navigational obstructions").

had any impact on the Final EIS. Indeed, the term "Smart From the Start" is not found anywhere in the Final EIS or Draft EIS. The same is true for Plaintiffs' unsupported allegation that "the approval of the COP constitute[s] application of Smart From the Start to the Vineyard Wind project, which directly and adversely injured the Plaintiffs." *Id.* at 34. Plaintiffs rely on unspecified sections of Mr. Aripotch's first declaration and Ms. Brady's second declaration, *id.*, but neither declaration mentions the Policy. Nor does the COP approval or any version of Vineyard Wind's COP application reference this Policy.

Plaintiffs offer rote assertions that the Policy somehow <u>caused</u> regulatory violations. *See*, *e.g.*, Doc. No. 90 at 35-36 (Policy "tainted the entire leasing process and led to specific violations cited by the Plaintiffs" through unexplained means); *id.* at 28, 29, 37, 42 (Policy caused unexplained "ripple effects"). And their single attempt to grapple with record evidence fails. Plaintiffs assert "that the policy was *applied* by BOEM to the [Wind Energy Area] that contains the Vineyard Wind lease." *Id*. at 37 (bold text omitted) (citing BOEM_0000116, 0000370, 0000374-0000375, 0000377, 0000379-0000380, 0000388, 0000428, 0000400, 0000558).

Plaintiffs are wrong. None of these pages shows that the Policy "was *applied*" to the Lease EA. For instance, BOEM 0000116 merely states that then-Secretary of the Interior Ken Salazar "announced the 'Smart from the Start' Atlantic wind energy initiative" that "calls for the identification of areas on the Atlantic OCS that appear most suitable for commercial wind energy activities, and the opening of these areas for leasing and detailed site assessment activities." Nothing on that page, or any other, indicates the Policy influenced BOEM's decision to perform an EA instead of an EIS for the lease sale. *Contra*, *e.g.*, Doc. No. 90 at 40-41 ("Smart From the Start caused BOEM to forgo preparing an EIS when it issued the lease for the Vineyard Wind

project"). In fact, the Lease EA explains that comments on the Policy were "outside the scope of the EA." BOEM 0000379-80.

In the absence of affirmative evidence, Plaintiffs claim "we know the policy was applied to the Vineyard Wind lease because only an EA was performed for the entire WEA and the Vineyard Wind lease was issued subsequently without an EIS." Doc. No. 90 at 38. But an EA is "for a proposed action that is not likely to have significant effects." 40 C.F.R. § 1501.5(a). BOEM found no significant environmental effects, BOEM 0000100, and Plaintiffs never dispute this conclusion. Given that the lease did "not, by itself, authorize any activity within the leased area," BOEM 0000765, BOEM had no conceivable reason to prepare an EIS. Thus, even if BOEM applied the Policy to the Lease EA, it did not change the outcome and did not harm Plaintiffs.

## III.   Plaintiffs' OCSLA Claims Have no Legal or Record Basis

Despite the myriad jurisdictional obstacles noted above, if the Court considered Plaintiffs' OCSLA claims on the merits, each one would fail for lack of legal authority and record support.

### A.   BOEM's Approval of the Lease and Site Assessment Plan Complied with OCSLA

The Federal Defendants argued that Site Assessment Plan approval should be viewed in the context of the entire leasing process and that the Plan itself did not authorize any Project development. Doc. No. 73 at 15-16. In their reply, Plaintiffs stand on pages 35-37 of their opening brief. Doc. No. 90 at 35.[7] However, those pages do not appear to respond to the Federal Defendants' point.[8] Thus, Plaintiffs have effectively abandoned their opening brief's perfunctory

---

[7] The Federal Defendants also noted that Plaintiffs never included claims regarding the Site Assessment Plan in their 60 day notice, Doc. No. 73 at 14, and never raised a claim challenging the Site Assessment Plan in their Complaint. *Id.* at 16, n.5. Further, claims regarding the Site Assessment Plan are moot as the site characterization work BOEM authorized are complete.

[8] Plaintiffs frequently refer back to pages from their Motion for Summary Judgment, however, it appears that they may sometimes be using the numbers imprinted on the top of the page by the ECF system instead of the page numbers at the bottom of their brief and used in the Table of Contents and Table of Authorities. This has caused significant confusion. Where Vineyard Wind

accusation that the Site Assessment Plan "failed to properly assess the commercial fishing effort within the Vineyard Wind lease area," Doc. No. 67 at 27.

Similarly, Plaintiffs' challenge to the Vineyard Wind lease fails on the merits. Plaintiffs' reply brief ignored the Federal Defendants' arguments and, simply relied upon their opening brief to substantiate their claim. Doc. No. 90 at 35 (citing Doc. No. 67 at 35-37). Plaintiffs' claim that BOEM rushed through the Vineyard Wind lease is not serious. BOEM spent over 10 years from siting to approval of the Vineyard Wind Project. The process began with the December 2010 request for interest in commercial leases off Massachusetts. 75 Fed. Reg. 82,055 (Dec. 29, 2010). Over four years later, BOEM issued Vineyard Wind's lease in March 2014. BOEM 770. More than six years thereafter, BOEM finally approved the Vineyard Wind COP in July 2021. BOEM 0077150. Nothing about this Project was rushed.

B.  Resuming Review of the Construction and Operations Plan and the Draft Final EIS did not Violate OCSLA or NEPA

Plaintiffs have not identified any authority affecting BOEM's discretion to resume review of the COP and to complete the draft Final EIS after Vineyard Wind completed its review of the Haliade-X turbines. Nor could they because Plaintiffs' claims here are similar to those the Third Circuit recently rejected. In *Sanofi Aventis U.S. LLC v. U.S. Department of Health & Human Services* ("HHS"), 58 F.4th 696, 702 (3d Cir. 2023), the petitioners claimed that HHS violated the Administrative Procedure Act ("APA") by finalizing a proposed rule previously designated "withdrawn." That court held that the "APA does not mention withdrawing proposed rules. Nor has the Supreme Court. So we are reluctant to give withdrawal separate legal significance under the APA." *Id.* at 706. Thus, it rejected the petitioner's argument that, once a proposal is withdrawn,

---

addresses Plaintiffs' reference back to their Motion for Summary Judgment, it has checked both types of page numbers and relied on whichever numbers appear to make the most sense in context.

"if an agency later changes its mind, it must start over" as "nothing in the APA says that." *Id*. Here, Plaintiffs emphasize the word "terminated," Doc. No. 90 at 48, but like the word "withdrawn," it has no legal significance and cannot force BOEM to "start over."

Plaintiffs' reply also claims, for the first time, that BOEM "reviv[ed] its review under the hurry-up process initiated by Smart From the Start." *Id.* at 49. Courts "have held, with a regularity bordering on the monotonous, that issues advanced for the first time in an appellant's reply brief are deemed waived." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000) (citing cases). But even if the Court considers this improper argument, it fails because the decision to resume review never mentioned the Policy.

C.  BOEM's Review of the Haliade-X Turbine Did Not Violate OCSLA

Plaintiffs never explain how BOEM's review of the 13-megawatt Haliade-X turbine violated OCSLA. They do not dispute that the turbine fits within the Project Design Envelope used for both Vineyard Wind's COP application and the Final EIS.[9] Instead, Plaintiffs claim, without elaboration, that BOEM's memorandum on the Haliade-X turbine "does not satisfy OCSLA's requirement that BOEM 'ensure' its actions meet the statute's requirements." Doc. No. 90 at 49. But Plaintiffs never show how the memo was deficient or how selecting the Haliade-X turbine could violate the statutory requirements under 43 U.S.C. § 1337(p)(4). The record shows that BOEM fully considered the requisite OCSLA factors in approving the Vineyard Wind Project Doc. No. 73 at 17-19.

---

[9] Plaintiffs insinuate that BOEM did not actually review the Haliade-X turbine parameters because BOEM purportedly "did not alter the size of the turbine monopiles or scour protection from the Draft EIS, which analyzed 9 [megawatt turbines], to the Final EIS." Doc. No. 90 at 49 n. 10 (citing BOEM 35174-75 and BOEM 69350-51). But no alteration was needed because "the diameter, length, and penetration of the monopile foundations that will support the GE-Haliade-X [wind turbine generator] are within the COP envelope" analyzed in the Draft EIS. BOEM 67700. Plaintiffs do not dispute this either.

D.  Plaintiffs OCSLA Statutory Construction Arguments Have No Legal Support

OCSLA Section 8(p)(4) states that "The Secretary shall ensure that any activity under this section is carried out in a manner that provides for" 12 enumerated factors, including "safety," "protection of the environment," and "prevention of interference with reasonable uses (as determined by the Secretary)." 43 U.S.C. § 1337(p)(4). Plaintiffs improperly read the word "ensure" in isolation to argue that BOEM may not approve a COP unless there is a "guarantee" that there will be no adverse impact on any of these factors. Doc. No. 90 at 19-21. That interpretation improperly emphasizes "ensure" and expands its meaning in a manner that neglects the remaining statutory language in which the phrase appears. *See*, *e.g.*, *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989) ("the words of a statute must be read in their context with a view to their place in the overall statutory scheme").

 No party disputes "that the Secretary *must* perform the duties set forth in the section." Doc. No. 90 at 18-19. But those duties require evaluating how offshore energy projects are "carried out in a manner that provides for" the enumerated factors. To "provide for" means "To make ready," or "To take measures in preparation." Webster's II New Riverside University Dictionary (1988) at 948. As Federal Defendants explained (Doc. No. 73 at 35-36; Doc. No. 93 at 4-5), that language is "mandatory as to the object to be achieved" but leaves BOEM with discretion to determine what measures alternative energy projects should take to "provide for" "safety," "protection of the environment," "conservation of natural resources," and "prevention of interference with reasonable uses (as determined by the Secretary)."

Plaintiffs' absolutist reading of § 1337(p)(4) – "the mandatory, discretionless, and specific duty to protect, e.g., 'safety' and 'the environment,'" Doc. No. 90 at 22 – directly conflicts with the express statutory direction to "provide for" those factors. 43 U.S.C. § 1337(p)(4). All of the factors require discretion and expertise to determine how to "provide for" them. For instance, the

command to ensure that a wind energy project is carried out in a manner that "provides for … safety," *id.* § 1337(p)(4)(A), is not self-executing. An element of discretion is involved when evaluating the potential safety risks posed by a project and to develop conditions that reduce them to a "safe" level. Plaintiffs myopic reliance upon the word "ensure" would deny the Secretary the discretion that Congress expressly afforded in addressing this and other statutory factors, and would convert this statutory command into a regulatory straightjacket. Indeed, denying this discretion would effectively prohibit the approval of any offshore renewable energy project because they all involve some environmental impacts (*e.g.*, vessel exhaust, cable installation) and some risk to vessel safety from vessel or helicopter traffic, pile driving operations, or navigational hazards from the structures themselves. Congress could not have intended that result when it amended OCSLA specifically to allow those types of projects. *Cf. Dep't of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 920 (2015) (rejecting a "broad interpretation" of statutory text that "could defeat the purpose" of the statute).

   E.   Plaintiffs Have No Evidence Supporting an Improper "Pre-Determination" Claim

   As Vineyard Wind demonstrated in its opening brief, Doc. No. 87 at 23-24, Plaintiffs offer no evidence to meet the high standard for an improper "pre-determination" claim. Plaintiffs would need to make "a clear and convincing showing of an" agency's "unalterably closed mind on a matter critical to disposition of the proceeding." *Lead Indus. Ass'n, v. EPA*, 647 F.2d 1130, 1179-80 (D.C. Cir. 1980). In fact, Vineyard Wind provided record evidence showing that BOEM approved a Project configuration that Vineyard Wind did not propose and initially opposed. *See* Doc. No. 87 at 21. Once more, Plaintiffs declined to engage with this evidence and elected to stand on their opening brief's disproven allegations regarding the Smart From the Start Policy. Doc. No. 90 at 27. Their only addition is a quote from a 2009 *Federal Register* notice by BOEM's predecessor agency, stating that "[t]hrough this type of coordination" with other agencies, "we

expect to be able to speed the process of developing renewable energy projects in the OCS." 74 Fed. Reg. 19,638, 19,643 (Apr. 29, 2009). Plaintiffs never explain how this is "impermissibly fast-tracking the entire process" or violates OCSLA. Doc. No. 90 at 27. Plaintiffs' proffered statement from 2009 hardly amounts to "clear and convincing" evidence that BOEM improperly pre-determined to approve Vineyard Wind's COP twelve years later.

## IV.    Plaintiffs' Endangered Species Claims are Procedurally Barred and Otherwise Fail on the Merits

Plaintiffs concede they did not comply with the ESA mandatory pre-suit notice requirement. They claim "the argument is a red herring" because they are challenging the September 2020 BiOp, not the 2021 BiOp. Doc. No. 90 at 51. But, the superseded 2020 BiOp no longer has any legal effect and, therefore, cannot injure anyone. Thus, the Court cannot vacate such a document, depriving Plaintiffs of any potential relief. For this reason, Plaintiffs cannot avoid the mandatory pre-suit notice requirement claiming to challenge the 2020 BiOp.

Plaintiffs' brief ignores Vineyard Wind's arguments as to why Plaintiffs' ESA claims fail on the merits. Doc. No. 87 at 16-18. Instead, it incorporates "by reference the ESA arguments made in the Opposition/Reply brief in *RODA* and *Melone*," Doc. No. 90 at 51, even though the *RODA* brief contains no response to Vineyard Wind's arguments and *Melone* raised no ESA claims. Therefore, Vineyard Wind's arguments – that the Project will not harm right whale critical habitat, that the ESA does not require a cumulative effects analysis, and that Plaintiffs' various other complaints are unrelated to a jeopardy analysis – are unrebutted.

Lastly, the only argument Plaintiffs elaborate upon is one they raise for the first time in their reply brief: that the Federal Defendants' "no jeopardy" determination is invalid because it did not consider the potential biological removal ("PBR") level for the North Atlantic right whale as discussed in an extra-record document created a year after BOEM issued the October 2021

BiOp. Doc. No. 90 at 50-51. Plaintiffs never raised the PBR in their motion for summary judgment and, therefore, it cannot be raised for the first time in their reply. *Mowbray*, 208 F.3d at 299. Even if considered, the claim still fails. As discussed in response to the *Melone* MMPA claims and the *ACK RATs* Endangered Species Act claims, the PBR is not relevant as the Federal Defendants did not authorize even a single right whale death or injury. *See Melone v. Coit*, Case No. 21-cv-11171-IT, Doc. No. 167 at 7; *ACK Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgm't*, Case No. 21-cv-11390-IT, Doc. No. 96 at 18. In other words, the metric has no bearing on the jeopardy analysis when the Project will not "remove" any right whales.

## V.    Federal Defendants Complied With NEPA

Vineyard Wind and the Federal Defendants provided extensive arguments demonstrating why Plaintiffs' NEPA claims lack any legal merit. Once again, instead of responding to those specific arguments,  Plaintiffs offer only perfunctory rebuttals, and present  new arguments lacking any legal or record support.

### A.  BOEM Examined Alternative Locations

Vineyard Wind explained that BOEM considered alternative locations for offshore wind development during the Lease EA process. Doc. No. 87 at 19-20. Plaintiffs offer only a cursory argument that this analysis "does not substitute for a review of reasonable alternative locations" because "every step in the process leading up to the COP approval must comply with NEPA 'to the fullest extent possible.'" Doc. No. 90 at 47-48 (citing 42 U.S.C. § 4332). But reliance upon this hortatory language does not advance Plaintiffs' claim of NEPA non-compliance. Section 4332 is a Congressional policy statement that, "to the fullest extent possible … the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." This unassailable admonition involves no direction as to how and when BOEM should review alternative project locations. Similarly, *Flint Ridge Development*

*Company v. Scenic Rivers Association*, 426 U.S. 776, 785 (1976), in the context of finding NEPA's goals inapplicable to the situation confronting the Department of Housing and Urban Development, quotes this language as general legal background in stating that federal agencies must "analyz[e] the consequences of, and alternatives to, the proposed action." Lastly, Plaintiffs cite to 40 C.F.R. §§ 1503.4 and 1506.6, requiring agencies to respond to public comments and provide the public an opportunity to comment on NEPA documents, respectively. Neither is relevant to Plaintiffs' summary allegation that BOEM should have pointlessly and repetitively analyzed alternative locations in multiple environmental reviews.

      B.  <u>BOEM's Reasonably Rejected Alternative F</u>

Plaintiffs' opening brief complained that BOEM rejected Alternative F, which would have required a two- to four-nautical mile wide transit lane through the Project. BOEM reasoned that the Alternative F configuration was technically complex, would lead to project delays, and not meet the Project's purpose and need. Doc. No. 67 at 29-30. Vineyard Wind noted that BOEM also rejected Alternative F for its larger environmental impacts, transmission losses, the U.S. Coast Guard's recommendation against it, and its overall unpopularity with the public. Doc. No. 87 at 20-23. Contrary to Plaintiffs' unsupported accusation that "Vineyard Wind decided unilaterally" to reject Alternative F or that BOEM "impermissibl[y] deferred to Vineyard Wind," Doc. No. 67 at 29-30, Vineyard Wind showed that BOEM ultimately selected a mix of alternatives, including aspects that Vineyard Wind did not favor. Doc. No. 87 at 21-22. Plaintiffs' only response is to claim "that Vineyard Wind's own preferences outweighed those of the commercial fishing industry or other interested groups." Doc. No. 90 at 48 (citing BOEM 76823). The Record of Decision page cited by Plaintiffs, however, provides a reasonable and rational explanation of why BOEM found that Alternative F was a poor fit for the Project. Plaintiffs offer no substantive, record-based critique of BOEM's decision.

C.  <u>The Purpose and Need Statement is Valid</u>

The Federal Defendants explained that the Final EIS' purpose and need statement properly considered both the needs and goals of the applicant and satisfied BOEM's statutory duty to enable orderly development of the Outer Continental Shelf. Doc. No. 73 at 19-21 (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) and *Beyond Nuclear v. U.S. NRC*, 704 F.3d 12, 19 (1st Cir. 2013)). Plaintiffs respond by arguing that *Busey* and *Beyond Nuclear* do not apply, and Vineyard Wind's goals should receive no consideration, because Vineyard Wind is <u>not</u> a private sponsor seeking federal approval. Doc. No. 90 at 43-44. Instead, Plaintiffs claim that Vineyard Wind is some strange entity conscripted by the government to conceal that "BOEM was the driving force initiating the entire Vineyard Wind project pursuant to its Smart From the Start directive." *Id*. at 43. Of course, Plaintiffs' conspiracy theory of BOEM as a strong-man has no record basis and clashes with Plaintiffs' other conspiracy theory painting BOEM as a regulatory puppet, acceding to Vineyard Wind's every demand. *See*, *e.g.*, Doc. No. 67 at 29 (Vineyard Wind dictated that the Final EIS would not consider any federal purpose); *id.* (BOEM "impermissibly acquiesced to Vineyard Wind's major policy decisions"); *id.* ("Vineyard Wind decided unilaterally" against "reorienting and respacing its wind turbine array"); *id.* ("BOEM acquiesced to Vineyard Wind's refusal to budge on transit lanes").[10]

Well established NEPA law makes clear that a purpose and need statement need only "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. *See also Allen v. Nat'l Insts. of Health*, 974 F. Supp. 2d 18, 37 (D. Mass. 2013) (purpose and statement need only be

---

[10] Amazingly, Plaintiffs argue that "BOEM itself acted as the project's sponsor" while claiming in the very same paragraph that BOEM purportedly "acced[ed] to Vineyard Wind's threat to abandon the project." Doc. No. 90 at 44-45. Of course, as with Plaintiffs' other theories, there is no record basis for any of these allegations.

reasonable and avoid unreasonably narrowing the alternatives considered under NEPA). The resulting range of alternatives considered is guided by a rule of reason. *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 742-43 (2d Cir. 1983). Plaintiffs identify no relevant alternatives that BOEM excluded because of a purportedly improper purpose and need statement. Instead, they complain that BOEM should have considered alternative locations (which BOEM already did under the Lease EA, *see* Section VII.A, *supra*) and should not have approved the Project at all, *Allen*, 974 F. Supp 2d at 43-45, a question unrelated to the scope or reasonableness of the purpose and need statement.

    D.  The Final EIS Properly Analyzed Impacts to Commercial Fishing

       Plaintiffs' complaints about the severity of harm to commercial fishing, Doc. No. 90 at 45-46, misunderstand both NEPA's obligations and the Court's scope of review. NEPA requires agencies to "take a 'hard look' at environmental consequences" that may result from federal actions but "NEPA itself does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal quotations omitted). Here, the Federal Defendants discussed how the Final EIS provided an extensive analysis of the potential impacts to commercial fishing. Doc. No. 73 at 25-27. In response, Plaintiffs raise only a cursory and unsupported claim that the Final EIS did not provide "enough" analysis on unspecified aspects of commercial fishing impacts,[11] while continuing to wrongly claim that the Federal Defendants concluded that the area will be entirely abandoned to commercial fishing. Doc. No. 90 at 45-46.[12]

---

[11] Plaintiffs cite to various pages of their opening brief as purported showing that the Federal Defendants "did not engage in 'detailed and careful analysis,' but rather applied the hurry-up principles of Smart From The Start." Doc. No. 90 at 46 (citing Doc. No. 67 at 23-25, 28-29, 34-41, 47-48). However, none of these cited pages discuss BOEM's  analysis of commercial fishing impacts.

[12] As the Federal Defendants explained, no agency ever concluded that the entire project area would be abandoned by commercial fishermen, nothing in the record could support such a conclusion, and the U.S. Army Corps of Engineers corrected the error that Plaintiffs repeatedly

However, even if the Final EIS had concluded that commercial fishermen would abandon the area, there would be no NEPA violation. An agency may proceed with an action even if there will be adverse impacts: "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. Since Plaintiffs declined to identify any aspect of the Final EIS' analysis of commercial fishing impacts that was incomplete or inadequate, their claim must fail.

### E. The Final EIS Appropriately Analyzed Other Potential Environmental Impacts

The Federal Defendants explained that, contrary to Plaintiffs' allegations, the Final EIS provides an extensive analysis of other environmental impacts, including potential impacts to the benthic environment, fish species, marine mammals, and sea turtles. Doc. No. 73 at 28. Plaintiffs did not respond to these arguments other than to declare, without any supporting argument or record evidence, that "NEPA requires more than a cursory look at environmental impacts." Doc. No. 90 at 46.

### F. Federal Defendants Had no Obligation to Wait Until NMFS Completed the October 2021 Biological Opinion

The Federal Defendants provided an extensive analysis of why BOEM was fully justified in approving Vineyard Wind's COP while ESA consultation for fisheries monitoring surveys was ongoing. Doc. No. 73 at 28-31. Further, Vineyard Wind argued that Plaintiffs' challenge to the 2020 BiOp is moot as it was superseded by its successor in October 2021, no longer has any legal effect, and to the extent Plaintiffs are seeking a re-initiation of consultation to cure any purported

---

quote. Doc. No. 93 at 11-12, 30-31; Doc. No. 73 at 43-44. Sea Freeze itself admitted that "other mobile gear fishing members have indicated that they will be able to operate if the turbines are oriented in an east-west layout." USACE_AR_004855. Thus, there is no record support for Plaintiffs' allegation.

defect, that consultation was already completed and resulted in the October 2021 BiOp. Doc. No. 87 at 9, 18. Plaintiffs responded by abandoning their opening brief arguments (that BOEM issued the Final EIS, ROD, and COP approval "based on incomplete and inadequate data"), Doc. No. 67 at 37, to now claim that the 2021 BiOp "has no bearing on this suit, and the Plaintiffs have already moved for it to be stricken from the record." Doc. No. 90 at 50.

Plaintiffs overlook two key facts. First, Plaintiffs' complaint sought judicial review of the 2021 BiOp, Doc. No. 1 ¶¶ 140-41, 191-92, 205-18, and despite their various arguments to the contrary, it is the only BiOp that can be subject to judicial review. Second, this Court has, to date, rightfully declined to strike the 2021 BiOp from the administrative record. But even if it did, striking the 2021 BiOp from the administrative record is not the same as vacating it. Even if the Court grants Plaintiffs' motion, the 2021 BiOp would continue in effect and the 2020 BiOp would remain inoperative. At the end of the day, the Federal Defendants' arguments on why it was legally permitted to issue federal approvals while consultation with NMFS was ongoing stand unrebutted, and Vineyard Wind's arguments that the 2020 BiOp is not subject to judicial review are also unrebutted. Thus, even if the Court granted Plaintiffs' motion to strike, their claims would still fail.

**VI.    Vineyard Wind and the Federal Defendants are Entitled to Summary Judgment on All Claims Not Raised in Plaintiffs' Motion for Summary Judgment**

Plaintiffs do not dispute that they abandoned the Sixth, Seventh, Eighth, Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, and Sixteenth claims raised in their complaint. Doc. No. 87 at 24. Plaintiffs, however, assert that "a careful review of RODA's MSJ brief shows that RODA's arguments" that Plaintiffs claim to adopt by reference "cover issues that fall within Plaintiffs' Clean Water Act claims." Doc. No. 90 at 51. Vineyard Wind's motion provided that "careful review," demonstrating that RODA raised different claims involving different regulations. Doc. No. 87 at 25. Plaintiffs' general denial leaves Vineyard Wind's argument unrebutted. Vineyard

Wind and Federal Defendants are also entitled to summary judgment on Plaintiffs' eighteenth, nineteenth, and twentieth claims because no party briefed them.

The same is true of Plaintiffs' MMPA claims. Although Plaintiffs adopted the MMPA arguments raised in *Melone v. Coit*, Case No. 21-cv-11171-IT, Vineyard Wind's motion showed that the claims briefed in *Melone* were different from those in Plaintiffs' complaint (with one exception). Doc. No. 87 at 26. *Melone*'s claims assert that BOEM (not NMFS, as Plaintiffs alleged in their Twenty-First Claim for Relief, Doc. No. 1 ¶¶ 266-71) violated the MMPA by approving the COP (not the Incidental Harassment Authorization, as Plaintiffs alleged). Plaintiffs, however, claim this bait-and-switch is justified because it is "obvious" that both BOEM and NMFS are defendants in this case and because Plaintiffs allege, for the first time anywhere, that BOEM violated the MMPA. Doc. No. 90 at 52. Thus, Plaintiffs not only conceded they abandoned their Twenty-First Claim for Relief, but Vineyard Wind's argument that Plaintiffs largely abandoned their Twenty-Second Claim is unrebutted.

To hold otherwise would violate Federal Rule of Civil Procedure 15(a)(2). At this stage of the litigation Plaintiffs may only amend their complaint to raise new claims "with the opposing party's written consent or the court's leave." There is ample case law prohibiting parties from attempting to constructively amend complaints through summary judgment briefing. *See, e.g.*, *Calvi v. Knox Cnty.*, 470 F.3d 422, 431 (1st Cir. 2006) (plaintiffs may not "raise new and unadvertised theories of liability for the first time" in summary judgment briefing); *Roberts v. Crowley*, 538 F. Supp. 2d 413, 417 (D. Mass. 2008) ("It hardly bears worth mentioning that a plaintiff cannot raise a theory of liability for the first time in a memorandum in support of a motion for summary judgment."). Plaintiffs neither sought nor obtained the parties' written consent or the Court's leave.

**VII.    Plaintiffs Failed to Comply with Federal Rule 56(c) or Local Rule 56.1**

Vineyard Wind provided a detailed listing of how Plaintiffs violated Rule 56(c) and Local Rule 56.1. Doc. No. 87 at 29-33. Plaintiffs did not rebut any of the 107 instances listed. Instead, they declare that an affidavit from their lawyer, discussing the Court's order for the parties to provide a joint statement of facts once briefing concludes, explains how "Plaintiffs complied fully with this Court's orders regarding such statement." Doc. No. 90 at 54. This is a puzzling defense given that the parties have not yet submitted a joint statement and Plaintiffs never explain what purportedly excuses them from compliance with Rule 56(c) and Local Rule 56.1. Thus, they fall back on general denials and accuse Vineyard Wind of not being truthful with the Court about Plaintiffs' random use of record citations ("the assertion is false"). *Id.* Their "proof" is the lawyer's affidavit, which both admits to, and denies, "scrivner's errors," *id.* (citing Mighell Decl. ¶¶ 17-19), but does not otherwise address, much less refute, Vineyard Wind's demonstration that specific statements in Plaintiffs' Statement of Material Facts failed to comply with Federal Rule 56(c) and Local Rule 56.1.[13]

**VIII.    Disclosure and Report Requirements Do Not Apply to Mr. Scott's Declaration**

Plaintiffs incorrectly claim that, prior to offering the declaration of Mr. R. Douglass Scott, Ph.D, P. Eng., Federal Rule of Civil Procedure 26(a)(2) required Vineyard Wind to disclose his name and a written report of his opinions to Plaintiffs. Plaintiffs apparently fail to realize that these

---

[13] In a footnote, Plaintiffs ask the Court to strike "the arguments made in Doc. No. 87 at 38-40, or, in the alternative, to strike" the entire brief. Doc. No. 90 at 54, n. 12. Setting aside that Vineyard Wind's motion does not contain pages 38-40, Vineyard Wind admits it mistakenly exceeded the 30-page limit by three pages. For this, Vineyard Wind apologizes to the Court and has limited this brief to 23 pages instead of the 30 pages it would otherwise have. Doc. No. 65. However, even if the Court struck the excess pages, the argument that Plaintiffs failed to comply with Rule 56(c) and Local Rule 56.1 would stand, as it ended at page 29. Nevertheless, even if the Court strikes the argument entirely, it is free to raise Plaintiffs' non-compliance with the Federal and Local Rules, *sua sponte. Vazquez-Rijos v. Anhang*, 654 F.3d 122, 127 (1st Cir. 2011).

requirements only apply to "any witness" a party "may use <u>at trial</u> to present evidence." Fed. R. Civ. P. 26(a)(2)(A) (emphasis added); *see also* Rule 26(a)(2)(B) (report requirement applies only to witness subject to "this disclosure"). This matter will be decided without a trial.

## CONCLUSION

For the foregoing reasons, Intervenor-Defendant Vineyard Wind asks this Court to deny summary judgment to Plaintiff and grant summary judgment to Vineyard Wind.

Dated: March 10, 2023                                                  Respectfully submitted,

David T. Buente, Jr. (*pro hac vice*)                 /s/ Jack W. Pirozzolo
Peter C. Whitfield (*pro hac vice*)                     Jack W. Pirozzolo (BBO # 564879)
James R. Wedeking (*pro hac vice*)                  Sidley Austin LLP
Brooklyn Hildebrandt (*pro hac vice*)              60 State Street, 36th Floor
Sidley Austin LLP                                               Boston, MA 02109
1501 K Street, N.W.                                           (617) 223-0304
Washington, D.C. 20005                                   jpirozzolo@sidley.com
(202) 736-8000
dbuente@sidley.com
pwhitfield@sidley.com
jwedeking@sidley.com
bhildebrandt@sidley.com

*Counsel for Vineyard Wind 1 LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 10th day of March 2023, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record for Plaintiffs and Defendants via the Court's electronic filing system.

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo
