UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SEAFREEZE SHORESIDE, INC., et al,          )
                                           )
          Plaintiffs,                      )
                                           )
     v.                                    )
                                           )
THE UNITED STATES DEPARTMENT OF THE        )
INTERIOR, et al.,                          )
                                           )
          Defendants,                      )
                                           )   Civil Action No.
     and                                   )   1:22-cv-11091-IT
                                           )
VINEYARD WIND 1, LLC,                      )
                                           )
          Intervenor-Defendant;            )          and
                                           )
     and                                   )
                                           )
RESPONSIBLE OFFSHORE DEVELOPMENT           )   Civil Action No.
ALLIANCE,                                  )   1:22-cv-11172-IT
                                           )
          Plaintiff,                       )
                                           )
     v.                                    )
                                           )
THE UNITED STATES DEPARTMENT OF THE        )
INTERIOR, et al.,                          )
                                           )
          Defendants,                      )
                                           )
     and                                   )
                                           )
VINEYARD WIND 1, LLC,                      )
                                           )
          Intervenor-Defendant.            )
_____

BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


MOTION HEARING


Monday, April 3, 2023
2:07 p.m.


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

1                          **A P P E A R A N C E S**

2

   On behalf of the Plaintiffs:

3

        TEXAS PUBLIC POLICY FOUNDATION
4       BY:  THEODORE HADZI-ANTICH
              CONNOR WILLIAM MIGHELL
5       901 Congress Avenue
        Austin, TX  78701
6       (512) 472-2700
        tha@texaspolicy.com
7       cmighell@texaspolicy.com

8

        LAWSON & WEITZEN, LLP
9       BY:  IRA H. ZALEZNIK
        88 Black Falcon Avenue
10      Suite 345
        Boston, MA  02210
11      (617) 439-4990
        izaleznik@lawson-weitzen.com

12

13      MARZULLA LAW, LLC
        BY:  ROGER J. MARZULLA
14      1150 Connecticut Avenue NW
        Suite 1050
15      Washington, DC  20036
        (202) 822-6760
16      roger@marzulla.com

17

18   On behalf of the Defendants:

19      UNITED STATES DEPARTMENT OF JUSTICE
        BY:  LUTHER L. HAJEK
20            MARK BROWN
              PERRY M. ROSEN
21      999 18th Street, South Terrace
        Suite 370
22      Denver, CO  80202
        (303) 844-1376
23      luke.hajek@usdoj.gov
        mark.brown@usdoj.gov
24      perry.rosen@usdoj.gov

25

```
 1    On behalf of the Intervenor-Defendant:

 2        SIDLEY AUSTIN LLP
          BY:  JACK W. PIROZZOLO
 3             DAVID T. BUENTE
               JAMES WEDEKING
 4             BROOKLYN HILDEBRANDT
          60 State Street
 5        36th Floor
          Boston, MA  02109
 6        (617) 223-0300
          jpirozzolo@sidley.com
 7        dbuente@sidley.com
          jwedeking@sidley.com
 8        bhildebrandt@sidley.com

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1  (In open court at 2:07 p.m.)

2  THE DEPUTY CLERK:  United States District Court is

3  now in session, the Honorable Indira Talwani presiding.

4  This is Civil Action Number 22-11091, Seafreeze

5  Shoreside, Inc., et al., versus United States Department of

6  the Interior, et al., and Civil Action 22-11172, Responsible

7  Offshore Development Alliance versus the United States

8  Department of the Interior, et al.

9  Will counsel please identify yourselves for the

10  record.

11  MR. HADZI-ANTICH:  Good afternoon, Your Honor.

12  Theodore Hadzi-Antich for the Seafreeze plaintiffs.  I'm

13  joined at counsel's table by co-counsel Connor Mighell and

14  local counsel Ira Zaleznik.

15  THE COURT:  Good afternoon.

16  MR. MARZULLA:  And good afternoon, Your Honor.  I

17  am Roger Marzulla representing the Responsible Offshore

18  Development Alliance, and Mr. Zaleznik is also local counsel

19  for my client.

20  THE COURT:  Good afternoon.

21  MR. MARZULLA:  Good afternoon, Your Honor.

22  MR. HAJEK:  Good afternoon, Your Honor.  Luke Hajek

23  of DOJ on behalf of the federal defendants, and I have a

24  number of DOJ counsel and agency counsel with me.  I'd like

1    them to just briefly identify themselves.

2           MR. VORKOPER:  Stephen Vorkoper, Department of

3    Interior.

4           MR. BROWN:  Good afternoon, Your Honor.  Mark

5    Brown, Department of Justice.

6           MR. ROSEN:  Your Honor, Perry Rosen, Department of

7    Justice.

8           MR. HARRIS:  Your Honor, Matthew Harris, US Army

9    Corps of Engineers.

10          MS. WILLIAMS:  Julie Williams, NOAA Office of the

11   General Counsel.

12          THE COURT:  Good afternoon.

13          MR. PIROZZOLO:  Good afternoon, Your Honor.  Jack

14   Pirozzolo on behalf of Vineyard Wind.  And with me at counsel

15   table are David Buente, Jim Wedeking, Brooklyn Hildebrandt;

16   and also present in the courtroom are Klaus Moeller, CEO of

17   Vineyard Wind, Jennifer Simon, who is general counsel, and

18   Geri Edens, who's also counsel for Vineyard Wind.

19          THE COURT:  Good afternoon.

20          MR. PIROZZOLO:  Good afternoon.

21          MR. BUENTE:  Good afternoon.

22          THE COURT:  So we're here on a number of different

23   motions.  I have to start by saying I regret my order

24   allowing the increased page limits.  I don't -- I don't feel

25   like this has been an effort to bring forward everybody's

1    most succinct and direct way of addressing arguments, and I

2    hope we can do better during the hour and 20 minutes more,

3    which is what I have allotted for today.

4            A couple of housekeeping matters -- the Jones Act

5    claim is gone; is that correct?

6            MR. MARZULLA:  That is correct, Your Honor.  We do

7    not plan to address the Jones Act claim.

8            THE COURT:  Well, not just not planning to address

9    it; you're conceding it, correct?

10            MR. MARZULLA:  Yes, Your Honor.

11            THE COURT:  Thank you.

12            With regard to standing, the individual, at least

13    one, and I guess several of the individual fishing companies,

14    are members of the organizations that are plaintiffs,

15    correct?

16            MR. MARZULLA:  Yes, Your Honor.  That is correct.

17    A number of the named plaintiffs in Seafreeze are also

18    members of the Responsible Offshore Development Alliance.

19            THE COURT:  And, therefore, factor into the

20    standing analysis, correct, for Responsible?

21            MR. MARZULLA:  Yes, Your Honor.  It does go to

22    member standing, independently of the organizational

23    standing; that is, if the member has standing, then so does

24    the organization.

25            THE COURT:  So let me ask you this question:  If I

1    want to clog up the courts, why not join ten different

2    organizations and have each of them file a separate lawsuit?

3            MR. MARZULLA:  Well, that certainly was not our

4    intent in this case, Your Honor.

5            THE COURT:  Why do I have two actions here?  Other

6    than the lawyers for both sides -- both sets of plaintiffs

7    want to both get paid.  But short of that, why do I have two

8    actions?

9            MR. MARZULLA:  Your Honor, we were retained by the

10   alliance.  We were not contacted or retained by any of the

11   individuals who will sought their own independent counsel.

12   So beyond that fact, I think that Mr. Hadzi-Antich would have

13   to speak to why the individuals might have brought their own

14   lawsuit.

15           MR. HADZI-ANTICH:  If I may, Your Honor, I'm with a

16   not-for-profit organization, the Texas Public Policy

17   Foundation, so we have no pecuniary interest in this

18   litigation.

19           We were approached by a number of commercial

20   fishing companies as well as their trade associations to

21   represent them in connection with this matter, and we took a

22   very hard look at this very big and complex litigation and

23   decided to take it on a pro bono basis.

24           THE COURT:  Why was the motion to consolidate not

25   renewed once it was transferred to my court?

```
 1              MR. HADZI-ANTICH:  I will apologize, Your Honor.  I
 2      don't remember a motion to consolidate.
 3              THE COURT:  There was a motion to consolidate filed
 4      before it was transferred here.  It was denied without
 5      prejudice.  Am I wrong about that?  I believe it was denied
 6      without prejudice to be addressed, if you wanted to address
 7      it, once you came here.  No?
 8              MR. HADZI-ANTICH:  Again, Your Honor --
 9              THE COURT:  After the transfer.
10              MR. HADZI-ANTICH:  -- that was in the District
11      Court of the District of Columbia.
12              THE COURT:  Correct.
13              MR. HADZI-ANTICH:  Honestly, I don't remember that.
14              THE COURT:  The federal defendants took the
15      position that they'd wait and see what happened with the
16      motion to transfer.  The motion to transfer was granted.  All
17      the other motions -- I think there was a motion to strike.
18      Various things have all been refiled, but the motion to
19      consolidate wasn't.
20              MR. HADZI-ANTICH:  Roger, do you want to help me
21      out on that?
22              MR. MARZULLA:  Yeah, I -- Your Honor, this does
23      reach back quite some time, but I'm certain the Court is
24      correct that we had originally moved to consolidate.  Quite
25      frankly, I'm not sure it even came to our attention once the
```

1    case was transferred, and I apologize for that.

2           THE COURT:  Yeah, I -- this (indicating) is just

3    the briefs you filed.

4           Okay.  I trust we'll have a succinct argument as we

5    go forward here.  I am -- I will start here with the

6    plaintiffs, and I don't care which amongst you wants to start

7    off, but please make sure you're not still talking in

8    15 minutes.

9           MR. HADZI-ANTICH:  Yes, Your Honor.

10          I'm going to start with standing on behalf of the

11   Seafreeze plaintiffs.  We filed declarations alleging

12   economic injuries attributable to environmental harms.  Those

13   environmental harms are set forth both in the declarations

14   and in the administrative record, and that establishes

15   standing for all of the corporate plaintiffs.

16          THE COURT:  Okay.  So on the corporate plaintiffs

17   and the Endangered Species Act, how do any of your fishing

18   members or associations have standing to raise claims under

19   the Endangered Species Act?

20          MR. HADZI-ANTICH:  I'll address that.  I should

21   have indicated that the corporate plaintiffs all established

22   standing through the declarations for purposes of NEPA and

23   the Clean Water Act.  And now to answer your question, with

24   regard to the Endangered Species Act, the -- David

25   Aripotch --

1          THE COURT:  And let me just stop you there for one

2    minute.

3          I'm -- maybe I'm old-fashioned here or something,

4    but I have this view of corporations that I learned in law

5    school, which is that they're separate entities.  They're

6    not -- even if it's a wholly owned corporation, as soon as

7    you're a corporate interest, it's that corporation.

8          So I understand that some of the people involved in

9    these corporations might have great interest in species

10   protected under the Endangered Species Act.  My question for

11   you is what interest do the corporations, the fishing

12   companies and the membership organizations that the fishing

13   companies belong to, what interest do they have that gives

14   them standing for the purposes of the Endangered Species Act?

15         MR. HADZI-ANTICH:  For purposes of the Endangered

16   Species Act, David Aripotch, who happens to be the owner and

17   president of Old Squaw Fisheries filed two declarations.

18         THE COURT:  I read his declarations.  He says, "I

19   have these beliefs."  My question or -- or these interests or

20   these loves, whatever.

21         My question isn't what the owner of a corporation

22   has an interest in.  My question is the corporation -- you

23   get all the privileges as a corporation, as an independent

24   person, independent from that owner.  So my question for you

25   is what interest does the corporation have under the

1    Endangered Species Act?

2            MR. HADZI-ANTICH:  The corporation, as a

3    corporation, does not have an interest.  My point is that

4    David Aripotch is a member of the Long Island Fishing

5    Commercial Association, in his individual capacity, as well

6    as Old Squaw Fisheries, Inc., in its corporate capacity.

7    We've got two different declarations from Mr. Aripotch to

8    that effect as well as a declaration from the executive

9    director --

10           THE COURT:  And the member -- and the Long Island

11   fishing association, which he is a member of, has what

12   interest in the Endangered Species Act?

13           MR. HADZI-ANTICH:  As Ms. Brady, the executive

14   director of -- I'll refer to it as LICFA -- stated in her --

15   in her declarations, Long Island Commercial Fishing

16   Association since its inception has supported and advocated

17   for clean, fishable waters free from pollution so that LICFA

18   members can pursue their livelihoods as commercial fishermen

19   and that the presence and good health of and access to marine

20   life in the Vineyard Wind area is vital to LICFA's members.

21   That's set forth in Ms. Brady's declaration in connection

22   with the motion for summary judgment at paragraphs --

23           THE COURT:  So let's move on.  That doesn't get you

24   Endangered Species Act.  It's pretty specific.  The *Lujan* --

25   you cannot get past the requirements of those statutes with

1   that.  Why don't we move on to the other environmental -- I

2   think the Endangered Species is pretty well articulated by

3   the Supreme Court, and you don't get there.

4           But let's talk about the others.

5           MR. HADZI-ANTICH:  Well, with regard to NEPA and

6   the Clean Water Act --

7           THE COURT:  Sure.

8           MR. HADZI-ANTICH:  -- standing?

9           THE COURT:  Well, actually, on the Clean Water Act,

10  is there a challenge to standing on the Clean Water Act?

11          MR. BUENTE:  No, Your Honor.

12          THE COURT:  I didn't think so.  So I don't think

13  we're talking about the Clean Water Act.  And I don't think

14  there's a challenge to standing under the Outer

15  Continental -- OCSLA statute either, correct?

16          MR. HAJEK:  Correct.

17          THE COURT:  So for standing, we're talking about

18  NEPA and MPA.

19          MR. HADZI-ANTICH:  So specifically focusing on

20  NEPA, the declarations alleging economic injuries

21  attributable to environmental harms, those environmental

22  harms are set forth in the administrative record and in the

23  declarations.  They establish standing for all of the

24  corporate plaintiffs, under *Aberdeen*, under *Conservation Law*

25  *Foundation*, and under *Monsanto*.

```
 1              THE COURT:  So I think that's fully briefed, and I
 2    can take that under advisement.  Let's move on to the
 3    further -- I guess we should just go through -- clear through
 4    some of the further initial hurdles.
 5              Under the Clean Water Act, I believe, the
 6    government takes the position -- the federal defendants take
 7    the position that you failed to comment with regard to the
 8    permit in advance of the permit being issued.  Is there any
 9    disagreement about that?
10              MR. HADZI-ANTICH:  No disagreement on that.  We did
11    not comment with regard to the Army Corps of Engineers'
12    permit.  However --
13              THE COURT:  Which is the basis of the Clean Water
14    Act claims, correct?
15              MR. HADZI-ANTICH:  With regard to the specifics on
16    the Clean Water Act claims, I'll need to defer to
17    Mr. Marzulla.  But with regard to the issue of commenting,
18    certainly, none of the Seafreeze plaintiffs commented on the
19    proposed Army Corps of Engineers' issuance of the permit.
20              This, though, is a citizen suit provision under the
21    Clean Water Act; and in connection with that citizen suit
22    provision, we filed a 60-day notice informing the federal
23    defendants of our Clean Water Act concerns.  That served as
24    notice that's comparable to the notice in the APA with regard
25    to APA issues.  This is a citizens suit provision case under
```

1    the Clean Water Act.

2            And moreover, at the time when the public comment

3    period was present for that permit by the Court, at that

4    time, none of the plaintiffs knew that this permit was part

5    and parcel of the overall Vineyard Wind project that was

6    being reviewed at that time by the federal defendants.

7            So to the extent that there is -- there's an issue

8    out there that we did not comment during that comment period,

9    the federal register notice setting forth or asking for

10   comments did not basically inform, did not give the public a

11   reasonable heads-up, if you will, that this permit was part

12   of this specific project.

13           And I think that, under those circumstances, the

14   60-day notice under the -- under the citizens suit provision

15   should be sufficient.

16           THE COURT:  Maybe before we get to the -- maybe

17   I'll stop you there.  Let me get responses on the standing

18   and on the 60-day notice, and then we'll come back on the

19   merits of whatever claims we need to address.

20           MR. ROSEN:  Your Honor, there's no 60-day notice

21   requirement to challenge a permit under the Clean Water Act

22   at all.  The requirement is to submit comments.  The Corps

23   put out a request for comments --

24           THE COURT:  And let me just stop you there.  The

25   60-day notice that we're talking about is, for example, under

1    the Endangered Species Act.

2              MR. ROSEN:  That's correct.

3              THE COURT:  Before you're allowed to bring a claim,

4    you have to give notice of the claim.  There is no parallel

5    provision for that.

6              MR. ROSEN:  There is not.  And it's very clear in

7    the regulations.  It's very clear in the case law of the

8    First Circuit that you have to submit comments to have any

9    claim to come to court, and they did not do that at all.

10             And as to -- as to being misled or something like

11   that, their only claim in this case is as to their claim

12   under the Clean Water Act, not the Rivers and Harbors Act.

13   That's the first 23 miles.  That's exactly what it says in

14   the proposal for comments.  That's exactly what it says in

15   all of the Corps documents.

16             And a mistake was made.  They didn't talk about the

17   rest of the cable, but that's their only claim here.  So the

18   proposal asked for comments like that.  They got -- the Corps

19   got comments from no parties at all, and that claim has been

20   clearly waived under the law of this circuit.

21             THE COURT:  And I think they're suggesting that the

22   case law that they cited is to the contrary.

23             MR. ROSEN:  Is -- I'm sorry?

24             THE COURT:  To the contrary.  They're suggesting

25   that that gives them the basis to be able to proceed despite

1    the absence of comments.

2        MR. ROSEN:  There is no case law -- there is

3    Supreme Court cases.  There's First Circuit cases.  There's

4    no case law to get around the fact that there's notice

5    requirement.

6        And this was a sophisticated party.  RODA itself

7    talks about in its briefs that it submits comments about

8    these issues to the government all the time.  From pages 8

9    and 11 of their brief, they lay out the fact that they always

10    submit comments.  They failed to do so here.

11        And this is the core -- the comment requirement is

12    the core of the administrative process.  It gives the agency

13    a chance --

14        THE COURT:  So there are --

15        MR. ROSEN:  -- to address their claims.  And, in

16    fact, in other aspects of this, the federal agencies

17    specifically address the claims about the fishing and changed

18    the project because of that.  There's no --

19        THE COURT:  So their argument, though, is that they

20    didn't give comments because they didn't know it was

21    happening.  What's your answer to that?

22        MR. ROSEN:  They have to read the notice asking for

23    public comments.  It's right there.  It's --

24        THE COURT:  They're saying, "Well, we didn't

25    realize this had anything to do with the wind project."

1          MR. ROSEN:  Well, I don't know how that's possible.

2    The comments were for the cable for the wind project.

3          THE COURT:  With regard to the standing question --

4    I don't need to hear anything more on the ESA -- but on the

5    other environmental challenges --

6          MR. HAJEK:  Just briefly on NEPA, Your Honor, the

7    first point I would make is the one that Your Honor was

8    making.  The suits were brought by commercial fishing

9    businesses, not individual ship captains.  They were not

10   named plaintiffs, and so the individual aesthetic

11   environmental interest of those ship captains are not

12   relevant to the standing analysis.

13         THE COURT:  What about the argument that, well, our

14   members include individuals and not just companies?

15         MR. HAJEK:  I don't -- I didn't realize that there

16   were individuals listed in the -- in the Seafreeze complaint.

17   If --

18         THE COURT:  No, individual members of the --

19   individuals members of the organizational plaintiffs --

20         MR. HAJEK:  Of RODA?

21         THE COURT:  -- associational plaintiffs.  I don't

22   think it was RODA.  It was of the other one.

23         MR. HAJEK:  The Long Island --

24         THE COURT:  I think he's arguing Long Island

25   Commercial Fishing Association has individual members.

1          MR. HAJEK:  That was not my understanding.  My

2    understanding was that Mr. Aripotch -- I'm not sure if I

3    pronounced that correctly -- he was the captain of the

4    Old Squaw Fisheries, and Old Squaw Fisheries was a member of

5    the Long Island Coastal Fishing Association.  That's what I

6    understood.

7          THE COURT:  I'll have to go back and look at the

8    declaration, but his contention is that the declaration says

9    that the person is -- and I don't remember which person it

10   was.  Was it --

11         MR. HADZI-ANTICH:  Aripotch, Your Honor.

12         THE COURT:  But he says that he is personally

13   individually, not just his company, a member of that.  Does

14   that make a difference?

15         MR. HAJEK:  It would.  If he individually was and

16   his individual interest could be ascribed to the Long Island

17   Commercial Fishing Association, then it would make a

18   difference, but I would point out that --

19         THE COURT:  Would it matter if the associations --

20   whether this is germane to the association's purposes?

21         MR. HAJEK:  Yes, it would.  And this is a point I'm

22   sure Vineyard Wind's counsel wants to comment on, because

23   they pointed out that the Long Island fishing association is

24   actually interest- -- interested in a different location than

25   where the project would be.  So I'll let them comment further

1    on that.

2            MR. BUENTE:  That's correct, Your Honor.

3            We pointed out that the articles of incorporation

4    that surfaced late in this case were restricted to the waters

5    of the County of Suffolk and environs thereof, which is

6    65 miles west of the project, the wind development area.

7            But in addition to that, in addition to the

8    germaneness consideration, we think the declaration of the

9    ship captain insofar as it purports to raise environmental

10   harms as opposed to interference with commercial fishing is

11   defective because it's replete with assertions that there's

12   no evidence in the declarations that the ship captain is an

13   expert and able to offer, and we pointed all that out in our

14   brief.

15           THE COURT:  Okay.  This is a question, really, for

16   the defendants.  I have -- in addition to the two cases here,

17   I have the two other cases that are filed by Mr. Melone and

18   the ACK Residents Against Turbines.  It obviously makes a

19   difference to the parties involved of who gets to continue on

20   in the litigation or, if there's an appeal, who gets to

21   appeal which case.

22           But as I'm making my way legally through worrying

23   about the substantive arguments regardless of which case it

24   falls within, are there -- well, let me start, for example,

25   with the MMPA claim.

1          As I read the briefing here on the MMPA claim, it

2     simply says, "We adopt Mr. Melone's MMPA arguments."  So at

3     the end of the day, if I find Mr. Melone had standing to

4     raise the MMPA arguments and I address the MMPA arguments in

5     that case, is there anything in addition that needs to be

6     addressed that I need to -- I mean, obviously, I do -- will

7     need to address standing here because there's a question of

8     people's participation going forward.

9          But is there any substantive issue?  I would posit

10    on the MMPA there is not any substantive difference since

11    they adopted the briefing.  You would agree with that?

12         MR. BROWN:  Your Honor, with respect to the RODA

13    and Seafreeze complaints, they -- there were MMPA claims

14    included.  They did not spell out the same claims that were

15    in the -- Mr. Melone's Allco complaint.  And so they could

16    say, "Well, we adopt and incorporate that by reference," but

17    I'm not sure that they brought all of the claims.  There

18    wasn't a perfect unity, so I don't think that they would get

19    to travel under claims that Mr. Melone asserted but they did

20    not assert.

21         And as far as --

22         THE COURT:  Well, so any claims they asserted that

23    Mr. Melone didn't assert you would say at this point are

24    waived.  So the question is any claims that Mr. Melone

25    asserted that they asserted, those are one-to-one; I could

1    address.  You're saying any claims Mr. Melone asserted that

2    they didn't raise in their complaint are not properly in

3    front of me?

4              MR. BROWN:  Yes, Your Honor.

5              And as to standing, I would just point out that

6    Vineyard Wind made arguments with respect to standing and the

7    germaneness of the claims presented.  We would defer to the

8    arguments that they made and defer to them to address that if

9    you have questions about the germaneness.

10              THE COURT:  Thank you.

11              MR. BUENTE:  We did object to standing with respect

12    to the MMPA claims, and I think Your Honor's characterization

13    of standing with respect to the ESA claims carries forward to

14    MMPA.  There's very specific creatures being protected, and

15    there's no word anywhere in the plaintiffs' papers,

16    declarations, or whatever that suggests that they have --

17    their members have suffered injuries with regard to marine

18    mammals.

19              THE COURT:  Okay.  So what I would like to spend

20    the rest of the time -- I think on the ESA and the MMPA, I

21    have the briefing I have, and I'll figure that one out on my

22    own.  I think I'd like to turn to the OCSLA and CWA claims,

23    which I have nothing on those from the other cases and then,

24    to the extent we have time, address the remaining claims.

25    But I'd like to start with the OCSLA and CWA claims.

1           MR. HADZI-ANTICH:  Your Honor, the defendants'

2    misreading of OCSLA is fatal to their arguments because they

3    disregard the ordinary meaning of Section 8(p)(4) of the

4    statute.

5           The heading of the statute is the term

6    "requirements."  So the section itself requires the Secretary

7    of interior to ensure that --

8           THE COURT:  You're saying the title of the section?

9    Because I think the Supreme Court's pretty clear that I can't

10   look at captions of titles, titles of statutes to interpret

11   them.  I need to look at the text.

12          MR. HADZI-ANTICH:  It's certainly not definitive,

13   but we cite cases in the briefing that it's relevant to the

14   issue of the meaning of the actual language within that

15   section.

16          So the term used is "shall ensure," shall ensure

17   that any activity carried out under that section is done in a

18   manner that provides for a litany of requirements, including,

19   among other things, safety and protection of the environment.

20   And as the defendants, both federal and Vineyard Wind have

21   admitted those duties are not discretionary.  That's in the

22   briefing.

23          So the term "ensure" means to make sure, to make

24   certain that a certain thing occurs.  Nothing in the text of

25   OCSLA, Section 8(p)(4) permits the Secretary to balance the

1    general goal of authorizing renewable energy projects in one

2    section of OCSLA against the specific limitations that

3    Congress placed on attaining that goal in Section 8(p)(4).

4         And courts should not permit agencies to read

5    nonexisting congressional authorizations into statutes --

6    *Louisiana v. Public Service Commission*, a 1986 Supreme Court

7    case.

8         So Section 8(p)(4) stands as an express limitation

9    on the Secretary's authorization to issue leases and approve

10   COPs in connection with renewable energy projects.  And that

11   section directly and expressly limits the Secretary's power

12   to authorize such projects.

13        The federal defendants argue in the briefing that

14   BOEM struck a reasonable balance.  Those arguments are

15   meritless because nothing in Section 8(p)(4) authorizes the

16   agency to conduct a balancing test to evade the

17   nondiscretionary duties imposed by that section in OCSLA.  So

18   in conducting such a balancing test, the Secretary exceeded

19   her authority under OCSLA and acted in an ultra vires

20   fashion.

21        There's a regulation cited by the federal

22   defendants, 30 CFR 585.621, that impermissibly -- the

23   regulation itself impermissibly adds the modifier

24   "unreasonably" to the statutory language.  And that modifier

25   is not in the text of Section 8(p)(4); and, therefore, that

1    modifier itself as set forth in the CFR is ultra vires on the

2    part of the agency.

3            Now, the federal -- I'm sorry, Your Honor.

4    Vineyard Wind takes another approach in its -- in its papers,

5    and that approach is that -- just one moment, Your Honor.

6            They argue that the term "provide for" -- and

7    that's also included in the introductory clause of

8    Section 8(p)(4), they agree that term modifies the term

9    "ensure" so that the term "ensure" only means that the

10   Secretary must ensure not safety, not protection of the

11   environment, but only to make ready to take measures in

12   preparation for ensuring safety and the protection of the

13   environment.

14           Under Vineyard Wind's reading, all the Secretary

15   need do is ensure she has taken measures in preparation for

16   safety and the protection of the environment without actually

17   protecting safety and the environment.  And Vineyard Wind

18   cites no legal authority for such a stilted reading of

19   Section 8(p)(4), which would mandate --

20           THE COURT:  You're saying it's an absolute, that

21   there's no -- there's no reasonableness, there's no

22   balancing, there's -- it's an absolute bar.  If there is any

23   concern for any one of these factors, it can't be approved?

24           MR. HADZI-ANTICH:  I'm saying that with regard --

25   with specific reference to the record, the final

1    environmental impact statement and the record of decision,

2    what they've provided for in terms of protection of safety

3    and the environment is not enough to make sure that safety

4    and the environment are protected.

5            THE COURT:  But just to understand your argument,

6    before I get to how they applied it, you're saying, as a

7    matter of statutory interpretation, there's no room for

8    anything other than, essentially, perfection on safety and

9    environment on these things?  There's no balancing, there's

10   no reasonableness, there's no modifying word at all?

11           MR. HADZI-ANTICH:  There's no modifying word at all

12   in the statute.  There is no balancing.  There is no

13   reasonableness in the statutory language.

14           Here, no matter if you use the "make sure" standard

15   or put in the word "reasonably" and call it the "make

16   reasonably sure" standard, this FEIS and record of decision

17   does not meet either standard.  I'm going to give you some

18   examples, if I may.

19           So with regard to noise --

20           THE COURT:  Are there ones that are already here

21   that I've gone through?

22           MR. HADZI-ANTICH:  I'm sorry?

23           THE COURT:  Are there ones that you have given me

24   in the briefing?

25           MR. HADZI-ANTICH:  I just wanted -- wanted to, if I

1    may, just summarize our position that --

2            THE COURT:  Summarize is fine.  You were going to

3    give me examples, and I've got loads of examples, so I

4    thought you were summarizing.

5            MR. HADZI-ANTICH:  I wanted to pick out five

6    specific examples, if I may, that either -- under the ensure

7    standard or the reasonably ensure standard this FEIS and ROD

8    doesn't cut it.

9            So, first, noise from turbines set forth in

10   BOEM_110390, electromagnetic frequency impacts on all living

11   things in the water, 11100388, adverse impacts on benthic

12   species.

13           THE COURT:  So I guess what I'm a little bit --

14   before we spend too much time on it, I don't think -- maybe

15   I'm wrong.  Maybe they'll argue to the contrary, but I don't

16   think they're going to argue that they hit perfect here.  So

17   I don't think we have to have debate about whether this is a

18   perfect situation.

19           I think the question that I'd rather hear more

20   about is how -- your understanding of how this statute --

21   what it means and how -- how -- you're, essentially, saying,

22   I think, that the regulation is invalid.  So I'm sort of more

23   interested in the statutory construction, the regulatory

24   construction, because if you're right, the rest of it is

25   easy.  If you say it has to be perfect, we can go through

1    what's not perfect.  Maybe they'll say they hit perfect, but

2    I don't think so.

3        I think the question is, is that -- is that the

4    standard we're working on, or are we working on something

5    different?  And if that's the standard, how -- that's not

6    generally the way the standards are in most -- most statutes

7    passed by Congress.  So help me with how we get there.

8        MR. HADZI-ANTICH:  Sure.  So I'm not saying that

9    perfection is required by Section 8(p)(4).  What I am saying

10   is the term "reasonably" cannot be read into Section 8(p)(4).

11       THE COURT:  Okay.  So reasonably is not read in,

12   but you concede it's not perfection.  How do I read it?  What

13   do I read that statute to say?

14       MR. HADZI-ANTICH:  You should read it, Your Honor,

15   as answering the question, did the federal defendants make

16   sure to provide for safety on the open seas and protection of

17   the environment?

18       With reference to the record -- and we've got all

19   the citations in the briefing, you're right -- they did not

20   make sure to protect safety and protection of the

21   environment.

22       THE COURT:  But you're -- I feel like it's a little

23   bit unhelpful here for me, because what you're -- what you

24   want me to say or find, I think, sounds like perfection; but

25   you're saying, no, that's not what it is.  So I still need

1  some help on what -- what the -- what the government was, in

2  your view, supposed to do, not how did they fail in what they

3  did, but what is it you think they were supposed to do.

4          MR. HADZI-ANTICH:  Let me give you a few examples,

5  if I may.  They were supposed to ensure that commercial trawl

6  fishing boats could continue to use the Vineyard Wind area as

7  their traditional fishing ground for squid.  They were

8  supposed to ensure to do that.  They didn't ensure that

9  because of the placement of the turbines one mile apart from

10  each other, the relative placement of the cables going into

11  the turbines, and the fact that within the confines of this

12  75,000-acre project, not only is fishing not going to happen

13  anymore with regard to trawl fishing operations, but they --

14  these commercial fishing companies won't even have passage

15  through them in order to maintain safety.

16          Their nets would be hung up on the obstacles

17  created by the turbines, by the bases, and by the scour

18  protection over the cables and the bases of the turbines.  So

19  they didn't provide for safety there.  They didn't make sure

20  that fishing could continue in that area in a safe way;

21  therefore, they didn't provide for safety.

22          And that's an example of what I mean that it's not

23  so much an absolutist, you know, under every conceivable

24  scenario, but it comes down to the issue, given what they've

25  said in the final environmental impact statement and in the

1    record of decision.  They didn't make sure to provide for

2    safety for commercial fishing operations.

3            And the -- you know, Your Honor has a motion

4    pending with regard to -- it's a motion to strike the

5    language that amends the ROD, the statement in the ROD that

6    says commercial fishing will cease as a result of the

7    construction and operation of the project.

8            THE COURT:  I'm anticipating denying that motion.

9    If you want to respond to their opposition to that motion,

10   you're welcome to, but at this point, I'm anticipating -- I

11   don't mean in writing; I mean, right now, if you have some

12   further argument you want to make -- I found their opposition

13   to your motion compelling there.

14           MR. HADZI-ANTICH:  Well, Your Honor, you have a

15   record of decision that was finalized in May of 2021.

16           THE COURT:  And then, turns out, there's a -- what

17   they view as a typo, and it's based on a statement that's

18   being attributed to the government which was a comment.  And

19   so they say that's corrected.  And why is that not okay?

20           MR. HADZI-ANTICH:  Well, they say it's corrected,

21   but, Your Honor, the record of decision is the final agency

22   action under NEPA, and that final agency action --

23           THE COURT:  Even if it has typos, can't get

24   corrected?

25           MR. HADZI-ANTICH:  There's no proof that it was a

1    typo.  All they did was they submitted this two-page document

2    saying that this is a clarification of what the record of

3    decision said.

4              It was done eight months, maybe more like nine

5    months, after the record of decision came out.  And just as,

6    importantly, it was done 30 days after we filed our

7    complaint.  And in the complaint, we highlighted that

8    statement from the record of decision and so --

9              THE COURT:  But it was a statement that they --

10   there's nothing else in there to point that it was anything

11   but a clerical mistake, correct?

12             MR. HADZI-ANTICH:  Every --

13             THE COURT:  They don't go through there saying,

14   "We've thought about this hard, and this is how we're landing

15   on this question."

16             MR. HADZI-ANTICH:  Everything points to the fact

17   that it could not have been a clerical mistake on something

18   that important that, you know, an admission, essentially,

19   that they did not provide for safety under Section 8(p)(4)

20   because commercial fishing operations would cease in the area

21   in the entire 75,000-plus acre area.

22             That --

23             THE COURT:  Which is a huge deal.  You're right.

24             MR. HADZI-ANTICH:  It's huge.

25             THE COURT:  It's a huge deal.  But why does that

1  make it more likely that it's not a typo than more likely

2  that it is a typo?  They're doing all of this thing, and then

3  at the end --

4           You know, you've written a brief, haven't you,

5  where you say the whole thing, and at the end, you say -- you

6  want to say the motion should not be granted, and instead you

7  say the motion should be granted?  It's happened to all of us

8  at some point, right?

9           MR. HADZI-ANTICH:  It's an entirely different

10  situation.  This is three federal agencies reviewing this

11  ROD, making sure that this final agency action says exactly

12  what the position of the government is.

13           Now, 30 days after filing our complaint, they see

14  that we cited this as one of our claims under OCSLA,

15  Section 8(p)(4); and they say, "Oh, no, well, we better

16  change this.  We better say that we actually meant

17  commercial -- that we actually meant that commercial fishing

18  companies said that commercial fishing would stop in the

19  area."

20           It is just too cute by half.  Had they actually

21  looked -- had they actually tried to make a reasonable

22  supplement, surely they would have included a declaration

23  from the individuals responsible for either writing that

24  first statement in the ROD or editing it saying, "Oops, I

25  made a mistake.  Here are the circumstances under which I

1    made a mistake.  And we're terribly sorry, but we need to

2    correct this clerical error."

3            They provided no explanation whatsoever from anyone

4    of -- in the three federal agencies as to how such a

5    significant -- Your Honor, yourself said how such a

6    significant omission could have occurred in the final agency

7    action.  And so it's just too cute by half.

8            THE COURT:  Do you want to respond?

9            MR. ROSEN:  Yes, Your Honor.

10           So this determination was made not as part of the

11   analysis of the environmental impacts.  It was made as a

12   determination as part of the public interest, weighing the

13   public interest, which is a core specific determination.  It

14   weighs different factors.  In this particular context, it was

15   weighing economic factors, and it took the fishermen's

16   statements as a worse case scenario to determine what the

17   economic impacts are or were, in their view.

18           And, yes, it didn't attribute to this statement to

19   the fishermen, but it came back and gave that attribution.

20   It didn't change its rationalization.  It didn't present

21   through evidence.  It just informed the Court, which courts

22   say all the time, "Come back and explain something if

23   something is missing," and that's what the Court did here.

24           And if you look in the exact same document, talking

25   about the joint ROD here, the Court states in another -- in

1    another spot, "Proposed discharge of fill will likely have

2    minor long-term effects on recreational and commercial

3    fishing."  At page 43 it says, "It's anticipated that the

4    Vineyard Wind project will have neutral impacts to navigation

5    during construction and operation with the incorporation of

6    mitigation."

7            And, again, at page 36 it says the cable protection

8    could be beneficial, creating an artificial reef attracting

9    higher concentrations of fish.

10           So the statement that is attributable to the

11   fishermen that they want to say was based on some analysis,

12   they point to no analysis of navigation that the Court did.

13           BOEM did that analysis, and BOEM went through for

14   30 pages, and BOEM looked at that analysis of the effects on

15   fishing and changed the project to accommodate the fishing

16   interests and found after -- with that mitigation -- it

17   reduced the number of turbines.  It reduced the area in the

18   north where some of their turbines would be.  It changed the

19   east-west orientation specifically to accommodate the fishing

20   interest.  It did all those things, and it found that this

21   area would not be abandoned after consultation with the Coast

22   Guard and other agencies.

23           All the Corps did here was, in this context of its

24   public interest determination, weigh the benefits and the

25   detriments and everything like that; and this economic

1    analysis, it merely took the statement of the fishermen as to

2    their worse case scenario, and said you know what?  There are

3    some impacts, but you're going to be paid $14 million for

4    some of those impacts, and you're getting all this other

5    mitigation so that, in the end, you will not be foreclosed

6    from fishing in that area.

7            MR. HADZI-ANTICH:  May I respond to that,

8    Your Honor?

9            THE COURT:  Certainly.

10           MR. HADZI-ANTICH:  So even as far back as the draft

11   environmental impact statement, BOEM acknowledged, quote,

12   "Some fisheries may not be able to safely operate and harvest

13   the resource in the area."  That's BOEM_34946.

14           That provides evidence that the statement in the

15   ROD that the entire area will be abandoned for commercial

16   fishing was something in the mind of the federal defendants

17   way back at the draft environmental impact stage.  That's not

18   something that --

19           THE COURT:  I'm sorry.

20           MR. HADZI-ANTICH:  They call it a scrivener's

21   error.  That's not a scrivener's error.

22           THE COURT:  So "some fisheries may not be able"

23   means that they had in their mind that all -- that the entire

24   area will be abandoned?  That's the line you want me to draw?

25           MR. HADZI-ANTICH:  No, Your Honor.  No.  What I'm

1    saying is that the issues of abandoning commercial fishing in

2    the area as a result of failure to provide for safety was in

3    the minds of the federal defendants back at the

4    environmental -- draft environmental impact stage.

5                THE COURT:  Were they concerned about what the

6    impact on fishing might be?  Absolutely.  You see that all

7    the way through their papers.  They have been concerned.

8    They look at it.  They considered it.  They've mitigated what

9    they thought they could do to mitigate it.

10                To say that they're taking a position that they --

11    they're not saying, "We never thought about fishing."  That

12    would put them in a worse position.  They're not saying that.

13                MR. HADZI-ANTICH:  I'm sorry, but maybe I misheard,

14    but I thought I heard counsel say that they -- they had not

15    done any of that before; they had not reviewed or analyzed

16    the fact that commercial fishing may be abandoned in this

17    area.  Maybe I misheard, but --

18                THE COURT:  I didn't hear that.

19                MR. HADZI-ANTICH:  -- the truth is that, as far

20    back as that environmental impact statement, this issue had

21    been raised.  It was considered.  And the final document

22    reaches the conclusion.  I mean, this is a finding in the

23    final document.

24                THE COURT:  I'm denying your motion to strike.

25                I think there's some other issues you wanted to

1    raise on the -- on OCSLA, so let's go through those.

2            MR. HADZI-ANTICH:  Yes, Your Honor.  Just one

3    moment, please.

4            So going back to the statutory interpretation,

5    using traditional rules of statutory construction, we've

6    covered the difference between to make sure safety and

7    protection of environment is provided for, and I think we've

8    also covered the rather stilted interpretation that Vineyard

9    Wind offers that "making sure to provide for safety and the

10   protection of the environment," that simply means taking

11   measures in preparation for making sure that safety and the

12   environment are provided for.

13           I mean, it's kind of like saying that if Joe is in

14   a contract under which he must provide Sam with a blue house,

15   and he goes out and he buys blue paint, he's not complying

16   with his contract.  He has to actually paint the house blue.

17   And it's not enough to prepare to paint the house blue; the

18   house actually has to be painted blue.  So Vineyard Wind's

19   interpretation is not -- is not reasonable under any

20   standard.

21           THE COURT:  Am I correct that -- as far as

22   interpreting the language of 1337(p)(4), you both have given

23   me the statute.  BOEM is giving me the regs, which you're

24   disagreeing with.  But I don't have any case law interpreting

25   the statute; is that correct?

```
 1              MR. HADZI-ANTICH:  That is correct.  This is a case

 2    of first impression in the context of a construction and

 3    operation plan that's gone through the entire NEPA process,

 4    through the ROD, and has been approved.

 5              THE COURT:  And is it your contention that the

 6    language is unambiguous?

 7              MR. HADZI-ANTICH:  I think the language is

 8    absolutely unambiguous.

 9              THE COURT:  Only look at the statute, don't look at

10    anything else, in your view?

11              MR. HADZI-ANTICH:  Precisely, using the traditional

12    tools of statutory construction, which we spent page after

13    page in the briefing discussing.

14              THE COURT:  Does the government take the position

15    as to whether -- take a position as to whether the language

16    is ambiguous or not ambiguous and whether I should be looking

17    at anything else other than the statute?

18              MR. HAJEK:  So, Your Honor, the Court should look

19    at the regulations.

20              And one thing that counsel has overlooked, and I'll

21    start with the legal interpretation side, is that BOEM has a

22    set of regulations at 30 CFR 585.102; and those regulations

23    specifically require by BOEM to ensure that all authorized

24    activities are carried out in a manner that provides for all

25    of the listed factors.  That's in the regulations.
```

1          So BOEM has never said that those are

2     discretionary.  Those are in the regulations.

3          And there is a -- BOEM prepared --

4          THE COURT:  I think he's saying you can't add the

5     word "reasonable" in front of them.

6          MR. HAJEK:  So there is a separate provision of

7     BOEM's regulations, and that's at 30 CFR 585.621, and that

8     governs what BOEM does when it reviews a COP, what has to be

9     in the COP.

10         And there was a provision subsection,

11    subsection (C), which states that -- which interprets

12    subsection (I) of the statute.  And just to be clear, I'll

13    just read the -- subsection (I) of the statute.  That's the

14    section that the Secretary shall ensure that any activity

15    under this subsection is carried out in a manner that

16    provides for prevention of interference with reasonable uses

17    as determined by the Secretary of the exclusive economic

18    zone, the high seas, and the territorial seas.

19         And so for that particular subsection, that's what

20    BOEM interpreted in subsection 585.621(c) as meaning that the

21    project should not unreasonably interfere with other uses of

22    the outer continental shelf.

23         And to the question about was the language

24    ambiguous, it doesn't really matter in this instance because

25    Congress used the words "as determined by the Secretary."

1      And so once Congress uses that phrase, what the First Circuit

2      and the DC circuit have said, then you go the second step and

3      ask whether it's a reasonable interpretation; and it is a

4      reasonable interpretation, and the plaintiffs have failed to

5      show otherwise.

6            Your Honor asked whether there are any cases that

7      would govern the outcome here, and I think plaintiffs

8      answered correctly, that there is no case interpreting

9      Section 8(p)(4) of OCSLA.  There was a case in the DC circuit

10     involving Cape Wind, but that's not relevant here.

11           But I would point the Court to the *Massachusetts v.

12     Andrus* case, which both parties have briefed and argued.

13     *Andrus* was in the oil and gas context and interpreted

14     Section 5(a) of OCSLA.  Section 5(a) of OCSLA doesn't contain

15     all of the same language as Section 8(p)(4), but it includes

16     language that is similar, such as "provide for the prevention

17     of waste and conservation of natural resources of the outer

18     continental shelf."

19           And what the plaintiffs argued in the *Andrus* case

20     is that the statute meant that BOEM could only approve oil

21     and gas development if it could ensure that absolutely no

22     harm would come to the fisheries, and that is what the

23     First Circuit rejected.

24           And what the Court stated in its holding -- and

25     I'll quote -- "Where two sets of interest conflict where

1    particular mineral leases threaten particular fishing

2    interests, the Secretary must determine which interest must

3    give way and to what degree in order to achieve a proper

4    balance."

5              And in answer to Your Honor's question, what is the

6    standard that we're proposing, it's a reasonableness

7    standard, and I think even RODA has agreed with that.  It's

8    not perfection.  It's reasonableness.

9              Other --

10             THE COURT:  Do you -- do you disagree that that

11    parallel provision for oil and gas is a relevant place for me

12    to be looking and comparing?

13             MR. HADZI-ANTICH:  Yes, we do disagree, Your Honor.

14    It dealt with an entirely different section of OCSLA, as

15    counsel has pointed out.  That's Section 5 --

16             THE COURT:  Recognizing that it's a different

17    section, my question is -- it's a different section, but

18    looking at how that is interpreted, I -- is there any

19    reason -- I mean, you're not going to say to me I should

20    interpret cases having to do with wind differently than cases

21    having to do with gas and whatever because I might have some

22    different -- people might have different preferences about

23    that.  I've got to look at the language of the two statutes.

24             So looking at the language of the two statutes,

25    recognizing that there are different factors that you want to

1    be continuing -- considering, would you disagree that it is

2    an informative place to look at how the one statute, which is

3    an older one, has been interpreted and compare that to

4    whether the same language is or isn't there and whether the

5    same reasoning would apply?

6            MR. HADZI-ANTICH:  I would disagree with that,

7    Your Honor; and the reason is, in the oil and gas context,

8    you don't have this balancing -- well, you don't have this

9    same structure as you do in connection with renewable energy

10   resource approvals on the outer continental shelf.

11           You've got a relatively new statute allowing for

12   the first time in decades the Secretary to approve renewable

13   energy projects, and so that gives the Secretary power to

14   approve renewable energy projects on the outer continental

15   shelf.

16           But then within that same statutory amendment of

17   OCSLA, you have limitations on that power.  Limitations going

18   from 8(p)(4)(A) through (G) -- well, actually, through (I) --

19   if I may, I'll get to (I) in a second -- that actually limit

20   the power of the Secretary to authorize these types of

21   projects.

22           It's an entirely different structure; and,

23   therefore --

24           THE COURT:  Aren't there limits on oil and gas

25   drilling?

```
 1            MR. HADZI-ANTICH:  There are.  There are limits,
 2   but not in --
 3            THE COURT:  I mean, I understand there may be a
 4   different set of limits.
 5            MR. HADZI-ANTICH:  Yes.
 6            THE COURT:  It's a different statute.
 7            MR. HADZI-ANTICH:  Yes.
 8            THE COURT:  I'm not importing one over the other.
 9   But I'm looking to what the framework is for trying to
10   understand these statutes.  We have a new statute without any
11   case law.  Is it informative -- and the fact that there may be
12   be additional conditions would obviously mean you couldn't
13   just juxtapose this versus this.
14            But as sort of a structural analysis, you're saying
15   they can't do balancing, it shouldn't be balancing.  And I
16   think they're saying you might have some of the similar type
17   of balancing in the oil and gas context.
18            MR. HADZI-ANTICH:  And what I'm saying, Your Honor,
19   is you do not.
20            THE COURT:  Okay.  I'll --
21            MR. HADZI-ANTICH:  The statutory language for oil
22   and gas approvals is entirely different from the statutory
23   language for renewable energy approvals.
24            I just want to mention one other thing, if I may.
25   Counsel discussed OCSLA Section 8(p)(4)(I).  And counsel
```

1    accurately described what that section does.  That's one

2    subsection.  We thus far have been talking about 8(p)(4)(A)

3    for safety and (B) for protection of the environment.

4         (I) doesn't address either one of those issues

5    per se.  (I) basically said, as counsel pointed out, that the

6    Secretary must consider reasonable existing uses.  Okay?  And

7    in the parenthetical of that section, the Secretary must

8    consider reasonable uses in the Secretary's opinion.  That

9    refers to the Secretary's opinion of what uses are

10   reasonable.  It doesn't authorize any balancing in

11   Section 8(p)(4).

12        And there's no question that the Secretary has not

13   found that existing commercial fishing operations are not a

14   reasonable use of this part of the outer continental shelf.

15   That's never happened, nor would I think that counsel would

16   argue today that that would be the Secretary's position now

17   or ever.

18        And so Section 8(p)(4)(I) stands as a unique

19   provision that's different from what we're talking about as

20   to make sure you provide for safety, make sure you provide

21   for protection of the environment.

22        THE COURT:  Okay.  Did you want to respond to the

23   (I) comment?

24        MR. HAJEK:  So if I could, I think I've made my

25   point there.  I think what counsel is trying to do is say

1    that it's just uses as determined by the Secretary, rather

2    than prevention of interference with reasonable uses as

3    determined by the Secretary.

4         What the Department of the Interior has interpreted

5    that to mean is it has the authority to define that whole --

6    that whole language, and that's why it has landed on the

7    interpretation of whether it's a unreasonable interference.

8         I'd like to make one more point about the statutory

9    interpretation, and I would -- I would go back to the

10    regulations first.  So those were issued in 2009.  All of the

11    balancing language that counsel is talking about comes from

12    what's known as an M-opinion that was issued in 2021.

13         And in that M-opinion, the Secretary mentioned

14    balancing and also concluded that OCSLA imposes a general

15    duty on the Secretary to act in a manner providing for the

16    subsection's enumerated goals, but the Secretary retains wide

17    discretion to determine the appropriate balance between two

18    or more goals when they conflict.

19         And that's important because what the department

20    meant when it made that statement was not that any of these

21    factors would not be complied with when BOEM is evaluating a

22    COP.  Instead, if there are uses that conflict, if there are

23    factors that conflict, that's when the balancing needs to be

24    conducted.

25         And I'd also point out that in -- in *Norton v.*

1    *SUWA*, a different context interpreting the Federal Land

2    Policy and Management Act, the Court interpreted language

3    which said that the agency should act in a manner so as to

4    not to impair the suitability of such areas for preservation

5    as wilderness and interpreted that language in a manner as

6    giving the Secretary wide discretion to determine how to meet

7    the goals of the statute.

8         And that's what we're saying here, is that the

9    Secretary has the discretion to determine how to meet all of

10   the different factors in the statute.

11        I'd like to make just one point about the

12   compliance with the Section 8(p)(4) factors.  That is set

13   forth in BOEM's memorandum, which is, you know, a 30-page

14   memorandum, and I don't need to go into all the points here.

15   But the one I would make and want to make sure that the Court

16   is aware of and focuses on is similar to the one that my

17   colleague made.

18        The US Coast Guard prepared a report.  It's known

19   as the Areas Offshore of Massachusetts and Rhode Island, Port

20   Access Route Study, or the MARIPARS report.  And one of the

21   key recommendations of that report is that, in order to allow

22   fishing vessels to transit within the turbine array and to

23   fish, the turbines should be spaced one nautical mile apart,

24   and they should be oriented in a east-west direction for

25   vessel traffic, consistent with fishing vessel traffic that

1    existed in the area that was studied.

2              And so that --

3              THE COURT:  Does that mean they should be oriented

4    in an east-west fashion?

5              MR. HAJEK:  The -- essentially, what I take from

6    that in looking at the diagrams that are in the EIS, instead

7    of having the lines go in a diagonal northeast-southwest

8    direction, the rows go vertical and horizontal.

9              As my colleague also mentioned, there was -- there

10   were turbines that were removed from a northernmost portion

11   of the turbine array in order to prevent interference with

12   fishing boats in that area.  The project size also was

13   reduced.

14             Otherwise, unless the Court has questions about

15   specific areas of compliance with the statutory factors, I

16   would rest on our papers.

17             THE COURT:  Okay.  Did Vineyard Wind have anything

18   to add on this OCSLA issue?

19             MR. BUENTE:  Your Honor, at some point, I think

20   counsel said that these were -- we're talking about the oil

21   and gas provision in the renewable energy provision.  They

22   were different statutes.  They're in the same statute.

23   They're separate paragraphs.

24             With respect to the analogy to the oil and gas

25   provision that was interpreted in 1979 by the First Circuit

1    in the *Andrus* case, in that context, that was the first time

2    that the Interior was faced with authorizing oil and gas

3    leasing off of the Atlantic coast of the United States.

4         So it was a new program just like this is a new

5    program, and the Court of Appeals managed to determine that

6    the Secretary had correctly construed the statute to allow

7    for a balancing test.

8         The kind of balancing test that they envision, and

9    we submit that Interior has done here, is that you meld

10   together competing interests and figure out a way to allow

11   the competing interests to continue to coexist; and that's

12   exactly what, as Mr. Hajek was just explaining, the Interior,

13   after a lot of studying, thinking, consulting with the

14   National Marine Fisheries Service, the Corps and the Coast

15   Guard, they have managed to do.

16             THE COURT:  Okay.

17             MR. HADZI-ANTICH:  May I respond, Your Honor?

18             THE COURT:  You may.

19             MR. HADZI-ANTICH:  So a couple of things.  First,

20   with regard to counsel's statement that at one point back in

21   1979 the oil and gas provision was a new program in

22   connection with judicial review and, therefore, because we're

23   dealing with a new program in connection with renewable

24   energy resources, the interpretation of the oil and gas

25   program in 1979 somehow must now relate to the current

1    interpretation of Section 8(p)(4), the language is different.

2    The language is entirely different.

3            There may be some words that are similar, but the

4    structure and language is entirely different.  I may have

5    misspoke saying before that they're two separate statutes.

6    Obviously, they're the same statute, but two entirely

7    different regulatory programs authorized in those statutes.

8            And with regard to federal defendants' counsel

9    talking about a different -- different statutory language

10   saying, quote, "in a manner," that one court construed the

11   term "in a manner" consistent with what the federal

12   defendants are suggesting this Court do with regard to the

13   reasonableness of protecting safety and the environment.  The

14   "in a manner" language is not in Section 8(p)(4) whatsoever,

15   so there's no correlation there.

16           And the other thing, just in general with regard to

17   what does it mean to balance, given the "must ensure safety

18   and protection of environment," so what is an agency supposed

19   to do to ensure protection of safety and the environment?

20           So, basically, okay.  Well, we'll take away a

21   little bit of protection for safety, but, you know, to

22   balance that, we're going to give a lot of protection to the

23   environment, or maybe we're going to give less protection to

24   the environment, but, gee, a whole lot of protection to

25   safety.

```
 1              That doesn't ensure either safety or protection of
 2    the environment.
 3              THE COURT:  Okay.  I think I have a lot on --
 4              MR. HAJEK:  Your Honor?
 5              THE COURT:  Yes.
 6              MR. HAJEK:  I would just mention, the words "in a
 7    manner" are in Section 8(p)(4); those words are there.
 8              THE COURT:  Okay.  I'm going to go back and stare
 9    at the statutes for a while.
10              Let's -- can we talk a little bit more about what
11    the Clean Water -- I understand what I need to work my way
12    through on the OCSLA claims.  On the Clean Water claim,
13    there's no dispute that the plaintiffs have standing to raise
14    the Clean Water Act, correct?  But the argument that the --
15    the global argument the defendants are making is that
16    theirs -- didn't submit comments.
17              MR. ROSEN:  Yes.
18              THE COURT:  Do I have that right?
19              MR. ROSEN:  No argument on standing.  Waiver is the
20    argument here.
21              THE COURT:  Okay.  And then on regard -- with
22    regard to what the specific claims are that I -- assuming I'm
23    getting to the Clean Water Act claims, do you want to discuss
24    those briefly?
25              MR. MARZULLA:  Yes, Your Honor.  I'd be happy to do
```

1    so.

2            I have three points to make with respect to the

3    ways in which the Corps of Engineers failed to comply with

4    the requirements of the Clean Water Act, Section 404, and the

5    relevant regulations.

6            Let me start momentarily, however, with comments.

7    Your Honor has heard, I think, and ruled on the basis of the

8    government's representation that the Corps of Engineers

9    stated that the fishing interests would abandon this area

10    based on the comments that were made by the fishing

11    interests.  And yet they tell you, "We had no comments,

12    Your Honor."  They can't both be true.

13            Let me tell you how I think --

14            THE COURT:  Well, wait a minute.

15            MR. MARZULLA:  Yes.

16            THE COURT:  Let me just stop you right there.

17            MR. MARZULLA:  Sure.

18            THE COURT:  The question isn't, was a comment made

19    by someone on a subject; the question is was a comment made

20    by the plaintiff?

21            MR. MARZULLA:  Yes.

22            THE COURT:  And -- right?

23            MR. MARZULLA:  I think -- I don't think the

24    government says that the statements were made by someone

25    other than a plaintiff in this case.  In fact -- and let me

1    give you the -- the answer to the riddle; and that is, of

2    course, that we are dealing with what they call a joint

3    record of decision, which specifically states that each of

4    the entities, though they made separate decisions and they

5    had separate discussions of the reasons for their decisions,

6    were relying on each other's records as well.

7              So --

8              THE COURT:  So you --

9              MR. MARZULLA:  -- the comments come from the

10   comments that RODA made in connection with the environmental

11   impact statement, the NEPA comments.  Those are the comments

12   that you see reflected in the Corps of Engineers record of

13   decision.  That's why that comment about abandonment based on

14   navigation is found in the Corps of Engineers.  That's why

15   they can say we got that from the fishermen.

16             So there are --

17             THE COURT:  Let me get a response to that.

18             MR. ROSEN:  Yes, Your Honor.

19             THE COURT:  Are the comments we're talking about in

20   the environmental impact statement?

21             MR. ROSEN:  Right.  Those are the comments in the

22   environmental impact statement; and they're using those

23   comments, this abandonment comment, for the claims against

24   BOEM and BOEM's determination and trying to cut and --

25             THE COURT:  No, what he's now trying to say is that

1    you've conceded those comments existed, and they consisted

2    somewhere that the federal government was -- considered; and,

3    therefore, in connection with the Clean Water Act permit,

4    there was proper comments.  I think that's --

5                    That's your argument, right?

6                    MR. MARZULLA:  Fundamentally.  And mind you,

7    Your Honor, this is the Corps of Engineers that --

8                    THE COURT:  So let me get the response on that.  I

9    think --

10                    MR. ROSEN:  There were absolutely no comments

11   challenging their -- as to the Clean Water Act and the Corps,

12   all they're seeking is vacatur of the permit.  There were no

13   comments on the permit.  These comments about abandonment

14   don't have to do with the permit, the Corps permit.  They

15   don't have to deal with water quality --

16                    THE COURT:  They have to deal with where the --

17   where the turbines are going.

18                    MR. ROSEN:  Yes.  Yes.

19                    THE COURT:  Is that not, correct?

20                    MR. MARZULLA:  They are -- I think counsel is not

21   quite focusing on the issue, Your Honor.

22                    THE COURT:  Well, the issue I'm focused on is

23   whether you made comments in connection with the permit

24   relating to the Clean Water Act claim.  That's the question

25   I'm looking at to figure out whether I can reach the Clean

1    Water Act claim and whether, in fact, you raised Clean Water

2    Act issues before the permit issued in connection with the

3    Clean Water Act.

4            MR. MARZULLA:  Would the Court consider looking at

5    whether the Corps received comments on that topic?  Because

6    the Corps considered the NEPA comments to be part of the

7    record.

8            What counsel is talking about is the statement of

9    the Corps of Engineers that says, "We received these comments

10    from the fishermen."

11            MR. ROSEN:  The only --

12            MR. MARZULLA:  So his technical argument is, oh,

13    yes, we -- the Corps had comments, but they weren't filed in

14    the right place.

15            THE COURT:  Well, somebody is trying to make a

16    decision about issuing a permit, and that's the question that

17    I think I have to decide is whether, in connection with

18    issuing the permit, they had any of these concerns raised.

19            MR. MARZULLA:  Yeah.  Yes, and I'm saying they did

20    have those concerns raised.  There were multiple comments

21    filed.  They happened to be in the NEPA section, but the

22    Corps relied on them in issuing its permit.  The Corps relied

23    on them.

24            MR. ROSEN:  No, the --

25            THE COURT:  Okay.  If you can let -- if you can let

 1     your brother respond.

 2              MR. ROSEN:  Again, the Court did not -- the only

 3     challenge here is to the first 23.3 miles of the cable.  The

 4     statement by plaintiffs' --

 5              THE COURT:  Because -- just to make sure I'm

 6     following this -- the permit is only dealing with the area

 7     closer to shore.

 8              MR. ROSEN:  The --

 9              THE COURT:  And the comment about the fishing has

10     to do with the area by the turbines?

11              MR. ROSEN:  That's exactly right, but let me just

12     clarify on the first point.  The Corps issued two permits or

13     combined permits, but the only one challenged here is that

14     first 23 miles, and it has nothing to do with navigation

15     amongst the turbines.  It's not even in the same place.

16              THE COURT:  Okay.  And counsel --

17              MR. MARZULLA:  Our second argument, Your Honor --

18              THE COURT:  Hold on a minute.  Counsel for Vineyard

19     Wind has been patiently waiting.

20              MR. BUENTE:  Thank you, Your Honor.

21              In addition, Your Honor, the issues that the

22     plaintiffs want to raise in challenging the permit, the

23     specific substantive issues, they're not addressed in the

24     comments that Mr. Marzulla continues to refer to.  They're

25     not in the NEPA comments.

         1              MR. MARZULLA:  Yes.  May I raise the second issue,

         2      Your Honor, with respect --

         3              THE COURT:  Okay.

         4              MR. MARZULLA:  -- to comments?  And that is the

         5      permit issued is not the permit on which the Corps sought

         6      comments.  In December of 2018, the Corps published a notice

         7      that said that there would be, within Section 404, within the

         8      near area, a requirement or a request for erosion control;

         9      that is, the use of rock and concrete and so forth covering

        10      the pristine sea bottom.  They would cover two acres.  That's

        11      what they sought comment on.  That's what their notice said.

        12              In point of fact, we know that -- and the

        13      government has now admitted -- that the permit they issued

        14      covered 17 acres.  The Corps said this is a project that is

        15      going to have a total length of these high-tension wires that

        16      are going to be bringing the cables, that are going to be

        17      bringing this electricity on shore.  The total length of that

        18      is going to be 23 miles.

        19              Well, it wasn't 23 miles.  It was 39 miles.  It was

        20      an entirely different project.

        21              Now, to get into that a bit, because that is one of

        22      the three issues that counsel refers to that we raise, the

        23      government purported to correct that.  They said, oh, that

        24      was just a clerical error.  A clerical error where?

        25              It was a clerical error in 2018 when they published

1    the notice requesting comment.  It was a clerical error when

2    they prepared their biological assessment in connection with

3    the environmental impacts -- I mean, in connection with the

4    biological opinion under the Endangered Species Act.

5              It was a clerical error once again repeated at

6    least half a dozen times in the record of decision in which

7    they decided that they were going to issue this permit.  And

8    how did they find out about it?  We know because they've

9    filed this subsequent August 4, 2021, report about their,

10   quote, clerical error.

11             They issued a draft of the permit to Vineyard Wind,

12   sent it over to them, once again, with the same figures, the

13   same 2 acres, 23 miles, in the permit itself.  It was

14   Vineyard Wind who called them up in 2021.  We're now 2½ years

15   after the original notice.  And Vineyard Wind said, "Wait a

16   minute, that's not our plan.  What you are proposing to

17   approve is not a permit for what we want to build."  And it

18   was only at that point that the Corps of Engineers prepared

19   their correction of the clerical error.

20             THE COURT:  Counsel, this is all in your papers,

21   correct?

22             MR. MARZULLA:  It is, Your Honor.  And --

23             THE COURT:  Because we are running to the end of

24   our time.

25             MR. MARZULLA:  We're happy to stand on that.

1              Two other points.  There are two other requirements

2    of the Clean Water Act that have not been complied with here.

3    One is cumulative impact analysis.  And this is an issue

4    here.  It was not discussed today, but it is certainly

5    discussed in the NEPA context.

6              And that is that the Clean Water Act, like NEPA,

7    does not allow the agency to simply put on blinders and say,

8    "We're just issuing a permit for this particular project, and

9    we don't have to consider anything else.  We don't have to

10   consider any of the pollution that will be introduced by any

11   other wind project that may be built offshore," even knowing

12   that there was a major program to build as many as 16 or more

13   such projects involving several thousand turbines covering --

14   with leases -- covering millions of acres all up and down the

15   Atlantic coast.

16             That cumulative impact analysis is not found in the

17   record, and for that reason, as well, the Clean Water Act

18   permit is invalid.

19             Third -- and counsel has kind of referenced this, I

20   think, perhaps a little inadvertently -- the record is

21   entirely inconsistent in the public interest analysis.

22   Specifically, as counsel said, the Corps found that the

23   construction of this project would have a minor impact on the

24   fishing industry.  BOEM found that it would have a moderate

25   impact.  We've already talked about the abandonment --

```
1              THE COURT:  We've already talked about it.

2              MR. MARZULLA:  We have.

3              THE COURT:  We have four minutes left.

4              MR. MARZULLA:  But --

5              THE COURT:  And it's not all on your side.

6              MR. MARZULLA:  And I can do it in 30 seconds.

7         That inconsistency invalidates the public interest

8    analysis.  The Corps can't say, on the one hand, it's a minor

9    impact on fisheries; and on the other hand, but we've

10   required that Vineyard Wind set aside $14 million to

11   compensate these fishermen for that impact.

12             Nothing further, Your Honor.

13             MR. ROSEN:  And, Your Honor, again, briefly on the

14   cumulative impacts, I'm not sure what documents that counsel

15   is reviewing.  The Corps reviewed the cumulative impacts.

16             First of all, the cumulative impacts under the

17   Corps' regulations are related to fill.  What is the effect

18   of fill from other projects on this project?  The Corps

19   reviewed that.  The Corps, in fact, cited sediment suspension

20   during cabling laying for all these other projects, cited it

21   four times.

22             And plaintiffs' briefs, in fact, in several points,

23   talk about the fact that the briefs cite to 3,398 acres of

24   disturbed cables.  That's the total acreage of all of the

25   projects here.
```

1          In this project, we're only talking about 35 acres.
2     So the Corps did look at the disturbed sediment from cable
3     work from all of these projects, and nowhere in plaintiffs'
4     briefs do they say that there are any impacts to this project
5     from that -- from those operations.
6          Finally, the Corps looked at the level of impacts
7     under its public interest determination, and there's no magic
8     words about major and minor impacts.  Under the Corps'
9     regulations, it weighs not only the impacts; it weighs the
10    benefits.  There are significant benefits to this project.
11    And the Corps is only to deny a permit if there is an
12    unacceptable level of impacts.
13         The Corps here found there were some significant
14    impacts, but they're very isolated around these 35 acres.  In
15    a temporal standpoint, they only occur over a certain amount
16    of time.  And you compare that to all of the benefits of this
17    project to reducing $CO_2$ by 50 million tons over the life of
18    this project and bringing renewable resource power to 400,000
19    homes.
20         And then it looked at all of the mitigation that
21    was put in to protect the fishing industry, which counsel has
22    laid out several times here.  And it made the
23    determination -- and there's public interest determination --
24    that this case, that this matter should go forward.  That's
25    what the record reflects.

1              THE COURT:  Okay.  Thank you.

2              I'm going to come back to where I started on the

3      consolidation question.  Is there any reason that these two

4      cases here in front of me should not result in a consolidated

5      decision?

6              MR. ROSEN:  There's no reason --

7              MR. MARZULLA:  There's --

8              MR. ROSEN:  I'm sorry.

9              There's no reason the cases should not be

10     consolidated.

11             MR. HADZI-ANTICH:  The Seafreeze plaintiffs agree.

12             THE COURT:  And RODA agrees as well?

13             MR. MARZULLA:  Absolutely, Your Honor.  Yes, we do.

14             THE COURT:  Okay.  These two cases were -- are

15     consolidated, at least through the summary judgment decision,

16     and I will make my way through it.

17             Thank you.

18             THE DEPUTY CLERK:  All rise.

19             (Court in recess at 3:29 p.m.)

20

21

22

23

24

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3

4          I, Robert W. Paschal, Registered Merit Reporter and

5     Certified Realtime Reporter, in and for the United States

6     District Court for the District of Massachusetts, do hereby

7     certify that pursuant to Section 753, Title 28, United States

8     Code, the foregoing pages are a true and correct transcript

9     of the stenographically reported proceedings held in the

10    above-entitled matter and that the transcript page format is

11    in conformance with the regulations of the Judicial

12    Conference of the United States.

13

14                    Dated this 2nd day of May, 2023.

15

16

17

18

19                    /s/ Robert W. Paschal

20                    _____

21                    ROBERT W. PASCHAL, RMR, CRR
                       Official Court Reporter

22

23

24

25