**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SEAFREEZE SHORESIDE, INC., *et al.*,

            Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, *et al.*,

            Defendants,

   v.

VINEYARD WIND 1 LLC,

            Intervenor-Defendant

Civil Action No. 1:22-cv-11091-IT

Hon. Indira Talwani

ORAL ARGUMENT REQUESTED

**VINEYARD WIND 1 LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR A**
**PRELIMINARY INJUNCTION**

Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

*Counsel for Vineyard Wind 1 LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      STATEMENT OF FACTS ................................................................................. 2

II.     LEGAL STANDARD ......................................................................................... 5

III.    CONSTRUCTION OF THE PROJECT WILL NOT CAUSE PLAINTIFFS
        IRREPARABLE HARM ..................................................................................... 5

        A.     Plaintiffs' delay in seeking a preliminary injunction undermines their claims of
               irreparable harm ........................................................................................ 6

        B.     Plaintiffs have not established irreparable harm. .................................... 7

IV.     PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS ......................... 12

V.      THE HARMS TO VINEYARD WIND DRAMATICALLY OUTWEIGH PLAINTIFFS'
        PURPORTED MONETARY DAMAGES ............................................................ 14

        A.     A preliminary injunction or stay will cause vineyard wind to incur at least $1
               million per day in uncompensated costs. ............................................. 14

        B.     A preliminary injunction or stay could make it impossible for vineyard wind to
               complete the project. ............................................................................. 15

VI.     A PRELIMINARY INJUNCTIVE OR STAY IS NOT IN THE PUBLIC INTEREST .. 16

VII.    ANY PRELIMINARY INJUNCTION OR STAY SHOULD BE CONDITIONED ON
        PLAINTIFFS' POSTING A BOND TO PAY FOR THE COSTS AND LOSSES
        SUSTAINED BY VINEYARD WIND ............................................................... 19

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)......................................................................................................14, 18

*Arborjet, Inc. v. Rainbow Tree Sci. Advancements, Inc.*,
794 F.3d 168 (1st Cir. 2015)...................................................................................................5

*Buckingham Corp. v. Karp*,
762 F.2d 257 (2d Cir. 1985)....................................................................................................6

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*,
370 F.3d 151 (1st Cir. 2004)...............................................................................................5, 6

*Crowley v. Local No. 82*,
679 F.2d 978 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) .........................20

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993).............................................................................................................11

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
445 F.3d 13 (1st Cir. 2006)....................................................................................................5

*Friends of Merrymeeting Bay v. NextEra Energy Res., LLC*,
No. 2:11-cv-38-GZS, 2013 WL 1835379 (D. Me. Apr. 30, 2013)......................................6, 7

*HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*,
847 F.2d 908 (1st Cir. 1988)..................................................................................................20

*McGuire v. Reilly*,
260 F.3d 36 (1st Cir. 2001)...................................................................................................16

*Michigan v. U.S. Army Corps of Eng'rs*,
667 F.3d 765 (7th Cir. 2011) ...............................................................................................11

*Narragansett Indian Tribe v. Guilbert*,
934 F.2d 4 (1st Cir. 1991).......................................................................................................6

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................................5

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
397 F.3d 56 (1st Cir. 2005).....................................................................................................8

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996)................................................................................11

*Russell v. Farley*,
   105 U.S. 433 (1881)...........................................................................................20

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) .............................................................................11

*Shurtleff v. City of Boston*,
   928 F.3d 166 (1st Cir. 2016) .............................................................................12

*Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*,
   No. 21-cv-10216, 2022 WL 4096910 (D. Mass. Sept. 7, 2022)........................18

*Sindicato Puertorriqueño v. Fortuño*,
   699 F.3d 1 (1st Cir. 2012)..................................................................................12

*Standing Rock Sioux v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ........................................................................19

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
   587 F.3d 464 (1st Cir. 2009) .............................................................................10

*Warner v. Gross*,
   776 F.3d 721 (10th Cir. 2015) ..........................................................................11

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)............................................................................................5, 6

## Statutes

5 U.S.C. § 705..........................................................................................................19

43 U.S.C. § 1332.......................................................................................................17

43 U.S.C. § 1349.......................................................................................................19

## Other Authorities

*Safety Zone; Vineyard Wind 1 Wind Farm Project Area, Outer Continental Shelf,
Lease OCS-A 0501, Offshore Massachusetts, Atlantic Ocean*, 88 Fed. Reg.
27,839, 27,843 (May 3, 2023)....................................................................................8

Fed. R. Civ. P. 65.....................................................................................................19

Fed. R. Evid. 602......................................................................................................10

Fed. R. Evid. 702......................................................................................................11

Press Release, Fact Sheet: Biden Administration Jumpstarts Offshore Wind
Energy Projects to Create Jobs (Mar. 29, 2021),
https://www.whitehouse.gov/briefing-room/statements-
releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-
wind-energy-projects-to-create-jobs/ ....................................................................18

Press Release, Special Presidential Envoy for Climate John Kerry
"Implementation Plus: Global Climate Action in 2022," (Feb. 21, 2022),
https://www.state.gov/special-presidential-envoy-for-climate-john-kerry-
implementation-plus-global-climate-action-in-2022/ ............................................19

Vineyard Wind 1 Fisheries Compensatory Mitigation Program (Mar. 9, 2023),
https://static1.squarespace.com/static/5a2eae32be42d64ed467f9d1/t/6409f438
2459f11c574dff63/1678373944682/VW1+Fisheries+Compensatory+Mitigati
on+Program+-+FINAL_R1.pdf ................................................................................5

Vineyard Wind, *Offshore Wind Mariner Updates*,
https://www.vineyardwind.com/offshore-wind-mariner-updates (last visited
May 17, 2023) .........................................................................................................4

Plaintiffs hold no exclusive rights to any part of the fishing grounds off the coast of New England, much less to the Vineyard Wind lease area, which comprises less than 5% of the New England squid fishing area and less than 1% of the fishing revenue for most vessels. Yet Plaintiffs now ask this Court, quite literally after the ships have sailed, to enjoin Vineyard Wind 1 from continuing activities under a permit that has been in effect for nearly two years. Plaintiff's request is unfounded and untimely, and this Court should unequivocally deny the Plaintiffs' motion.

To be clear, Plaintiffs' motion is not about protecting the environment. Each year, Plaintiffs harvest tons of longfin squid and other marine species by dragging gear for miles through benthic habitat on the ocean floor. Vineyard Wind's Project will have less impact on squid and squid habitat in the Project's lifetime than Plaintiffs' trawling operations will have in a single year. Plaintiffs seek to protect only their bottom line. And despite their protestations of irreparable harm, Plaintiffs sat idle for months knowing Vineyard Wind was laying cable and scour protection. Their motion does not satisfy a single one of the four factors necessary for an administrative stay or injunction and therefore they have no entitlement to that extraordinary relief.

First, Plaintiffs are not facing irreparable harm. Commercial fishing is not precluded in Vineyard Wind's lease. At most, Plaintiffs will have to use more caution in the Wind Development Area or be somewhat inconvenienced by fishing in other areas of the ocean. At worst, they may bring in less revenue (and even that is speculative). But those economic injuries are not irreparable, because any lost revenue can be reimbursed from one of the compensation funds that Vineyard Wind is establishing to recompense such losses.

Second, Plaintiffs have no likelihood of success on the merits. As explained in the summary judgment briefing, the Federal Defendants complied with the Outer Continental Shelf Lands Act ("OCSLA") by extensively analyzing Vineyard Wind's Project and imposing conditions to protect

the environment, ensure safety, and avoid unreasonable interference with commercial fishing. Third, a preliminary injunction or administrative stay would cause substantial—and potentially catastrophic—harm to Vineyard Wind. Vineyard Wind has been planning and developing this Project for years. It cannot simply bring construction to a halt without major consequences. At a minimum, Vineyard Wind would incur over $1 million per day in standby costs. What is more, an order to stop construction would put the entire Project at risk by imperiling financing and causing downstream construction disruptions with potentially fatal financial consequences.

Finally, an injunction or administrative stay would disserve the public interest in development of offshore renewable energy projects—an interest reflected in OCSLA and the policies of both the federal government and the Commonwealth of Massachusetts. Plaintiffs' motion should be denied.

## I.   STATEMENT OF FACTS

Development and construction of an offshore wind project is a complex and time-consuming process that requires the use of specialized equipment to perform a series of distinct yet inter-related activities that adhere to a strict schedule. Exh. 1, Declaration of Klaus Skoust Moeller ("Moeller Decl."). ¶ 4. Vineyard Wind has worked for years to design the Project, prepare the lease area, and procure the equipment and contractors needed to install the wind turbines. *Id.* ¶ 5. The schedule should not be a surprise to any interested party, as BOEM made it publicly available on its website since January 2022. *Id.* ¶ 18. The schedule has also been the subject of communications between Plaintiffs' counsel and counsel for Vineyard Wind and Federal Defendants—including in March 2023, before Vineyard Wind began installing the scour protection on the ocean floor where the monopile foundations for each wind turbine will be installed. *See, e.g.,* Doc. No. 116-1. Yet Plaintiffs did not file their motion for a preliminary

injunction or administrative stay until May 10, 2023—more than six months after Vineyard Wind began installing the offshore export cables and two months after the scour protection work started. Moeller Decl. ¶¶ 7-8.

On March 18, 2023, Vineyard Wind began installing scour protection, which consists of two layers of small to medium sized rocks that prevent the seabed from eroding after the monopile foundation is installed. *Id.* ¶ 8. At each foundation location, the scour protection occupies an area on the seabed of 0.273 acres, so the scour protection for all 62 wind turbine foundations and one foundation for the electrical service platform will occupy a total of approximately 17 acres of seabed out of the project's total 65,296 acres. *Id.* Scour protection has been installed at 59 of the 63 locations with 36 locations having both filter (small stones under 4 inches in diameter) and armor (larger stones 4 to 12 inches in diameter) stone layers and 23 locations having the filter stone layer installed. The remaining work will be completed by June 3, 2023. *Id.* ¶ 9.

Vineyard Wind is now mobilizing to install the monopile foundations for the wind turbines, which is the next step in the construction sequence. *Id.* ¶ 12. Due to numerous restrictions principally designed for the protection of the North Atlantic right whale, Vineyard Wind may only install the monopile foundations between May and December. *Id.*; *see also, e.g.* BOEM_0077196-97 (pile-driving time of year, weather and time restrictions). Installation of the monopiles requires a specialized vessel for pile driving. There are only a handful of these vessels globally, and they are in high demand. Moeller Decl. ¶ 12. In May 2021, Vineyard Wind contracted to have the services of one of these vessels (the *Orion*), and it is only available to Vineyard Wind from May through early December 2023. *Id.*

The *Orion* is currently at the Port of Halifax, Canada, as are the first six monopiles and transition pieces for Vineyard Wind's Project. *Id.* They are being transferred to the *Orion*, which

will then sail to the Project area to begin installing the monopiles. It will take approximately two weeks for the *Orion* to install the first six monopiles. *Id.* It will then return to the Port of Halifax to pick up an additional six monopiles and transition pieces. *Id.* This process will continue until all 62 monopiles are installed. *Id.* Thereafter, the wind turbine generators will be installed on the monopiles on a rolling basis. *Id.*

Vineyard Wind also has a fisheries communication program to ensure that fishing interests are aware of Project activities and can safely transit and fish in the area. Before it laid the scour protection, Vineyard Wind issued a series of Mariner Updates that gave mariners the locations of each scour/monopile location and provided a scannable QR Code so they could download Plotter files with the geolocations of the scour/monopile locations for use in their vessel chart plotters. *Id.* ¶ 10. For mariners without the ability to download those files, Vineyard Wind offered thumb drives with the data that could be plugged into chart plotters. *Id.* Plaintiffs have seen these updates, and one is attached as Exhibit A to their motion. *See* Doc. No. 116-1. Vineyard Wind also employs fishing vessels and captains as "scout vessels" to communicate in real-time with other vessels in the Project area while activities are underway. Moeller Decl. ¶ 11]; *see also* Vineyard Wind, *Offshore Wind Mariner Updates*, https://www.vineyardwind.com/offshore-wind-mariner-updates (last visited May 17, 2023) (Mariner Updates for all Project activities).

If gear damage occurs despite the protections noted above, fishermen can obtain compensation from a compensation fund established by Vineyard Wind and that is a condition of the Construction and Operations Plan ("COP") approval. The compensation fund will also compensate vessel operators, as well as shoreside fishing businesses, for lost revenues directly attributable to construction and operation of the Project. *See, e.g.*, BOEM_0077222; BOEM_0076945-46; BOEM_0036884. Vineyard Wind is currently finalizing the application process, but the fund will

compensate for eligible losses from the 2023 fishing season, and in the meantime, information is available online.[1]

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). A movant must satisfy four elements to obtain a preliminary injunction: "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Tree Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

The same standards govern a motion for a stay of an agency decision. *Nken v. Holder*, 556 U.S. 418, 426 (2009). In considering a request for a stay, the reviewing court should bear in mind that the public is "generally entitled to the prompt execution" of an agency action "that the legislature has made final," so a stay "is not a matter of right, even if irreparable injury might otherwise result to the [plaintiff]." *Id.* at 427.

## III.   CONSTRUCTION OF THE PROJECT WILL NOT CAUSE PLAINTIFFS IRREPARABLE HARM

The preliminary injunction or stay should be denied because construction of the Project will not irreparably harm Plaintiffs. Irreparable harm is a "necessary threshold showing for an award of preliminary injunctive relief." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). It cannot be assumed or "woven from the gossamer threads of speculation and

---

[1]  *See* Vineyard Wind 1 Fisheries Compensatory Mitigation Program (Mar. 9, 2023), https://static1.squarespace.com/static/5a2eae32be42d64ed467f9d1/t/6409f4382459f11c574dff63/1678373944682/VW1+Fisheries+Compensatory+Mitigation+Program+-+FINAL_R1.pdf

surmise." *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991). Plaintiffs must prove that "irreparable injury is *likely* in the absence of an injunction"; "the possibility of some remote future injury" is not enough. *Winter*, 555 U.S. at 22 (emphasis in original). And "delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm." *Charlesbank Equity Fund II*, 370 F.3d at 163.

A. Plaintiffs' delay in seeking a preliminary injunction undermines their claims of irreparable harm

Plaintiffs' claim of irreparable harm is "sharply undercut by [their] own rather leisurely approach to the question of preliminary injunctive relief." *Id.* Plaintiffs explain that they are filing for a preliminary injunction now, because "[c]ommercial trawl fishing season in the Vineyard Wind lease usually commences in late May of each year." Doc. No. 116 at 12. But their request for extraordinary relief comes too late, because the basis for their alleged irreparable injury— Project activities that supposedly make it too dangerous for them to fish in the Wind Development Area—have already occurred. Plaintiffs claim that "[t]rawl fishermen (including the Plaintiffs) will be unable to fish" wherever cable protection or scour protection are "put in place." *Id.* at 13; *see also* Doc. No. 115-1 ¶ 9. But most of the cables and scour protection have been laid, and all of it will be installed by June 3, 2023. *See* Moeller Decl. ¶¶ 8-9. Accordingly, a preliminary injunction against further construction activity will not eliminate their harm. *See Buckingham Corp. v. Karp*, 762 F.2d 257, 262-63 (2d Cir. 1985) (a "past injury that may be remedied by an award of damages" cannot justify issuance of a preliminary injunction).

Plaintiffs' untimely injunctive motion is a consequence of their own making, not Vineyard Wind's: "Plaintiffs could have predicted the alleged importance of this [situation] and filed this Motion before the eve of [construction]." *Friends of Merrymeeting Bay v. NextEra Energy Res.,*

*LLC*, No. 2:11-cv-38-GZS, 2013 WL 1835379, at *9 (D. Me. Apr. 30, 2013). As noted above, the construction schedule has been publicly available on BOEM's website for over a year. *See supra* at 2. At minimum, Plaintiffs knew over two months ago that Vineyard Wind was going to install the scour protection, and they threatened to file a motion for preliminary injunction then if Vineyard Wind would not agree to delay the installation until the Court ruled on the summary judgment motions. Exh. 2, Email from Ted Hadzi-Antich (Mar. 8, 2023). Though Vineyard Wind replied that it would not delay the scour protection activity because of the substantial adverse impact that delay would have on the Project, it filed its summary judgment reply brief early and offered to support a motion to expedite the hearing on the summary judgment motions. *See* Doc. No. 116-1 at 17, 20. Plaintiffs chose not to seek preliminary relief or to expedite the hearing. *Id.* at 22-23. Moreover, they never mentioned the need for a preliminary injunction at the hearing. Plaintiffs now seek that extraordinary relief when the scour protection activity is almost completed and installation of the monopiles is ready to begin. Their inexplicable delay is fatal to their claims of irreparable harm. *Friends of Merrymeeting Bay*, 2013 WL 1835379, at *9.

B. <u>Plaintiffs have not established irreparable harm.</u>

Even apart from the delay, Plaintiffs have failed to establish any irreparable injury. In support of their motion, Plaintiffs proffer the declaration of David Aripotch, the owner of Old Squaw Fisheries, Inc. ("Old Squaw") who (1) contends that Old Squaw will be "less profitable" because it will be unable to fish in the Project's Wind Development Area due to the increased risk that its vessel would be caught on "navigational obstructions caused by the installation of scour protection, pile driving, and related construction activities"; (2) expresses his personal belief that Vineyard Wind's compensation fund is "woefully inadequate" to cover his lost revenues; and (3) opines that

the Project will permanently alter the benthic environment. Doc. No. 115-1 ¶¶ 10-14. That is not proof of irreparable injury.

First, Plaintiffs' alleged inability to fish in the Wind Development Area is not an irreparable injury, which, "in the preliminary injunction context, means an injury that cannot be compensated for either by a later-issued permanent injunction … or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). As an initial matter, Plaintiffs overstate the degree of disruption that construction will cause to commercial fishing and navigation. Sequential installation of each of the monopiles will not put the entire Wind Development Area off limits. The *Orion* can install only one monopile at a time. The Coast Guard will impose a 500-meter safety zone around the one monopile being installed, in which vessel traffic will be prohibited "during periods of actual construction"—a period that is anticipated to "last approximately 48 hours" at each monopile location. *See* Coast Guard, *Safety Zone; Vineyard Wind 1 Wind Farm Project Area, Outer Continental Shelf, Lease OCS-A 0501, Offshore Massachusetts, Atlantic Ocean*, 88 Fed. Reg. 27,839, 27,843 (May 3, 2023). Consequently, vessels may navigate and fish in areas where the *Orion* is not working. Moeller Decl. ¶ 11. And even if Plaintiffs chose to leave the entire Wind Development Area, there are many places they can fish instead. The 65,296-acre Wind Development Area is a small fraction of longfin squid fishing grounds, which includes millions of acres running from Georges Bank to Hatteras, North Carolina and more than a million acres in New England alone. *See* Exh. 3, Declaration of Dennis M. King ("King Decl.") ¶ 23; Exh. 4, Declaration of Jill Rowe ("Rowe Decl.") ¶¶ 10-13.

Noticeably, Plaintiffs do not claim that they cannot fish and earn revenue in other parts of the ocean. This is not surprising, as the best data available show that: (1) squid revenues derived from fishing in the wind development area comprise less than 1% of total squid revenues from the

New England Region; and (2) on an individual permit (i.e., vessel) basis, revenues from fishing in the wind development area rarely exceed more than a few percent of a permit's total annual revenues. *Id.* ¶¶ 19, 28. Indeed, only twice in the 14 years between 2008 and 2021 did an individual fishing permit generate more than 25% of its annual revenue from fishing in the Wind Development Area – one vessel in 2011 (about 27%) and one in 2012 (29%). *Id.* ¶ 28. Therefore, Plaintiffs' claims that they earn 30% (or more) of their annual revenue from the Wind Development Area are not credible. *See* Doc. No. 115-1 ¶ 4; Doc. No. 66-3 ¶ 12; Doc. No. 66-4 ¶ 12.

Moreover, all parties agree that the amount of squid caught in the Wind Development Area varies from year to year. *See* Doc. No. 66-1 ¶ 12 (declaration of Mr. Aripotch). It is thus entirely possible that Plaintiffs will be able to make up lost revenue by fishing in other areas. *See* King Decl. ¶ 24. Notably, Plaintiffs do not claim that their commercial fishing operations will not be viable if they were to abandon the Project area. *See* Doc. No. 115-1 ¶ 13 (stating only that Old Squaw's business would be "less profitable"). Nor could they, because they can obtain compensation from the fund if they cannot make up lost revenue by fishing elsewhere. *See infra* at 10.

Second, Plaintiffs' fear that it will be unsafe to operate within the Project area is not an irreparable injury that can support issuance of a preliminary injunction, because they say they will no longer fish in that area. Doc. No. 116 at 11-12. But if they were to operate in the Project area, they could safely avoid the construction activities. As the COP approval requires, the wind turbines will be spaced one nautical mile apart to facilitate navigation and fishing, and Vineyard Wind will have scout vessels on site to assist mariners navigating in the vicinity of the construction activity. Moeller Decl. ¶ 11. Plaintiffs worry that trawling gear will become entangled in the Project's

structures and scour protection. Doc. No. 116 at 13. But Vineyard Wind provides Mariner Updates to advise mariners of all construction activities. The locations of the scour portion and monopile foundations are also marked on mariner's charts, which commercial fishermen use to avoid other obstructions that may damage trawling gear. *Supra* at 4. In short, Plaintiffs have all the information they need to navigate safely, and their empty assertions about navigational safety should not be credited.

<u>Third</u>, Vineyard Wind is establishing a fund to compensate commercial fishermen for income that is lost if they cannot fish in the Wind Development Area. Accordingly, Plaintiffs' feared losses "can be remedied by compensatory awards, and thus do not rise to the level of being irreparable." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009). Plaintiffs claim that the fund is "woefully inadequate" to compensate Plaintiffs for their economic losses. Doc. No. 116 at 14. But that claim is not credible as it relies on the inadmissible opinion of Mr. Aripotch, who has no "personal knowledge of the matter." Fed. R. Evid. 602. Mr. Aripotch's statement acknowledges his opinion is based not on his first-hand knowledge, but on some unspecified information he received from the Long Island Commercial Fishing Association. Doc. No. 115-1 ¶ 14. Furthermore, Mr. Aripotch's unsubstantiated belief is contradicted by the facts before the Court.

The compensation funds were negotiated between Vineyard Wind and Massachusetts and Rhode Island as part of the state certifications that the Project is consistent with their state coastal management plans. BOEM found that they "are generally consistent with the revenue exposure information provided in Table 3.10-4a in Appendix B of the FEIS," and that the $26.7 million the compensation funds "should be adequate to cover any gear and/or revenue losses over the life of the Project." BOEM_0076945-46. As explained in the declaration of marine resource economist

Dennis King, BOEM's conclusions are sound. *See* King Decl. ¶¶ 29-32. And regardless of the size of the compensation mitigation fund, Plaintiffs have made no showing that any future deficiency is so substantial that they cannot make up lost revenues by fishing elsewhere. *See supra* at 9.

Finally, Plaintiffs are wrong to claim the Project will cause irreparable harm to the benthic environment. Their declarant, Mr. Aripotch (the owner of Old Squaw and the captain of the F/V *Caitlin & Mairead*), has not demonstrated he is qualified to express opinions regarding complex matters of marine biology and oceanography, as required by Federal Rule of Evidence 702(a).[2] The declaration also fails to explain the "sufficient facts or data" necessary to support his opinions, identify any "reliable principles and methods" he utilized, or explain how he "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Accordingly, the Court should reject Mr. Aripotch's declaration on these subjects.[3]

Mr. Aripotch's unsubstantiated opinions are also contradicted by the opinions of qualified experts. The Final Environmental Impact Statement found that the Project will not cause the environmental harms he fears. *See, e.g.*, BOEM_0068529 ("impacts on benthic resources of EMF" will be "**negligible**"); BOEM_0068532 ("Given that most benthic species in the region are either mobile as adults or planktonic as larvae," areas disturbed by pile-driving noise "would likely be

---

[2] The First Circuit has not determined whether Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), apply at the preliminary injunction stage. However, because any ruling on a motion for preliminary injunction must "reflect a plausible rendition of the evidence … before the court," *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 17 (1st Cir. 1996), many courts have applied Rule 702 and *Daubert* when considering such a motion. *See, e.g., Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 277-78 (4th Cir. 2002); *Warner v. Gross*, 776 F.3d 721, 733-34 (10th Cir. 2015); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011).

[3] *See e.g.,* 115-1 ¶¶ 9 (effects of pile driving noise, operational turbine noise, and "EMF energy" on loligo squid); 11 (pile driving, "EMF energy dispersal," ocean noise, and "benthic pollution" will harm "the surrounding environs"); 14 (even if wind turbines were removed, the area might not "revert to the pre-construction stage so as to be navigable and commercially fishable").

recolonized naturally" and "in the short term"). As the declaration of Jill Rowe explains, modeling of the Electromagnetic Field ("EMF") produced when electricity is run through the specific cables that will be used for the Project indicates that the squid and fish harvested by Mr. Aripotch will not be harmed. Exh. 4, Rowe Decl. ¶ 29. In fact, these species should not even be able to detect the EMF generated by the cables, which will be substantially weaker than the Earth's steady magnetic field. *Id.* ¶ 30. As for noise impacts, the most recent studies available indicate that noise generated from the operation of wind farms does not cause injury or lead to permanent avoidance of the area. *Id*. ¶¶ 27-28. Even for the louder pile driving, the impact is temporary and minimal. Squid may swim away from the noise during the soft start of pile driving, and the zone of potential mortality to squid would be limited to the time when pile-driving is occurring and would not extend beyond 112 meters. *Id*. ¶¶ 17, 20-21.

## IV.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Plaintiffs are unlikely to succeed on the merits of their claims, which is another reason to deny their motion. Likelihood of success is the "sine qua none of the four-part" preliminary-injunction test. *Shurtleff v. City of Boston*, 928 F.3d 166, 171 n.3 (1st Cir. 2016) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). Plaintiffs "must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Plaintiffs have not made that showing. Their motion simply reiterates, in abbreviated fashion, a few of the arguments made in their summary judgment briefs. But as Federal Defendants and Vineyard Wind's summary judgment briefing demonstrates, those arguments lack merit.[4]

---

[4] Rather than repeat arguments the Court has already seen, Vineyard Wind will rely on its summary judgment briefs (Doc. Nos. 86, 94), which are incorporated herein by reference.

Plaintiffs first claim that the COP approval violated section 8(p)(4) of OCSLA. Doc. No. 116 at 6. They are wrong. *See* Doc. No. 73 at 35-39; Doc. No. 87 at 23-24; Doc. No. 93 at 3-12; Doc. No. 94 at 12-13. Plaintiffs then repeat their assertion that BOEM violated OCSLA by approving the COP notwithstanding a statement in the Record of Decision ("ROD") that the Project area would "be abandoned by commercial fisheries due to difficulties with navigation." Doc. No. 116 at 7. But as this Court has already recognized, there is "nothing" in the record to indicate that the statement "was anything but a clerical mistake" by the Army Corps of Engineers, (Doc. No. __[2023-04-03 Hr'g Tr.] at 31:10-11), which later clarified that it was simply acknowledging the comments of some commercial fishermen and not making an independent finding that fishermen would abandon the area. Doc. No. 74 at 11-13; *see also* Doc. No. __[2023-04-03 Hr'g Tr.] at 34 (denying Plaintiffs' motion to strike the correction). Moreover, BOEM carefully considered the issue and imposed numerous conditions to ensure that the Project will be carried out in a manner that does not unreasonably interfere with commercial fishing, which is all that OCSLA requires. *See* Doc. No. 73 at 40-44; Doc. No. 87 at 23-24; Doc. No. 93 at 3-12; Doc. No. 94 at 12-13.[5]

Plaintiffs also advance a series of unmeritorious National Environmental Policy Act ("NEPA") claims. Doc. No. 116 at 7-9. Plaintiffs cannot succeed on any of these claims because their alleged economic injuries are outside NEPA's zone of interest. *See* Doc. No. 73 at 7-8. The NEPA claims also lack merit because (1) the Final Environmental Impact Statement ("FEIS") explored a broad range of alternatives, *see* Doc. No. 73 at 19-22; Doc. No. 87 at 19-23; Doc. No. 93 at 25-33; Doc. No. 94 at 13-18; and (2) BOEM addressed the cumulative impact of Vineyard

---

[5] Rather than repeat arguments the Court has already seen, Vineyard Wind will rely on its summary judgment briefs (Doc. Nos. 86, 94), which are incorporated herein by reference.

Wind's Project and other reasonably foreseeable offshore wind energy projects, *see* Doc. No. 73 at 31-33; Doc. No. 93 at 36.

## V.   THE HARMS TO VINEYARD WIND DRAMATICALLY OUTWEIGH PLAINTIFFS' PURPORTED MONETARY DAMAGES

The balance of the equities is clearly in Vineyard Wind's favor. A preliminary injunction or stay will impose at least $1 million of dollars of uncompensated costs on Vineyard Wind *each day*. Moreover, any significant delay threatens the very existence of the Project, for which over $1.85 billion has been spent. These harms far outweigh Plaintiffs' speculative fishing losses, which can be compensated from Vineyard Wind's compensation fund. A preliminary injunction should not be issued under these circumstances. *See*, *e.g.*, *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (reversing preliminary injunction against oil and gas exploration on OCLSA leases where irreparable harm to plaintiffs was "not at all probable. And on the other side of the balance of harms was the fact that the oil company petitioners had committed approximately $70 million to exploration to be conducted during the summer of 1985 which they would have lost without chance of recovery had exploration been enjoined.")

A.   <u>A preliminary injunction or stay will cause vineyard wind to incur at least $1 million per day in uncompensated costs.</u>

The scour protection work is in its last stages, and the *Orion* is mobilizing to begin installation of the first six monopile foundations. *See supra* at 2-3. A delay would throw the entire construction schedule out of kilter. At a minimum, Vineyard Wind must pay for vessel time even if it is idle or prevented from working. Moeller Decl. ¶ 23. If the *Orion* is not able to begin monopile installation as scheduled, Vineyard Wind would incur standby costs of approximately $1 million to $1.4 million per day. *Id.* Moreover, a delay in the installation of the monopiles would cause a cascade of delays in subsequent stages of the Project, each of which carries a contractual cost. *Id.* Vineyard Wind's ability to install the wind turbines would also be impaired if the schedule

were pushed back beyond the available windows of the specialized installation and transport vessels contracted to do that work. *Id.* Vineyard Wind estimates that the cost of halting construction together with knock-on effects and delayed revenue would reach approximately $200 million by the beginning of July 2023. *Id.*

    B.  <u>A preliminary injunction or stay could make it impossible for vineyard wind to complete the project.</u>

Beyond those costs, a preliminary injunction or stay could make it impossible for Vineyard Wind to complete the Project. Completing installation of the monopile foundations as called for in the existing construction schedule is critically important. A delay in the commencement of installation of any of the monopile foundations for even a short period, would make completing installation of all foundations by December 2023 extremely challenging. Moeller Decl. ¶ 24. The installation schedule lacks margin for delay, because there will be days when pile driving cannot occur, not only because of weather and rough seas, but also because Vineyard Wind will comply with the protected species mitigation measures. *Id.* ¶ 14.; *see also* NMFS 3490-94 (Incidental Harassment Authorization conditions imposing time of day restrictions, visual and acoustic clearance zone conditions, and shut down conditions that can delay pile driving). When mid-December arrives, the *Orion* must depart for its next assignment. Moeller Decl. ¶ 14. The *Orion* is under contract with other projects through 2025, and no other vessels could be secured to complete the work. *Id.* Because construction of subsequent stages of the project depends on timely installation of the foundations, the contractual arrangements for those later stage would be impaired as well. Consequently, the failure to install the foundations by December would have contractual, logistical, and financial consequences that are so significant that the company would be at significant risk of being unable to complete the Project. *Id.* ¶ 24.

Finally, an injunction would put the Project at risk by imperiling its financing. Vineyard Wind has secured debt financing for the Project's construction pursuant to a Credit Agreement totaling approximately $2.4 billion. *Id.* ¶ 25. Every two weeks Vineyard Wind requests a draw from the banks to cover construction costs. *Id.* To do so, Vineyard Wind must show that it is in compliance with the financing covenants, which include continued progress towards completing construction. *Id.* The Project must also certify that no litigation-related event has occurred that would meet the definition of a "Material Adverse Effect" under the Credit Agreement. *Id.* The issuance of an injunction qualifies as a "Material Adverse Effect." *Id.* If the Project cannot make these certifications, the lenders may suspend any further drawdowns on the loan. *Id.*

Vineyard Wind believes it is very likely that the banks would withhold further funding if Plaintiffs' motion were granted. *Id.* ¶ 26. To date, Vineyard Wind has expended approximately $1.825 billion constructing the Project. *Id.* Without ongoing access to its financing, Vineyard Wind could not sustain its monthly construction costs beyond June. *Id.* If this motion is granted and Vineyard Wind loses its access to its financing, the Project would come to a complete stop. *Id.*

In summary, an injunction at this stage would put the entire Project at risk by creating downstream disruptions to subsequent Project phases and immense financial consequences that Vineyard Wind could not recover from.

## VI.   A PRELIMINARY INJUNCTIVE OR STAY IS NOT IN THE PUBLIC INTEREST

Plaintiffs failed to demonstrate that a preliminary injunction against Vineyard Wind "will promote (or, at least, not denigrate) the public interest." *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001). They claim the Project will cause "radar interference that w[ill] endanger national security and public safety." Doc. No. 116 at 18. They are wrong. The Coast Guard looked at the issue and found no authoritative scientific studies showing that the wind turbines will degrade marine vessel radar. BOEM_0068739, BOEM_0068744, BOEM_0054795; *see also* Doc. No. 73

at 24.  Moreover, the National Academy of Sciences recently conducted a study of the effects of wind turbines on marine vessel radar. Exh. 5, Declaration of Larry Wise ("Wise Decl.") ¶ 13.  This study found that simple measures, including improved operator training, the requirement for smaller vessels to carry radar reflectors to improve detectability, and the standardization of radar mounting procedures on vessels, mitigate much of the effects of wind turbines. *Id*. The study also found that installation of newer "solid-state" radar would result in vessel radar systems that are resilient to wind turbine effects.  *Id*.  The cost of installing solid-state radar systems would be covered by the $12.5 million Rhode Island Fishermen's Future Viability Trust described in Dennis M. King's declaration. King Decl. ¶ 30.  And BOEM consulted with the Department of Defense and included mitigation measures in the COP approval to safeguard against potential impacts on military activities. BOEM_0076939; *see also* Doc. No. 73 at 44-45.

Plaintiffs' claim that their refusal to fish in the Project area will decrease their "catch, thereby decreasing the national food supply" and "possibly driving food prices higher for Americans" (Doc. No. 116 at 18), is also wrong. The Final Environmental Impact Statement found it "highly unlikely that seafood processors would see a measurable loss of available product given that less than 2 percent of landings from any given fishery (average of 0.20 percent and high of 1.61 percent) are sourced from the [wind development area];" and the "product is available outside the [wind development area.]" BOEM_0068722. For squid in particular, landings from the wind development area account for less than 0.7% of annual squid revenue in New England, and no more than 0.8% of annual squid revenue in Rhode Island. King Decl. ¶ 19. The personal views expressed in Plaintiffs' declarations provide no basis for questioning that conclusion.

Plaintiffs' discussion of the public interest also ignores that Congress enacted OCSLA because it found that development of the Outer Continental Shelf is in the public interest. *See* 43

17

U.S.C. § 1332(3) ("the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."). As the Supreme Court recognized in *Amoco*, an injunction against energy development on the Outer Continental Shelf frustrates that policy. *See Amoco*, 480 U.S. at 545 & n.11.

An injunction would also contravene the policy of the federal government and the Commonwealth of Massachusetts to develop offshore wind energy projects as an important component in combatting climate change.[6] An injunction that delays "largescale wind energy projects can impact efforts to combat this [climate] crisis" and is not in the public interest. *Siemens Gamesa Renewable Energy A/S v. Gen. Elec. Co.*, No. 21-cv-10216, 2022 WL 4096910, at *4 (D. Mass. Sept. 7, 2022).

Finally, climate change is a global problem and while many nations are undertaking measures to reduce carbon pollution, others have yet to act. As the first major offshore wind development project approved by the United States, the fate of Vineyard Wind is important in our nation's efforts to enlist other countries to reduce their carbon footprint. As recognized by John Kerry, the President's Special Envoy for Climate, in a speech at the American University in Cairo on February 21, 2022, we know "one thing above all: the world will not follow our advice; it will

---

[6] Press Release, Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs (Mar. 29, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/; Brief of the Commonwealth of Massachusetts as *Amicus Curiae* in Support of Defendants' Motions to Dismiss, Doc. No. 57, *Allco Renewable Energy, Ltd. v. Haaland*, Case No. 1:21-cv-11171 (Feb. 18, 2022) (Project is needed to meet the Commonwealth's aggressive statutory greenhouse gas emission reduction mandates).

follow our example." https://www.state.gov/special-presidential-envoy-for-climate-john-kerry-implementation-plus-global-climate-action-in-2022/.

## VII.  ANY PRELIMINARY INJUNCTION OR STAY SHOULD BE CONDITIONED ON PLAINTIFFS' POSTING A BOND TO PAY FOR THE COSTS AND LOSSES SUSTAINED BY VINEYARD WIND

Because Plaintiffs fail to meet any of the criteria for a preliminary injunction, their motion should be denied. But if the Court were nevertheless inclined to grant the motion, it should condition any preliminary relief on Plaintiffs' posting a bond to pay for the costs and losses sustained by Vineyard. Imposition of a bond is expressly authorized by Rule 65(c) and OCSLA, the only statute mentioned in Plaintiffs' motion for which they have standing to even request relief. *See supra* at 13; 43 U.S.C. § 1349(a)(5); Fed. R. Civ. P. 65(c).

Plaintiffs seek to avoid the imposition of a bond by arguing that the Court could simply stay the COP approval and ROD pursuant to 5 U.S.C. § 705. Doc. No. 116 at 19. That argument fails. A stay of the COP or ROD approval would not by itself enjoin Vineyard Wind from acting in its leased area. *See Standing Rock Sioux v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) (without an accompanying injunction, vacatur of an easement for an oil pipeline over government land does not automatically require cessation of pipeline activities). And even if it could, nothing in 5 U.S.C. § 705 prohibits a court from conditioning the stay on the issuance of a bond.[7] Nothing deprives the Court of its inherent equitable authority to condition the issuance of

---

[7] 5 U.S.C. § 705 states: "When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."

the stay on a bond or other conditions to protect the defendant if it is determined that the injunction was wrongly issued.[8]

Here, equity requires that any preliminary injunction be conditioned on a bond to compensate Vineyard Wind for losses it will incur if construction is halted. Plaintiffs claim that it would be a "substantial financial challenge to the Plaintiffs" to post more than a "nominal" bond, but they cite no evidence to substantiate that claim, Doc. No. 116 at 19, and it is not credible. Plaintiffs are not "indigent plaintiffs, from whom it would be unjust to require security." *Crowley v. Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). They are financially successful fishing companies.[9]

## CONCLUSION

For the foregoing reasons, Intervenor-Defendant Vineyard Wind asks this Court to deny Plaintiffs' motion for preliminary injunction or stay.

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo (BBO # 564879)
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
(617) 223-0304
jpirozzolo@sidley.com

*Counsel for Vineyard Wind 1 LLC*

---

[8] *See, e.g.*, *Russell v. Farley*, 105 U.S. 433, 438-40 (1881) (discussing inherent equitable authority); *HMG Prop. Invs., Inc. v. Parque Indus. Rio Canas, Inc.*, 847 F.2d 908, 915 (1st Cir. 1988) ("courts have inherent powers, rooted in the chancellor's equity powers," to "process litigation to a just and equitable conclusion," including the power to require a bond not authorized by the Federal Rules of Civil Procedure) (cleaned up).

[9] *See* Doc. No. 66-1 ¶ 12 (Old Squaw Fisheries annual revenue of up to $1.167 million); Doc. No. 66-3 ¶ 12 (Heritage Fisheries annual revenue of approximately $966,667); Doc. No. 66-4 ¶ 12 (Nat. W. Fisheries annual revenue of approximately $753,846). That is not counting Plaintiff Seafreeze Shoreside, Inc. and the members of the fishing association Plaintiffs that have provided no evidence of their revenues.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 19th day of May 2023, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record for Plaintiffs and Defendants via the Court's electronic filing system.

/s/ Jack W. Pirozzolo
Jack W. Pirozzolo
