UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SEAFREEZE SHORESIDE, INC., et al.,    )
                                      )
          Plaintiffs,                 )
                                      )
     v.                               )
                                      )
UNITED STATES DEPARTMENT OF THE       )
INTERIOR, et al.,                     )    Civil Action No.
                                      )    1:22-cv-11091-IT
          Defendants,                 )
                                      )
and                                   )
                                      )
VINEYARD WIND 1 LLC,                  )
                                      )
          Intervenor-Defendant.       )
                                      )
_____


     BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE


                    MOTION HEARING


               Tuesday, May 23, 2023
                    9:36 a.m.



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts


Robert W. Paschal, RMR, CRR
Official Court Reporter
rwp.reporter@gmail.com

1
2

**A P P E A R A N C E S**

3      On behalf of the Plaintiffs:

4          TEXAS PUBLIC POLICY FOUNDATION
            BY:  THEODORE HADZI-ANTICH
5              CONNOR WILLIAM MIGHELL
            901 Congress Avenue
6          Austin, TX  78701
            (512) 472-2700
7          tha@texaspolicy.com
            cmighell@texaspolicy.com
8
            LAWSON & WEITZEN, LLP
9          BY:  IRA H. ZALEZNIK
            88 Black Falcon Avenue
10         Suite 345
            Boston, MA  02210
11         (617) 439-4990
            izaleznik@lawson-weitzen.com
12

13     On behalf of the Federal Defendants:

14
            UNITED STATES DEPARTMENT OF JUSTICE
15         BY:  LUTHER L. HAJEK
            999 18th Street, South Terrace
16         Suite 370
            Denver, CO  80202
17         (303) 844-1376
            luke.hajek@usdoj.gov
18

19         UNITED STATES DEPARTMENT OF JUSTICE
            BY:  ANGELA ELLIS
20         150 M Street NE
            Room 2.900
21         Washington, DC  20002
            (202) 305-0466
22         angela.ellis@usdoj.gov

23

24

25

On behalf of the Intervenor-Defendant:

    SIDLEY AUSTIN LLP
    BY:  JACK W. PIROZZOLO
    60 State Street
    36th Floor
    Boston, MA  02109
    (617) 223-0300
    jpirozzolo@sidley.com


    SIDLEY AUSTIN LLP
    BY:  DAVID T. BUENTE
        PETER C. WHITFIELD
        JAMES WEDEKING
        BROOKLYN HILDEBRANDT
    1501 K Street NW
    Washington, DC  20005
    (202) 736-8000
    dbuente@sidley.com
    pwhitfield@sidley.com
    jwedeking@sidley.com
    bhildebrandt@sidley.com

# <u>TABLE OF CONTENTS</u>

## PROCEEDINGS & WITNESSES

|  | <u>Page</u> |
|---|---|
| Opening by Mr. Hadzi-Antich | 13 |
| Opening by Mr. Hajek | 14 |
| Opening by Mr. Buente | 18 |

| On behalf of the Plaintiffs: | <u>Page</u> |
|---|---|
| DAVID ARIPOTCH | |
| BY MR. PIROZZOLO | 21 |
| BY MR. HADZI-ANTICH | 45 |

| On behalf of Defendants | <u>Page</u> |
|---|---|
| JILL ROWE | |
| BY MR. HADZI-ANTICH | 63 |
| BY MR. BUENTE | 68 |
| DENNIS KING | |
| BY MR. HADZI-ANTICH | 74 |
| LARRY WISE | |
| BY MR. HADZI-ANTICH | 78 |
| By MR. WEDEKING | 82 |
| KLAUS MOELLER | |
| BY MR. HADZI-ANTICH | 83 |
| BY MR. PIROZZOLO | 97 |

**TABLE OF CONTENTS cont.**

                                                                    Page

Closing by Mr. Hadzi-Antich                                          104

Closing by Mr. Buente                                               110

1                    **P R O C E E D I N G S**

2              (In open court at 9:36 a.m.)

3              THE DEPUTY CLERK:  United States District Court is

4    now in session, the Honorable Judge Indira Talwani presiding.

5              This is Case Number 22-cv-11091, Seafreeze

6    Shoreside, Inc., et al., v. United States Department of the

7    Interior, et al.

8              Will counsel please identify themselves for the

9    record.

10             MR. HADZI-ANTICH:  Theodore Hadzi-Antich for

11   plaintiff.  I'm joined at counsel table by co-counsel Connor

12   Mighell and also our local counsel Ira Zaleznik.

13             MR. ZALEZNIK:  Your Honor, I just wanted to thank

14   you again for the courtesy that you granted to me.  I didn't

15   think I was going to be able to change my travel plans, but I

16   ultimately did, so here I am.

17             THE COURT:  Welcome.

18             MR. ZALEZNIK:  Thank you, Your Honor.

19             MR. HAJEK:  Good morning, Your Honor.  Luke Hajek

20   for the federal defendants.

21             THE COURT:  Good morning.

22             MS. ELLIS:  Good morning, Your Honor.  Angela Ellis

23   for the federal defendants.

24             THE COURT:  Good morning.

25             MR. PIROZZOLO:  Good morning, Your Honor.  Jack

1    Pirozzolo for Vineyard Wind; and with me are David Buente,

2    Peter Whitfield, Jim Wedeking, and Brooklyn Hildebrandt.

3            THE COURT:  Good morning.

4            And I see that I've got some documents here, so --

5    potential witness exhibits from Vineyard Wind, and what do I

6    have from plaintiffs?  I guess I'll figure it out as we go.

7            So do we have testimony that you are intending to

8    present?  How are we proceeding this morning?

9            MR. HADZI-ANTICH:  Yes, Your Honor.  I have with me

10   today, making available for testimony, David Aripotch, who is

11   the owner of one of the plaintiffs, and also Bonnie Brady,

12   who is the executive director of Plaintiff Long Island

13   Commercial Fishing Association, and Meghan Lapp, who is the

14   fisheries liaison for the plaintiff Seafreeze Shoreside, Inc.

15           We are aware of Your Honor's decision denying our

16   motion to add the declarations of Ms. Lapp and Ms. Brady to

17   support our motion for stay.  And respectfully, I would like

18   to ask Your Honor to reconsider that denial.

19           We first learned that --

20           THE COURT:  So let me just ask you this.

21           MR. HADZI-ANTICH:  Yes.

22           THE COURT:  I try hard to act expeditiously when

23   you file things and do my best to move things forward.  I had

24   your request to include that.  I had Vineyard Wind's

25   opposition.  And one of the things they pointed out in their

1    opposition is that they would now be required to prepare for

2    this late-filed material.

3            And I denied your leave to file those.  If you were

4    going to seek reconsideration, wouldn't the appropriate time

5    have been yesterday afternoon, again, so that defendant --

6    sorry -- intervenor had an opportunity to respond rather than

7    this morning in our limited hearing time?

8            MR. HADZI-ANTICH:  Co-counsel Mighell and myself

9    came in from out of town on Sunday.  We were at a hotel, and

10   we -- we did not have the resources --

11           THE COURT:  Have you heard of -- WeWork across the

12   street?

13           MR. HADZI-ANTICH:  Your Honor, we did not have the

14   resources.  We were preparing for this hearing --

15           THE COURT:  So you were preparing for this hearing

16   involving evidence that I have said I wasn't going to allow

17   those declarations?

18           MR. HADZI-ANTICH:  No, Your Honor.  We were

19   preparing for the hearing before we saw your order denying

20   our motion.  When we saw your order denying our motion, we

21   did not have the wherewithal and the resources to file a

22   formal reconsideration request.

23           However, I'm doing that now.  If Your Honor decides

24   not to reconsider that, I will point out that we brought

25   Ms. Lapp and Ms. Brady here today.  They're available to

1    testify.

2         And I would request that Your Honor,

3    notwithstanding the fact that their declarations may not be

4    admitted or are not currently admitted, that you allow us to

5    put them on the stand to present testimony, specifically in

6    reference to the issue of the compensation fund.  And it goes

7    to irreparability of harm and the adequacy of the

8    compensation fund.

9         Ms. Brady would speak to the adequacy of the

10   compensation funds, one for Rhode Island and the other for

11   Massachusetts.  And -- I'm sorry -- Ms. Brady would speak for

12   the compensation fund for New York, Connecticut, and

13   New Jersey; and Ms. Lapp would speak for the compensation

14   funds, individual ones, for Rhode Island and Massachusetts.

15        That goes directly to Mr. Wise's declaration with

16   regard to adequacy of that compensation fund to hold the

17   plaintiffs harmless, and that goes to the central issue of

18   irreparability of harm.  And I think it would be equitable

19   and appropriate, respectfully, for us to be able to put those

20   witnesses on the stand today, and of course subject to

21   cross-examination.

22        THE COURT:  How much time were you anticipating for

23   your presentation and -- well, how much time were you looking

24   for from me?

25        MR. HADZI-ANTICH:  Total time, including witnesses?

1          THE COURT:  Yes.

2          MR. HADZI-ANTICH:  Yeah, I would say no more than

3     just a few minutes, three minutes for opening statement, and

4     then with regard to Mr. Aripotch, I can't really speak to how

5     much time cross-examination would take; but as Your Honor

6     indicated during the status conference, we were assuming that

7     all of the declarations that were filed and admitted would

8     serve as direct testimony so that there would be no need to

9     rehash that information.

10          And, obviously, no need to --

11          THE COURT:  It's just a simple question.

12          MR. HADZI-ANTICH:  Yeah.

13          THE COURT:  How much time?

14          MR. HADZI-ANTICH:  I would say roughly, with three

15     witnesses, one hour.  But that's off the top of my head,

16     Your Honor.

17          THE COURT:  How much time are defendants and

18     Vineyard Wind anticipating for their case?

19          MR. HAJEK:  We would just have a few minutes of

20     argument, Your Honor.

21          MR. PIROZZOLO:  We anticipate about 20 to

22     30 minutes for cross-examination of Mr. Aripotch.  And then

23     we did intend to have the direct for the four Vineyard Wind

24     witnesses who are present here through the declarations, so

25     there would be no direct testimony, so it would just be up to

1    how long the plaintiffs want to cross those four witnesses.

2              And then there would, of course, be maybe some

3    redirect of a few minutes.

4              THE COURT:  And what are defendant or defendant

5    intervenor's response to the motion for reconsideration of

6    the -- regarding the additional declarations and/or

7    witnesses?

8              MR. HAJEK:  We would object, Your Honor.  We were

9    prepared to file an opposition to this motion Monday

10   afternoon when the Court issued the order, and we considered

11   the issue to be resolved.

12             Counsel never called us yesterday afternoon or

13   emailed us to let us know that he was going to ask for

14   reconsideration of this.  We consider it to be resolved.  And

15   the Court's order is well-founded.  It was at the last

16   minute.  And, also, there were several -- there were lengthy

17   stretches of the declarations that went, essentially, to

18   merits issues in an attempt to reargue the case.

19             MR. PIROZZOLO:  Vineyard Wind's position is the

20   same, with the additional observation that, to the extent the

21   declarations that were submitted a couple of days ago served

22   as some form of offer of proof, none of that is admissible

23   evidence anyway.  It was just simply argument.  And there's

24   been no offer of proof or record to establish that those

25   witnesses are competent to provide any admissible evidence

1    with regard -- or any relevant evidence with regard to this

2    hearing.

3            MR. HADZI-ANTICH:  If Your Honor would permit me to

4    answer, contrary to what Vineyard Wind counsel has asserted,

5    the declarations are not -- at least were not intended to be

6    argument.  They were intended specifically to address the

7    issues arising primarily in Dr. Wise's declaration with

8    regard to the adequacy of the compensation fund to make the

9    plaintiffs whole in Rhode Island, Massachusetts, New York,

10   Connecticut, and New Jersey.

11           And it's with regard to those issues specifically

12   that I would ask Your Honor to use her discretion to allow at

13   least the -- Ms. Brady and Ms. Lapp to testify today on those

14   issues in direct response to the facts asserted in Mr. Wise's

15   declaration.

16           THE COURT:  Okay.  I am denying your motion for

17   reconsideration.  I do view it as untimely.

18           I will allow the following, which is that you are

19   welcome to make an offer of proof by marking which of those

20   paragraphs of their declaration you contend are the ones that

21   you think I should have allowed in, and then you at least

22   have a clean record in the event that you think that is an

23   error on my part in not allowing that testimony.

24           But I certainly -- I did issue an order saying that

25   I found the proposed testimony to go beyond what is normally

1    in an affidavit, so I will give you the courtesy of

2    identifying -- allowing you to identify those paragraphs that

3    you contend the Court should have considered in connection --

4              MR. HADZI-ANTICH:  Thank you, Your Honor.

5              THE COURT:  -- with this motion.

6              So my intention here is to evenly de- -- divide the

7    time I have available for examination.  And I -- that's --

8    roughly, I have an hour for each side, and I will take the

9    declarations that have been submitted thus far as -- if you

10   want to have those as your case in chief and just go straight

11   to cross-examination, we'll do it.  Fine.

12             I will -- with regard to the timing, I use

13   Judge Young's methodology.  When you are questioning, whether

14   it's on direct or on cross, that time is credited to you.

15   When it's the other side questioning, whether it's on direct

16   or cross, that time is accounted to them.

17             So -- so with that -- so, from Vineyard Wind, if

18   you want to -- I guess you wanted a few minutes of opening

19   statement; is that correct?

20             MR. HADZI-ANTICH:  Yes, Your Honor.

21             THE COURT:  Sorry.  Not Vineyard Wind, for

22   plaintiffs.

23             MR. HADZI-ANTICH:  Yes.  The reason we're here

24   today is because monopile installation associated with pile

25   driving on the ocean floor bottom is imminent, and also

1    imminent is the commercial fishing season in the Vineyard

2    Wind area.  The confluence of those two factors made it

3    imperative for us to file the motion for stay.

4           And so the motion for stay deals with all four of

5    the criteria for stays on the one hand and preliminary

6    injunction on the other hand, alternatives, stay or

7    preliminary injunction.  And they discuss likelihood of

8    success on the merits, irreparability, equities of the

9    parties and, finally, the public interest.  It's all in the

10   documents.

11          I don't need any further time to make an opening

12   statement, and I'm prepared after the government's and

13   Vineyard Wind's opening statement to call our first witness.

14          MR. HAJEK:  Good morning, Your Honor.

15          Plaintiffs' motion for a preliminary injunction

16   should be denied.  They have failed to demonstrate a

17   likelihood of success on the merits.  They have failed to

18   demonstrate irreparable harm, and they have failed to show

19   that the balance of the harms in the public interest weigh in

20   their favor.

21          We've argued the merits at length, so I will turn

22   to irreparable harm and the balance of the harms.  They have

23   failed to demonstrate that -- the irreparable harm to their

24   interest in fishing or their interests in the environment.

25   Plaintiffs' own delay in seeking the injunction is fatal to

1    their claims of irreparable harm in this case.

2            The Supreme Court has stated that a party seeking a

3    preliminary injunction must show reasonable diligence of

4    bringing such a motion.  And the First Circuit has stated

5    that a party's, quote, "cries of urgency are sharply undercut

6    by its own rather leisurely approach to the question of

7    preliminary injunctive relief."

8            Here, plaintiffs' approach has been too leisurely

9    to warrant the drastic remedy of an injunction.  BOEM

10   approved the COP for the Vineyard Wind project in July of

11   2021, roughly 22 months ago.  The proposed construction plan

12   has been available since that time.  Plaintiffs brought suit

13   in December of 2021, nearly 17 months ago.  They could have

14   brought a preliminary injunction at any time since then, but

15   they did not do so.

16           They even approached the government and Vineyard

17   Wind in mid-March and proposed filing a motion for

18   preliminary injunction from the scour protection, but they

19   chose not to do so.  Instead, they have chosen to wait until

20   Vineyard Wind has begun construction with the placement of

21   scour protection and the placement of the monopiles is

22   imminent.

23           Their delay in seeking injunctive relief severely

24   undermines their claimed irreparable harm.  If this matter

25   were truly as urgent as the plaintiffs claim it to be, they

1    would not have waited this long to seek injunctive relief.

2          Even aside from their delay, they have failed to

3    demonstrate irreparable harm.  The premise of their harm is

4    that they will not be able to fish in the project area and,

5    therefore, will suffer financial losses.  And their arguments

6    fail for several reasons.

7          First, even during construction and afterwards,

8    there is no prohibition on navigation and fishing in the

9    project as a whole.  During the scour protection, which is

10    nearly completed, the Coast Guard has advised vessels to give

11    a wide berth to the vessel laying the scour protection and

12    trawler vessels should avoid.

13          The area is not off limits to fishing.  And once

14    construction of the foundations and monopiles is underway,

15    the Coast Guard has issued a proposed rule for 500-meter

16    safety zones around the area where construction is occurring,

17    but fishing and navigation will not be precluded in those

18    areas.

19          And after construction is completed, fisherman

20    likewise will not be prohibited from the project area.  BOEM

21    required several measures to sure the fishermen may safely

22    navigate and fish within the area, including the marking and

23    lighting of turbines, a two-way communication channel between

24    the fishermen and the project operators, the sharing of

25    electronic chart information regarding the project

1    structures.

2         Second, the plaintiffs are free to fish in other

3    areas.  There are large areas for fishing, especially squid

4    fishing, outside of the project area.  And the plaintiffs

5    have not -- offered no explanation at to why they could not

6    temporarily shift their fishing practices to outside the

7    area, particularly during the interim time until the Court

8    decides the merits of the case.

9         Third, even if the Court accepts that plaintiffs

10   will lose all of the revenue that they otherwise would gain

11   from fishing in the area, that's still not enough to

12   demonstrate irreparable harm.  Mr. Aripotch claims that in a

13   typical year he loses 30 percent of his revenue; but under

14   the First Circuit standard, the plaintiffs have to show that

15   it would threaten the existence of their business to

16   demonstrate irreparable harm, and they have not done so.

17        Finally, Your Honor, the balance of the equities

18   and the public interest weigh in favor of denying the

19   preliminary injunction.  The Vineyard Wind project would

20   support the administration's objective of increasing

21   renewable energy production; and, therefore, it's in the

22   public interest.

23        The public interest is further demonstrated by

24   Congress's enactment of the Energy Policy Act of 2005, which

25   expressly authorized the Department of the Interior to

1   authorize renewable energy development on the outer

2   continental shelf.  The project will generate 800 megawatts

3   of electricity, which will provide renewable energy to

4   roughly 400,000 homes in Massachusetts.

5          And for these reasons, Your Honor, the Court should

6   deny the motion.

7          THE COURT:  Thank you.

8          MR. BUENTE:  Your Honor, Vineyard Wind agrees with

9   the government's presentation.  I would just add two

10  additional points.  One is with regard to the adequacy of the

11  compensation fund.  The Department of the Interior, through

12  BOEM, reviewed the amounts that are supposed to be in the

13  fund and determined that they were adequate based on an

14  examination of the projected possible future losses.  And

15  that's in the record and cited in our brief.

16         The other point is the harm that will accrue to

17  Vineyard Wind should this project be enjoined.  As of the end

18  of April, the company has already invested $1.85 billion.  An

19  injunction now would force it to stop the use of very

20  expensive and essentially unique vessel craft to do the pile

21  driving.  That would cost an excess of a million dollars a

22  day.  And by early July, they would have lost $200 million

23  more.  Further, it will severely jeopardize the possibility

24  of continued financing of the project and risk its collapse.

25         So for all of these reasons, we also request that

1    the motion be denied.

2              THE COURT:  Want to call your witness, first

3    witness?

4              MR. HADZI-ANTICH:  Yes, Your Honor.  I call David

5    Aripotch to the stand.

6              THE DEPUTY CLERK:  Before you sit, could you please

7    raise your right hand.

8              (Witness duly sworn.)

9              THE DEPUTY CLERK:  Please state your name for the

10   record and spell your last name.

11             THE WITNESS:  My name is Dave Aripotch,

12   A-r-i-p-o-t-c-h.

13             THE DEPUTY CLERK:  Thank you.  You may have a seat.

14             MR. HADZI-ANTICH:  Your Honor, at this time, I

15   would just like to confirm that we are relying on

16   Mr. Aripotch's declaration as direct testimony.

17             THE COURT:  Thank you.  And that is Document 115-1?

18             MR. HADZI-ANTICH:  Yes, correct.

19             THE COURT:  And it had, I believe, three exhibits.

20             MR. HADZI-ANTICH:  Yes, it does.

21             THE COURT:  Okay.

22             MR. PIROZZOLO:  And for the record, Your Honor,

23   before I start cross, we object to the admission of

24   Mr. Aripotch's declaration with respect to paragraphs 9 and

25   then 11 through 14.  And the basis for the objection with

regard to those paragraphs is that there has not been an
adequate foundation laid that Mr. Aripotch is competent to
testify to the assertions that are set forth at paragraphs 9
and then 11 through 14.

THE COURT:  And I'm going to just tell you how I
intend to proceed here.  The case law is a little ambiguous
as to what evidentiary standards I should be applying in the
case of a preliminary injunction hearing.  That said,
although there is some forgiving policies regarding hearsay
and other matters, the reason for that lower threshold is
because of the urgency of the situation.

So to the extent that we are here this far into the
case, to the extent that the testimony in front of me -- I'm
letting the material in.  The question is what weight I give
it; and given where we are in the litigation, I would
probably be demanding a slightly higher level of formality
then I would if this had come in on the first day of the
case.

So that said, your objection is noted.  I will
consider what the lack of foundation is or isn't.  You're
welcome to explore that on cross-examination; but in terms of
what weight I give it, I will -- I will consider it as I
think through what's there.

MR. PIROZZOLO:  Thank you, Your Honor.

May I approach?

1        THE COURT:  You may.

2        And we're working -- I think just to keep this

3   clean, I am going to mark 115-1 as Exhibit 1.

4        MR. PIROZZOLO:  Thank you, Your Honor.

5        And for the record, what I've put in front of

6   Mr. Aripotch is a folder of potential exhibits, the same

7   folder that the Court and the other parties have been given

8   before the hearing today.  They are numbered 1 through 13.

9   And Mr. Aripotch's exhibit that you just identified now as

10  Exhibit 1 is also Exhibit 1 in the folder that I just put in

11  front of Mr. Aripotch.

12       THE COURT:  Okay.

13                      **DAVID ARIPOTCH**

14       having been duly sworn, testified as follows:

15   **CROSS-EXAMINATION BY COUNSEL FOR INTERVENOR-DEFENDANT**

16  BY MR. PIROZZOLO:

17  **Q.**  Good morning.

18  **A.**  Good morning.

19  **Q.**  I want to make sure I'm pronouncing your name correctly.

20  Is it Aripotch?

21  **A.**  Yes, sir.

22  **Q.**  My name is Jack Pirozzolo.  I represent Vineyard Wind in

23  this matter.

24  **A.**  Okay.

25  **Q.**  Good morning.

1    **A.**   Good morning.

2    **Q.**   If you could open the folder and put what is marked as

3    Exhibit 1 -- you can put the list to the side that's on the

4    top.  There's an Exhibit 1.

5    **A.**   First page, that I'm looking at?

6    **Q.**   So you can put that to the side.  You should see a

7    document that has a sticker on it that says Exhibit 1.

8    **A.**   Exhibit 1 yes.

9    **Q.**   Do you see that?  And you can just pull that out of the

10   folder and put the rest of the folder aside for now.  Just

11   put that to the side.  Great.  Perfect.

12          So, Mr. Aripotch, that's your affidavit that you've

13   submitted in connection with this motion that we're here

14   today on, correct?

15   **A.**   Yes, sir.

16   **Q.**   And you read it before you signed it?

17   **A.**   Yeah.

18   **Q.**   And it's -- of course, you signed it?

19   **A.**   Yes, sir.

20   **Q.**   And did you review all the exhibits that were attached

21   to -- to the -- to the declaration?

22   **A.**   Yeah.

23   **Q.**   And you did that before you signed it?

24   **A.**   Yeah.

25   **Q.**   And that included Exhibit 1, Exhibit 2, and Exhibit 3,

1    correct?

2    **A.**   I'd have to look at them, but, yeah, I'm sure I did.

3    **Q.**   Okay.  So with regard to your statements in the

4    declaration, your complaint is that you are going to suffer

5    monetary harm --

6    **A.**   Yes, sir.

7    **Q.**   -- as a consequence of the -- of the construction of the

8    wind farm in the wind lease area, correct?

9    **A.**   Yes.

10   **Q.**   And with regard to the monetary harm that you say that

11   you will suffer, it's going to make your business less

12   profitable, correct?

13   **A.**   Yeah, it could put it in jeopardy.

14   **Q.**   Okay.  But in your declaration, you said it would be less

15   profitable, correct?

16   **A.**   Less profitable.

17   **Q.**   And you did not say that it would be in jeopardy,

18   correct?

19   **A.**   That was before I knew they were putting down these

20   boulders that they're putting down now.  We were never told

21   they were putting boulders down.  That's dangerous.

22   **Q.**   Okay.  So you --

23   **A.**   That puts the area off limits for us, sir.

24   **Q.**   And the boulders you're referring to are -- are what's

25   commonly referred to as scour, correct?

1    **A.**  Scour protection.

2    **Q.**  Scour protection?

3    **A.**  Yeah.

4    **Q.**  And so when you're referring to the boulders that have

5    been put down, that's what you're referring to, correct?

6    **A.**  Yes, sir.

7    **Q.**  Okay.  And so with regard to those boulders at this

8    point, are you aware that they're already down?

9    **A.**  Yeah.  I just found that out recently.

10   **Q.**  And so does that mean that you are not going to be

11   fishing in the wind lease area at all?

12   **A.**  Yes, it does.  It makes it extremely dangerous, and I'm

13   responsible for my crew and my boat and the safety of them.

14   **Q.**  But in any event, you're not going to go there?

15   **A.**  No.

16   **Q.**  Okay.  And you're not going to go there unless it's

17   removed?

18   **A.**  Yes, sir.

19   **Q.**  Now -- and with regard -- well, strike that.

20            I want to just ask some questions sort of generally

21   about sort of what the complaint is here today.  I asked you

22   some questions about monetary harm?

23   **A.**  Yeah.

24   **Q.**  Right.  So that relates to squid fishing, correct?

25   **A.**  Also whiting fishing.  We don't -- we fish for a lot of

1    different things, but squid fishing is extremely important to

2    me.  And the gentleman said 25 -- 25 percent of my income or

3    30 percent.  It can be.  At times, up to 50 percent of my

4    income comes from that area from squid fishing this time of

5    year when they're going to be doing construction.

6    **Q.**  So in your declaration, you said that it was 30 percent,

7    correct?

8    **A.**  Yeah.  Average, yeah.

9    **Q.**  Right.  So -- but you're saying it can be up to

10   50 percent?

11   **A.**  It can be.

12   **Q.**  Has it ever been --

13   **A.**  Depending on the year, yes, it has.  In 2016, it was.

14   **Q.**  And that's within the lease area?

15   **A.**  Yes, sir.

16   **Q.**  All right.  I'm going to circle back to that in a minute,

17   but I want to ask you a couple of questions just about sort

18   of time frame.  So the squid season is from when to when?

19   **A.**  Well, it's not an exact date, but normally, most years,

20   it's been the last week in May to right through August.

21   Sometimes it might -- the end of July, it's dropping off.

22   **Q.**  So has squid season started yet?

23   **A.**  It's just starting right now.

24   **Q.**  Just starting.  Okay.

25           And have you been out fishing for squid?

**A.**   Yeah.  I was fishing for squid right before I came in
here.

**Q.**   And you're fishing for squid outside the lease area,
correct?

**A.**   I was fishing off of Montauk because I had to be close to
home to come here and testify.  I would have rather been down
there, but --

**Q.**   And, now, with regard to -- I asked you about the skid
season.  So is your complaint here today that the harm that
you're going to suffer is with regard to the squid season
this year?

**A.**   No.  I think it's always -- I'm not going to fish in
there.  It's going to be -- it's -- we're not going to be
able to fish in there with those boulders.

          I mean, you hang up a net.  A net for my boat is
between 20 and 30,000 dollars.  If I destroy a net, I have to
come home, stop fishing, fix the net, which can take up to
three or four days putting a net back together.  I don't want
to do it.  It's dangerous.

          That's when hydraulics break, that's when net reels
break.  That's when steel breaks.  That's -- people can get
hurt.  I've seen boats roll over that were hung up on
boulders.

          As a prudent mariner, I wouldn't even steam through
these things.  I will not steam my boat through them, and

1    I've been fishing all my life.  I'm 67 years old.  I've done

2    nothing but fish.  I'm a very successful fisherman.

3            I wouldn't even steam the boat through there with

4    my gear on the boat.  I am certainly not going to tow a net

5    through there and risk damaging or injuring one of my a crew.

6    **Q.**  And so that means, what you're complaining about today,

7    as I understand it, is for all time, so long as those rocks

8    are down there?

9    **A.**  Yes, sir.  And that's for whiting, squid, fluke,

10   butterfish, scup -- everything we fish for.  We don't --

11   we're squid fishing right now this time of year; but later

12   on, I'm whiting fishing there, scup fishing in the fall.

13           You know -- I've paid off every boat I've owned

14   down there.  I've put five daughters through college fishing

15   right there the last 40 summers.

16   **Q.**  And so that means it's for at least the entire life of

17   the project --

18   **A.**  Yes, sir.

19   **Q.**  -- you won't be able to go in there?

20           Now, with respect to when you knew that the scour

21   was going down, the boulders that I think you say basically

22   mean you cannot go into the leasing area --

23   **A.**  Yes, sir.

24   **Q.**  -- when did you know that?

25   **A.**  I found out last week that they were putting boulders

1    down because a friend of mine from Point Judith called me,

2    and he said that Point Judith had been told by the safety

3    vessel -- he asked if he was transiting the area, and the

4    fellow said, "No, I just set my net."

5            And the safety vessel said, "You better haul it

6    back immediately.  You're going to lose your net.  We're

7    dropping boulders here."

8    **Q.**  So could you -- could you open up to Exhibit 1 of your

9    declaration, please.

10   **A.**  Yep.

11   **Q.**  That's a document that you reviewed before you signed --

12   **A.**  Yeah.

13   **Q.**  -- right?  And we're talking -- when you use the term

14   "boulders," you're talking about what is called "scour,"

15   right?

16   **A.**  Well --

17   **Q.**  Scour protection?

18   **A.**  Scour protection, yeah, which seems odd that they're

19   putting the scour protection down before they install the

20   units.

21           I mean, I understand the concept of the scour

22   protection.  There's going to be scour behind these things.

23   Depending on which way the tide moves, you can have scour.

24   But scour protection might be small rocks or cobbles, which

25   won't endanger a boat.  But a boulder endangers a boat.

1          I've ripped the net reel off of my own boat about

2     25 years ago on a rock.  Thank God nobody was killed.  We

3     broke a 2½ -inch stainless steel shaft on the net reel, and

4     the net reel was laying on deck.

5     **Q.**  Did you get that fixed?

6     **A.**  Yeah.  I put a brand-new net reel on.  Yes.

7     **Q.**  How much did that cost?

8     **A.**  I don't remember at the time.  It was 25 years ago.  It

9     was probably $12,000, $15,000.

10    **Q.**  Did not put you out of business?

11    **A.**  No, it didn't put me out of business.

12    **Q.**  So if you can look at the schedule, Exhibit 1, which I

13    think you reviewed before you signed, the declaration, do you

14    see that?

15    **A.**  What page would that be on?

16    **Q.**  That's -- one, two, three, four, five -- it's the sixth

17    page in.  And if you're having trouble finding it, I can

18    approach and --

19    **A.**  Well, my sixth page says Exhibit 1.

20    **Q.**  Yeah, so the next page, right.  Right behind Exhibit 1.

21    Do you see that?

22    **A.**  High-Level Construction Plan?

23    **Q.**  High-Level Construction Plan.  Right.  That's the BOEM

24    construction schedule that was on the BOEM website, correct?

25    **A.**  Yep.

1    **Q.**  And you can see -- one, two, three -- four items down,

2    you can see there's a list of construction activities.  Do

3    you see that?

4    **A.**  Yeah, scour protection.

5    **Q.**  Scour protection.  So the first -- there's onshore duct

6    bank and export table, onshore substation, offshore export

7    cables.  And are you complaining about the cables?

8    **A.**  Well, I'm bothered by them -- not yet because there's no

9    electricity running through them, but I'm certainly worried

10   about my future and all the people following me fishing when

11   electricity starts running through them.  Cephalopods are

12   pretty resistant to electricity, from what I --

13   **Q.**  And then you go down to scour protection.  Do you see

14   that?

15   **A.**  Yes, sir.

16   **Q.**  And if you look over on the schedule, you can see 2023.

17   It says Q2.  Correct?

18   **A.**  Quarter 2, I assume, yeah.

19   **Q.**  And so this schedule was published at least as early as

20   January 2022, correct?

21   **A.**  I would assume so, yeah.

22   **Q.**  Right.  And so you knew at least as early as January 2022

23   that the scour protection was going to be going down in Q2 of

24   2023?

25   **A.**  Was there a description of the size of the rocks and

1  boulders that were going to be put down for scour?  Was there

2  a description?  Did they say, "We're going to put down

3  boulders that will endanger, that will keep you from towing

4  your net there"?  I wasn't told that.  I didn't read that.

5  **Q.**  You did not read that.  So you did not understand what

6  scour protection would include, would entail?

7  **A.**  I guess not.  I guess it's all pretty new territory, huh?

8  **Q.**  And you've been aware of the project for some time --

9  **A.**  Yeah.

10  **Q.**  -- correct?

11  **A.**  Sure.

12  **Q.**  Did you ever somebody what is scour protection?  What

13  does it exactly mean?

14  **A.**  No.

15  **Q.**  Do you know that there were notices that went out to

16  mariners at least as early as March of this year that said

17  the scour protection was going down?

18  **A.**  But it didn't say what size scour -- we assumed scour

19  protection would -- you know, you put down boulders, you're

20  going to have scour behind the boulders.  We thought scour

21  protection was something much smaller than something that can

22  endanger a vessel.

23  **Q.**  So your precise complaint here is that -- is that it's

24  the size of the scour boulders that --

25  **A.**  Yes, sir.

1    **Q.**  -- are at issue?

2           Okay.  And what's the basis upon which you're

3    saying that the scour protection boulders are in excess of

4    what you anticipate?

5    **A.**  If the safety vessel is coming up to a 90-foot dragger

6    and telling the fella to haul back immediately because he's

7    going to lose his net, then that tells me that you're not

8    putting down 3-inch pebbles.  Correct?

9    **Q.**  And it's your understanding that the scour was just going

10   to be 3-inch pebbles?

11   **A.**  I don't know.  I'm just asking.  I was never told -- I

12   never saw a -- I never heard a notice to mariners saying,

13   yeah, vessels -- trawl vessels be advised we're putting down

14   boulders in the Vineyard Wind lease area.

15   **Q.**  But there were notices that said that, with respect to

16   the scour protection, when the scour was being put down, you

17   should avoid the area, correct?

18   **A.**  Yeah.  Well, I would avoid it anyway normally, but if the

19   construction hasn't started and you can fish in there, to me

20   it was irresponsible to start putting them in.

21   **Q.**  So you would have avoided it anyway?

22   **A.**  I would have, yes, but other people haven't.

23   **Q.**  And you've been following the lawsuit here pretty

24   carefully?

25   **A.**  Somewhat, yeah.  I'm pretty busy fishing.

1    **Q.**  But you're also aware, because it's in your exhibit in

2    your declaration, of the schedule that was provided to your

3    counsel at the summary judgment hearing back in April --

4    **A.**  Yeah.

5    **Q.**  -- correct?  You're aware of that, because it's attached

6    to your exhibit?

7    **A.**  Yes.  And I've voiced the fact that I'm very scared of

8    when this is going on because you're going to be driving

9    these monopiles into the ocean bottom right when the squid

10    are coming out of Nantucket Sound.

11          And, by the way, with all those cables going up

12    through Muskeget Channel, I don't know where the squid are

13    going to go.  I mean, this is all new territory, right?  I

14    have a lot of complaints with this.  I have a lot of fears

15    with this that this is going to change the ecology of that

16    area past the point where we can save it.

17    **Q.**  And of course the basis of your fears are what?  Well,

18    let me -- you're not a marine biologist, correct?

19    **A.**  No, sir.

20    **Q.**  You're not a marine economist?

21    **A.**  No, sir.

22    **Q.**  You're not an engineer?

23    **A.**  No, sir.

24    **Q.**  And you're not an expert in acoustics, correct?  I know

25    in your declaration you said you were concerned about the

1  noise.

2  **A.**  Well, I've -- I've steamed along, and I watch my fish

3  finders.  That's my job.  I watch the fish finders.  I try to

4  find where the fish are.  Then I set the net on them.

5       More than once I've seen where I've stopped the

6  boat, seen marks, laid there, looked at them for a few

7  minutes, deciphered what it was, and then started the

8  haul-back engine.  I have a six-cylinder Caterpillar engine

9  in the boat that's for the hydraulics.

10       And as soon as I start it, a second later you start

11  seeing this stuff coming up off the bottom.  So, obviously,

12  they don't like noise.  Porgies don't.  Whiting don't.  No,

13  none of these things like noise.

14  **Q.**  But you don't actually know or have any specific basis to

15  understand or to know what the actual noise impact will be,

16  correct?

17  **A.**  No.  But I've seen that happen more than once, and I

18  stopped -- finally I stopped -- if I see the marks, I keep

19  going.  I mark on the plotter where they are.  I get a mile

20  and a half away, set -- I start the haul-back engine and then

21  turn around and set then.

22  **Q.**  And you -- and with regard to the electromagnetic EMF?

23  **A.**  I'm not an expert on it, but --

24  **Q.**  You're not an expert.

25  **A.**  -- I don't like the idea that the squid may not cross

1    those cables.

2    **Q.**  So your complaint is that you just don't like the idea

3    that they might not cross the cables?

4    **A.**  I'm very frightened.  I mean, are you willing to take a

5    chance to destroying something that's been happening for a

6    million years?  I'm not.

7    **Q.**  And so aside from that fright, you don't have any basis

8    to say as you sit here today what effect the EMF would have

9    on the skid at all?

10   **A.**  I'm not sure, but I don't want to take a chance and find

11   out.  Unfortunately, I think, we're past that point.

12           And I don't have any degrees, but I've been

13   fishing -- I'm 67 years old.  I'm known up and down the

14   East Coast as a pretty successful fisherman.  All I've

15   done -- I've trawled fish since 1982 with my own boats,

16   starting out with a 35-footer, then bought a 60-footer, now

17   to this 73-footer.  It's all I've ever done.

18           I'm not a scientist, but I've had plenty of

19   scientists to say to me, "Wow, Dave, I'm surprised at your

20   background, at what you know."  I've read a lot about fish.

21   Fish is my business, so I make it my business to know what

22   they do, what they don't, what they like.

23           I'm not trying to be argumentative here, but I do

24   feel like my -- my background has some relevance here.  And

25   certainly with regard to operating a 70-foot fishing vessel

1    safely in these areas, I've fished 300 days a year for the

2    last 30 years.  I mean, I've been -- I've been on land less

3    than I've been on the water.

4    **Q.**  I'm going to move on to a different topic.

5         THE COURT:  And I just want to let you know, the

6    way this works in the formal court proceeding is right now it

7    is Vineyard Wind's counsel's turn to ask you questions.  And

8    we're actually timing how much time he uses.

9         THE WITNESS:  I'm sorry.  I'm sorry.

10        THE COURT:  And your counsel can ask questions of

11   you afterward.

12        THE WITNESS:  Okay.  I'm sorry, Your Honor.

13        MR. PIROZZOLO:  Just to move on -- I'm going to

14   move on.

15   BY MR. PIROZZOLO:

16   **Q.**  So you mentioned that your concern is profitability?

17   That's in your declaration?

18   **A.**  Yes.

19   **Q.**  And in your declaration, you said 30 percent, but today

20   you're saying 50 percent?

21   **A.**  30 to 50 percent.

22   **Q.**  30 to 50.  How much money is that?

23   **A.**  In 2016, I stocked $370,000 in three weeks.  Then the

24   squid closed.  We would have done much more.  And my crewmen

25   and I count on that.  We count on that every year.  And it's

1    not always -- some years it's nowhere's near that.  But

2    it's -- it's from -- my income, my gross income -- for the

3    boat, rather, I should say -- my gross income for the boat,

4    it's from 25 to 50 percent some years.

5    **Q.**  Okay.  So I just -- I just want to get the dollar figure.

6    So for 2016, 30 to 50 percent was 375 -- 370,000

7    approximately?

8    **A.**  30 -- 30 percent.  Roughly, I think.

9    **Q.**  I just want to get the math.  30 percent of 370?

10   **A.**  No.  370 was about 30 percent of my -- the gross income

11   for the boat that year.  The gross stock from fishing.

12   **Q.**  And that was all from catch in the lease area?

13   **A.**  Yes, sir.

14   **Q.**  And that's 2016?

15   **A.**  Yes, sir.

16   **Q.**  And what did you do last year?

17   **A.**  I'm going to say $200,000 in two -- in June and July.

18   Maybe a little more than that.  Maybe $250,000 in two months.

19   **Q.**  250 within the lease area?

20   **A.**  Yeah.

21   **Q.**  Have you provided any financial statements to support

22   those numbers?

23   **A.**  I suppose you could check my tax records.  I pay my taxes

24   every year.

25   **Q.**  Did you provide your tax returns?

1    **A.**  Could I provide them?

2    **Q.**  Did you?

3    **A.**  No, I didn't.  I wasn't asked to.

4    **Q.**  And you didn't provide -- do you have a QuickBooks?  How

5    do you keep track of your revenue?

6    **A.**  My wife does my books.  I just do the square-ups for the

7    screw.  I know what the grows stock is.  I know -- I chase

8    down the checks from the fish buyers and processors.

9    **Q.**  And did you provide any QuickBooks information or any

10   underlying information to support the 370,000 or the 200,000?

11   **A.**  No, sir.

12   **Q.**  You did not do that?

13   **A.**  No.

14   **Q.**  And the number we're talking about is revenue, correct?

15   **A.**  Gross revenue.

16   **Q.**  Gross revenue?

17   **A.**  There's expenses.

18   **Q.**  Not profit?

19   **A.**  Not profit, no.

20   **Q.**  Of course it costs.  You have costs and expenses,

21   right --

22   **A.**  Yes, sir.

23   **Q.**  -- to running the boat?

24   **A.**  Yeah, fuel --

25   **Q.**  So what's approximately your profit margin?

1    **A.**  I don't know.  I never figured it out.  I have payments

2    on the boat.  The insurance on the boat is expensive.  Maybe

3    15 percent.

4    **Q.**  15 percent?

5    **A.**  Maybe.

6    **Q.**  1-5?  Okay.  And I'm just going to take the 370 that you

7    said that you had gross revenue in the lease area in 2016,

8    right?

9    **A.**  Yes, sir.

10   **Q.**  Now, 2016 was a bumper year, correct?

11   **A.**  It was.

12   **Q.**  It was unusual.  It was atypical, correct?

13   **A.**  Yes.

14   **Q.**  In fact, ordinarily, it's much lower in that area,

15   correct?

16   **A.**  Yeah.

17   **Q.**  Okay.  So does this -- so does this number -- so if you

18   do the math, basically you're complaining about a maximum of

19   370,000 for a season in the lease area?

20   **A.**  Well, that's squid.  Whiting -- we catch whiting in that

21   area.  We catch other -- butterfish, scup, fluke.  You know,

22   we do fish for other things in the area.

23   **Q.**  But your principal complaint here today is about the

24   squid, correct?

25   **A.**  No, my principal -- well, yeah.

1   **Q.**  And that number, of course, when you talk about -- is

2   that the number you claim that you're going to lose?

3   **A.**  Well, I --

4   **Q.**  In terms of the gross revenue --

5   **A.**  I think you assume -- I think you assume I can just go

6   somewhere's else to catch those squid.  You know,

7   occasionally squid show up on Fire Island, occasionally off

8   Cholera.  As a matter of fact, pretty much whenever you guys

9   want to put the wind farms, the squid show up there from time

10  to time.

11          But they always show up down there by the Vineyard.

12  So if that area is off limits, that's going to -- could

13  curtail my profitability, certainly, and an awful lot of

14  other boats in the Mid-Atlantic from New Jersey to Maine.

15  **Q.**  So what you're saying is that you can't go somewhere else

16  to fish?

17  **A.**  Fish -- fish are in certain areas for a certain reason,

18  and if they can't go to that certain area anymore, I don't

19  know what they'll do.  Maybe they'll go into rocks where we

20  can't catch them anyway.  Maybe they will stay up in

21  Nantucket Sound all summer long because they don't want to

22  come out because of the cable.  I don't know.  I don't know.

23  But, yes --

24  **Q.**  So you don't know?

25  **A.**  No, but I do know that the fish are in certain areas for

1    certain areas.  They like certain habitats.  And if you can't

2    fish in that habitat, well, then you can't --

3    **Q.**  As you sit here today, you don't know?

4    **A.**  No.  I know that it's going to affect my business.  I

5    know that the squid are not -- they're not going to like the

6    noise.  I know that, and I think you guys do too.

7          Whether I'm going to be able to catch them

8    somewhere's else, it's never worked like that.  The squid

9    come out of Nantucket Sound in a huge body.  The boats work

10   on them.  You have 15 boats to 50 boats, depending on the

11   year, working on them.  After they come off of there, they

12   disappear for a while and the --

13         MR. PIROZZOLO:  Your Honor -- Your Honor, I know

14   this is a free -- this is not typically like in front of a

15   jury; but at a certain point, I would just request that the

16   witness be responsive to the questions.

17         THE WITNESS:  All right.

18         THE COURT:  So the question was, as you sit here

19   today, you don't know?

20         THE WITNESS:  No, I don't know.

21         THE COURT:  I think you attempted to answer it.

22   Let's move on.

23         THE WITNESS:  I don't know.

24         MR. PIROZZOLO:  Thank you.

25   BY MR. PIROZZOLO:

1  **Q.**  Do you keep records of what catch you get from the wind

2  development area or the lease area?

3  **A.**  Yes, sir.

4  **Q.**  And where are those?

5  **A.**  They're on the boat.  I have probably 40 years' worth of

6  logbooks on them, those daily planner books.

7  **Q.**  And did you provide them in support of your affidavit?

8  **A.**  I wasn't asked to.  I can.

9  **Q.**  But you did not?

10  **A.**  I did not.  I can.

11  **Q.**  I have just one more -- a couple more questions for you.

12  So you've -- you've claimed that the compensation fund is

13  woefully inadequate?

14  **A.**  Yes.  $3 million for Connecticut and New Jersey and

15  New York?  There's a lot of boats that fish there.

16  Connecticut has about maybe three or four boats.  It would be

17  woefully inadequate for them.  What if for the next 30 years,

18  you can't catch squid because of what's happened here?

19  Then -- and it's not enough, no.

20  **Q.**  So I have a couple of follow-up questions.  Do you know

21  how much the money is that's been set aside?

22  **A.**  $3 million.

23  **Q.**  $3 million?

24  **A.**  That's what I was told.

25  **Q.**  So that was what you were told.  So you were told this by

1  somebody else, correct?

2  **A.**  Yes.

3  **Q.**  Okay.  So you don't actually know of your own personal

4  knowledge what that number is, correct?

5  **A.**  No, I know that's -- the person that told me, I trust

6  them implicitly.  That's what I was told that New York,

7  New Jersey, and Connecticut's compensation fund was.

8  **Q.**  And do you know how it gets paid out?

9  **A.**  No.  But I know friends who have had problems with other

10  people already -- Orsted, I think -- and haven't gotten paid.

11  And I had proof.  I watched a guy in EEAS going through the

12  guy's lobster gear, and still he hasn't received any money.

13  It's been two years.

14  **Q.**  So the answer to my question is no, you don't know,

15  correct?

16  **A.**  Correct.

17  **Q.**  You don't know even the process for getting the payment,

18  correct?

19  **A.**  Yeah, they make -- yeah, you have to go to the port

20  liaison or whatever you have to do.  I mean, I've been told

21  this by the port liaison --

22  **Q.**  But you don't know?

23  **A.**  -- the fisheries liaisons --

24  **Q.**  But you don't know?

25  **A.**  -- and they will help you make a claim.

1    **Q.**  But you don't know?

2    **A.**  Yes, actually, I do because I went through it with Orsted

3    because they put some kind of cement blocks down off of

4    Amagansett two years ago.  I had a brand-new $30,000 net from

5    Trawlworks.  I put it on the boat.

6              And a week later, I ripped the thing in half on one

7    of those cement blocks that we were never told they put down.

8    Actually, the head of Orsted told them, the DEC and them,

9    "Don't tell them where we're putting these things."  It was

10   acoustic things to monitor where the fish were going.

11             And then, yes, Paul Forman, the port guy, and my

12   wife and I and Trawlworks put together a package to explain

13   what the damage was, and I did get a check.

14   **Q.**  And that's with regard to Orsted?

15   **A.**  That was Orsted.

16   **Q.**  Which is not Vineyard Wind?

17   **A.**  Right, it is not.

18   **Q.**  Which is not this project?

19   **A.**  I agree.

20   **Q.**  Which is not this compensation fund?

21   **A.**  Right.

22   **Q.**  And with regard to the specific compensation fund, you

23   really don't know?

24   **A.**  No, I don't know.

25             MR. PIROZZOLO:  If I could just have a moment.

1          I have no further questions, Your Honor.

2          THE COURT:  Okay.  Anything on redirect?

3          MR. HADZI-ANTICH:  Yes, Your Honor, redirect.

4          **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFFS**

5     BY MR. HADZI-ANTICH:

6     **Q.**  Mr. Aripotch, would you please tell us what's the basis

7     of your knowledge that squid, whiting, and other fish don't

8     like and are harmed by noise in the ocean that's not natural?

9     **A.**  Well, I've seen it before where I've -- as I stated

10    before, I started my haul-back engine.  It's got a 20-volt --

11    4-volt starter.  It's a fairly big diesel engine.  You start

12    it, and the fish will come off the bottom.  So I stopped

13    doing that.

14          And I also -- I worked on a swordfish boat at one

15    point when I was very young, and you didn't change the speed

16    of the engine.  Even if you saw a swordfish, you didn't

17    change the speed of the engine because the swordfish would

18    dive.  Any slight change -- people get exited and run the

19    throttle a little bit, 100 rpm, the swordfish disappear.

20    That's the swordfish.

21          Squid, whiting, scup -- I've seen those bottom

22    species, I've seen them, when I've started that haul-back

23    engine, and they've come off the bottom.  I've seen where --

24    you know, I've steamed over them, and they've come off the

25    bottom because they didn't like the boat going over them.

```
 1              So noise bothers them.  I mean, I don't have
 2     anything in the water.  I'm steaming.  I'm steaming at
 3     7 knots.  I'm looking at the fish.  I see the fish.  I go
 4     over them.  By the time I turn around and go back over them,
 5     they're all off the bottom now.  And nobody towed a net
 6     through them.  I just had ran the boat over them in 300 feet
 7     of water.
 8     Q.  So this is based on your 40-plus years of experience as a
 9     commercial fisherman?
10     A.  Yes, sir.
11     Q.  And you have seen within the Vineyard Wind project area
12     that noise disturbs whiting and scup and other fish?
13     A.  Squid, yeah.
14     Q.  Squid?
15     A.  Yes, sir.
16     Q.  And you've seen this consistently over the --
17     A.  Yeah.
18     Q.  -- 30, 40 years?
19     A.  Yep.
20     Q.  Is there any reason for you to believe that noise
21     generated by the construction and operation of the Vineyard
22     Wind project would not disturb those fish in the same way?
23     A.  I'm pretty certain that it's going to disturb them.  And
24     that's another worry right now, because the squid are coming
25     out of Nantucket Sound, and the Vineyard Wind area is right
```

1    there, right on the squid tows.

2    **Q.**  You also indicated that you're concerned for the safety

3    of your property, the vessel?

4    **A.**  And my crew, yes, sir.

5    **Q.**  And also concerns for life and limb of your crew and

6    yourself.

7    **A.**  Yeah.

8    **Q.**  So health and safety is a concern of yours.  What is the

9    basis for your -- for those concerns?

10   **A.**  I've seen the results of snagging on boulders.  I have

11   had to abandon other areas.  On the west side of the Hudson

12   Canyon, a ship dropped two containers back, I think, in 2014

13   or '13.  I forget when it was.

14            But they never made a report until much later, and

15   boats kept ripping up nets on them and stopping them.  I

16   mean, even a 75-foot boat is going to stop, and you have

17   250-ton boat, and the gear is connected by 20-millimeter tow

18   wire.  That's steel wire.

19            You have stainless steel seven-eighths ground wire,

20   which is from the doors to the net.  The net is hung on

21   five-eights stainless combination, is what they call it, but

22   it's actually stainless wire with rope.

23            And I've seen a time where I hung up on something.

24   It wasn't on one of them.  I hung up on a boulder in what we

25   call rock pile down off Montauk, and it was southwest, about

1    30, 35 miles hour.  And the boat was awash in seconds.  And,

2    fortunately, I let the brakes go.  It popped off finally.

3         But that's the problem with all these -- the scour

4    protection.  You have boulders in there.  And with the tide

5    and the wind, I've seen boats roll over because they've hung

6    up.  I've seen it happen.  It happened to a friend of mine,

7    you know?  And they were in the water.  Before they even knew

8    it, they were towing.  They were on deck.  The boat stopped

9    dead.  The boat rolled over.

10        And especially now going to -- you're adding these

11   monopiles into that area.  This is if you're fishing in the

12   wind area, which I have no intention of.

13        But you're towing through there.  You snag on one

14   of these scour protection boulders, and you're hung there.

15   You can't steer the boat.  And if you can't get the boat

16   back, you're going to yaw back and forth with the tide and

17   the wind.  God forbid you go up against one of the monopiles.

18   The tide will roll the boat right over.  Even a 70-, 80-,

19   90-foot boat, they roll over.

20   Q.  Now, you've been in the commercial fishing business for a

21   long time, and yet you've made a decision not to go -- not

22   only not to fish in the Vineyard Wind area, but not even to

23   transit through the Vineyard Wind area because of safety

24   concerns.

25        What does that do to the financial condition of

1    Old Squaw Fisheries?

2    **A.**  It's going to damage it.  It's going to be more fuel

3    getting through these areas.  And our normal practice is I

4    would take the wheel.  It's usually nine hours, let's say.

5    I -- to steam we leave at eight o'clock at night.  I take the

6    first watch, take it for maybe three hours, and then the

7    other three guys will each take a watch, divide it up.

8            I'll no longer put a crewman on the wheel.  I mean,

9    you know, there's going to be other wind farms.  It's not

10   only this wind farm, but there's going to be other wind

11   farms.  It's going to change the way we operate, I have no

12   doubt, safety-wise.

13           And, you know, they say, "We'll give you a

14   mile-wide transit zone," which is better than nothing, I

15   suppose.  But still, if there's -- I wouldn't transit

16   something a mile -- I wouldn't let my crewmen transit

17   something at a mile, and I -- only under the worst conditions

18   would I go in there.  I mean, if I had to go grab somebody

19   that was in trouble or something or -- I just don't see

20   transiting through those areas.

21   **Q.**  And why wouldn't you transit through those areas because

22   of your concerns for the crew?  What are those concerns?

23   **A.**  Well, that the boat's going to come in contact with one

24   of those monopoles.  I mean, you know, that's a dangerous --

25   you know, they're immovable, obviously.

1    I mean, even the wind farm boats -- I read

2    something in a professional mariner where one of the wind

3    farm boats in England hid the thing, and there were seven

4    people on it watching what they were doing.  And then for

5    some reason -- I think a bunch of people got hurt on the

6    boat, and those were people working there, technicians

7    working there.  It will be a dangerous thing to transit.

8    You know, you put something in the ocean where it's

9    never been before, there's a good chance of it getting hit by

10   somebody.  You're going to have to be very vigilant in those

11   areas.

12   And radar is affected by them too.  You know, you

13   have radar scatter.  So it becomes hard to trust your radar

14   at night or in the fog.  And by the way, fog starts getting

15   very prevalent down -- all along like the south shore of

16   Long Island, Block Island, right to the Nantucket Shoals this

17   time of year when the squid are there.

18   **Q.**  Would it be less dangerous if the distance between the

19   monopoles was further, say two miles rather than one mile?

20   **A.**  Yes, it would be safer.

21   **Q.**  Under those circumstances, they would be twice the

22   distance that --

23   **A.**  Yeah.

24   **Q.**  -- that's contemplated now.

25   **A.**  A mile sounds like a big distance, and people probably

1    say, "Well, jeez I could drive my car and" -- you know, but

2    you're talking about a boat that's not on the road.  It's --

3    it's fairly -- fairly accurate where you can move the boat,

4    but it's not precise always.

5         And all you need is that one thing to go wrong.

6    You have a -- clog a fuel filter or you get something -- a

7    rope in the wheel or anything can happen, and the next thing,

8    you're hitting a turbine, hitting a monopole.

9    **Q.**  So would you feel it would be safer if the distance were,

10   say, two miles rather than one?

11        MR. HAJEK:  Objection, Your Honor.  I'm sorry; the

12   monopiles are not going to be constructed until later in the

13   year, not during the time of a potential preliminary

14   injunction.

15        THE COURT:  Counsel?

16        MR. HADZI-ANTICH:  I don't understand the

17   objection.  We're here today because the construction of the

18   monopiles is imminent along with the beginning of commercial

19   fishing season.  I don't see how that's not relevant at all

20   to this -- this hearing.  That's very relevant.

21        MR. HAJEK:  Some of the foundations will be

22   constructed beginning in late May to early June.  Some

23   monopiles will go in, and Vineyard Wind would know the exact

24   schedule better than I.  But that means some monopiles, a

25   few, would go in over the next few months, as I understand.

1          THE COURT:  Okay.  So the suggestion that two miles

2     is better than one mile, you've made that point.  Why don't

3     you move on?

4          MR. HADZI-ANTICH:  Yes, Your Honor.

5     BY MR. HADZI-ANTICH:

6     **Q.**  Mr. Aripotch, why are you qualified to determine that

7     pile driving and operation of the turbines is going to

8     produce noise and electromagnetic frequency that repels and

9     disturbs existing marine life, including loligo squid?

10    **A.**  I'm not positive about the electromagnetic, but I have

11    read things in *National Fishermen* and in *Commercial Fisheries*

12    *News* where they have done reports in England and places like

13    that where they have wind farms where they've said that these

14    things don't like it.

15          But as far as making the noise, you're driving

16    something into the ocean bottom.  A piece of huge piece of

17    steel you're driving it into the bottom of the ocean.  I've

18    been close enough to them at Block Island when they were

19    doing them.  I wasn't right next to them, but I was a couple

20    miles away.

21          And even over a diesel engine, you could at times

22    hear that hammering into the bottom, you know.  They were

23    doing something else.  They had four leg stands on them.

24    And, certainly, you know that it's going to make noise.

25    Driving steel into the bottom is going to make a loud noise.

1          I think the windmills -- once the turbines are

2     turned on, they will make noise as well.  I mean, there's

3     going to be noise generated from these things throughout.

4     **Q.**  Based on your experience, have the marine organisms in

5     the Vineyard Wind area ever been exposed before to this level

6     of noise?

7     **A.**  I can't say definitely, but I don't think so.  I -- I

8     mean I -- maybe at some point some catastrophe happened, but

9     I can't picture that it's ever been exposed to this kind of

10    noise for this duration of time.

11    **Q.**  Can you describe the obstruction caused by -- and, also,

12    tell us about the definition of the term "hang"?

13    **A.**  Well, "hang" is a wreck or a rock or a piece of reef,

14    sometimes even a raised piece of bottom that can stop the

15    boat.  And, you know, the nets are not -- they're not

16    indestructible.  They're pretty delicate when you come right

17    down to it, and you can rip nets up pretty easily.

18          Some things are movable, like a boulder, a wreck, a

19    container, like those containers that fell off that ship in

20    the Hudson Canyon.  I mean, God forbid you get hung up on one

21    of them in really bad weather.  You know, a few boats lost

22    nets on them from Rhode Island and Montauk, squid in that

23    winter.

24    **Q.**  Would you consider the scour protecting, including the

25    armor, to be a hang or hangs?

1    **A.**  Yes, I would.

2    **Q.**  And so what does that mean because of the -- the

3    increased number of hangs attributable to the scour

4    protection?

5    **A.**  Well --

6             MR. PIROZZOLO:  Objection, Your Honor.  This is

7    just getting leading, Your Honor.

8             THE COURT:  So, Counsel, I'll give you my advice on

9    leading.  If you want me to think that a witness is saying

10   something on direct, but you've given the leading statement,

11   it's of very little value.  So we're not very formal here,

12   but anything that's complete leading gets me nothing.

13            MR. HADZI-ANTICH:  Thank you, Your Honor.

14            Just one moment.

15   BY MR. HADZI-ANTICH:

16   **Q.**  So on cross-examination, you discussed this issue I'd

17   like you to elaborate some more on.  Why will increased hangs

18   and other navigable obstructions caused by the installation

19   of scour protection and armoring and pile driving and related

20   construction activities, all of those together, at the

21   Vineyard Wind project, why would that make the area untenable

22   for commercial fishing by Old Squaw Fisheries and its boat

23   the *Caitlin* and *Mairead*?

24   **A.**  Well, because there's already hangs there to some extent.

25   There are rocks there.  I know that they cleared some out for

1    cables, but there's rocks there, or wrecks or whatever

2    happens to be there.  And now they're going to add more.

3           So I don't know how big the area of scour

4    protection around each monopile is, but I think -- I don't

5    plan on fishing in there.  A prudent mariner wouldn't fish in

6    there.  But, regardless, there are people that, I think, will

7    try it.  And you're going to have less distance, less clear

8    spots between it.  Certainly two boats couldn't get through

9    there.

10          A mile sounds like a lot.  But you put a trawl net

11   out, the doors are spreading 350 feet, the doors that spread

12   the net.  You have 125 to 150 fathoms of wire out behind you,

13   tow wire.  The gear stretch is quite a ways behind the boat.

14   The gear can sometimes not be directly behind the boat.  It

15   can be off to one side or the other with tide, with wind.

16          I say, it's not -- it's not as precise as driving

17   car or something.  There's got to be some -- you've got to

18   give things a wide berth.

19   **Q.**  Thank you.

20          How do you know that installation of monopile

21   foundations would permanently alter the character of the

22   ocean floor and benthic environment at the Vineyard Wind

23   site?  How do you know that?

24          MR. PIROZZOLO:  Objection, Your Honor.  I believe

25   this is way beyond the scope.

1          THE COURT:  It is.  It is beyond the scope of both

2     the direct affidavit and the cross.

3          MR. HADZI-ANTICH:  Counsel for Vineyard Wind as

4     well as, I believe, counsel for the federal defendants raised

5     the issue of the basis of Mr. Aripotch's knowledge that these

6     obstructions would cause safety dangers and environmental

7     dangers.

8          All I'm asking, in response to that

9     cross-examination on redirect, is how does Mr. Aripotch know

10    what he knows?  That's all I'm asking.

11         THE COURT:  Well, you're asking him what he knows

12    about something beyond what he's already talked about.  So

13    you could say that was a way to avoid a leading question, but

14    it was testimony that wasn't in here already, and then you

15    were asking him how he knew something that wasn't already in

16    the record.

17         MR. HADZI-ANTICH:  Your Honor, my recollection --

18    we don't have the transcript in front of us -- is that he was

19    cross-examined on his knowledge of the environmental impacts

20    of the construction and operation of the facility.

21         THE COURT:  So a fair question, perhaps:  What is

22    the basis of your knowledge regarding environmental impacts

23    that you've testified to today?

24         THE WITNESS:  Okay.  Well, there was three

25    gillnetters that were working -- that have worked for as long

1    as I've known the guys right where they built the

2    Block Island wind farm.  And when they were doing that work

3    there, the sound, percussion, whatever you call it, they

4    were -- they were right up to the point where they started

5    construction they were working there.  Then they told them

6    they had to move their gear.

7            They moved the gear a ways away.  They told them

8    they could fish there.  And they were finding monkfish in

9    their gear dead the next day with the bellies blown out of

10   them.  They were finding skates with the bellies blown out of

11   them too.  That's Orsted, I guess -- I don't know --

12   Eversource.  I don't know who owns that wind farm now,

13   National Grid.  I don't even know who owns it.

14           But all three of those guys told me what they saw

15   in their nets.  The fish would go in there alive, and then

16   just from sitting in there have -- be completely

17   disemboweled.  And that I don't -- that was an unusual thing.

18   I mean, occasionally you get some other fish that came along

19   and bit another fish, but not where you find every skate or

20   every monkfish in the net was disemboweled.

21           MR. PIROZZOLO:  I would move to strike that answer.

22   It's clear that he's testifying to something that's clearly

23   hearsay, not admissible, and not --

24           THE COURT:  So we're not in formal rules.  He's

25   testifying it.  It is hearsay.  I've allowed him to say it.

1    I'm not striking it from the record.  It has very little

2    weight because there's no way to cross-examine it because we

3    don't know who it was and what they saw, and they're not

4    being asked about it.

5              MR. PIROZZOLO:  Thank you, Your Honor.

6              THE COURT:  So if you want to spend your hour

7    this -- with information that he doesn't direct knowledge of,

8    the problem is that it's not that helpful to me.

9    BY MR. HADZI-ANTICH:

10   **Q.**  Mr. Aripotch, why don't you just go fish somewhere else

11   to make up for any lost profits attributable to the

12   construction and operation of the Vineyard Wind project?

13   **A.**  I've got my hang books that I've gotten from the guys

14   that I worked for when I was a kid.  I protect those hang

15   books, all my charts, everything that I have.  I fish the

16   same tows, not every year.  Fish don't follow a calendar, but

17   more or less, I fish on the same tows, and the parameters are

18   close every year.

19             And if there was fish in other places, we'd fish

20   for them.  We don't.  These are where the concentrations of

21   fish are.  I can't just go fish, tow my net at $4 a gallon or

22   3.50 a gallon now and just hope that I catch something.  I

23   have to go where I know I'm going to catch the best, the most

24   amount of fish to make a profit.  And those areas have been

25   proven already, and now they're being taken away from us.

1  Q.  What makes you believe that the damage to the Vineyard
2  Wind project area is going to be permanent?
3  A.  I -- it's a very fragile area.  I don't think the squid
4  are going to like it.  We've been trawling there.  I started
5  trawling there personally myself in 1985 on my own boat.
6  Previous to that, I had worked on several boats out of
7  Montauk that -- the guys that I worked for before I owned a
8  boat.
9        That noise I think is going to preclude squid from
10  coming into that area.  The electricity, the cables going up
11  through Muskeget Channel, I think it's going to preclude the
12  squid from going through there.
13  Q.  Has anyone from the federal government or from Vineyard
14  Wind approached you and told you about the existence of a
15  compensation fund?
16  A.  No.
17  Q.  You testified before on cross-examination that you don't
18  know the procedures for seeking reimbursement for damages
19  from the farm, correct?
20  A.  Correct.  I -- the one I did was with Orsted.
21  Q.  Do you know whether there are such procedures in place
22  now?
23  A.  No.  The Vineyard Wind plan kind of left New York out of
24  it.  And New York was the first -- New York was the one who
25  started the squid fishery, really.

1          You know, I was one of the guys that started it

2   years ago.  We had joint ventures with the Italians, the

3   Chinese -- the Japanese, rather, and the Spanish.  And they

4   brought ships over because there was no domestic market.

5          Now, as everybody knows calamari is really

6   important.  It's become an important fish for us.

7   Restaurants love it.  So now we have a fishery.  But I was

8   one of the guys transferring -- with my little 35-foot

9   boat -- transferring bags of squid to the Japanese ship.

10         And I -- I'm frightened that that fishery is going

11  to be severely impacted by all these wind farms, Vineyard

12  Wind, I think, the most because it's right there where we --

13  where we almost every year can count on getting squid.

14         You do see squid in other places, and it goes back

15  to the same thing:  You can't just tow the net around and

16  hope you catch them.  You have to go to where the maximum

17  amount of squid are.

18  **Q.**  Finally, in your fishing license issued by the federal

19  government, are you permitted to go fishing wherever you

20  want, whenever you want, for whatever you want?

21  **A.**  No.  I have specific licenses.  You know, I've had to buy

22  some landing licenses for other states up and down the coast

23  over the years.  But, no, my particular set of licenses is

24  more or less from -- at this point in time -- from Nantucket

25  Shoals to North Carolina.

1   **Q.**  Do they limit the types of fish --

2   **A.**  Yes, sir.

3   **Q.**  -- that you can catch?

4   **A.**  Yeah, there's quotas on everything.  Squid is unlimited

5   until you hit a -- it's trimester and once -- the trigger is,

6   I think, at 90 percent -- the trigger is reached, it shuts

7   down to 250 pounds, which, you know, you're not going to

8   steam then to Nantucket for 250 pounds.

9   **Q.**  So just as matter of complying with your fishing permit,

10  it would be true or untrue to say that you can just go

11  anywhere else and fish --

12  **A.**  I can't.

13  **Q.**  -- for whatever you fish in the Vineyard Wind area?

14          MR. PIROZZOLO:  Objection.  This is just leading

15  and argument, Your Honor.

16          THE COURT:  I'm letting him do leading questions.

17  It's not useful.

18          MR. PIROZZOLO:  Thank you, Your Honor.

19  BY MR. HADZI-ANTICH:

20  **Q.**  Is it true or untrue that --

21  **A.**  I can't just go anywhere's else, and there's -- I say,

22  the squid are in certain places, and they've been there as

23  long as I've been fishing and before, long before.  And if

24  they're not able to utilize those places in their life cycle,

25  I hope we don't damage the stock of squid.

1    **Q.**  And if someone were to tell you, "Well, you can go

2    elsewhere and you can be made 100 percent whole," what would

3    your answer be?

4    **A.**  Maybe I can, but I doubt it.  It's not been my

5    experience.  I've fished the same spots.  I've fished the

6    same spots since I started fishing.

7                MR. HADZI-ANTICH:  Okay.  Thank you.

8                No further questions, Your Honor.

9                MR. PIROZZOLO:  No further questions, Your Honor.

10               THE COURT:  So you may step down.

11               THE WITNESS:  Thank you, Your Honor.

12               THE COURT:  And so Vineyard Wind has spent

13   30 minutes and plaintiffs 23.  Any other witnesses for

14   plaintiffs?  No.  That was your one witness.

15               MR. HADZI-ANTICH:  No, Your Honor.

16               THE COURT:  Federal defendants are not introducing

17   any witnesses, correct?

18               MR. HAJEK:  Correct, Your Honor.

19               THE COURT:  Vineyard Wind, your presentation.

20               MR. BUENTE:  We call as our first witness Ms. Jill

21   Rowe, please.

22               THE DEPUTY CLERK:  Please raise your right hand.

23               (Witness duly sworn.)

24               THE DEPUTY CLERK:  Please state your name for the

25   record and spell your last.

1          THE WITNESS:  Jill Rowe, R-o-w-e.

2          THE DEPUTY CLERK:  Thank you.  You may have a seat.

3          MR. BUENTE:  Ms. Rowe's declaration is Exhibit 11

4    in the folder, Your Honor.

5                          **JILL ROWE**

6          having been duly sworn, testified as follows:

7          **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

8    BY MR. HADZI-ANTICH:

9    **Q.**  Good morning, Ms. Rowe.

10   **A.**  Good morning.

11   **Q.**  My name is Theodore Hadzi-Antich.  I represent the

12   plaintiff Seafreeze Shoreside, Inc., et al., in this case.

13          THE COURT:  Could you just hold on just one second?

14   I'm still pulling Exhibit 11 out.

15          Exhibit 11 has been identified and made part of the

16   record.  Please go ahead.

17          MR. HADZI-ANTICH:  Thank you, Your Honor.  Just

18   give me one moment, please.

19   BY MR. HADZI-ANTICH:

20   **Q.**  Ms. Rowe, pile-driving noise that's going to be generated

21   by the installation of the wind turbine generator foundations

22   has the potential to cause injury or mortality to fish and

23   invertebrates that are close to the source, correct?

24   **A.**  Yes.

25   **Q.**  And physiological and behavioral changes to fish and

1    invertebrates would -- could occur for those that are further

2    away from the source, correct?

3    **A.**  Yes.

4    **Q.**  The 2020 Jones study found that pile-driving noise

5    elicits alarm responses in squid; is that correct?

6    **A.**  Yes, that's correct.

7    **Q.**  And that study was based on pile driving sand at 190 --

8    I'm sorry -- pile-driving sound played at 190 to 194

9    decibels, correct?

10   **A.**  Yes, that's correct.

11   **Q.**  What was the actual source of the recorded pile-driving

12   noise in that study?

13   **A.**  I believe it was a -- I'm -- actually, I'm not

14   100 percent sure right now.

15   **Q.**  It wasn't pile driving of a 13.5 megawatt turbine,

16   correct?

17   **A.**  Yes, that's correct.

18   **Q.**  And you never personally conducted or oversaw a study

19   that investigated the response of fish and invertebrates in

20   the environment to the types of pile-driving noise to which

21   they're going to be subject at the Vineyard Wind site project

22   for 13-megawatt turbines, correct?

23   **A.**  I have not.

24   **Q.**  So you don't really know how squid or other marine

25   organisms in the area will react to the pile-driving noise at

1    the Vineyard Wind project, correct?

2    **A.**   Not specifically to the Vineyard Wind project.

3    **Q.**   Cumulative pile driving where you have more than simply

4    one monopile for which pile driving is a necessary threshold,

5    but you have 2, 3, 4, 64 -- cumulative pile driving

6    creates -- increases the impact on marine species, correct,

7    the noise impact?

8    **A.**   Yes.  But I will just add a quick statement to that, that

9    the modelling that had been conducted for Vineyard Wind

10    looked at the cumulative impacts of the pile driving.

11    **Q.**   Did they look at the cumulative impacts for pile driving

12    only within the Vineyard Wind project or also within the

13    surrounding projects, of which there are at least six?

14    **A.**   I am only here to talk about the Vineyard Wind project

15    and not the cumulative impacts of other projects.

16    **Q.**   So you don't have any information with regard to the

17    cumulative noise impacts of neighboring projects?

18    **A.**   Not for today's testimony.

19    **Q.**   With regard to operational impacts of cables, they're

20    going to generate electromagnetic fields, correct?

21    **A.**   Yes, they will generate some electronic-magnetic fields.

22    **Q.**   And the electromagnetic fields may affect the ability of

23    some marine species to navigate and to detect predators and

24    prey, correct?

25    **A.**   It depends on the species, but, yes, that's correct.

**Q.** And those electromagnetic fields may have physiological
and developmental effects on marine species, correct?

**A.** Again, it depends on the species and where they are
located in the water column.

**Q.** Installation of the electric cables will cause sediment
from the sea floor to be suspended in the water column,
correct?

**A.** Yes, that's correct.

**Q.** And the deposition of those sediments on the sea floor,
that has the potential to adversely impact marine species,
correct?

**A.** Again, it depends on exactly the method that's being used
to do that as well as how far you're looking from the cable
itself.

**Q.** But that potential for adverse impact to marine organisms
is there, correct?

**A.** Yes, in the immediate vicinity of the cable.

**Q.** And those marine organisms that cannot quickly move away
from the construction activity, turbidity from the suspended
sediments can impair vision, impact foraging, navigation, and
sheltering behavior and impair gas exchange across the gills,
correct?

**A.** Yes, that's correct.

**Q.** And these activities could also cause mortality to
benthic eggs and larvae, correct?

1    **A.**   Yes.  But, again, it depends on the burial depth and the

2    burial width of the sediment deposition.

3    **Q.**   But they have the potential to cause mortality to those

4    benthic eggs and larvae, correct?

5    **A.**   If they are buried to the exact depth, half the diameter

6    of the egg.

7    **Q.**   And also potential for sessile adults?

8    **A.**   Sessile, those ones that are right directly on the bottom

9    of the sea floor, yes, in the immediate vicinity of the cable

10   route.

11   **Q.**   Are you being paid to present your testimony today?

12   **A.**   Yes.

13   **Q.**   And what's the type of compensation you're receiving for

14   your testimony here today?

15   **A.**   I am salaried.

16   **Q.**   Is this the first project you've ever worked on for

17   Vineyard Wind?

18   **A.**   Yes.  The Vineyard Wind 1 project was the first project I

19   worked on for Vineyard Wind.

20   **Q.**   And how long have you been working in your salaried

21   position?  You're not employed directly by Vineyard Wind,

22   correct?

23   **A.**   No, I am not.

24   **Q.**   Who are you employed by?

25   **A.**   I am by Epsilon Associates.

1   **Q.**  And how long have you been working with Epsilon

2   Associates on the Vineyard Wind project?

3   **A.**  Can you please clarify in terms of my history, in terms

4   of -- I used to work for RPS, and now I work for Epsilon.

5   **Q.**  And when you worked for RPS and Epsilon, you worked

6   for -- on the Vineyard Wind project for both companies?

7   **A.**  Yes, that's correct.

8   **Q.**  Okay.  So how long would be the total?

9   **A.**  I have been working on this project since 2017.

10  **Q.**  Okay.

11          MR. HADZI-ANTICH:  I have no further questions at

12  this time.

13          THE COURT:  Okay.  Redirect?

14  **REDIRECT EXAMINATION BY COUNSEL FOR INTERVENOR-DEFENDANT**

15  BY MR. BUENTE:

16  **Q.**  Ms. Rowe, can you explain to the Court, first of all,

17  with respect to noise impacts, what studies that were

18  undertaken, the potential impacts from the Vineyard Wind

19  farm?

20  **A.**  Yes.  So as part of the Vineyard Wind project, the

21  Vineyard Wind contracted some hydrodynamic or hydroacoustic

22  model- -- company, JASCO, to undergo noise modelling

23  assessments with a number of different -- a number of

24  different scenarios looking at both pile driving and all

25  different aspects of the pile driving.

1              So the number one study has been hydroacoustic

2    modelling in the area, as well as extensive literature review

3    of all offshore wind farms in the UK and their effects on

4    noise.

5    Q.   So the principal effect that they were trying to examine

6    was pile driving, which is by far and away the largest source

7    of noise?

8    A.   Yes, absolutely.  Pile driving is the largest frequency

9    and noise generator for this project.

10   Q.   And is the level of noise produced by the pile driving

11   going to be appreciably different depending upon whether it's

12   a 13.5-megawatt generator or something slightly smaller?

13   A.   I'm not certain on that, but I don't believe so.

14   Q.   With respect to whether it would be possible to do a

15   cumulative impact study beyond the Vineyard Wind project, at

16   the time that the assessment was being done, what kind of

17   information existed about other projects?

18   A.   At the time of the beginning of the assessment in 2017,

19   no other knowledge was known of the other existing projects

20   in the area.

21   Q.   And you've been involved with some of the other projects,

22   have you not?

23   A.   Yes, I have.

24   Q.   Which projects were those?

25   A.   I did some sediment dispersion modelling for the South

1    Fork Wind farm, and then I am working on some of the future

2    projects for Vineyard Wind offshore.

3    **Q.**  And in those -- as for each one of those projects, will

4    BOEM assess the noise potential from each of those projects?

5    **A.**  Yes, I believe so.

6            MR. ZALEZNIK:  Objection, Your Honor.

7            THE COURT:  I'm sorry; what's the objection?

8            MR. ZALEZNIK:  She's been asked about what BOEM's

9    going to do.  She had no indication that she knows what the

10   government is going to do.

11           THE COURT:  So lack of foundation.  If you want to

12   add what foundation she has or not --

13   BY MR. BUENTE:

14   **Q.**  What experience do you have working with BOEM in terms of

15   the assessment of noise impacts?  Can you identify your

16   experience, please?

17   **A.**  Yes, absolutely.  As part of the process, BOEM conducts

18   an environmental impact statement and bioimpact study.  And

19   as part of that, they are assessed and required to look at

20   the cumulative impacts.

21           So, for instance, for this Vineyard Wind project,

22   one project, there was a supplemental EIS in which they did

23   further assess the cumulative impacts of the projects that

24   were known at the time of the Vineyard Wind 1 project.

25   **Q.**  Okay.  With regard to electromagnetic frequency and its

1    potential impact on the environment, can you explain to the

2    Court what assessment was performed under your direction for

3    the Vineyard Wind 1 project?

4    **A.**   Absolutely.  So, again, I was working primarily with

5    Vineyard Wind as a consultant at that point, our PS.  So I

6    didn't directly manage the folks who did this other work, but

7    Gradient was employed by -- contracted by Vineyard Wind and

8    their subcontractor to do, again, EMF modelling over the sea

9    floor to assess how -- what's the distance above the sea

10   floor in which the electromagnetic fields would be observed.

11   **Q.**   And you read the reports and examined the reports and

12   discussed the reports?

13   **A.**   Absolutely, because the part that I was involved with is

14   I led a group of marine biologists to write the fish and

15   benthic and EFH sections of the COP; and as part of that, we

16   assessed what the results of the Gradient reports stated in

17   terms of the impacts, the potential impacts from EMF.

18   **Q.**   And what conclusion did your team reach with respect to

19   the impact, the potential impacts?

20   **A.**   Yeah, so we assessed that from the AC cables the amount

21   of EMF was generated was lower than the earth's gravitational

22   background magnetic field.

23           So we did not -- we concluded that the impacts to

24   those organisms just directly above the cable would be

25   minimal, and the distance above that would be minimal.  So we

1    found it to be temporary impacts, but, again, just in the

2    very vicinity of the cable itself.

3    **Q.**  And for -- for biota that were a further distance from

4    the cable, there wouldn't have been --

5    **A.**  Absolutely, yeah.  And the other thing that we assessed

6    too was that the cable would be buried, so any EMF impacts

7    that there would be, again, because they're buried below the

8    surface, two meters or so below the surface, that impact

9    would be even further minimalized.

10   **Q.**  And finally, with respect to sediment caused by delaying

11   of the cables, haven't you been advised that the cable laying

12   is almost completed now?

13   **A.**  Yes.  Absolutely.  The cabling -- yep, exactly.  And as

14   part of that, I was the manager and I did manage and direct a

15   group of ocean oceanog- -- oceanographic engineers to do this

16   sediment dispersion modelling as part of that.  So we were

17   definitely involved with the cables and the laying of -- and

18   assessing the impacts of that.

19   **Q.**  What did your team predict with respect to the impact

20   on --

21   **A.**  Yes.

22   **Q.**  -- sedimentation?

23   **A.**  Yes.  So the sediment that would go into the water column

24   from dispersal of the cabling, because of the hydrodynamic

25   currents in the area it would be short lived.

1          So one of the things is that the organisms, they

2     need to have a sustained amount of impact or exposure to the

3     sediment within the water column.  So we found out that the

4     sediment in the water column would be less than about six

5     hours, so those organisms would not have sustained exposure

6     to that.

7          And then in terms of the deposition of the sediment

8     on the sea floor, again, that's also dependent on -- there's

9     thresholds of concern for all the different organisms.  So,

10    again, the area in which the sediment would be dispersed and

11    on the sea floor greater than 1 millimeter was, again, just

12    in the very vicinity of the cable route.

13         So in both of those cases, we found minimal impacts

14    to the organisms and definitely not permanent organism -- or

15    impacts to the organisms from the sediment dispersion related

16    to the cable burial.

17              MR. BUENTE:  No further questions, Your Honor.

18              THE COURT:  Anything on redirect, or recross?

19              MR. HADZI-ANTICH:  No, Your Honor.

20              THE COURT:  Thank you.

21              THE WITNESS:  Thank you.

22              THE COURT:  You may step down.

23              Call your next witness.

24              MR. WHITFIELD:  Your Honor, Vineyard Wind calls

25    Dr. Dennis King.  His declaration will be Exhibit Number 5 in

1    your folder.

2             THE COURT:  Okay.  And where we are now is

3    38 minutes on -- by Vineyard Wind and 31 minutes by

4    plaintiffs.

5             And I'm sorry; the declaration number was -- the

6    exhibit number was --

7             MR. WHITFIELD:  Exhibit 5, Your Honor.

8             THE COURT:  Thank you.

9             THE DEPUTY CLERK:  Sir, would you please raise your

10   right hand.

11            (Witness duly sworn.)

12            THE DEPUTY CLERK:  Please state your name for the

13   record and spell your last name.

14            THE WITNESS:  Dennis King, K-i-n-g.

15            THE DEPUTY CLERK:  Thank you.  You may have a seat.

16                         **DENNIS KING**

17            having been duly sworn, testified as follows:

18            **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

19   BY MR. HADZI-ANTICH:

20   **Q.**  Good morning, Dr. King.

21   **A.**  Good morning.

22   **Q.**  My name is Theodore Hadzi-Antich.  I'm an attorney

23   representing the plaintiffs, Seafreeze Shoreside, Inc.,

24   et al.

25            You were retained by Vineyard Wind 1 in 2018 as a

1  fishery economics consultant, correct?

2  **A.**  Correct.

3  **Q.**  In 2019, you prepared two reports to assist with Vineyard

4  Wind's development of the project's construction and

5  operations plan, correct?

6  **A.**  Correct.

7  **Q.**  In those reports, you estimated the magnitude of

8  potential economic impacts of the project on commercial fish

9  fleets in two states:  Rhode Island and Massachusetts,

10  correct?

11  **A.**  Correct.

12  **Q.**  Those 2019 reports did not cover potential economic

13  impacts on commercial fishing fleets in New York, in

14  Connecticut, or in New Jersey, correct?

15  **A.**  Correct.

16  **Q.**  Vineyard Wind established a $3.3 million compensation

17  fund to be held in escrow to compensate fishing interests in

18  New York and Connecticut and New Jersey inclusively for

19  claims of economic losses resulting from the project for the

20  entire 30-plus-year life of the project, correct?

21  **A.**  Correct.

22  **Q.**  You've -- before filing your declarations for -- your

23  declaration for today's hearing, you've never prepared a

24  report to Vineyard Wind opining as to the adequacy of that

25  compensation fund, correct?

1    **A.**   Correct.  I did not prepare a formal report.

2    **Q.**   What kind of informal report did you --

3    **A.**   Vineyard Wind used the same approach that I used in

4    Massachusetts and Rhode Island to the other states, including

5    New York, based on their share of the fishing revenues from

6    the lease area.

7    **Q.**   And when you say it was an informal report, what do you

8    mean by that?

9    **A.**   It wasn't a report.  It was just a phone call.

10   **Q.**   It was just a phone call?

11   **A.**   Uh-huh.

12   **Q.**   You've never owned a commercial fishing company, correct?

13   **A.**   Correct.

14   **Q.**   And you've never been responsible for the profitability

15   of a commercial fishing company, correct?

16   **A.**   Correct.

17   **Q.**   And you've never had to make payroll for a commercial

18   fishing company, correct?

19   **A.**   Correct.

20   **Q.**   And you've never captained a commercial fishing boat,

21   correct?

22   **A.**   Correct.

23   **Q.**   And you've never been responsible for the safety of a

24   commercial fishing boat on the outer continental shelf,

25   correct?

**A.**  Correct.

**Q.**  Are you being paid by Vineyard Wind for your testimony today?

**A.**  Yes.

**Q.**  At what hourly rate?

**A.**  $250 an hour.

**Q.**  And how many hours did it take you to prepare for this testimony?

**A.**  15 hours, about.

**Q.**  And you were paid by Vineyard Wind for -- to prepare the declaration?

**A.**  Correct.

**Q.**  At what hourly rate?

**A.**  The same, 250.

**Q.**  And you were paid by Vineyard Wind for the preparation of the two 2019 reports, correct?

**A.**  Correct.

**Q.**  Approximately how much were you paid for by Vineyard Wind for the preparation of those 2019 reports?

**A.**  My best estimate would be $90,000.

         MR. HADZI-ANTICH:  No further questions for Dr. King at this time.

         THE COURT:  Anything on redirect?

         MR. WHITFIELD:  No, Your Honor.

         THE COURT:  Thank you.  You may step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  And your next witness?

3          MR. WEDEKING:  Vineyard Wind calls Mr. Larry Wise,

4     and his declaration is Exhibit Number 12.

5          THE DEPUTY CLERK:  Please raise your right hand.

6          (Witness duly sworn.)

7          THE DEPUTY CLERK:  Please state your name for the

8     record and spell your last name.

9          THE WITNESS:  Larry Wise, W-i-s-e.

10         THE DEPUTY CLERK:  Thank you.  You may have a seat.

11                         **LARRY WISE**

12         having been duly sworn, testified as follows:

13         **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

14     BY MR. HADZI-ANTICH:

15     **Q.**  Good morning, Mr. Wise.

16     **A.**  Good morning.

17     **Q.**  My name is Theodore Hadzi-Antich; and, again, I represent

18     Seafreeze Shoreside, Inc., the plaintiffs, et al., in this

19     case.

20         Mr. Wise, you've never captained a bottom trawl

21     commercial fishing boat, correct?

22     **A.**  No, sir, I have not.

23     **Q.**  And you've never personally been responsible to ensure

24     the safety of a bottom trawl fishing boat operating on the

25     outer continental shelf, correct?

1    **A.**   No, sir, I have not.

2    **Q.**   The United States Coast Guard has not reached a definite

3    conclusion that Vineyard Wind generators will not degrade

4    marine radar, correct?

5    **A.**   That is correct.  There is evidence both ways.  There can

6    be degradation, correct.

7    **Q.**   I'm sorry.  Repeat the last part.

8    **A.**   There can be degradation of the radar system, correct.

9    **Q.**   And there are studies underway now to determine the

10   extent to which wind turbine generators will degrade marine

11   radar, correct?

12   **A.**   Yes, sir.

13   **Q.**   And in 2021, the National Academy of Sciences conducted a

14   study on the effects of wind turbine generators on marine

15   radar, correct?

16   **A.**   That is correct.

17   **Q.**   And results of that study indicate that wind turbine

18   generators could affect marine radar systems, correct?

19   **A.**   That is correct.  They -- it identifies that there can be

20   effects, but it also identifies mitigations.

21   **Q.**   And the National Academy of Sciences study also

22   recommended the development of improvements in solid state

23   radar design by manufacturers of those units to deal with the

24   current risks to --

25   **A.**   Correct.

1  **Q.**  -- marine radar, correct?

2  **A.**  Correct.  That is one of the mitigation measured that's

3  identified.

4  **Q.**  And to your knowledge, manufacturers have not yet made

5  any such improvements to their equipment, correct?

6  **A.**  Manufacturers of marine radar have not at this time.

7  Other radar types, aviation, military, have done similar.

8  **Q.**  But not marine radar?

9  **A.**  But not marine radar, correct.

10  **Q.**  So as of now, the best scientific evidence suggests at

11  least that wind turbine generators could degrade currently

12  available marine radar, correct?

13  **A.**  There -- there can be effects on radar.  There are

14  effects that are known and can be mitigated, and there are

15  other mitigations that can be employed as well.

16  **Q.**  Well, according to the National Academy of Sciences, they

17  are recommending manufacturers to develop such mitigation

18  equipment, but you just testified that manufacturers have not

19  yet developed that equipment?

20  **A.**  They -- the National Academy of Sciences report also

21  identifies that the current magnetron-based radars can be

22  operated safely within the wind farm and that there's

23  experience doing so outside the United States.  And mariners

24  have been able to successfully safely navigate with that

25  technology in the presence of wind farms.

1    **Q.**  Does the National Academy of Sciences study provide a

2    level of confidence with regard to that particular finding?

3    **A.**  It cites prior findings from outside the United States.

4    **Q.**  But not within the United States?

5    **A.**  There are -- there are no wind farms of this scale in the

6    United States at the moment.

7    **Q.**  Yes.

8           Now, you state at paragraph 14 of your declaration

9    that transit around the Vineyard Wind project site would add

10   15 minutes to a trip, correct?

11   **A.**  That is correct for the route that was identified.  There

12   are -- obviously, there can be an infinite number of routes.

13   **Q.**  For the route that was identified by whom?

14   **A.**  The route that was identified in the declaration.

15   **Q.**  And did you develop that route?

16   **A.**  Yes, we developed that route.  That's the predominant

17   route shown from AIS traffic density.

18   **Q.**  Have you ever steered a commercial bottom trawl fishing

19   vessel around the Vineyard Wind project site?

20   **A.**  No, sir, I've not.

21   **Q.**  What's the basis of your 15-minute estimate?

22   **A.**  The distance to sail the farther distance to avoid going

23   through the -- through the area is established by the route,

24   and then the average speed along that route gives you the

25   time delta.

1    **Q.**  And how did you establish those -- well, first of all,

2    what were the average speeds that you generated?

3    **A.**  Approximately 8 knots.

4    **Q.**  8 knots.  You don't have any personal experience of

5    traveling that 15 minutes, correct?

6    **A.**  In that particular area, no, sir.

7          MR. HADZI-ANTICH:  I have no further questions at

8    this time.

9          THE COURT:  Anything on recross -- or redirect?

10   Sorry.

11         MR. WEDEKING:  Very briefly, Your Honor.

12       **REDIRECT EXAMINATION BY COUNSEL FOR INTERVENOR-DEFENDANT**

13   BY MR. WEDEKING:

14   **Q.**  Mr. Wise, have you ever captained a vessel yourself?

15   **A.**  Yes, sir, I have.

16   **Q.**  And do you have personal experience operating marine

17   radar?

18   **A.**  Yes, I do.

19         MR. WEDEKING:  Nothing further, Your Honor.

20         THE COURT:  Thank you.  You may step down.

21         MR. PIROZZOLO:  Your Honor, the final witness for

22   Vineyard Wind is Klaus Moeller.

23         THE COURT:  You're keeping your time fairly even:

24   Plaintiffs, 40 minutes; Vineyard Wind, 38 minutes.

25         THE DEPUTY CLERK:  Sir, please raise your right

1    hand.

2                    (Witness duly sworn.)

3                    THE DEPUTY CLERK:  Please state your name for the

4    record and spell your last name.

5                    THE WITNESS:  My name is Klaus Moeller.  It's

6    spelled M-o-e-l-l-e-r.

7                    THE DEPUTY CLERK:  Thank you.  You may have a seat.

8                    MR. PIROZZOLO:  Mr. Moeller's declaration is in the

9    folder at Exhibit 13.

10                              **KLAUS MOELLER**

11           having been duly sworn, testified as follows:

12           **CROSS-EXAMINATION BY COUNSEL FOR PLAINTIFFS**

13    BY MR. HADZI-ANTICH:

14    **Q.**  Good morning, Mr. Moeller.

15    **A.**  Good morning.

16    **Q.**  My name is Theodore Hadzi-Antich -- just, again, for the

17    record -- counsel for Seafreeze Shoreside, Inc., and the

18    other plaintiffs in this case.

19           You are currently the chief executive officer of

20    Vineyard Wind 1 LLC, correct?

21    **A.**  That's right.

22    **Q.**  From January 2019 until February 2022, you served as

23    project director for the Vineyard Wind project, correct?

24    **A.**  Correct.

25    **Q.**  As project director, you were responsible for overseeing

1    and managing the planning, procurement, and construction of

2    the Vineyard Wind project, correct?

3    **A.**  Right.

4    **Q.**  And you served in that capacity of project director until

5    February of 2022, when you became chief executive officer,

6    correct?

7    **A.**  Correct.

8    **Q.**  Now, on July 18, 2018, Vineyard Wind entered into power

9    purchase agreements with electric utility companies providing

10   for -- providing power to residents of Massachusetts,

11   correct?

12   **A.**  The date, I need to double-check, but, yes, that was

13   right.

14   **Q.**  Okay.  And on April 12, 2019, the Massachusetts

15   Department of Public Utilities approved those power purchase

16   agreements, correct?

17   **A.**  Right.

18   **Q.**  That was a "correct"?

19   **A.**  Yeah.

20   **Q.**  Okay.  And those power purchase agreements require

21   Vineyard Wind to provide deliveries of renewable energy to

22   the power companies, correct?

23   **A.**  Correct.

24   **Q.**  And the delivery dates under those power purchase

25   agreements informed Vineyard Wind's judgment as to when

1    financing, engineering, manufacturing, logistical,

2    construction, and operation of the Vineyard Wind project

3    would have to occur in order to meet Vineyard Wind's

4    contractual obligations under those power purchase

5    agreements, correct?

6    **A.**  Yes.

7    **Q.**  I'm sorry?

8    **A.**  Yes.

9    **Q.**  Now, on July 18, 2018, when Vineyard Wind entered into

10   those power purchase agreements, at that time, Vineyard Wind

11   did not know and could not have known whether the federal

12   government would approve the construction or operation of the

13   Vineyard Wind project, correct?

14   **A.**  That's right.

15   **Q.**  And the federal government at that time, July 18, 2018,

16   did not provide Vineyard Wind with assurances that the COP

17   would be approved, correct?

18   **A.**  No.  Correct, yeah.

19   **Q.**  Yet Vineyard Wind committed to meet those contractual

20   obligations with the utility companies anyway, correct?

21   **A.**  Correct.

22   **Q.**  At the time Vineyard Wind entered into those contracts on

23   July 18, 2018, the federal government had prepared a draft

24   environmental impact statement, correct?

25   **A.**  Yes.

1    Q.  But at that time, the federal government had not yet

2    solicited public comment on the draft environmental impact

3    statement, correct?

4    A.  I am not sure about that.

5    Q.  At that time, the federal government had not yet issued

6    final approval of the COP, correct?

7    A.  Correct.  The COP was issued in '21, May of '21.

8    Q.  The COP -- the COP was issued on July 15, 2021, correct?

9    A.  Yes, sorry.  The ROD was issued in May '21.

10   Q.  So Vineyard Wind didn't know until July of 2021 that the

11   federal government would approve the Vineyard Wind project,

12   correct?

13   A.  Correct.

14   Q.  And so three years before July 15, 2021, Vineyard Wind --

15   before Vineyard Wind knew whether the federal government

16   would give the green light to the project, Vineyard Wind

17   entered into the power purchase agreements not knowing

18   whether the project would be approved, correct?

19   A.  Correct.

20   Q.  So by entering into the power purchase agreements at that

21   early date, Vineyard Wind assumed the risk that the COP would

22   never be approved, correct?

23   A.  I will -- I don't know if the power purchase agreements

24   include certain clauses that are subject to financial close

25   and permanent approval.

1  **Q.**  I'm sorry.  I can't hear you.  If you would please --

2  **A.**  Yeah, sorry.  Right now I'm not aware if the power

3  purchase agreements include clauses that makes them subject

4  to financial close and permanent approval of the project.

5  **Q.**  Subject to financial what, sir?

6  **A.**  Financial close, the financing of the project.

7  **Q.**  I'm sorry.  I'm having difficult understanding your

8  answer.  You're not aware of what?

9  **A.**  So many of our contracts are subject to certain things

10  before they become in effect, and one -- a typical -- a

11  typical clause is that we make our contracts subject to

12  financial close, which is the financing of the project, and

13  that we would not have financial close without the permits.

14  I'm right now not aware whether the PPA includes such

15  clauses.

16  **Q.**  But my question was not with regard to financing yet, but

17  with regard to assuming the risk back in 2018 that the

18  federal government would not approve the COP at some point in

19  the future.  You entered into the power purchase agreements

20  in 2018, three years before COP was approved.  So in 2018,

21  you assumed the risk that the COP may not be approved by the

22  federal government, correct?

23  **A.**  Right.  That's why my answer is that I don't know whether

24  the PPA was subject to some of these conditions.

25  **Q.**  So --

1    **A.**   So when you say I -- we assumed the risk, if they were

2    subject to these things, of course we -- that's a different

3    risk, right?

4    **Q.**   I see.  Do you have access to the PPAs?

5    **A.**   Yes, I do, yeah.

6    **Q.**   Would you provide the Court and the Seafreeze plaintiffs

7    with copies of those PPAs?

8    **A.**   I would have to consult on confidentiality.  I mean, many

9    PPAs are public.

10              THE COURT:  I don't think this is proper

11    questioning.  Would you please move on.

12              MR. HADZI-ANTICH:  Okay.

13    BY MR. HADZI-ANTICH;

14    **Q.**   When you entered into the PPAs, I understand that you

15    said that you don't know the extent to which there were

16    shifting risks associated with those contractual documents.

17              MR. HADZI-ANTICH:  I'm not sure, Your Honor, how we

18    can -- how we can determine --

19              THE COURT:  If there was discovery you needed in

20    this case, you could have asked for discovery when we were

21    doing a discovery schedule.

22              Right now, you have fully briefed summary judgment.

23    We are -- when I can get to it, I'm going to get a summary

24    judgment issue decided and out.  In the meantime, you're here

25    on a preliminary injunction, so what discovery you do or

1    don't want, this isn't the forum for it.

2              MR. HADZI-ANTICH:  Understood, Your Honor.  Thank

3    you.

4    BY MR. HADZI-ANTICH:

5    **Q.**  Without knowing whether the federal government would

6    approve the COP, didn't you, in effect, assume the risk --

7    vis-à-vis the federal government, not vis-à-vis the PPAs --

8    that there could be project delays, correct?

9    **A.**  Yes.  The plan was not fixed at that point.  That's

10   right.

11   **Q.**  I'm sorry.  I didn't understand the last part of that

12   answer.

13   **A.**  No, the plan was not fixed at that point in 2018.  We

14   could assume delays, yes.

15   **Q.**  Now, the plaintiffs filed their complaint on December 15,

16   2021.

17   **A.**  Yes.

18   **Q.**  And you were aware of that filing, correct?

19   **A.**  Yes.

20   **Q.**  When you became aware of the action by plaintiffs, at

21   that point, Vineyard Wind decided to intervene in the

22   lawsuit, correct?

23   **A.**  Correct, yeah.

24   **Q.**  And you did so because you were concerned that the

25   lawsuit may interfere with the schedules that you were

1   obligated to meet under the power purchase agreements,

2   correct?

3   **A.**   Sorry, can you repeat that?

4   **Q.**   The question is, when you -- when you entered -- when you

5   intervened in the lawsuit, you did so because you were

6   concerned that this lawsuit may interfere with the schedules

7   of construction that you had already agreed to meet under the

8   power purchase agreements, correct?

9            MR. PIROZZOLO:  Objection.  I don't know -- first

10   of all, it's an argumentative question, among other things;

11   and I'm not sure that the foundation is laid that he speaks

12   for all of the reasons that Vineyard Wind may have done

13   something.  I object.

14           MR. HADZI-ANTICH:  This is --

15           THE COURT:  I'm going to -- I've been very liberal

16   about what questions can be asked.  I am going to allow the

17   question.  I do think it is argumentative.  I think you've

18   tried to make a point.  It may or may not have landed.  I'm

19   not sure seven more questions on this will get you any

20   further, but I will allow the question.

21           MR. HADZI-ANTICH:  Thank you, Your Honor.

22   BY MR. HADZI-ANTICH:

23   **Q.**   So I'm just going to repeat this.  You intervened in the

24   lawsuit because you were concerned that the lawsuit may

25   interfere with the schedules for power delivery under your

1    contract with the utility companies, correct?

2    **A.**   So we intervened because the lawsuit was a risk for the

3    project, and we hired a law firm to engage in that.  So there

4    was -- there were multiple reasons for doing that -- for

5    doing that, including, of course, we wanted a timely process

6    for the lawsuits.

7    **Q.**   What are the other reasons?

8    **A.**   Well, the other reasons is that we didn't -- obviously,

9    at that point, we didn't know the outcome of the lawsuit.

10   They could have -- they can end in other restrictions in how

11   we install and how we operate in the ocean.

12   **Q.**   So you intervened in the lawsuit because you were

13   concerned about the impact of the lawsuit on your business

14   activities, correct?

15   **A.**   We intervened for that, but also because we wanted to be

16   part and hopefully have a quick process.

17   **Q.**   Now, December 15, 2021, at that point in time, when we

18   filed the lawsuit, you had already contracted with equipment

19   and transportation suppliers necessary to construct the

20   Vineyard Wind project, correct?

21   **A.**   Yes.

22   **Q.**   And you had already obtained financing for the project at

23   that time, correct?

24   **A.**   Yes.

25   **Q.**   At the time you became -- the lawsuit -- you were

1    concerned that it may impact Vineyard Wind's ability to meet

2    the construction schedule because it could delay construction

3    of the project and -- correct?

4    **A.**  Can you repeat that?  I didn't get it.

5    **Q.**  Sure.  At the time you became aware of the lawsuit, you

6    were concerned that it may impact Vineyard Wind's ability to

7    meet the construction schedule and because it could delay

8    construction of the project, correct?

9    **A.**  Well, that was one of the concerns, yes.

10   **Q.**  From the time of the commencement of the lawsuit to

11   today, did you ever notify the electric utility companies,

12   your lenders, or your contractors or transportation --

13   equipment contractors or transportation contractors of this

14   lawsuit?

15   **A.**  Yes, we did.

16   **Q.**  And why did you feel it appropriate to notify those

17   entities of this lawsuit?

18   **A.**  So you mentioned a few -- a few stakeholders.  One was

19   the lenders.  We are -- we are under the credit agreement

20   obligated to inform them about certain events.  Like a

21   preliminary injunction like this case is a -- may be

22   considered a material adverse effect, which would have an

23   extreme impact on the project and stop the project for a

24   period, which will be hard to recover.  So that's why we need

25   to inform them about that.

1    **Q.**   So in your declaration, you state in paragraph 25 that

2    Vineyard Wind has secured debt financing totaling

3    approximately $2.4 billion, correct?

4    **A.**   Correct.

5    **Q.**   And every two weeks, Vineyard Wind must request a draw

6    from the banks to cover construction costs, correct?

7    **A.**   Yes.  Unfortunately, they don't just give me 2.4 billion.

8    **Q.**   And to do so, Vineyard Wind must show that it is in

9    compliance with the financing covenants, correct?

10   **A.**   Correct, yeah.

11   **Q.**   And those covenants include continued progress towards

12   completing construction, correct?

13   **A.**   Right.

14   **Q.**   And under those covenants, Vineyard Wind must certify

15   that no litigation-related event or circumstance has occurred

16   that would meet the definition of a, quote, "material adverse

17   effect," closed quote, under the lending agreements, correct?

18   **A.**   Correct.

19   **Q.**   And the issuance of a stay or injunction qualifies as a

20   material adverse effect under that -- under those contracts,

21   correct?

22   **A.**   There's a high risk for that, yes.

23   **Q.**   I'm sorry?

24   **A.**   There's a significant risk for that, yes.

25   **Q.**   And if the project cannot make the certifications, the

1    lenders may suspend any further drawdowns or loans, correct?

2    **A.**  Correct.

3    **Q.**  What is the definition --

4           THE COURT:  Counsel, just to warn you, you have

5    four minutes left.

6    BY MR. HADZI-ANTICH:

7    **Q.**  What is the definition of the term "material adverse

8    effect" in the lending agreements?

9    **A.**  It's a legal term that I -- I cannot quote precisely, but

10   it needs to have a high degree of financial impact on the

11   project.

12   **Q.**  In paragraph 11 of your declaration, you state that

13   fishermen are not precluded from fishing in the area,

14   correct?

15   **A.**  Yes, that's right.

16   **Q.**  Yet your notice to mariners, Number 76, addresses --

17   addressing -- advises fishermen that, until the areas are

18   marked on the NOAA chart and the wind turbine foundations are

19   installed later in 2023, it is recommended that the area be

20   avoided by any vessels dragging gear at the bottom.  There

21   will be no surface marking of the scour protection locations,

22   correct?

23   **A.**  Yes.  I believe that's what it says, yeah.

24   **Q.**  And with respect to paragraph 12 of your declaration, you

25   state that Vineyard Wind will install its 62 monopile

1    foundations and one ESP between May and December of 2023,

2    correct?

3    **A.**   Correct.

4    **Q.**   And Vineyard Wind has advised mariners that they

5    should -- the area should be avoided until the foundations

6    are installed, correct?

7    **A.**   Well, that was a recommendation.  I believe it was

8    updated later.  What we have done is we've -- we've marked

9    the positions very clearly, as I think was mentioned before.

10   We are at the end of the scour protection installation right

11   now, and the foundations are ready to be installed.

12           So, of course, very soon, they will be very

13   visible -- they will be very visible where the foundations

14   are.  But we also marked them on the charts, and we have

15   safety vessels out there to hinder any safety --

16   **Q.**   How many safety vessels do you have out there?

17   **A.**   I believe there's two or three right now.

18   **Q.**   Are you aware that on May 3rd of this year, earlier this

19   month, the Coast Guard published a notice establishing 63

20   temporary safety zones to ensure the safety of life and

21   property in the area within the 500-meter radius of each of

22   the 62 monopiles?  Are you aware of that?

23   **A.**   I was not aware, no.

24   **Q.**   And, also, the Coast Guard indicated that construction of

25   those turbines would be from June 15, 2023, to May 31, 2024.

1    Is that --

2    **A.**  Can you -- sorry -- repeat the dates?

3    **Q.**  Well, according to the Coast Guard, the construction of

4    the turbine activities, construction activities for the

5    turbines will be from June 15, 2023, to May 31, 2024,

6    correct?

7    **A.**  I'm sorry; what's the question?  Your -- I said I didn't

8    know about that document, right?

9    **Q.**  You didn't know about the document, but is that an

10    accurate statement regarding the construction schedule for

11    the turbines, from June 15, 2023, to May 31, 2024?

12    **A.**  So we -- so the process of installing a turbine is a

13    complex and a long one.  We were planning to start turbines

14    this summer.  The date hasn't been fixed yet.  And they -- we

15    will be installing throughout this year and next year as

16    well.  The end date also has also not been set because it's

17    dependent on weather.

18    **Q.**  Vineyard Wind does not have a decommissioning plan

19    approved by BOEM setting forth precisely how the project will

20    be decommissioned, correct?

21    **A.**  We don't have an approved plan, but we have discussed it

22    with BOEM.  You know, this has been done in the industry

23    before.  We know -- we know pretty well how to decommission a

24    wind farm.

25    **Q.**  But BOEM --

```
 1              THE COURT:  Counsel, you're --
 2              MR. HADZI-ANTICH:  I'm sorry?
 3              THE COURT:  -- pushing your time.  You've run out
 4     of time.
 5              MR. HADZI-ANTICH:  I'm out?  Then I'm out.
 6              Thank you, Your Honor.
 7              THE COURT:  Anything on redirect?
 8              MR. PIROZZOLO:  Just a couple questions,
 9     Your Honor.
10         REDIRECT EXAMINATION BY COUNSEL FOR INTERVENOR-DEFENDANT
11     BY MR. PIROZZOLO:
12     Q.  With regard -- you were asked some questions about the
13     PPA --
14     A.  Right.
15     Q.  -- agreement?  The PPA agreements are actually public
16     documents?
17     A.  Right.
18     Q.  You were asked some questions about the notification
19     regarding the placement of the scour?
20     A.  Right.
21     Q.  And that is a temporary, that is a temporary process,
22     right?
23     A.  Correct.
24     Q.  Once the scour is -- correct?
25     A.  We expect to be done within a week or so, about, with the
```

1    scour.

2                MR. PIROZZOLO:  I have no further questions.

3                THE COURT:  You may step down.  Thank you.

4                THE WITNESS:  Thanks.

5                THE COURT:  Okay.  There were exhibits attached to

6    plaintiffs' memo.  Did you want to introduce those?  I don't

7    think they were attached to the declaration, but I do think

8    they were attached to your memo.

9                MR. HADZI-ANTICH:  The plaintiffs' memo to stay or,

10    in the alternative, preliminary injunction?  Just one moment,

11    Your Honor.

12                MR. PIROZZOLO:  I apologize, Your Honor.  I

13    couldn't hear the response.  Is -- are these additional

14    documents that are being moved for admission in the hearing?

15                THE COURT:  I'm asking if he's asking to move them

16    for admission.

17                MR. HADZI-ANTICH:  I'm sorry, Your Honor.  I

18    misunderstood you.  I am asking for -- to move them for

19    admission, yes.

20                THE COURT:  Is there any objection?

21                MR. PIROZZOLO:  Well, we object.  We could go one

22    by one, but these are basically -- looks like these are other

23    affidavits and declarations that have been supplied in the

24    case at other times, it looks like, to me.

25                THE COURT:  Maybe I'm misremembering what was here.

1    There were attachments -- there were a few documents, and
2    they were limited, but there were a few documents, I believe.
3    Maybe I -- I don't have it in front of me, but maybe I'm
4    misremembering.
5              MR. HADZI-ANTICH:  I can clarify that, Your Honor.
6    So Exhibit A is Offshore Wind Mariner Update Number 76.  This
7    is a Vineyard Wind document updating mariners regarding the
8    status of construction activities.
9              THE COURT:  That was my memory, is they were all
10   short.
11             MR. HADZI-ANTICH:  Yes.  And then -- I'm just
12   flipping through the pages here.
13             I'm just looking for Exhibit B.  Exhibit B is a
14   May 3, 2023, United States Coast Guard mariner update
15   containing text of -- there are actually several.
16             THE COURT:  Here, I have -- so Tab A was a
17   March 2023 communication with Vineyard Wind regarding scour
18   protection; B was a May 3, 2023, regarding on shore offshore
19   work regarding the Vineyard Wind project; C was a May 23rd
20   communication with Vineyard Wind regarding the project
21   schedule; D was a May 2023 mariner advisory; E was an
22   excerpt, a map of the lease area; and F was another excerpt,
23   a map of the wind development area.
24             MR. HADZI-ANTICH:  Thank you, Your Honor.
25             MR. PIROZZOLO:  And we do not object to that.  I

1    apologize.  I had a different stack of papers in front of me,

2    so we do not object to those.

3            THE COURT:  Those are also part of the record,

4    then.

5            The other thing I had, there was an email that was

6    attached to Mr. Moeller's declaration.  Was that part of what

7    you put in now?  I just want to make sure my record is clean

8    of what I have and don't have in front of me, so --

9            MR. PIROZZOLO:  So, Your Honor, I believe it's

10   122-2, which was attached to Vineyard Wind's submission.  I

11   don't actually think that's part of his declaration.  I think

12   it's a separate attachment that went with the file.

13           THE COURT:  Okay.  And are you moving to admit 122?

14           MR. PIROZZOLO:  Yes, we are.  We're moving to admit

15   all attachments that were submitted as part of Vineyard

16   Wind's submission in connection with 122.

17           THE COURT:  So this Exhibit 13 that you gave me, by

18   the way, stops at page 5 of 10 and --

19           MR. PIROZZOLO:  Oh.  So I have -- I have a full

20   copy.  I apologize.  We must have double sided it or

21   something.  So I can --

22           THE COURT:  Thank you.

23           MR. PIROZZOLO:  I apologize.

24           THE COURT:  Any objection to that?

25           MR. HADZI-ANTICH:  No objection, Your Honor.

```
1              We do have the offer of proof, just the highlighted

2    portions of the two declarations, Brady and Lapp, on the

3    issue of the compensation fund.

4              THE COURT:  Okay.

5              MR. HADZI-ANTICH:  Shall I --

6              THE COURT:  Maybe if you can --

7              MR. PIROZZOLO:  May I approach with the exhibit,

8    Your Honor?

9              THE COURT:  Yes, you may approach with the exhibit,

10   and you should alert counsel to which paragraphs you've

11   highlighted or give them a copy if -- either way.

12             MR. HADZI-ANTICH:  That will take us a few minutes

13   because Mr. Mighell just did it longhand.

14             THE COURT:  Why don't you do this, which is why

15   don't you make a copy of the highlighted and give it to all

16   of us, or you may not have color copying where you are --

17             MR. MIGHELL:  Not until we get home.

18             MR. HADZI-ANTICH:  Can we do that when we -- I'm

19   going to be back in the office later this week.  Can we do

20   that later this week or --

21             THE COURT:  You have a motion for preliminary

22   injunction pending.

23             MR. HADZI-ANTICH:  Yes.

24             THE COURT:  If you are asking me not to rule on it

25   for a while, let me know, but --
```

1          MR. HADZI-ANTICH:  I'm going to give it to local

2     counsel, and local counsel will take care of delivering it to

3     everyone.  Should we do that through ECF?

4          THE COURT:  Yeah, I think -- if you can -- are

5     there portions of the paragraphs, is that the problem, rather

6     than just saying specific paragraphs?

7          MR. HADZI-ANTICH:  I think we can cite specific

8     paragraphs.

9          MR. MIGHELL:  Yes.

10          MR. HADZI-ANTICH:  Should I simply tell you what

11     those paragraphs are?

12          THE COURT:  Yeah, why don't you tell counsel what

13     those paragraphs are on each declaration.

14          MR. HADZI-ANTICH:  Okay.

15          THE COURT:  And then we can clean it up right now.

16          MR. HADZI-ANTICH:  Okay.  So -- so with regard -- I

17     guess my communication is with counsel now for Vineyard Wind?

18          So with regard to Megan Lapp's declaration in

19     support of plaintiffs' motion for stay or in the alternative

20     preliminary injunction, the offer of proof with regard to the

21     compensation fund is constituted by paragraphs 1, 2, 13, 14,

22     15, 16, 17, 18, 19, and that is all.

23          And then with regard to Ms. Brady's declaration in

24     support of plaintiffs' motion for stay or, in the

25     alternative, preliminary injunction, the offer of proof on

1    the compensation fund is comprised of paragraphs 1, 2, 3, 7,

2    8, 9, 10, 11, and 12.

3            THE COURT:  And, Mr. Pirozzolo, you have the full

4    exhibit?

5            MR. PIROZZOLO:  Yes.  I apologize, Your Honor.

6    This is marked as Exhibit 13.

7            THE COURT:  Thank you.

8            MR. MIGHELL:  Your Honor, may I approach?

9            THE COURT:  Certainly.  Thank you.

10           Yes, counsel?  You're standing.  I'm assuming you

11   wanted --

12           MR. HADZI-ANTICH:  I thought you had more questions

13   for me.  That's all.

14           THE COURT:  I have your briefing.  Are you looking

15   to do closing argument?  If so, we need to probably do it

16   fairly quickly or give the court reporter a five-minute

17   break, one or the other.

18           MR. HAJEK:  Just a question for the Court.  We had

19   an exhibit to our preliminary injunction motion.  It was an

20   email exchange regarding scheduling from July 2022.  If that

21   needs to be -- if we need to request that it be admitted,

22   then we do so.

23           THE COURT:  So that's 123-1?  Is that what that

24   would be?

25           MR. HAJEK:  Correct.

 1              THE COURT:  Any objection?  Okay.

 2              MR. HADZI-ANTICH:  No objection, Your Honor.

 3              THE COURT:  So 123-1 is part of the record for the

 4    preliminary injunction motion.

 5              If you want five minutes of closing, I can give

 6    that to you now.  I -- otherwise, I think we're all running

 7    out of -- a little bit of energy here, but --

 8              MR. HADZI-ANTICH:  Yes, I would like to make a very

 9    short closing argument, Your Honor.

10              The commercial fishing season in the Vineyard Wind

11    lease area is scheduled to begin -- I've got it here in my

12    notes -- within a couple of weeks.  That's still true, but

13    it's shorter than within a couple weeks now.

14              We're just seeking to temporarily pump the brakes

15    on the ongoing construction activities while the Court

16    decides the motions for summary judgment.

17              You know, this case is really complex.  The record

18    is huge, and the filings are lengthy.  We want the Court to

19    have a fair chance to fully consider this case for as long as

20    it takes.  That's why temporary relief pending the Court's

21    decision on the cross motions for summary judgment is so

22    important at this time given the beginning of the commercial

23    fishing season before the end of this month.

24              That's why we're asking the Court to issue a stay

25    under 5 USC Section 705 postponing the effective date of the

1    federal defendants' COP approval and ROD issuance until this

2    case is resolved.

3          This gives time for the Court to sort through this

4    matter.  In the alternative, the Court could enjoin the

5    federal defendants to revert to the status quo before they

6    approved the COP and issued the ROD.  We're not asking the

7    Court to order Vineyard Wind to do anything.  We're asking

8    the Court to temporarily suspend the legal effect of those

9    past agency actions pending resolution of this lawsuit.

10         When we filed the 60-day notice, when we filed the

11    complaint, and when we filed our motion for summary judgment,

12    construction was still a ways off.  But the commercial

13    fishing season is here and now.

14         We were considering filing our stay motion prior to

15    the motion for summary judgment hearing on April 3rd, but

16    Vineyard Wind's counsel persuaded us.  They persuaded us as

17    set forth in the email exchanges that form one of the

18    exhibits to the motion for stay.  Vineyard Wind's counsel

19    persuaded us that their activities would be minimal before

20    the hearing date.  Plus commercial fishing season for our

21    plaintiff fishermen wasn't for a month and a half.  So we

22    refrained from filing the motion at that time.

23         Now Vineyard Wind is going full steam ahead by

24    placing scour protection and armoring around each of the

25    62 monopiles and constructing the monopiles at each of those

1    locations between May and December of this year, going right

2    through the commercial fishing season; and conducting cabling

3    orientations through July 2023, 24 hours a day, seven days a

4    week, at the height of the fishing season; and announcing the

5    correction of the wind turbines will continue through the

6    summer of 2024; and recommending that the area be avoided by

7    any vessels dragging gear at the bottom during construction.

8            Originally, prior to the April 3rd hearing,

9    Vineyard Wind told us that -- and mariners -- that they'd

10   only be doing filler scour protection at 11 and then

11   subsequently 17 turbine sites.

12           After the hearing, not only did they revise that

13   notice to mariners to tell them that they would be placing

14   scour protection at all 62 turbine sites, but they'd be

15   placing armor stone, which are essentially giant boulders,

16   not the smaller filler stone that they originally had said,

17   as Mr. Aripotch testified.  And they're not going to mark

18   these new hangs on the surface.

19           This is really important because Vineyard Wind was

20   required to establish a mariner communications plan and keep

21   all affected parties notified of the status of the project

22   via regular updates by the RODs, terms, and conditions

23   regarding COP approval.  They didn't do that.

24           We had to proactively search through Vineyard

25   Wind's websites and proactively go through each and every

1    iteration of Mariner Report Number 76.  I believe there were

2    three or four revisions, each time indicating a greater and

3    the greater number of construction activities and each time

4    changing the dates on it.  So we're looking at a moving

5    target.

6            On top of that -- and, really, the precipitating

7    factor -- was that on May 3rd of this month, the Coast Guard

8    published a notice in the federal register establishing

9    63 temporary safety exclusion safety zones within the

10   Vineyard Wind lease area around the turbine construction

11   sites because of the, quote, "extremely complex and unusually

12   hazardous conditions involved in the construction

13   activities," making the area unsafe during the plan

14   construction period from June 15, 2023, to May 31, 2024.

15           That federal register notice from the Coast Guard

16   containing the Coast Guard's finding of unusually hazardous

17   conditions and establishment of the exclusion zone was the

18   precipitating factor leading to our filing of the motion for

19   temporary relief.

20           The confluence of these --

21           THE COURT:  Is that May 3rd document one of the

22   exhibits?

23           MR. HADZI-ANTICH:  It is, Your Honor.

24           THE COURT:  Thank you.

25           MR. HADZI-ANTICH:  So in closing, the confluence of

1    current and future construction activities, coupled with the

2    imminent beginning of commercial fishing season, makes it

3    crucial for the plaintiffs to have filed their motion for

4    temporary relief now and no longer wait.

5         We did exchange emails with counsel for the federal

6    defendants and Vineyard Wind in a good faith effort to ask

7    them to wait until this Court makes its decision on the cross

8    motions for summary judgment.  They refused.  And we felt

9    that it simply was infeasible to wait any longer.

10         Now is the time for this motion before the

11    monopiles at 62 locations start to be pile-driven and before

12    the exclusion zones that have been instituted by the Coast

13    Guard.

14         Thank you, Your Honor.

15         MR. HAJEK:  Good afternoon, Your Honor.

16         So just a word about the timing, the Coast Guard

17    safety zones were discussed in the final environmental impact

18    statement and the need for those safety zones during

19    construction.  The final EIS was available at least in 2021,

20    and so the plaintiffs did know about that.

21         I would also point to, on the timing issue, point

22    to the declaration of David Aripotch that he submitted with

23    his summary judgment motion.  This is Document 66-1 dated

24    November 7, 2022, as marked as Exhibit 2.  I'm not sure if it

25    was shown to the witness.

1           But in his declaration, he discussed many of the

2    same things that he did today.  He discusses the spacing of

3    the turbines, the potential interference with radar, and the

4    potential snags.  And in paragraph 16, he says that if

5    in-water construction were to begin, because of the risks

6    posed by the project, he would not be able to fish within the

7    project area.  This was November 2022.

8           And for the record, we disagree with his assertions

9    in the declaration.  They are contradicted by the record in

10   this case, which establishes that fishing and navigation will

11   be able to occur within the project area during that time.

12   But it does show that plaintiffs were well aware of the risks

13   that they claim the project posed back in November, and they

14   did not file a motion for a preliminary injunction.

15           I would also point out we share Vineyard Wind's

16   objections to Mr. Aripotch testifying about areas that are

17   beyond his expertise.  He does not have authority to testify

18   about EMF or the specific impacts of pile driving, noise on

19   fish.  He hasn't been involved in studies on that, and

20   he's -- he doesn't have the training.

21           But I would also point out that this is an

22   Administrative Procedure Act case, and those topics are

23   covered in the record in the final environmental impact

24   statement.

25           The final EIS found that there will be impacts from

1    pile driving.  Those are expected to be negligible to

2    moderate and temporary.  The impacts from EMF are expected to

3    be negligible to minor.  So those are the things that are

4    fully covered in the EIS, and those determinations by the

5    agencies exercising their areas of expertise are entitled to

6    deference by the Court.

7         The third thing I would point out is that we heard

8    from Mr. Aripotch today.  He gave varying figures for the

9    amount of revenue that he would stand to lose if he couldn't

10   fish over the next several months.

11        He has not provided any logs of where the trips

12   that he plans to take over that period of time will take

13   place, and he has not provided specific financial information

14   from previous years showing during what time periods and in

15   what geographic areas he obtained those revenues.  There's

16   simply not enough evidence before the Court to find that that

17   constitutes irreparable harm.

18        And against that, as Vineyard Wind's counsel I'm

19   sure will say in its summation, we have the million dollars a

20   day that this could cost Vineyard Wind and the 1.8 billion

21   that they've already put into the project.

22        The preliminary injunction should be denied.

23        MR. BUENTE:  Your Honor, in addition to concurring

24   with the justice department's statement, I'll point out just

25   a few things.  One is that, as we have said repeatedly, the

1    construction schedule was published on the BOEM website in

2    January of 2022, over 17 months ago.  It has not changed

3    materially since then.

4            So the plaintiffs all along should have been aware

5    of the sequence of the scheduling and the pace of the

6    scheduling and when the armor was going to go in and then

7    when the wind turbines themselves would be constructed, and

8    none of that has changed.

9            And lastly, when we were approached again in May

10   after they advised us in March that they weren't going to

11   seek a preliminary injunction, we told them about the

12   catastrophic economic harm that would flow if we agreed to

13   suspend construction.  It simply will kill the project.

14           Thank you, Your Honor.

15           THE COURT:  Okay.  Thank you.  You kept it within

16   the allotted time.  I appreciate that.  And I'm -- I will

17   hopefully get you a decision out very shortly.

18           THE DEPUTY CLERK:  We are in recess.

19           (Court in recess at 12:02 p.m.)

20

21

22

23

24

25

**CERTIFICATE OF OFFICIAL REPORTER**

1

2

3

4        I, Robert W. Paschal, Registered Merit Reporter and

5  Certified Realtime Reporter, in and for the United States

6  District Court for the District of Massachusetts, do hereby

7  certify that pursuant to Section 753, Title 28, United States

8  Code, the foregoing pages are a true and correct transcript

9  of the stenographically reported proceedings held in the

10  above-entitled matter and that the transcript page format is

11  in conformance with the regulations of the Judicial

12  Conference of the United States.

13

14                Dated this 1st day of June, 2023.

15

16

17

18

19                /s/ Robert W. Paschal

20                _____

21                ROBERT W. PASCHAL, RMR, CRR
                 Official Court Reporter

22

23

24

25